**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

NAPLETON'S ARLINGTON HEIGHTS MOTORS, INC. f/k/a NAPLETON's PALATINE MOTORS, INC. d/b/a NAPLETON'S ARLINGTON HEIGHTS CHRYSLER DODGE JEEP RAM, an Illinois corporation, NAPLETON'S NORTH PALM AUTO PARK, INC. d/b/a NAPLETON'S NORTHLAKE CHRYSLER DODGE JEEP RAM, an Illinois corporation,

        Plaintiffs,

v.

FCA US, LLC, a Delaware corporation and FCA REALTY, LLC, a Delaware limited liability corporation f/k/a CHRYSLER GROUP REALTY COMPANY, LLC,

        Defendants.

_____/

CASE NO. _____

## **COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs, NAPLETON'S ARLINGTON HEIGHTS MOTORS, INC. f/k/a NAPLETON's PALATINE MOTORS, INC. d/b/a NAPLETON'S ARLINGTON HEIGHTS CHRYSLER DODGE JEEP RAM (hereinafter referred to as "NAPLETON ARLINGTON HEIGHTS CDJR" and/or "Plaintiff") and NAPLETON'S NORTH PALM AUTO PARK, INC. d/b/a NAPLETON'S NORTHLAKE CHRYSLER DODGE JEEP RAM (hereinafter referred to as "NAPLETON NORTHLAKE CDJR") sues Defendant, FCA US, LLC (hereinafter referred to as "FCA" and/or "Defendant") and NAPLETON ARLINGTON HEIGHTS CDJR sues FCA

1

REALTY, LLC, a Delaware limited liability corporation f/k/a CHRYSLER GROUP REALTY COMPANY, LLC (hereinafter referred to as "FCAR") and states:

**Parties**

1.      Plaintiff, NAPLETON ARLINGTON HEIGHTS CDJR, is a corporation existing under the laws of the State of Illinois and is authorized to do business in the State of Illinois. NAPLETON ARLINGTON HEIGHTS CDJR is a "motor vehicle dealer" as defined in 815 ILCS 710/4 et, seq.  NAPLETON ARLINGTON HEIGHTS CDJR's primary place of business is located at 1155 West Dundee Road, Arlington Heights, IL 60004, Cook County, Illinois.

2.      Plaintiff, NAPLETON NORTHLAKE CDJR, is a corporation existing under the laws of the State of Illinois and is authorized to do business in the State of Florida.  NAPLETON NORTHLAKE CDJR is a "motor vehicle dealer" as defined in section 320.60(11)(a). NAPLETON NORTHLAKE CDJR's primary place of business is located at 3703 Northlake Boulevard, Lake Park, FL 33401, Palm Beach County, Florida.

3.      Defendant, FCA, is a corporate entity organized and existing under the laws of the State of Delaware.  FCA conducts business in DuPage County, Illinois and Palm Beach County, Florida at all times pertinent hereto.  FCA is a licensed "Distributor" as defined in 815 ILCS 710/2(k) and Florida Statutes, section 320.60(8).

4.      Defendant FCAR is a limited liability company organized and existing under the laws of the State of Delaware conducting business in Cook County, Illinois at all times pertinent hereto.

**Jurisdiction and Venue**

5.     Pursuant to 28 U.S.C. §§ 1331 and 1367, this Court has jurisdiction over the issues herein raised.

6.     Pursuant to section 28 U.S.C. § 1391, venue is proper in this Court.

**General Allegations**

7.     FCA has and continues to engage in a practice wherein it provides performance driven incentives to its dealers. One of these performance driven programs is commonly referred to as the "volume growth program" or "VGP" (hereinafter referred to as "VGP").  Dealers are informed that they may achieve VGP status based upon their achieving a specific number of sales.  These vary from dealership to dealership and are increased annually by a percentage of growth arbitrarily established by FCA.  Upon becoming a VGP dealer (hereinafter referred to as "VGP Dealer") the dealership is provided subsidies on each and every new motor vehicle sale that a dealer who does not achieve VGP status (hereinafter referred to as "Non-VGP Dealers") does not enjoy. In fact, FCA, through its business zones, has actively solicited its VGP dealers (hereinafter referred to as "Conspiring Dealer") to falsely report sales and thereby has created a defacto multiple tiered pricing based upon its VGP incentive program by funneling money to Conspiring Dealers.  Upon information and belief, FCA has utilized the mail or wires to engage in this fraudulent conduct and racketeering resulting in the Conspiring Dealers' unfairly competing with Plaintiffs [for example one instance involving a dealership competing with NAPLETON ARLINGTON HEIGHTS CDJR, reporting eighty-five (85) false new vehicle delivery reports (hereinafter referred to as "NVDR's") and receiving tens of thousands of dollars as an illicit reward for their complicity in the scheme].

3

8.     FCA's actions have been arbitrary and capricious as well as coercive, with FCA strong-arming its dealers to achieve sales numbers not clearly defined by FCA. Non-Conspiring Dealers who do not reach FCA's VGP sales numbers are, unlike the Conspiring Dealers, ineligible to get into the "bonus round" where the incentives to the dealers significantly increase. In theory, increased sales should increase a dealer's VGP.  When dealers fail to reach their VGP goals, adjusted for annual growth, FCA increases their VGP for the successive month by twenty percent (20%) for the sales shortfall for the prior month (hereinafter referred to as "VGP Clawback").  Of course, FCA knows and understands that were it to record the false NVDRs as true sales, it would inflate the dealers VGP to the point that the VGP Clawback would become so great as to be completely beyond the reach of its dealers. FCA has purposely structured the VGP though its unspoken policy to exclude falsely reported sales and is guilty of bad faith as a result of its complete lack of transparency towards its dealers generally and the Plaintiffs specifically.

9.     Similarly, dealers are rewarded for "earn and turn" through the allocation process. In other words, FCA will reward a dealer who is selling a particular model vehicle with more of that same model.  As a result, dealers who falsely report sales through NVDRs at FCA's behest will tend to report only the most desirable models so as to enhance their allocation of inventory at the expense of dealers who accurately report their sales.

10.     At all times pertinent hereto, FCA has advised its dealers that its metrics to determine performance and allocation are applied uniformly, fairly, without bias and in-good faith.  As is set forth more fully herein below, this is not true.

11.     FCA knowingly endorses and encourages the false reporting of motor vehicle sales by directly rewarding its local managers (hereinafter referred to as "Business Center Directors") with monetary and quarterly bonuses which are directly related to reported vehicle

sales numbers. Upon information and belief these bonuses resulting from this fraudulently pumped up vehicle volume is to some lesser extent shared by the entire business center ensuring everyone's cooperation in FCA's enterprise. Upon information and belief, the Business Center Directors were aware of and conspired and combined with FCA's practice to encourage the filing of false NVDR's. Upon information and belief, FCA's practices as alleged herein have been facilitated and occurred with the full consensus and cooperation of FCA Vice President of US Sales Operations, Florida, JEFF KOMMOR, as well the Business Center Directors who, at all relevant times, were employed by FCA as Business Center Directors for the regions identified below, to wit:

    A.  Phil Scroggin-Midwest Business Center Director;

    B.  Carlos Jimenez-Southeast Business Center Director;

    C.  Tom Shanley-Northeast Business Center Director;

    D.  Mike Dragojevik-Southwest Business Center Director;

    E.  Jeff Hines-Great Lakes Business Center Director;

    F.  Steve Yandura-Denver Business Center Director;

    G.  Jason Stoicevich-California Business Center Director.

12.    At the same time, FCA directly benefits from this practice as it results in the inflation of the number of year over year sales which, in turn, create the appearance that FCA's performance is better than, in reality, it actually is. These results are reported to the public at large and investment community. FCA has every reason to continue to be opaque about this issue as it would not be helpful for the truth to come to light at the same time as FCA may be pursuing mergers and other business opportunities.

13.     The Business Center Directors of FCA have conspired with FCA to facilitate the false reporting of sales of new motor vehicles through the submission of NVDR's.  By way of example, in one particular instance, Business Center Director', PHIL SCROGGINS, FCA subordinate, RALPH JONES,  without the knowledge and/or consent of upper management, and particularly the Plaintiffs' principal EDWARD F. NAPLETON, acquiesced to sixteen (16) falsely reported vehicles with one of Plaintiffs' affiliates. FCA's scheme to falsely report sales was neither authorized or sanctioned at the time it occurred and was only discovered by EDWARD F. NAPLETON when a second offer was made directly to EDWARD F. NAPLETON by PHIL SCROGGINS, to falsely report the sales of forty (40) new vehicles in exchange for Twenty Thousand and 00/100ths ($20,000.00) Dollars which would reach the Plaintiffs' accounts as a credit under the disguise as cooperative ("Co-Op") advertising support. This offer was soundly rejected by EDWARD F. NAPLETON who (i) opined that FCA's actions appeared improper if not outright illegal, (ii) notified FCA of the unwillingness Plaintiffs or any of their affiliates to participate in FCA's scheme and (iii) warning FCA that it should refrain from this practice in the future.  FCA's reaction was not to take this warning seriously, but to simply move on to other dealers to participate in this arrangement in place and stead of the Plaintiffs.

14.     At all times pertinent hereto, FCA was aware of this practice and has routinely attempted to avoid its detection (which could possibly expose the Conspiring Dealers to a sales audit which would require them to disgorge any monies made as a result of its over reporting of sales) by disguising the increased VGP payments to the Conspiring Dealers as things such as Co-Op money and/or factory based incentives, not directly tied to sales.

15. Upon information and belief, FCA actually changed its policies and procedures to allow its dealers to disavow these sales (or "backed-out" the NVDRs) after the fact even though they had already been reported and recorded by FCA as sales. The timing of the solicitations by FCA to its Conspiring Dealers was also a contrivance by FCA, indicative of its knowledge and active participation in the above-described practices. FCA's plan contemplated and, in fact, resulted in the false NVDRs occurring at month's end. This timing allowed the sales to be reported for that particular month, only then to be "backed-out" on the first of the following month before the factory warranty on the vehicles could be processed and start to run. FCA did this because it knew that the Conspiring Dealers would be adversely affected were they unable to sell these vehicles to the actual retail customer without full factory warranty in place.

16. Apart and aside from the conduct described hereinabove, FCA's pattern of conduct towards its dealers has been one of coercion and threats of termination having nothing to do with the actual performance of its dealers. All dealers are required to enter into a Sales and Service Agreement with FCA (hereinafter referred to as "Dealer Agreement") in order to become one of its franchised dealerships. FCA purportedly monitors their dealer's performance by using a proprietary metric which it refers to as Minimum Sales Responsibility ("MSR"), being the minimum number of sales which it argues its dealerships should have achieved. The Dealer Agreement provides, among other things, for the assignment to the dealers of market areas or "CC Sales Zones" used to determine the dealers MSR.

17. Among the responsibilities undertaken by the dealer to use its best efforts to promote and retail FCA vehicle lines. This is measured by the MSR, which is calculated as the number of new vehicle registrations for FCA's vehicle lines in the geographical market area

established by FCA or "CC Sales Zone" and then computing the number of retail sales necessary for those vehicle lines to achieve statewide market share.

18.     After investing approximately Eighteen Million and 00/100ths ($18,000,000.00) Dollars in the land and facility being operated by Plaintiff, NAPLETON ARLINGTON HEIGHTS CDJR, its principal, EDWARD F. NAPLETON met with TIM DUNCAN, FCA Market Representative Manager.   At that meeting FCA agreed that Plaintiff, NAPLETON ARLINGTON HEIGHTS CDJR would have direct and meaningful input in the size and configuration of the market  area or "CC Sales Zone" that would be used to determine its MSR. In particular, TIM DUNCAN discussed certain demographic phenomena that would be shared and would play a prominent role in this process such as "population bursts".  Notwithstanding these representations, EDWARD F. NAPLETON was never allowed to participate in or observe this process.

19.     FCA's concealment and lack of transparency resulted in the existence of misrepresentations of the market area to exist and be perpetuated. This was exacerbated when a competing dealer, Fields Chrysler Jeep Dodge Ram, relocated into Plaintiff, NAPLETON ARLINGTON HEIGHTS CDJR's market area (hereinafter referred to as "Fields Relocation"). This occurred a mere twelve (12) months after the construction by NAPLETON ARLINGTON HEIGHTS CDJR of the new Arlington Heights Chrysler Dodge Jeep Ram facility.

20.     FCA wrongly demands its dealers achieve market share pitting its non-luxury sport utility vehicle against premium brand "SUVs" or sport utility vehicles.  In doing so, FCA has included luxury brands such as Lexus, Range Rover, BMW, and Mercedes Benz ("Luxury Brands") in its analysis to artificially inflate the market and drive down its dealers market share or MSR.  FCA's conduct was intended to, and did, negatively impact the MSRs of dealers, such

as Plaintiffs, who do business in markets with a large Luxury Brand presence. Indeed, FCA has not used MSR so much as a tool to evaluate its dealers, but rather to cover-up its practice of multi-tier pricing. FCA also consistently has used MSR to directly control and otherwise intimidate dealers to bow its will under the constant threat of the termination of their dealerships for contrived "defaults" in FCA's Dealer Agreement.

21. To make matters worse, FCA has attempted to use third party vendors such as J.D. Power and an entity commonly referred to as Urban Science as window dressing to create the illusion that it is allowing a disinterested and neutral party to provide FCA with this statistical sales data. Urban Science, in fact, notified FCA about the fact that the inclusion of the Luxury Brands was skewing their metrics in a manner so as to put its dealers at a disadvantage. This information from Urban Science was met with inaction on the part of FCA. Urban Science's furtive attempts to fulfill its role as FCA's hand-maiden have been ineffective to conceal the FCA's intentional manipulation of MSR to the disadvantage of the dealers; and FCA has been forced to admit that Urban Science's data was misused by FCA to inflate the market by pitting its Grand Cherokee SUV against competitive sales of luxury brands. Every sale of a Luxury Brand vehicle has had detrimental financial effect on the dealers distorting both the VGP program as well as the MSR metric and enhances FCA's unequal bargaining position and leverage with the dealer.

22. The Jeep Grand Cherokee SUV is sold in high volume, typically generating the largest volume of sales for a typical Chrysler Dodge Jeep Ram dealer. FCA is well aware that actions which affect the volume of Jeep Grand Cherokee sales are bound to have a significant effect on the MSR which it assigns to its dealers.

23. In large metropolitan areas, such as Chicago and South Florida (and Palm Beach in particular) where the Plaintiffs operate, there is a larger presence of Luxury Brands. Consequently, the market share for FCA's Jeep Grand Cherokee SUV is higher for almost every dealer outside large metropolitan areas because the luxury segment is not as large and influential. The result, as FCA is well aware, is that the MSR number for the Jeep Grand Cherokee SUV is nearly unattainable for dealers like Plaintiffs. Being that Plaintiffs operate in Chicago and South Florida, they and other large metropolitan dealers cannot reach their MSR numbers because of FCA's inclusion of the Luxury Brands as being part of the Jeep Grand Cherokee SUV's market segment. FCA's actions to reduce its dealers MSR have been done intentionally by FCA even though, as more fully described below, it is well aware that its MSR performance metric is flawed and works to the competitive disadvantage of a large number of its dealers. FCA's inaction was deliberate and tantamount to theft of dealers' money and otherwise constitutes a fraud by omission.

24. Both J.D. Power and Urban Sciences pointed this flaw out to FCA. While it would have been quite easy to remedy this situation by simply eliminating the Luxury Vehicles from its MSR analysis, FCA, for its own misplaced venal concerns regarding brand image, elected to continue to calculate its MSR metric in the same fashion. Upon information and belief, this was done at the behest of FCA's Jeep President and Chief Executive Officer, MIKE MANLEY, who did so, representing to the dealers that it was a good faith accurate measure of their performance.

25. FCA has also engaged in the following conduct:

    A. Taking actions with respect to Plaintiff which were arbitrary, in bad faith and/or unconscionable and which causes damage to any of the parties or to the public;

B. Engaging in the allocation and distribution of new motor vehicles which was both arbitrary and/or capricious;

C. Though the improper subsidization of the Conspiring Dealers described herein, selling and/or leasing new motor vehicles to the Conspiring Dealers at a lower (or subsidized) actual price than the Non-Conspiring Dealer and otherwise engaging in preferential pricing to the Conspiring Dealers;

D. Offering to sell or lease new motor vehicles to the Conspiring Dealers at a subsidized lower actual price than the actual price offered and charged to Plaintiff for the same model vehicle similarly equipped by otherwise utilizing the practices described herein which have resulting in a lesser actual price to the Conspiring Dealers; and/or

E. FCA's bad-faith threat to discontinue, cancel or not to renew its sales and service agreement.

26.    FCA's actions have been willful and wanton.

**COUNT I**
**Civil RICO Violation**
**18 U.S.C § 1962**
**AS TO NAPLETON ARLINGTON HEIGHTS CDJR**
**AND NAPLETON NORTHLAKE CDJR**

27.    The allegations of paragraphs 1 through 26 are re-alleged as if fully set forth herein.

28.    This is an action for damages for violation of 18 U.S.C. § 1962.

29.    FCA engaged in a "pattern of racketeering activity" as defined by 18 U.S.C. § 1961(1) in violation of 18 U.S.C. § 1962(c), to-wit, that FCA (i) engaged in a scheme to defraud the Plaintiffs, (ii) knowingly participated in such fraud and (iii) utilized the mail or wires in furtherance of the fraudulent scheme set forth more fully herein.

30.    FCA's actions providing Conspiring Dealers with price subsidies payoffs and preferred allocations of artifices and/or acts of deceit which were intended to deprive Plaintiff of monies in favor of the Conspiring Dealers who were willing to falsely report sales.

31.     FCA fraudulently propped up the value of its stock by utilizing false year over year results based on false vehicle sales reporting thereby purposefully creating the illusion of financial strength in order to fraudulently induce its dealers, such as Plaintiffs, to invest in dealership improvements and otherwise to contribute ever increasing capital to their business operations.

32.     Moreover, FCA representatives on multiple occasions made representations to its dealers, including Plaintiffs, that FCA would treat all of its dealers alike on a level playing field and utilize their best efforts to make each and every one of its dealers, including Plaintiffs, profitable. As a result Plaintiff, NAPLETON ARLINGTON HEIGHTS CDJR, invested heavily moving its Chrysler Dodge Jeep Ram facility from its dated facility in Des Plaines and constructing a brand new facility in Arlington Heights, Illinois and Plaintiff, NAPLETON NORTHLAKE CDJR, agreed to renovate its dealership facility.  FCA, in fact, had no intention of honoring this pledge of equal treatment among and its dealers by taking actions including, but not limited to, (i) preferential subsidies and allocations of vehicles to Conspiring Dealers at the cost of Non-Conspiring Dealers as well as (ii) knowingly and intentionally manipulating its MSR performance metric to reflect poorly on FCA's dealers in large metropolitan areas competing with a large presence by the Luxury Brands.

33.     FCA knew that its representations as set forth herein were false and intentionally misrepresented same.

34.     FCA's actions detailed herein violate 18 U.S.C. §§ 1341 and 1343 in that they used the United States mail, interstate telephone calls and/or electronic correspondence in furtherance of these activities.

35.    FCA is an enterprise engaged in interstate commerce in that, among other activities, FCA sells motor vehicles to Chrysler, Dodge, Jeep and Ram franchised dealerships throughout the United States.

36.    As a result of FCA's actions in violation of 18 U.S.C. § 1962(c), NAPLETON ARLINGTON HEIGHTS CDJR and NAPLETON NORTHLAKE CDJR have suffered damages including, but not limited to, the loss of value of the business as a going concern.

37.    Pursuant to 18 U.S.C. § 1964(c), NAPLETON ARLINGTON HEIGHTS CDJR and NAPLETON NORTHLAKE CDJR are authorized to bring a civil action against FCA for violation of 18 U.S.C. § 1962(c).

**WHEREFORE**, pursuant to section 18 U.S.C. § 1964(c), Plaintiffs, NAPLETON ARLINGTON HEIGHTS CDJR and NAPLETON NORTHLAKE CDJR, demand entry of a judgment against FCA for treble damages, attorney's fees, costs, and such other relief as this Court deems just and equitable.

## COUNT II
### Violation of Robinson-Patman Act 15 U.S.C. § 13(a)
### AS TO NAPLETON ARLINGTON HEIGHTS CDJR
### AND
### NAPLETON NORTHLAKE CDJR

38.    The allegations of paragraphs 1 through 26 are re-alleged as if fully set forth herein.

39.    This is a claim arising under sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, based on FCA's violations of the Robinson-Patman Act, 15 U.S.C. § 13(a).

40.    FCA is a motor vehicle distributor engaged in the sale of Chrysler Dodge Jeep Ram motor vehicles in interstate commerce. The Chrysler Dodge Jeep Ram vehicles sold to Plaintiffs, NAPLETON ARLINGTON HEIGHTS CDJR and NAPLETON NORTHLAKE

13

CDJR, and its competitors are manufactured in Michigan and other states and transported across state lines to Plaintiffs, NAPLETON ARLINGTON HEIGHTS CDJR and NAPLETON NORTHLAKE CDJR, and their competitors for resale to consumers.

41.     Through its incentives and discount programs imparted on the Conspiring Dealers, FCA has sold motor vehicles of like grade and quality in contemporaneous interstate sales at lower prices than the prices at which those motor vehicles available to Non-Conspiring Dealers.  The Conspiring Dealers are favored dealers who receive greater discounts through the wrongful manipulation of FCA's incentives and discounts (disguised as things such as monies for advertising assistance).  This lowers their retail prices to reflect their lower acquisition cost thereby forcing Non-Conspiring Dealers to lose sales, reduce their margins, or both.  Both NAPLETON ARLINGTON HEIGHTS CDJR and NAPLETON NORTHLAKE CDJR are Non-Conspiring Dealers.

42.     FCA has also fraudulently manipulated its MSR metric for sales and has utilized this metric to declare defaults in FCA's Sales and Service Agreement by dealers generally, and the Plaintiffs in particular.  These practices have a greater negative impact on dealers, such as Plaintiffs, whose dealerships are in large metropolitan areas competing directly with the Luxury Brands, thereby putting dealers, such as Plaintiffs, at a competitive disadvantage.

43.     The effect of FCA's unlawful discrimination and purposeful manipulation of its performance metrics have been substantially to lessen competition between and among Plaintiffs, NAPLETON ARLINGTON HEIGHTS CDJR and NAPLETON NORTHLAKE CDJR and the other Chrysler Dodge Jeep Ram dealers with which it competes.

44.     As a direct and proximate result of FCA's violations of the Robinson-Patman Act, Plaintiffs, NAPLETON ARLINGTON HEIGHTS CDJR and NAPLETON NORTHLAKE

14

CDJR, have suffered injury to its business and property which includes, but is not limited to, (a) lost sales to the Conspiring Dealers and/or (b) lost profit margin in an attempt to prevent the loss of such sales. The injuries to Plaintiffs, NAPLETON ARLINGTON HEIGHTS CDRJ and NAPLETON NORTHLAKE CDJR, is injury of the kind the Robinson-Patman Act was designed to prevent and flows from that which makes FCA's conduct unlawful.

45. As a result of FCA's illegal conduct, NAPLETON ARLINGTON HEIGHTS CDJR and NAPLETON NORTHLAKE CDJR, have suffered damages including, but not limited to, the loss of value of the business as a going concern.

**WHEREFORE**, Plaintiffs, NAPLETON ARLINGTON HEIGHTS CDJR and NAPLETON NORTHLAKE CDJR, demand entry of a judgment against FCA:

A. Declaring that FCA has violated the Robinson-Patman Act, 15 U.S.C. § 13(a), by and through its continued implementation of discriminatory price discounts by way of the wrongful manipulation of its standing incentive programs (such as VGP);

B. Enjoining, pursuant to 15 U.S.C. § 26, FCA's continued implementation of discriminatory pricing through the VGP Program and fraudulent manipulation of FCA's MSR performance metric;

C. Awarding treble damages pursuant to 15 U.S.C. § 15(a) together with pre-judgment and post-judgment interest;

D. Awarding attorney's fees and costs pursuant to 15 U.S.C. § 15(a) and 15 U.S.C. § 26; and

E. Granting such other relief as this Court deems just and equitable.

15

**COUNT III**
**Violation of Automobile Dealers Day in Court Act—15 U.S.C. § 1222**
**AS TO NAPLETON ARLINGTON HEIGHTS CDJR**
**AND**
**NAPLETON NORTHLAKE CDJR**

46.     The allegations of paragraphs 1 through 26 are re-alleged as if fully set forth herein.

47.     The Federal Automobile Dealer's Day in Court Act, 15 U.S.C. § 1221 et seq., provides a cause of action for dealers against manufacturers that fail "to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer." 15 U.S.C. § 1222.

48.     Pursuant to 15 U.S.C. § 1221(e), the term "good faith" is defined as "the duty of each party to any franchise, and all officers, employees, or agents thereof to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party: Provided, That recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith."

49.     As set forth above, FCA engaged in coercive conduct by wrongfully seeking to compel Plaintiffs to engage in a sustained pattern of falsely reporting sales by threatening to and actually depriving Plaintiffs of cost subsidies and favorable allocations afforded to the Conspiring Dealers thereby threatening the very existence of Plaintiffs' business.

50.     FCA's actions clearly violate the express prohibition set forth in 15 U.S.C. § 1222.

51.     As a result of FCA's illegal conduct, NAPLETON ARLINGTON HEIGHTS CDJR and NAPLETON NORTHLAKE CDJR have suffered damages including, but not limited to, the loss of value of the business as a going concern.

16

**WHEREFORE**, Plaintiffs, NAPLETON ARLINGTON HEIGHTS CDJR and NAPLETON NORTHLAKE CDJR, demand entry of a judgment against FCA for damages, attorney's fees, costs, and such other relief as this Court deems just and equitable.

**COUNT IV**
**Fraud/Fraud In the Inducement**
**AS TO NAPLETON ARLINGTON HEIGHTS CDJR**
**AND**
<u>**NAPLETON NORTHLAKE CDJR**</u>

52.     The allegations of paragraphs 1 through 26 are re-alleged as if fully set forth herein.

53.     In furtherance of its efforts to fraudulently impress upon its dealers generally, and the Plaintiffs, in particular, FCA's purportedly good intentions, its principal, SERGIO MARCHIONNE, gave a speech on September 14, 2010 at the "Chrysler Group International Dealer Announcement Show",  attended by Plaintiffs' principal, EDWARD F. NAPLETON.  At this speech SERGIO MARCHIONNE described its dealer-principals as "partners" and equals and characterized his comments as between "Chief Executive" and "Chief Executive".

54.     These comments had their desired effect prompting Plaintiffs' principal, EDWARD F. NAPLETON, who wholeheartedly believed that FCA wished to truly partner with him and others of like ideals, to relocate its existing Chrysler Dodge Jeep Ram franchised sales and service facility from Des Plaines to Arlington Heights, Illinois at a cost of approximately Eighteen Million and 00/100ths ($18,000,000.00) Dollars and to improve its existing Chrysler Dodge Jeep Ram dealership in Northlake, Palm Beach, Florida for Three Million and 00/100ths ($3,000,000.00) Dollars.

55.     These specific projects were part of an investment of over One-Hundred Million and 00/100ths ($100,000.00) Dollars which Plaintiffs' principal has invested in his affiliated

Chrysler Dodge Jeep and Ram dealerships (including those franchised Chrysler Dodge Jeep Ram dealerships commonly known as Napleton's Ellwood Chrysler Dodge Jeep Ram and Napleton's Mid Rivers Chrysler Dodge Jeep Ram) all induced by the comments and representations of SERGIO MARCHIONE.

56.     The representations made by FCA (i) were representations of fact, (ii) were false and material, (iii) were made with FCA's knowledge of its falsity or with reckless disregard of whether same was true or false, (iii) were made by FCA's with the intent that they should be acted upon by Plaintiffs, NAPLETON ARLINGTON HEIGHTS CDJR and NAPLETON NORTHLAKE CDJR, and (iv) upon which Plaintiffs justifiably relied thereupon.

57.     As a result of FCA's fraud, Plaintiffs, NAPLETON ARLINGTON HEIGHTS CDJR and NAPLETON NORTHLAKE CDJR, have suffered damages including, but not limited to, the loss of value of the business as a going concern.

**WHEREFORE**, Plaintiffs, NAPLETON ARLINGTON HEIGHTS CDJR and NAPLETON NORTHLAKE CDJR, demand entry of a judgment against FCA for damages, attorney's fees, costs, and such other relief as this Court deems just and equitable.

**COUNT V**
**Negligent Misrepresentation**
**AS TO NAPLETON ARLINGTON HEIGHTS CDJR**
**AND**
**NAPLETON NORTHLAKE CDJR**

58.     The allegations of paragraphs 1 through 26, 53 and 54 are re-alleged as if fully set forth herein.

59.     The representations made by FCA (i) were representations of material fact, (ii) were made with negligence in ascertaining the truth of the statements by FCA, (iii) did, in fact, induce Plaintiffs to act in reliance on the trust of the statements by FCA, and (iv) caused

Plaintiffs damages including, but not limited to, the loss of value of the business as a going concern.

**WHEREFORE**, Plaintiffs, NAPLETON ARLINGTON HEIGHTS CDJR and NAPLETON NORTHLAKE CDJR, demand entry of a judgment against FCA for damages, attorney's fees, costs, and such other relief as this Court deems just and equitable.

**COUNT VI**
**Breach of the Implied Covenant of Good Faith and Fair Dealing**
**AS TO NAPLETON ARLINGTON HEIGHTS CDJR**
**AND**
**NAPLETON NORTHLAKE CDJR**

60.     The allegations of paragraphs 1 through 26 are re-alleged as if fully set forth herein.

61.     Pursuant to the Franchise Agreement entered into by and between Plaintiffs, NAPLETON ARLINGTON HEIGHTS CDJR and NAPLETON NORTHLAKE CDJR, and FCA, Plaintiffs reasonably expected certain benefits including but not limited to the opportunity to compete fairly against other Chrysler Dodge Jeep Ram dealerships.

62.     FCA's actions as described hereinabove establishing multiple tier pricing based upon the misuse and perversion of its VGP incentive program has placed Plaintiffs at a competitive disadvantage and constitutes a bad faith on the part of FCA.

63.     FCA has injured Plaintiffs, NAPLETON ARLINGTON HEIGHTS CDJR's and NAPLETON NORTHLAKE CDJR's, right to receive some or all of the benefits under the Franchise Agreement.

64.     Plaintiffs, NAPLETON ARLINGTON HEIGHTS CDJR and NAPLETON NORTHLAKE CDJR, have been damaged by FCA's breach of the implied covenant of good

faith and fair dealing. Such damages include, but are not limited to, the loss of value of the business as a going concern.

**WHEREFORE**, Plaintiffs, NAPLETON ARLINGTON HEIGHTS CDJR and NAPLETON NORTHLAKE CDJR, demand entry of a judgment against FCA for damages, attorney's fees, costs, and such other relief as this Court deems just and equitable.

**COUNT VII**
**Violation of 815 ILCS 710/4(b) Damages**
**AS TO NAPLETON ARLINGTON HEIGHTS CDJR**

65.     The allegations of paragraphs 1 through 24, 25A and 26 are re-alleged as if fully set forth herein.

66.     FCA has violated 815 ILCS 710/4(b) by taking actions with respect to Plaintiff which were arbitrary, in bad faith and/or unconscionable and which caused damage to Plaintiff or to the public;

67.     FCA's actions have been willful and wanton and of 815 ILCS 710/4(b) gives rise to a cause of action by NAPLETON ARLINGTON HEIGHTS CDJR for treble damages under 815 ILCS 710/13.

**WHEREFORE**, pursuant to 815 ILCS 710/4(b) and 815 ILCS 710/13, NAPLETON ARLINGTON HEIGHTS CDJR demands entry of a judgment against FCA for treble damages, attorney's fees, costs, and such other relief as this Court deems just and equitable.

**COUNT VIII**
**Violation of 815 ILCS 710/4(b)-Injunctive Relief**
**AS TO NAPLETON ARLINGTON HEIGHTS CDJR**

68.     The allegations of paragraphs 1 through 24, 25A and 26 are re-alleged as if fully set forth herein.

69.     This is an action for injunctive relief pursuant to 815 ILCS 710/4 and 815 ILCS 710/13.

70.     815 ILCS 710/13 provides that NAPLETON ARLINGTON HEIGHTS CDJR may apply to a Circuit Court for an injunction restraining FCA from engaging and/or continuing to engage in unfair methods of competition or an unfair or deceptive act or practices declared unlawful by 815 ILCS 710/4.

71.     Accordingly, an injunction preventing FCA from continuing to violate 815 ILCS 710/4 is appropriate and should be granted as a matter of law.

**WHEREFORE**, pursuant to 815 ILCS 710/4(b) and 815 ILCS 710/13, NAPLETON ARLINGTON HEIGHTS CDJR, hereby demands entry of an injunction enjoining FCA's continued and/or future violation of 815 ILCS 710/4 and hereby demands entry of an injunction enjoining FCA's continued and/or future violation of 815 ILCS 710/4(b) as well as attorney's fees, costs, and such other relief as this Court deems just and equitable.

**COUNT IX**
**Violation of 815 ILCS 710/4(d)(1)- Damages**
**AS TO NAPLETON ARLINGTON HEIGHTS CDJR**

72.     The allegations of paragraphs 1 through 24, 25B and 26 are re-alleged as if fully set forth herein.

73.     FCA has violated 815 ILCS 710/4(d)(1) by engaging in the allocation and distribution of new motor vehicles which was both arbitrary and/or capricious.

74.     FCA's actions have been willful and wanton and 815 ILCS 710/4 gives rise to a cause of action by NAPLETON ARLINGTON HEIGHTS CDJR for treble damages under 815 ILCS 710/13.

**WHEREFORE**, pursuant to 815 ILCS 710/4(d)(1) and 815 ILCS 710/13, NAPLETON ARLINGTON HEIGHTS CDJR demands entry of a judgment against FCA for treble damages, attorney's fees, costs, and such other relief as this Court deems just and equitable.

### COUNT X
### Violation of 815 ILCS 710/4(d)(1)-Injunctive Relief
### <u>AS TO NAPLETON ARLINGTON HEIGHTS CDJR</u>

75. The allegations of paragraphs 1 through 24, 25B, and 26 are re-alleged as if fully set forth herein.

76. This is an action for injunctive relief pursuant to 815 ILCS 710/4 and 815 ILCS 710/13.

77. 815 ILCS 710/13 provides that NAPLETON ARLINGTON HEIGHTS CDJR may apply to a Circuit Court for an injunction restraining FCA from engaging and/or continuing to engage in unfair methods of competition or an unfair or deceptive act or practices declared unlawful by 815 ILCS 710/4.

78. Accordingly, an injunction preventing FCA from continuing to violate 815 ILCS 710/4 is appropriate and should be granted as a matter of law.

**WHEREFORE**, pursuant to 815 ILCS 710/4(d)(1) and 815 ILCS 710/13, NAPLETON ARLINGTON HEIGHTS CDJR hereby demands entry of an injunction enjoining FCA's continued and/or future violation of 815 ILCS 710/4(d)(1) attorney's fees, costs, and such other relief as this Court deems just and equitable.

### COUNT XI
### Violation of 815 ILCS 710/4(e)(2)-Damages
### <u>AS TO NAPLETON ARLINGTON HEIGHTS CDJR</u>

79. The allegations of paragraphs 1 through 24, 25C, and 26 are re-alleged as if fully set forth herein.

80.    FCA has violated 815 ILCS 710/4(e)(2) though the improper subsidization of the Conspiring Dealers described herein, selling and/or leasing new motor vehicles to the Conspiring Dealers at a lower (or subsidized) actual price than the Non-Conspiring Dealer and otherwise engaging in preferential pricing to the Conspiring Dealers.

81.    FCA's actions have been willful and wanton and 815 ILCS 710/4 gives rise to a cause of action by NAPLETON ARLINGTON HEIGHTS CDJR for treble damages under 815 ILCS 710/13.

**WHEREFORE**, pursuant to 815 ILCS 710/13, NAPLETON ARLINGTON HEIGHTS CDJR demands entry of a judgment against FCA for treble damages, attorney's fees, costs, and such other relief this Court deems just and equitable.

### COUNT XII
### Violation of 815 ILCS 710/4(e)(2)-Injunctive Relief
### AS TO NAPLETON ARLINGTON HEIGHTS CDJR

82.    The allegations of paragraphs 1 through 23, 24C, and 25 are re-alleged as if fully set forth herein.

83.    This is an action for injunctive relief pursuant to 815 ILCS 710/4 and 815 ILCS 710/13.

84.    815 ILCS 710/13 provides that NAPLETON ARLINGTON HEIGHTS CDJR may apply to a Circuit Court for an injunction restraining FCA from engaging and/or continuing to engage in unfair methods of competition or an unfair or deceptive act or practices declared unlawful by this 815 ILCS 710/4.

85.    Accordingly, an injunction preventing FCA from continuing to violate 815 ILCS 710/4 is appropriate and should be granted as a matter of law.

**WHEREFORE**, pursuant to 815 ILCS 7104(e)(2) and 815 ILCS 710/13, NAPLETON ARLINGTON HEIGHTS CDJR hereby demands entry of an injunction enjoining FCA's continued and/or future violation of 815 ILCS 710/4(e)(2) as well as attorney's fees, costs, and such other relief as this Court deems just and equitable.

**COUNT XIII**
**Violation of 815 ILCS 710/4(e)(3)-Damages**
<u>**AS TO NAPLETON ARLINGTON HEIGHTS CDJR**</u>

86.     The allegations of paragraphs 1 through 24, 25D, and 26 are re-alleged as if fully set forth herein.

87.     FCA has violated 815 ILCS 710/4(e)(3) by offering to sell or lease new motor vehicles to the Conspiring Dealers at a subsidized lower actual price than the actual price offered and charged to Plaintiff for the same model vehicle similarly equipped by otherwise utilizing the practices described above which have resulted in a lesser actual price to the Conspiring Dealers.

88.     FCA's actions have been willful and wanton and 815 ILCS 710/4 gives rise to a cause of action by NAPLETON ARLINGTON HEIGHTS CDJR for treble damages under 815 ILCS 710/13.

**WHEREFORE**, pursuant to 815 ILCS 710/13, NAPLETON ARLINGTON HEIGHTS CDJR demands entry of a judgment against FCA for treble damages, attorney's fees, costs, and such other relief this Court deems just and equitable.

**COUNT XIV**
**815 ILCS 710/4(e)(3)-Injunctive Relief**
<u>**AS TO NAPLETON ARLINGTON HEIGHTS CDJR**</u>

89.     The allegations of paragraphs 1 through 24, 25D and 26 are re-alleged as if fully set forth herein.

24

90.     This is an action for injunctive relief pursuant to 815 ILCS 710/4(e)(3) and 815 ILCS 710/13.

91.     815 ILCS 710/13 provides that NAPLETON ARLINGTON HEIGHTS CDJR may apply to a Circuit Court for an injunction restraining FCA from engaging and/or continuing to engage in unfair methods of competition or an unfair or deceptive act or practices declared unlawful by 815 ILCS 710/4(e)(3).

92.     Accordingly, an injunction preventing FCA from continuing to violate 815 ILCS 710/4(e)(3) is appropriate and should be granted as a matter of law.

**WHEREFORE**, pursuant to 815 ILCS 710/4(e)(3) and 815 ILCS 710/13, NAPLETON ARLINGTON HEIGHTS CDJR hereby demands entry of an injunction enjoining FCA's continued and/or future violation of 815 ILCS 710/4(e)(3) as well as attorney's fees, costs, and such other relief as this Court deems just and equitable.

### COUNT XV
### Violation of Section 320.64(7), Florida Statutes—Damages
### AS TO NAPLETON NORTHLAKE CDJR

93.     The allegations of paragraphs 1 through 24, 25E and 26 are re-alleged as if fully set forth herein.

94.     Section 320.64(7), Florida Statutes, provides in pertinent part as follows:

A licensee is prohibited from committing the following acts:

(7)     The applicant or licensee has threatened to discontinue, cancel, or not to renew a franchise agreement of a licensed motor vehicle dealer, where the threatened discontinuation, cancellation, or nonrenewal, if implemented, would be in violation of the provisions of s. 320.641.

95.     Section 320.641(3), Florida Statutes, provides that a termination is unfair and prohibited:

if it is not clearly permitted by the franchise agreement; is not undertaken in good faith; is not undertaken for good cause; or is based on an alleged breach of the franchise agreement which is not in fact a material and substantial breach; or, if the grounds relied upon for termination, cancellation, or nonrenewal have not been applied in a uniform and consistent manner by the licensee.

96.     FCA engaged in bad faith conduct, routinely threatening to terminate its Dealer Agreement with NAPLETON NORTHLAKE CDJR.  FCA has repeatedly made these threats and has done so in writing no fewer than seven (7) times (on June 22, 2010, October 18, 2010, September 9, 2011, April 8, 2013, July 12, 2013 and June 15, 2015 and July 24, 2015).   These threats are based on FCA's allegations that NAPLETON NORTHLAKE CDJR has failed to meet one-hundred percent (100%) of its MSR score and that its dealership facilities are in need of "urgent" repair.

97.     In particular FCA has claimed an ability to terminate the Dealer Agreement based upon the MSR scores that FCA has calculated for NAPLETON NORTHLAKE CDJR. However, the Dealer Agreement contains no requirement that NAPLETON NORTHLAKE CDJR achieve any specific MSR score. Rather, the requirement is to use its "best efforts to promote energetically sell aggressively and effective at retail" the Chrysler Dodge Jeep and Ram vehicle lines in its area of market responsibility.

98.     NAPLETON NORTHLAKE CDJR undertook to renovate its dealership facility, having no obligation to do so as a direct result of the bad faith coercive conduct of FCA. Notwithstanding that FCA has acknowledged the fact that it has undertaken improvements to its facility its threats of termination continue unabated.

99.     These threats of termination are not in good faith or for good cause and have not been applied in a uniform and consistent manner by FCA.

100. Because the termination threatened by FCA violates section 320.641, Florida Statutes, FCA's threat constitutes a violation of section 320.64(7), Florida Statutes.

101. As a result of FCA's illegal conduct, NAPLETON NORTHLAKE CDJR has suffered damages including, but not limited to, the loss of value of the business as a going concern.

102. FCA's violation of section 320.64(7), Florida Statutes gives rise to a cause of action by NAPLETON NORTHLAKE CDJR under section 320.697, Florida Statutes, for treble damages, costs and reasonable attorney's fees.

**WHEREFORE**, pursuant to section 320.697, Florida Statutes, NAPLETON NORTHLAKE CDJR demands entry of a judgment against FCA for treble damages, attorney's fees, costs, and such other relief as this Court deems just and equitable.

## COUNT XVI
## FRAUD IN THE INDUCEMENT AGAINST FCAR

103. The allegations of paragraphs 1 through 26 are re-alleged as if fully set forth herein.

104. Plaintiff, NAPLETON ARLINGTON HEIGHTS CDJR, acquired substantially all of the assets of that Chrysler Dodge Jeep Ram new and used motor vehicle sales and service facility commonly referred to as Advantage Chrysler Jeep Dodge (hereinafter referred to as "ADVANTAGE" located at 77 Rand Road, Des Plaines, IL 60005 (hereinafter referred to as "Dealership Location"). Plaintiff, NAPLETON ARLINGTON HEIGHTS CDJR, subleased the Dealership Location from FCAR and occupied the Dealership Location in connection with its business operations as the successor franchisee.

105.    In connection with its occupancy of the Dealership Location Plaintiff, NAPLETON ARLINGTON HEIGHTS CDJR, made certain repairs to the Dealership Property including, but not limited to, replacing the cracked tile, broken glass and replacing approximately seventy-eight (78) lighting fixtures in the parking lot of the Dealership Location (hereinafter collectively referred to as "Dealership Repairs").

106.    At no time was Plaintiff, NAPLETON ARLINGTON HEIGHTS CDJR, legally obligated to make such repairs. Rather, Plaintiff, NAPLETON ARLINGTON HEIGHTS CDJR, was fraudulently induced by FCAR to make the subject repairs based upon FCAR's representations, upon which Plaintiff relied, that it would be fully reimbursed for all of its out-of-pocket expenses in connection with the Dealership Repairs including, but not limited to, the replacement of the approximately seventy-eight (78) lighting fixtures.

107.    Plaintiff, NAPLETON ARLINGTON HEIGHTS CDJR, had no legal obligation to make any of the Dealership Repairs.

108.    The foregoing representations made by FCAR that Plaintiff, NAPLETON ARLINGTON HEIGHTS CDJR, would be reimbursed its out-of-pocket expenses for the Dealership Repairs (i) were representations of fact, (ii) were false and material, (iii) were made with FCAR's knowledge of its falsity or with reckless disregard of whether same was true or false, (iii) were made by FCAR's with the intent that it should be acted upon by Plaintiff, NAPLETON ARLINGTON HEIGHTS CDJR and (iv) upon which Plaintiff, NAPLETON ARLINGTON HEIGHTS CDJR,  justifiably relied thereupon.

109.    FCAR's engaged in a scheme to defraud and, in furtherance thereof, misrepresentations were made with intent to induce Plaintiff, NAPLETON ARLINGTON

HEIGHTS CDJR to rely thereon and Plaintiff, NAPLETON ARLINGTON HEIGHTS CDJR was thereby deceived and relies thereon to its detriment.

   **WHEREFORE**, Plaintiff, NAPLETON ARLINGTON HEIGHTS CDJR, demands entry of a judgment against FCAR for damages, attorney's fees, costs, and such other relief as this Court deems just and equitable.

**COUNT XVII**
**QUANTUM MERUIT AGAINST FCAR**

   110. The allegations of paragraphs 1 through 26 and 104 through 109 are re-alleged as if fully set forth herein.

   111. Plaintiff, NAPLETON ARLINGTON HEIGHTS CDJR, performed the Dealership Repairs for the benefit of FCAR. The Dealership Repairs were not gratuitous and FCAR accepted the Dealership Repairs. No contract existed between Plaintiff, NAPLETON ARLINGTON HEIGHTS CDJR and FCAR for the payment of the Dealership Repairs.

   112. It would be unjust to permit FCAR to retain the benefits of the Dealership Repairs and Plaintiff, NAPLETON ARLINGTON HEIGHTS CDJR, is entitled to the reasonable value of the work performed.

   **WHEREFORE**, Plaintiff, NAPLETON ARLINGTON HEIGHTS CDJR, demands entry of a judgment against FCAR for damages, attorney's fees, costs, and such other relief as this Court deems just and equitable.

**Jury Trial Demand**

   Plaintiff hereby demands trial by jury of all matters so triable.

Respectfully submitted this 12th day of January, 2016.

NAPLETON'S ARLINGTON HEIGHTS MOTORS, INC. f/k/a NAPLETON's PALATINE MOTORS, INC. d/b/a NAPLETON'S ARLINGTON HEIGHTS CHRYSLER DODGE JEEP RAM, an Illinois corporation, NAPLETON'S NORTH PALM AUTO PARK, INC. d/b/a NAPLETON'S NORTHLAKE CHRYSLER DODGE JEEP RAM, an Illinois corporation


/s/ Kevin M. Hyde
One of Their Attorneys

Kevin M. Hyde, Esquire (ARDC #6286452),
Assistant General Counsel
Napleton Automotive Group
1 E. Oak Hill Drive
Suite 100
Westmont, Illinois 60559
630-530-3955
630-530-9981
kevin@napleton.com

30