## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| NAPLETON'S ARLINGTON HEIGHTS MOTORS, INC. f/k/a NAPLETON'S PALATINE MOTORS, INC. d/b/a NAPLETON'S ARLINGTON HEIGHTS CHRYSLER DODGE JEEP RAM, an Illinois corporation; NAPLETON'S RIVER OAKS MOTORS, INC. d/b/a NAPLETON'S RIVER OAKS CHRYSLER DODGE JEEP RAM, an Illinois corporation; CLERMONT MOTORS, LLC d/b/a NAPLETON'S CLERMONT CHRYSLER DODGE JEEP RAM, an Illinois limited liability company; NAPLETON'S NORTH PALM AUTO PARK, INC. d/b/a NAPLETON'S NORTHLAKE CHRYSLER DODGE JEEP RAM, an Illinois corporation; NAPLETON ENTERPRISES, LLC d/b/a NAPLETON'S SOUTH ORLANDO CHRYSLER DODGE JEEP RAM, an Illinois limited liability company; NAPLETON'S MID RIVERS MOTORS, INC. d/b/a NAPLETON'S MID RIVERS CHRYSLER DODGE JEEP RAM, an Illinois corporation ; NAPLETON'S ELLWOOD MOTORS, INC. d/b/a NAPLETON'S ELLWOOD CHRYSLER DODGE JEEP RAM, an Illinois corporation, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | CASE NO. 1:16-cv-0403 |
| v. | ) ) ) | |
| FCA US, LLC, a Delaware corporation, and FCA REALTY, LLC, a Delaware limited liability corporation f/k/a CHRYSLER GROUP REALTY COMPANY, LLC, | ) ) ) ) ) | |
| Defendants. | ) ) | |

## AMENDED COMPLAINT

Plaintiffs, Napleton's Arlington Heights Motors, Inc. f/k/a Napleton's Palatine Motors, Inc. d/b/a Napleton's Arlington Heights Chrysler Dodge Jeep Ram ("Napleton's Arlington Heights"); Napleton's River Oaks Motors, Inc. d/b/a Napleton's River Oaks Chrysler Dodge Jeep Ram ("Napleton's River Oaks"); Clermont Motors, LLC d/b/a Napleton's Clermont Chrysler Dodge Jeep Ram ("Napleton's Clermont"); Napleton's North Palm Auto Park, Inc. d/b/a Napleton's Northlake Chrysler Dodge Jeep Ram ("Napleton's Northlake"); Napleton Enterprises, LLC d/b/a Napleton's South Orlando Chrysler Dodge Jeep Ram ("Napleton's South Orlando"); Napleton's Mid Rivers Motors, Inc. d/b/a/ Napleton's Mid Rivers Chrysler Dodge Jeep Ram ("Napleton's Mid Rivers"); and Napleton's Ellwood Motors, Inc. d/b/a Napleton's Ellwood Chrysler Dodge Jeep Ram ("Napleton's Ellwood City") bring this action against the Defendant, FCA US, LLC ("FCA" and/or "Defendant"). Napleton's Arlington Heights also brings this action against the Defendant, FCA Realty, LLC f/k/a Chrysler Group Realty Company, LLC ("FCAR"). In this Amended Complaint, Plaintiffs allege as follows:

I. **NATURE OF THE CASE**

1. As the seventh-largest automobile manufacturer in the world, Defendant FCA enjoys substantial economic power and leverage over its franchisee-dealers, including Plaintiffs, dealers variously located in Florida, Illinois, Missouri, and Pennsylvania. Dealers must invest substantial capital to start, operate, and maintain dealerships geared toward marketing and selling vehicles that FCA, and only FCA, produces. But this investment depends on the good faith and fair dealing of FCA, which maintains plenary control over the lifeblood of Plaintiffs' business: cars people want at a price they are willing to pay.

2. FCA places particular focus on the appearance of sales volume growth—in other words, the semblance of ever-increasing retail sales by dealers. This figure provides the investing public, creditors, and partners in potential acquisitions with an important indicator of

the underlying health of FCA's business. In a February, 2016 press release, FCA prominently touted a 70-month record of year-on-year sales growth across all its brands (Chrysler, Dodge, Jeep and Ram Truck), and the most units sold in January by the company in the last nine years. Sales-volume growth is of paramount concern to FCA, and pervades its dealer relationships.

3.      To achieve the sales-growth figures management desires, FCA employs a carrot-and-stick approach. One carrot is an incentive program known as the "Volume Growth Program." The Volume Growth Program provides monies and other benefits to dealers who achieve sales targets that FCA in its sole discretion arbitrarily sets, and that it sets differently among competing dealers. Dealers who receive such monies have broad discretion to use those monies as they see fit, including as a subsidy to reduce the price of a given make and model below the competition's price.

4.      Another carrot is FCA's "turn and earn" policy of allocating vehicles, in which dealers who sell greater numbers of high-demand models are granted priority for those same models over other competitors.

5.      The two policies serve both as a reward to FCA dealers who sell greater numbers of specific vehicles, and also as an equally powerful punishment to dealers who do not achieve the sales targets set by FCA.

6.      FCA also has a stick at its disposal: the Minimum Sales Responsibility metric, or MSR, which FCA uses as an indicator of sales effectiveness of its dealers. FCA imposes non-negotiable, one-sided, and draconian terms on its dealers in their franchise agreements, which even purport to permit FCA to terminate Plaintiffs' franchises in the event Plaintiffs do not achieve Minimum Sales Responsibility targets set by FCA in its sole discretion. The methodology to determine the Minimum Sales Responsibility metric is not defined by contract;

rather, FCA retains the discretion to calculate Plaintiffs' Minimum Sales Responsibility using whatever methodology and market it chooses.

7.      In practice, FCA has applied its carrot-and-stick approach arbitrarily, capriciously, and in bad faith so as to restrict the lifeblood of Plaintiffs' business—by discriminating on price, discriminating on vehicle allocation, and setting Minimum Sales Responsibility targets using unreasonable methods that do not fairly measure Plaintiffs' performance in the relevant market.  FCA's policies have, in effect, created a two-tier system where preferred dealers get access to better prices and cars, thereby creating an underclass of dealers who have no functional access to these benefits and are set up to fail until terminated in favor of a preferred dealer.

8.      FCA has flexed its economic muscle by placing Plaintiffs in this underclass, endangering the very existence of their businesses.  Notwithstanding having induced an investment of tens of millions of dollars in a new dealership and repairs of an existing dealership for Napleton's Arlington Heights and Napleton's Northlake, respectively, FCA has engaged in a course of conduct to regularly threaten Plaintiffs' franchises, including through several pretextual default letters.

9.      In furtherance of keeping Plaintiffs in FCA's underclass, FCA has further stacked the deck against Plaintiffs by soliciting fraudulent sales reports from certain dealers, and by using the numbers generated from these false sales to further subsidize Plaintiffs' competing dealers and to allocate hotter-selling vehicles to them.  The dealers who conspire with FCA to falsely report sales ("Conspiring Dealers") understand that compliance will net them more sales diverted from dealers, like Plaintiffs, who refrain from that practice ("Non-Conspiring Dealers") and who have refused and continue to refuse to participate in the fraudulent scheme.

10.     Plaintiffs have repeatedly demanded that FCA's fraudulent practices come to an end.  FCA's practice of soliciting false reports, however, continued unabated.  Troublingly, based on reliable sources that include FCA's co-conspirators and former managers, FCA has engaged in such illegal practices not only in the markets in which Plaintiffs are located, but nationwide, using mail and wire means of interstate communications to execute their fraudulent schemes.

11.     The cumulative effect of FCA's conduct has already caused Plaintiffs millions in lost sales and business value, and will lead to substantially more losses if FCA is permitted to terminate certain of Plaintiffs' franchises, as it has threatened to do.  Plaintiffs have filed this federal civil action, requesting relief from the Court under several federal and state statutory and common law causes of action, seeking treble damages, injunctive and declaratory relief, attorney's fees, interest, and punitive damages to deter FCA from engaging in such egregious and unlawful conduct in the future.

12.     Specifically, the Plaintiffs pursue treble damages, costs of suit including attorney's fees, interest, and injunctive and declaratory relief against FCA based upon its violations of the Automobile Dealers Day in Court Act (15 U.S.C. § 1221 *et seq.*), Section 2 of the Clayton Act (also known as the Robinson-Patman Act) (15 U.S.C. § 13 *et seq.*), Section 4 of the Clayton Act (15 U.S.C. § 15), and the Civil RICO Act (18 U.S.C. § 1961 *et seq.*).  Plaintiffs also seek remedies under the state-law statutes enacted to protect automobile dealers in each Plaintiff's respective state, as follows:  treble damages, costs of suit including attorney's fees, interest, and injunctive and declaratory relief pursuant to the Illinois Motor Vehicle Franchise Act (815 ILCS § 710 *et seq.*) and Florida's Motor Vehicle Franchise Act (Florida Statutes § 320.64 *et seq.*); damages, punitive damages, costs of suit including attorney's fees,

interest, and injunctive and declaratory relief pursuant to the Missouri Motor Vehicle Franchise Protection Act (MO. Rev. Stat. § 407.810 *et seq*.); and damages, costs of suit including attorney's fees, interest, and injunctive and declaratory relief pursuant to the Pennsylvania Board of Vehicles Act (63 P.S. § 818.1 *et seq*.). Plaintiffs also seek damages (including punitive damages where applicable) and other relief against FCA and FCAR under the common law doctrines of fraud, negligent misrepresentation, breach of contract, and under the equitable doctrine of quantum meruit.

## II.  <u>PARTIES</u>

13.     Plaintiff, Napleton's Arlington Heights, is a corporation existing under the laws of the State of Illinois and is authorized to do business in the State of Illinois. Napleton's Arlington Heights is an automobile dealer and a "motor vehicle dealer" as defined in 815 ILCS § 710/4 *et seq*. Napleton's Arlington Heights' primary place of business is located at 1155 West Dundee Road, Arlington Heights, Illinois 60004 (Cook County).

14.     Plaintiff Napleton's River Oaks is a corporation existing under the laws of the State of Illinois and is authorized to do business in the State of Illinois. Napleton's River Oaks is an automobile dealer and a "motor vehicle dealer" as defined in 815 ILCS § 710/4 *et seq*. Napleton's River Oaks' primary place of business is located at 17225 Torrence Avenue, Lansing, Illinois 60438 (Cook County).

15.     Plaintiff Napleton's Clermont is a limited liability company existing under the laws of the State of Illinois and is authorized to do business in the State of Illinois and the State of Florida. Napleton's Clermont is an automobile dealer and a "motor vehicle dealer" as defined in Florida Statutes § 320.60(11)(a). Napleton's Clermont's primary place of business is located at 15859 State Road, Clermont, Florida 34711.

16.     Plaintiff Napleton's Northlake is a corporation existing under the laws of the State of Illinois and is authorized to do business in the State of Illinois and the State of Florida. Napleton's Northlake is an automobile dealer and a "motor vehicle dealer" as defined in Florida Statutes § 320.60(11)(a). Napleton's Northlake's primary place of business is located at 3703 Northlake Boulevard, Lake Park, Florida 33401.

17.     Plaintiff Napleton's South Orlando is a limited liability company existing under the laws of the State of Illinois and is authorized to do business in the State of Illinois and the State of Florida. Napleton's South Orlando is an automobile dealer and a "motor vehicle dealer" as defined in Florida Statutes § 320.60(11)(a). Napleton's South Orlando's primary place of business is located at 1460 East Osceola Parkway, Kissimmee, Florida 34744.

18.     Plaintiff Napleton's Mid Rivers is a corporation existing under the laws of the State of Illinois and is authorized to do business in the State of Illinois and the State of Missouri. Napleton's Mid Rivers is an automobile dealer and a "franchisee" of "motor vehicles" as those terms are defined under MO. Rev. Stat. § 407.815. Napleton's Mid Rivers' primary place of business is located at 4951 Veterans Memorial Parkway, Saint Peters, Missouri 63376.

19.     Plaintiff Napleton's Ellwood City is a corporation existing under the laws of the State of Illinois and is authorized to do business in the State of Illinois and State of Pennsylvania. Napleton's Ellwood City is an automobile dealer and a "new vehicle dealer" as that term is defined under 63 P.S. § 8182. Napleton's Ellwood City's primary place of business is located at 1000 Lawrence Avenue, Ellwood City, Pennsylvania 16117.

20.     Plaintiffs are each franchised Chrysler, Dodge, Jeep, and Ram Truck ("CDJR") dealers engaged in, among other things, the business of purchasing vehicles from Defendant FCA and reselling those vehicles primarily to retail purchasers located in various markets in

Northern Illinois (for Napleton's Arlington Heights and Napleton's River Oaks); Palm Beach County, Florida (for Napleton's Northlake); the greater Orlando, Florida area (for Napleton's Clermont and Napleton's South Orlando); the greater St. Louis, Missouri area (for Napleton's Mid Rivers); and the greater Pittsburgh, Pennsylvania area (for Napleton's Ellwood City). Plaintiffs also sell vehicles to residents of other states at retail. Plaintiffs operate their businesses under the terms of the written agreements with FCA referenced above, each known as Dealer Sales and Service Agreements ("Franchise Agreements"). Each of the Franchise Agreements is a "franchise" as that term is defined under 15 U.S.C. § 1221(b).

21. Defendant FCA is a limited liability company organized and existing under the laws of the State of Delaware, and is wholly owned by holding company Fiat Chrysler Automobiles N.V., a Dutch corporation headquartered in London, United Kingdom. FCA is doing business in the Northern District of Illinois and elsewhere. FCA's principal place of business and headquarters is in Auburn Hills, Michigan.

22. FCA (commonly referred to as Chrysler) is a motor vehicle "Manufacturer" and a licensed "Distributor" of new, previously untitled Chrysler, Dodge, Jeep, and Ram brand motor vehicles (hereinafter referred to as "vehicles") as defined in 815 ILCS § 710/2(k) and Florida Statutes § 320.60(8). FCA's Chrysler brand is one of the "Big Three" American automobile brands. FCA engages in commerce by distributing and selling new and unused passenger cars and motor vehicles under its Chrysler, Dodge, Jeep, and Ram brands. Other major divisions of FCA include Mopar, its automotive parts and accessories division, and SRT, its performance automobile division. As of 2015, FCA is the seventh largest automaker in the world by unit production.

23. FCA's business operations in the United States include the manufacture, distribution, and sale of motor vehicles and parts through its network of independent, franchised motor vehicle dealers. FCA is engaged in interstate commerce in that it sells vehicles through this network located in every state of the United States.

24. Defendant FCA Realty, LLC (hereinafter "FCAR")—formerly known as Chrysler Group Realty Company LLC—is a limited liability company organized and existing under the laws of the State of Delaware which has at all material times conducted business in the Northern District of Illinois. FCAR's principal place of business is in Auburn Hills, Michigan.

25. FCAR's business operations in the United States include the purchase, sale, and leasing of real property. FCAR is engaged in interstate commerce through its purchase, sale, and lease of real property throughout the United States. FCAR also holds options for ownership and lease on the physical locations of its FCA's dealers throughout the United States. These options for lease or purchase are triggered by events such a dealer's operation of non-FCA line-make facilities, and are employed as a mechanism to circumvent applicable Federal and State law which prohibit such restrictions on dealers.

## III. JURISDICTION AND VENUE

26. This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1332. There is also complete diversity of citizenship in this case because each Defendant is a citizen of different states from those states of the Plaintiffs, and the amount in controversy exceeds the sum of $75,000. 28 U.S.C. § 1332. This Court also has supplemental jurisdiction over the state-law claims because those claims are integrally related to the federal claims and form part of the same case and controversy under 28 U.S.C. § 1367.

27. This Court has personal jurisdiction over Defendants FCA and FCAR by virtue of their transacting and doing business in this district and because Defendants FCA and FCAR are

registered to do business in Illinois. FCA and FCAR have transacted and done business in the State of Illinois and in this district and have engaged in statutory violations and common law tortious conduct in Illinois and in this district.

28. Venue is proper pursuant to 28 U.S.C. § 1391(a) and (b) because a substantial part of the events or omissions giving rise to the claims occurred in this district. Venue is proper pursuant to 18 U.S.C. § 1965(a) and (b) because Defendants transact affairs in this district, and the ends of justice require it. Venue is also proper in this district under 28 U.S.C. §1391(b)(1) because Defendants FCA and FCAR reside in this judicial district for venue purposes.

## IV.    FACTS RELATING TO INTERSTATE COMMERCE

29. FCA manufactures the vehicles sold to Plaintiffs in various locations throughout the United States including in the State of Michigan.

30. Some or all of the vehicles that Plaintiffs purchased from FCA cross state lines between the time of their manufacture and their delivery to Plaintiffs in the markets in which Plaintiffs compete.

31. FCA also sells vehicles to other CDJR dealers, including other CDJR dealers located in the markets in which Plaintiffs compete ("Competing Dealers").

32. Some or all of the vehicles that FCA sells to Competing Dealers also cross state lines between the time of their manufacture and their delivery to Competing Dealers.

33. FCA's principal source of revenue is derived from the sale of new motor vehicles in the United States that comes from its network of independent franchised dealers (including Plaintiffs), which purchase new motor vehicles from FCA and resell them to the public.

## V.    GENERAL ALLEGATIONS

### A.    Scheme One:    FCA's Scheme to Defraud Dealers and the Public by Reporting Fictitious Motor Vehicle Sales.

34.    FCA has created zones, or territories, to deal directly with its dealers, and has established a network of business centers ("Business Centers") responsible for each dealer zone or territory.  Each Business Center, headed by an individual commonly referred to as a Business Center Director, is, in turn, comprised of districts, which are the responsibility of District Managers.

35.    Beginning no later than early 2015 (and likely earlier), and continuing until at least end of year 2015 (and, as far as Plaintiffs know, the present), FCA and its agents have actively devised and executed a scheme to falsely inflate the reported retail sales of FCA vehicles.  As part of this scheme, FCA has solicited and encouraged Conspiring Dealers to falsely report and to inflate motor vehicle sales.  FCA, through its employees, executed this scheme by causing Conspiring Dealers to create false New Vehicle Delivery Reports ("NVDRs") and transmit such false NVDRs to FCA.

36.    To induce the Conspiring Dealers to participate in the scheme, FCA has provided—and, as far as Plaintiffs know, continues to provide—incentives and subsidies to which those Conspiring Dealers would not otherwise be entitled.  Based upon reliable sources of information, these Conspiring Dealers are located nationwide, including but not limited to the Mid Atlantic, Midwest, Southeast, and Northeast sales territories.

37.    As part of the scheme, FCA also rewards dealers for "turn and earn" through the allocation process.  In other words, FCA will reward a dealer who is selling a particular model vehicle with more of that same model.  As a result, Conspiring Dealers understand that, in order to maximize their competitive edge, it behooves them to transmit false NVDRs for FCA's most

desirable models. Such false reports, in turn, increase the allocation and inclusion of FCA's models in highest demand in the inventory of the Conspiring Dealers at the expense of Non-Conspiring Dealers.

38.     FCA has exclusive access to facts that would demonstrate the full extent of its scheme to falsify NVDRs. FCA also is in the best position to identify all those Conspiring Dealers who have reported such fictitious motor vehicle sales. Nonetheless, Plaintiffs have independently learned the following facts to date proving the existence of this scheme:

a.      On June 1, 2015, an FCA employee and District Manager for portions of northern Illinois, made a request to a manager of Napleton's River Oaks to falsely report twenty-three (23) vehicles in return for the payment of $15,000 by FCA to Napleton's River Oaks;

b.      An FCA employee and District Manager for portions of northern Illinois confirmed in a conversation with a manager of Napleton's River Oaks on June 1, 2015, that the FCA Business Center Director for the Midwest Region had asked his District Managers to request certain classes of dealers in their respective areas—those in good standing with FCA and who exceeded their target sales numbers (established by FCA's Volume Growth Program)—to submit false NVDRs in return for the payment of incentives by FCA to the dealers submitting such false NVDRs;

c.      On June 30, 2015, the FCA Business Center Director for the Midwest Region and an FCA district manager requested that the manager of Napleton's River Oaks submit forty (40) false NVDRs at Napleton's River Oaks in exchange for the payment of $20,000 in incentives by FCA to the dealer. As set forth in greater

detail below, the same Business Center Director thereafter repeated the same offer over the telephone to the Dealer-Principal of the Napleton Dealership Group (the "Napleton Dealer-Principal");

d.     Plaintiffs have learned from an executive at Sherman Dodge, a CDJR dealer in suburban Chicago, that in June 2015, FCA requested Sherman Dodge to submit eighty-five (85) false NVDRs in exchange for the payment by FCA of substantial incentives;

e.     In June 2015, a source who is an executive of Northwestern Chrysler Jeep Dodge Ram ("Northwestern")—another CDJR dealership in suburban Chicago unaffiliated with Plaintiffs—similarly confirmed that FCA had requested Northwestern to submit false NVDRs in return for the payment of incentives by FCA to the dealer;

f.     In July 2015, a source who is a former manager at FCA confirmed with his contacts within FCA that Business Center Directors and other FCA employees in several regions were heavily engaged in the tactic of requesting dealers to submit false NVDRs in return for the payment of incentives by FCA to the dealers;

g.     On or about November 30, 2015, an FCA sales manager for the Orlando, Florida area placed a telephone call to a manager of various CDJR dealerships affiliated with Plaintiffs located in Florida, Georgia, and Pennsylvania, and during the call, the FCA manager asked the CDJR manager to submit false NVDRs in exchange for co-op money or an allocation of vehicles high in demand by consumers; and

h.     On or about November 30, 2015, an FCA sales representative from the Mid Atlantic Business Center placed a telephone call to the general manager of

Napleton's Ellwood City.  On the call, the FCA representative stated FCA was short on sales of units that month, that it had been handed down that "everyone needed to do their part," and that the representative wanted to do his part.  The FCA representative then requested that Napleton's Ellwood City report three (3) or four (4) new vehicles as sold, and then back these sales out a day or two later, offering to help Ellwood City with the backing out process.  The Napleton's Ellwood City general manager, however, refused to report vehicles as sold that were not actually sold, and refused again when the FCA representative called a second time that night to repeat the request.

39.     For the purpose of executing this scheme, FCA used the U.S. Mail and interstate wires.

40.     As part of the scheme, FCA also knowingly endorses and encourages the false reporting of motor vehicle sales by directly rewarding its District Managers and Business Center Directors with monetary and quarterly bonuses which are directly related to reported vehicle sales numbers.  Upon information and belief, these bonuses resulting from this fraudulently pumped-up vehicle volume are to some lesser extent shared by the entire Business Center, ensuring everyone's cooperation in FCA's enterprise.

41.     Based upon reliable sources of information, FCA's practices and misconduct have been facilitated and occurred with the full consensus and cooperation of FCA's Vice President of U.S. Sales Operations as well as by certain Business Center Directors, including but not limited to FCA's Midwest Business Center Director.

42.     FCA directly benefits from this scheme, as it results in the inflation of the number of monthly sales which, in turn, create the appearance that FCA's performance is better

than, in reality, it actually is. These false and misleading results are reported on a monthly basis to the public at large and to the investment community. FCA has every reason to continue to conceal this practice as it would not be helpful for the truth to come to light at the same time as FCA may be pursuing mergers and other business opportunities.

43. FCA's scheme to falsely report sales was discovered by the Napleton Dealer-Principal only when an FCA Business Center Director placed a telephone call to him to directly offer him $20,000.00 and extra allocations of high-demand vehicles in exchange for falsely reporting forty (40) new vehicle sales at Napleton's River Oaks. The FCA Business Center Director indicated that these monies would reach the accounts of Napleton's River Oaks as a credit under the guise of being co-op payments or advertising support monies. FCA's Business Center Director told the Napleton Dealer-Principal that there would be "no harm, no foul" with regard to this scheme because FCA would later back the sales out before they triggered the warranties on these vehicles. FCA's Business Center Director confirmed that FCA would not provide these monies or extra vehicles to Napleton's River Oaks unless Napleton's River Oaks falsely reported the sales.

44. The Napleton Dealer-Principal immediately rejected this improper offer, telling FCA's Business Center Director that his businesses would not get involved in falsely reporting sales. The Napleton Dealer-Principal subsequently notified FCA that (i) it was his opinion that FCA's actions appeared improper if not outright illegal; and (ii) Plaintiffs and their affiliates were not willing to participate in FCA's scheme. He further warned, requested, and admonished FCA to refrain from this practice in the future.

45.     Despite these admonitions, FCA continued to solicit Plaintiffs, as well as affiliated dealers, to continue to report false NVDRs. The Napleton Dealer-Principal made FCA aware of these instances in 2015, but the practice continued.

46.     Based upon reliable sources of information, including the FCA Business Center Director's illegal offer to the Napleton Dealer-Principal via telephone, it was part of FCA's scheme for FCA to allow its dealers to disavow these false sales (by "backing-out" the NVDRs) after the fact even though they had already been reported and recorded by FCA as sales.

47.     FCA furthered its scheme to falsely report and inflate sales by soliciting and causing Conspiring Dealers to report false NVDRs at month's end, a contrivance reflecting FCA's intent to conceal the scheme. By waiting until month's end to solicit falsified sales, Business Center Directors could calculate the gap between their bonus target sales and the legitimate sales reported for the month, and then fill the gap by causing Conspiring Dealers to falsify that precise number of sales. This timing of the false reports thereby facilitated the payment of bonuses to the Business Center Directors.

48.     The end-of-month timing also facilitated execution of the scheme, as any given falsely reported sale for a particular month could then be backed out or unwound on the first of the following month—purportedly before the factory warranty on the vehicles could be processed and start to run. In this manner, FCA engineered a plan to avoid adversely affecting the Conspiring Dealers, who, under normal circumstances, would be unable to sell these vehicles to an actual retail customer without a full factory warranty in place. By permitting the Conspiring Dealers to back out and to unwind the false NVDR sales, those vehicles remained in the inventory of the Conspiring Dealer to be sold to a retail customer with the period of the full warranty remaining completely intact.

49.     It was further part of the scheme that, by making payments in the form of co-op advertising or advertising support, FCA assisted the Conspiring Dealers in evading audits that could expose the scheme.

50.     FCA and the Conspiring Dealers intended and knew that Non-Conspiring Dealers would be harmed and directly injured by the scheme, resulting in the creation of a *de facto* multiple-tiered pricing system, in which Non-Conspiring Dealers pay significantly more for the motor vehicles that FCA supplies to them than do the Conspiring Dealers.

51.     As a result of the cost discrepancy among FCA's dealers, FCA and the Conspiring Dealers directly injured and continued to directly injure Plaintiffs, which are Non-Conspiring Dealers and are unable to receive the same financial benefits as the Conspiring Dealers.

52.     In furtherance of its scheme to defraud, FCA's practices in this regard are carefully designed to encourage and to coerce dealers to report false sales through the NVDR system in order to stay competitive and to have a competitive advantage over Non-Conspiring Dealers.

53.     For the purpose of executing the scheme to defraud, FCA's Business Center Directors have conspired to facilitate the false reporting of new motor vehicle sales through the submission of fraudulent NVDRs.

54.     In furtherance of the scheme to defraud, fraudulent NVDRs reports were transmitted to FCA electronically by mail and by wire transmissions on numerous occasions, beginning no later than early 2015 (and likely earlier), until at least end of year 2015 (and, as far as Plaintiffs know, continuing into the present).  All of the facts supporting the exact dates and times of those mail, wire, and electronic transmissions are not accessible to Plaintiffs, but such facts are known to FCA.

55.     At all relevant times, FCA was aware of the false NVDR scheme and has routinely attempted to avoid its detection by disguising the increased Volume Growth Program payments to the Conspiring Dealers as items such as co-op or advertising support monies.

**B.      Scheme Two: Separate Scheme to Defraud Plaintiffs by Impairing Their Businesses and Depriving Them of Monies.**

56.     Beginning no later than 2015 (and likely earlier), and continuing into the present, FCA and its agents have devised and executed a scheme to induce Plaintiffs to invest substantially in their dealership facilities and property, and to set Plaintiffs' Minimum Sales Responsibility baseline at unrealistic and unachievable levels based upon FCA's deceit and fraudulent manipulation of market sales data.  FCA and its agents perpetrated the scheme by threatening to terminate Plaintiffs' dealership agreements based upon skewed data and inaccurate assessments of Plaintiffs' performance against the Minimum Sales Responsibility baselines set by FCA.

57.     Apart and aside from the conduct described in Scheme One, FCA's pattern of misconduct towards Plaintiffs has been one of deceit and threats of termination having nothing to do with the actual performance of Plaintiffs.

58.     All dealers are required to enter into a Franchise Agreement with FCA to become one of its franchised dealerships.  The Franchise Agreements contain standardized terms which are non-negotiable.  Among the responsibilities undertaken by Plaintiffs is to use their best efforts to promote and retail FCA vehicle lines.  FCA purports to monitor its dealers' sales performance by using a proprietary metric which it refers to as Minimum Sales Responsibility, or MSR, which, generally, is the minimum number of sales FCA asserts its dealerships should have achieved.  FCA calculates Minimum Sales Responsibility by determining the number of new vehicle registrations for FCA's vehicle lines in the geographical market area established by

FCA (referred to under the Franchise Agreements as "CC Sales Zones"), and then computing the number of retail sales FCA deems necessary for those vehicle lines to purportedly achieve statewide market share.

59.     Just as is the case generally with the Franchise Agreements, the boundaries of the CC Sales Zone are established by FCA in its sole discretion.  The promises and commitments by FCA to consider input into the configuration of the CC Sales Zone as to Plaintiffs in particular, were, and have otherwise proven to be, completely illusory, as it has not allowed or permitted Plaintiffs to provide input into the determination of their CC Sales Zones.

60.     In one particular example, beginning in or about 2013, Plaintiff Napleton's Arlington Heights invested approximately $18,000,000.00 in the land and the new dealership facility currently being operated by its dealership in Arlington Heights, Illinois based, in large part, upon FCA's material representations that Plaintiff would have meaningful input with regard to FCA's definition of its applicable market and the establishment of a reasonable Minimum Sales Responsibility baseline for the dealership.

61.     In or around 2013, the Napleton Dealer-Principal and FCA's Market Representative Manager conducted an in-person meeting in Illinois regarding Plaintiff's investment.  At that meeting, FCA falsely represented that Napleton's Arlington Heights would have direct and meaningful input into the determination of the size and configuration of its CC Sales Zone, which would in turn significantly impact Napleton's Arlington Heights' Minimum Sales Responsibility.  In particular, FCA's Market Representative Manager represented that FCA would share certain demographic data and analysis, such as "market bursts," with the Napleton Dealer-Principal and Napleton's Arlington Heights, which information would supposedly play a prominent role in determining Napleton's Arlington Heights' market.  At all relevant times,

FCA's Market Representative Manager knew that his material representations to the Napleton Dealer-Principal were false and inaccurate.

62. Contrary to FCA's material representations and promises, FCA never provided any such data or analysis to Napleton's Arlington Heights, and never allowed Napleton's Arlington Heights to participate in or comment on FCA's determination of its CC Sales Zone.

63. FCA's concealment and deceit in the determination of Napleton's Arlington Heights' CC Sales Zone resulted in the creation and designation of an illogical, arbitrary, and unfair market area, which has existed and been perpetuated ever since.

64. The loss in revenue and profits to Napleton's Arlington Heights, caused by FCA's arbitrary and misleading determination of its market area, was exacerbated when FCA permitted a competing dealer, Fields Chrysler Jeep Dodge Ram, to relocate into what logically should have been Plaintiff's market area (hereinafter referred to as the "Fields Relocation").

65. The Fields Relocation occurred after Napleton's Arlington Heights had constructed its new facility in Arlington Heights, Illinois. FCA represented to Plaintiffs that Napleton's Arlington Heights would have direct and meaningful input into the determination of the size and configuration of its "CC Sales Zone" in light of the Fields Relocation, but FCA also knew those statements were false at the time they were made.

66. Beginning no later than 2015, and likely earlier, FCA has also deceptively and misleadingly assessed Plaintiffs' sales performance, *i.e.*, the percentage of the Minimum Sales Responsibility set by FCA that Plaintiffs achieved at a given time. As part of this scheme to defraud, FCA has used its deceptive methodology to set unrealistic and unachievable Minimum Sales Responsibility baselines for Plaintiffs in order to directly control and intimidate Plaintiffs

to bow to FCA's will under the constant threat of the termination of their dealerships, based upon false and misleading allegations that Plaintiffs are not abiding by their Franchise Agreements.

67.     FCA has exclusive knowledge of the full extent of their deceptive practices with respect to determining Plaintiffs' Minimum Sales Responsibility baselines.    Plaintiffs have independently learned, however, that as part of this scheme, FCA compared Plaintiffs' sales of FCA's non-luxury sport utility vehicle models against not only other manufacturers' non-luxury models but also against premium brand "SUVs" or sport utility vehicles.   In doing so, FCA included luxury brands such as Lexus, Land Rover, BMW, and Mercedes Benz ("Luxury Brands") in its analysis in order to artificially inflate the size of the market, thereby driving down its dealers' market shares, and elevating the difficulty in achieving the Minimum Sales Responsibility set by FCA for each Plaintiff.

68.     FCA's arbitrary and deceptive conduct described in the foregoing paragraph was intended to, and did in fact, further taint and inflate Plaintiffs' Minimum Sales Responsibility baselines, as each of the Plaintiffs operates in a market with a large Luxury Brand presence.

69.     As part of the scheme, FCA used third-party information vendors, such as J.D. Power and an entity commonly known as Urban Science, to provide market data under the pretense that FCA allows third parties to provide FCA with the statistical sales data, while FCA and its agents knew full well that these third parties routinely manipulate and skew that data. Notwithstanding their allied interests, the situation described herein was so egregious that even Urban Science felt compelled to notify FCA that the inclusion of the Luxury Brands in FCA's Minimum Sales Responsibility analysis was skewing their metrics in a manner so as to put FCA's own dealers at an apparent disadvantage.   FCA intentionally ignored this notification from Urban Science, and continued to use this faulty data to impose pressure on the Plaintiffs.

70.     By way of example, the Jeep Grand Cherokee SUV is sold in high volume by FCA dealers, typically generating the largest volume of sales for a typical Chrysler Dodge Jeep Ram dealer.  FCA is well aware that any data analysis that negatively affects Plaintiffs' apparent respective market shares in the Jeep Grand Cherokee market segment will have a significant effect on Plaintiffs' apparent performance against the Minimum Sales Responsibility targets set by FCA.

71.     Moreover, the negative impact of FCA's conduct is particularly acute in the large metropolitan areas—such as Chicago, St. Louis, Pittsburgh, Orlando, and Palm Beach, where the Plaintiffs' dealerships operate—where there is a larger presence of Luxury Brand SUVs. Consequently, the market share for FCA's Jeep Grand Cherokee SUV is higher for almost every dealer outside of large metropolitan areas because the luxury segment is not as large and influential in such non-metropolitan markets.  FCA knew and intended that its manipulation would result in a Minimum Sales Responsibility baseline for Jeep Grand Cherokee sales that would be virtually unattainable for large metropolitan dealers, like Plaintiffs.  FCA is well aware that its Minimum Sales Responsibility methodology is flawed and misleading, and thus that the Minimum Sales Responsibility baseline it asserts each Plaintiff must meet is flawed and misleading, and further that this works to the competitive disadvantage of a large number of FCA's large metropolitan dealers, including Plaintiffs.

72.     Based upon a source of information, Urban Science notified FCA of the foregoing flaws in FCA's Minimum Sales Responsibility methodology.  Although it would have been quite easy for FCA to correct this statistical flaw by simply eliminating the Luxury Brand vehicles from their determination of Minimum Sales Responsibility, FCA continued to calculate Plaintiffs' Minimum Sales Responsibility in the same irrational, misleading, and deceptive

manner, thereby enabling FCA to engage in this intimidating and coercive conduct by continually threatening Plaintiffs with termination.

73.     As a direct result of FCA's willful and intentional scheme to defraud Plaintiffs by imposing unattainable Minimum Sales Responsibility baselines upon them, Plaintiffs lost substantial amounts of sales revenue and profits, among other injuries including but not limited to lost goodwill and business value.

74.     In furtherance of this scheme to defraud Plaintiffs, FCA sent communications by mail and wire transmissions on numerous occasions no later than 2015 (and likely earlier) through 2016, including notice of default letters sent to Plaintiffs from time to time throughout these years, and communications setting forth Plaintiffs' Minimum Sales Responsibility baselines. All of the facts supporting the exact dates and times of other wire, mail, and electronic communications are not accessible to Plaintiffs, but are accessible to FCA.

### C.     Defendants Engaged in Price Discrimination.

#### 1.     Facts Relating to Price Differences Caused by False NVDRs.

75.     When Plaintiffs purchase a vehicle from FCA, they pay FCA an invoice price for the vehicle that is the same as the invoice price that FCA charges to every other CDJR dealer for a vehicle of like grade and quality.

76.     The incentives and subsidies paid each month to Conspiring Dealers in the markets in which Plaintiffs compete created a price difference per vehicle sold each month to the Conspiring Dealers as compared to the prices of vehicles contemporaneously sold to Plaintiffs of like grade and quality. Such price reduction was not functionally available to Plaintiffs because Plaintiffs are not involved in the fraudulent and illegal scheme for the ever higher and escalating levels of false NVDRs being offered by FCA through its Business Center Directors to Conspiring Dealers.

77. The incentives and subsidies paid to Conspiring Dealers in the markets in which Plaintiffs compete who submit false NVDRs amount to more than $800 in incentives and subsidies for each vehicle sold each month.

### 2. Facts Relating to Price Differences Created by Volume Growth Program.

78. FCA has and continues to engage in a practice wherein it provides incentives to its dealers. One of these programs is commonly referred to as the Volume Growth Program or "VGP." Dealers can receive the benefits of the Volume Growth Program by achieving a target arbitrarily established by FCA for a specific number of sales. The Volume Growth Program targets vary from dealership to dealership.

79. Upon meeting the requirements of the Volume Growth Program, the dealership is provided subsidies on new motor vehicle sales that a dealer who does not meet Volume Growth Program requirements does not enjoy.

80. The Volume Growth Program, as implemented by FCA, also provides dealers who meet Volume Growth Program requirements with a competitive advantage in pricing its vehicles to the public as compared to dealers that do not meet Volume Growth Program requirements. Such price reduction was not functionally available to Plaintiffs because of FCA's arbitrary and discriminatory application of the Volume Growth Program.

81. FCA also created an arbitrary and discriminatory program whereby it penalized any dealer who did not, for whatever reason (including, but not limited to, FCA's drawing of flawed CC Sales Zones and inclusion of sales for market segments in which its dealers did not compete), meet Volume Growth Program requirements for a particular month, by increasing the Volume Growth Program target for following months by anywhere from 10% to 20% for those

dealers who did not reach their Volume Growth Program targets (the amount added being referred to herein as the "Clawback Penalty").

82. The addition of the arbitrary and discriminatory Clawback Penalty, which was used to increase future Volume Growth Program targets, made it virtually impossible for a dealer who had at any time failed to meet Volume Growth Program requirements to do so in the future.

83. This arbitrary and discriminatory Clawback Penalty, and its consequent effect on the Volume Growth Program targets for dealers who had not met Volume Growth Program requirements, was created to establish a permanent class of dealer who would not likely ever receive Volume Growth Program incentives and subsidies.

84. The effect of the incentives and subsidies awarded to dealers who had met Volume Growth Program requirements created a net price difference in the prices paid by such dealers as compared to those dealers who were penalized with the Clawback Penalty and were therefore not likely to ever meet Volume Growth Program requirements and receive the incentives and subsidies.

85. For instance, FCA initially established a Volume Growth Program target for the Napleton's Arlington Heights dealership of eighty (80) units per month. This was consistent with the projections of Napleton's Arlington Heights' management that, once the facility established itself as a mature facility in the area, it would sell one-hundred (100) vehicles per month. FCA then arbitrarily increased the Volume Growth Program target for Napleton's Arlington Heights to one-hundred forty (140) vehicles per month.

86. When Plaintiff Napleton's Arlington Heights was unable to meet this new arbitrarily imposed Volume Growth Program target, FCA arbitrarily and discriminatorily imposed a monthly Clawback Penalty on the subsequent Volume Growth Program targets for

Napleton's Arlington Heights. This Clawback Penalty made it virtually impossible for Napleton's Arlington Heights to ever meet the requirements of the Volume Growth Program.

87. Napleton's Ellwood City, Napleton's South Orlando, Napleton's Mid Rivers, and Napleton's Northlake were each unable to meet Volume Growth Program requirements at various times in 2015 because of FCA's arbitrary and discriminatory conduct.

88. FCA's arbitrary and discriminatory imposition of its monthly Clawback Penalty has made it virtually impossible for these dealerships to meet Volume Growth Program requirements.

89. In furtherance of the establishment of a price differential between dealers who had met Volume Growth Program requirements and those who did not, FCA purposely structured its formula for Volume Growth Program targets so that falsely reported NVDRs would not operate to increase the Volume Growth Program targets for dealers who submitted false NVDRs. In that manner, the Conspiring Dealers were able to continue meeting Volume Growth Program requirements, but they would not be penalized by an ever-increasing Volume Growth Program target that would be based upon their false reporting of NVDRs.

90. Because of FCA's arbitrary and discriminatory application of the Clawback Penalties, the Volume Growth Program targets for Napleton's Arlington Heights, Napleton's Ellwood City, Napleton's South Orlando, Napleton's Mid Rivers, and Napleton's Northlake increased over time.

91. The effect of the foregoing price difference between dealers who met Volume Growth Program requirements and Plaintiffs is that the net wholesale prices paid by Competing Dealers who received incentives and subsidies were significantly lower by at least $800 per new vehicle, or more, than the prices paid by Plaintiffs.

3. **Facts Relating to Injury to Competition Because of Price Discrimination.**

92. The Plaintiffs and Competing Dealers in each relevant market sell the vehicles they purchase from FCA in the same form as the vehicles are received from FCA.

93. In each relevant market, there is considerable resale price competition in the retail sale of vehicles to the public between Plaintiffs and Competing Dealers who receive the incentives and subsidies noted above from FCA not functionally available to Plaintiffs.

94. In each relevant market, the retail prices at which Plaintiffs and the Competing Dealers sell vehicles are a substantial factor in most retail purchasers' decisions regarding from which dealer they will purchase a vehicle.

95. In each relevant market, the gross margin of profits obtained by Plaintiffs and Competing Dealers in the resale of vehicles is relatively small. Gross profits generally average less than 3% of the retail price of the vehicle. Accordingly, the net wholesale price paid to FCA for each vehicle is an important factor in the competition in the retail sale of vehicles for Plaintiffs and Competing Dealers.

96. By operation of FCA's conduct, the net wholesale price paid by Plaintiffs to FCA was significantly higher than the net wholesale price paid by the Competing Dealers in each relevant market who received incentives and subsidies from FCA that were and are not functionally available to Plaintiffs. The result is that Plaintiffs cannot lower their retail prices to offer retail pricing which is competitive with such Competing Dealers without reducing (and perhaps eliminating) Plaintiffs' profits.

97. These price differences were substantial and occurred over a significant period of time and, therefore, create a presumption of injury to competition.

98.     As a direct result of these price differences, vehicle sales have been siphoned from and diverted away from Plaintiffs and to Competing Dealers who received additional incentives and subsidies from FCA that were and are not functionally available to Plaintiffs.

99.     Such diversion has occurred because Competing Dealers receiving such additional incentives and subsidies were and are able to use the price advantage to lower their prices to levels with which Plaintiffs could not and cannot compete without reducing or even eliminating their profits.

100.    The additional incentives and subsidies paid to Competing Dealers through such co-op advertising and/or advertising support payments are promotions and allowances that were not available to Plaintiffs on proportionally equal terms.

**4.      Facts Relating to Plaintiffs' Lost Sales and Lost Profits Caused by Price Differences.**

101.    Since at least January 2015, Plaintiffs unit sales of vehicles have been substantially reduced compared to what they could have achieved if they had received the same incentives and subsidies as Competing Dealers, while the unit sales of vehicles made by those Competing Dealers who submitted false NVDRs and/or those who received Volume Growth Program incentives and subsidies, have substantially increased over what they would have achieved without such incentives and subsidies.

102.    Since January 2015, Plaintiffs unit sales of vehicles have been diverted to Competing Dealers who received incentives and subsidies not functionally available to Plaintiffs. This diversion has occurred as a direct result of the wholesale price differences between Plaintiffs and such Competing Dealers, and the resulting price advantage over Plaintiffs enjoyed by Competing Dealers who submitted false NVDRs and/or who subsequently obtained Volume Growth Program incentives and subsidies not functionally available to Plaintiffs.

## COUNT I
### (Violation of the Automobile Dealers Day in Court Act—15 U.S.C. § 1221)
### Brought by All Plaintiffs against FCA

103.     Plaintiffs re-affirm, re-allege, and incorporate each allegation and averment in the preceding and succeeding paragraphs as though fully set forth herein.

104.     Each of the Plaintiffs is an automobile dealer protected under the Automobile Dealer's Day in Court Act ("ADDCA"), 15 U.S.C. § 1221, *et seq*.

105.     Defendant FCA is an "automobile manufacturer" engaged in interstate commerce, as that term is defined under the ADDCA.

106.     A manufacturer-dealer relationship is embodied in each of the separate Franchise Agreements that FCA entered into with each of the Plaintiffs.

107.     The Federal Automobile Dealer's Day in Court Act, 15 U.S.C. § 1221 *et seq*., provides a cause of action for automobile dealers against automobile manufacturers that fail "to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer." 15 U.S.C. § 1222.

108.     Pursuant to 15 U.S.C. § 1221(e), the term "good faith" is defined as "the duty of each party to any franchise, and all officers, employees, or agents thereof to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party: *Provided*, That recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith."

109.     FCA failed to act in good faith in performing the terms of its Franchise Agreements with Plaintiffs. As noted above, FCA uses its substantial economic leverage to impose terms upon Plaintiffs in their respective Franchise Agreements. Nonetheless, a critical

protection in these Franchise Agreements is the freedom from termination on the basis of sales performance unless FCA can prove that a given dealership fell short of its Minimum Sales Responsibility after providing the dealership an opportunity to cure a purported default. FCA has eviscerated and actively circumvented this protection, rendering it meaningless through actions that fall far short of acting fairly and equitably toward Plaintiffs, and guaranteeing them freedom from coercion, intimidation, or threats of coercion or intimidation from FCA.

110.    Rather, FCA has (i) arbitrarily applied the Volume Growth Program to create incentives and subsidies available to certain dealers but not to Plaintiffs; (ii) arbitrarily and deceptively calculated the components of its Minimum Sales Responsibility metric to raise baseline sales performance for Plaintiffs to unachievable levels; (iii) conspired with other dealers to engage in a sustained pattern of falsely reporting sales; (iv) discriminated in price in favor of Conspiring Dealers; and (v) actually deprived Plaintiffs of cost subsidies and vehicle allocations afforded to the Conspiring Dealers. Combined with its practice of repeatedly harassing Plaintiffs with threats of termination, FCA's conduct is all designed to intimidate Plaintiffs, threaten Plaintiffs' franchises, and drive them out of business.

111.    Indeed, FCA has regularly threatened Plaintiffs' businesses on the pretext of letters of default alleging that Plaintiffs have fallen short of their Minimum Sales Responsibility baselines. Despite Plaintiffs' lawsuit again alerting FCA to its unfair, discriminatory, and arbitrary practices that have prevented Plaintiffs from fairly competing within their respective markets, FCA again sent a notice of default to Plaintiffs in a letter from FCA dated January 30, 2016. In the letter, FCA notes it is "imperative" that Plaintiffs address what it calls "performance deficiencies." Perhaps recognizing the questionable timing of the letter in light of

the Plaintiffs' pending lawsuit, FCA concluded its letter by stating "any claim by you that this follow-up letter somehow amounts to 'retaliation' for your lawsuit would not be credible."

112.    FCA's letters of default expose the coercive, intimidating, and inequitable nature of its business dealings with Plaintiffs.  FCA regularly sent and continues to send Plaintiffs default letters threatening termination on the basis of sales volume, emphasizing that it can exercise termination at any time, and purporting to grant Plaintiffs short extensions during which FCA will closely "monitor" Plaintiffs' performance to align with FCA's objectives.  FCA's recent correspondence purports to group the performance of several dealerships affiliated with Plaintiffs together, a tactic that has had the effect of intimidating and threatening all of the Plaintiffs' dealerships at once.  Meanwhile, FCA adopted underhanded, arbitrary, and fraudulent practices against each of the Plaintiffs—in many cases in favor of their direct competition—that together virtually ensure Plaintiffs will remain in a perpetual state of purported default, threatening the very existence of Plaintiffs' businesses.

113.    Defendant FCA's actions violate the express prohibitions set forth in 15 U.S.C. § 1221, *et seq*.

114.    As a direct result of FCA's bad faith and improper conduct, Plaintiffs have suffered substantial monetary and other damages including, but not limited to, lost retail sales of vehicles and related finance and insurance products, lost profits from vehicle sales, lost profits from the resale of used vehicles which would have been taken in trade on the lost vehicle sales, lost customer goodwill, lost market value as going concerns, lost marketing monies, lost potential future sales of vehicles to repeat customers, and lost profits from warranty and non-warranty sales of service and parts for vehicle owners who tend to have their vehicles serviced at

the same dealership where they were purchased. In addition, Plaintiffs have incurred substantial investigative fees, legal fees, and litigation expenses in an amount to be determined.

WHEREFORE, Plaintiffs demand entry of a judgment against FCA for treble damages, injunctive relief, costs of suit including reasonable attorney's fees, and such other relief as this Court deems just and equitable.

## COUNT II
### (Violation of Section 2(a) of the Robinson-Patman Act—15 U.S.C. § 13(a))
### Brought by All Plaintiffs against FCA

115. Plaintiffs re-affirm, re-allege, and incorporate each allegation and averment in the preceding and succeeding paragraphs as though fully set forth herein.

116. At all relevant times to this action, Plaintiffs and FCA were, and are, persons engaged in interstate commerce within the meaning of 15 U.S.C. § 13 of the Robinson-Patman Act in that the vehicles sold to Plaintiffs and to the Competing Dealers in the relevant markets crossed state lines.

117. The vehicles sold to Plaintiffs and the Competing Dealers in each relevant market were of like grade and quality.

118. FCA discriminated in price between Plaintiffs and Competing Dealers in each relevant market who received incentives and subsidies not functionally available to Plaintiffs. Such discrimination in price was for products of like grade and quality.

119. The effect of the foregoing price discrimination was to injure, destroy, and prevent competition to the advantage of the Competing Dealers in each relevant market who received incentives and subsidies not functionally available to Plaintiffs.

120. The incentives and subsidies paid to certain Competing Dealers were not functionally available to Plaintiffs.

121.     The foregoing price discrimination violates 15 U.S.C. § 13(a) of the Robinson-Patman Act.

122.     As a direct result of FCA's violation of 15 U.S.C. § 13(a), Plaintiffs have sustained injury to their businesses and property in the form of, among other things, lost retail sales of vehicles and related finance and insurance products, lost profits from vehicle sales, lost profits from the resale of used vehicles which would have been taken in trade on the lost vehicle sales, lost customer goodwill, lost market value as going concerns, lost marketing monies, lost potential future sales of vehicles to repeat customers, and lost profits from warranty and non-warranty sales of service and parts for vehicle owners who tend to have their vehicles serviced at the same dealership where they were purchased.  In addition, Plaintiffs have incurred substantial investigative fees, legal fees, and litigation expenses in an amount to be determined.

WHEREFORE, Plaintiffs respectfully request that judgment be entered against Defendant FCA, granting Plaintiffs the following relief:

(a)     This Court adjudge and decree that Defendant FCA has unlawfully breached Section 2(a) of the Robinson-Patman Act, 15 U.S.C. § 13(a);

(b)     Pursuant to 15 U.S.C. § 15(a), treble the damages that are shown to have been sustained by Plaintiffs by reason of Defendant FCA's above-alleged violations, plus interest, costs, and reasonable attorney's fees; and

(c)     This Court grant Plaintiffs such other further and different relief as the nature of the case may require or as the Court may deem just and proper.

## COUNT III
### (Violation of Section 2(d) of the Robinson-Patman Act—15 U.S.C. § 13(d))
### Brought by All Plaintiffs against FCA

123.    Plaintiffs re-affirm, re-allege, and incorporate each allegation and averment in the preceding and succeeding paragraphs as though fully set forth herein.

124.    At all relevant times to this action, Plaintiffs and FCA were, and are, persons engaged in interstate commerce within the meaning of 15 U.S.C. § 13 of the Robinson-Patman Act in that the vehicles sold to Plaintiffs and to the Competing Dealers in the relevant markets crossed state lines.

125.    To the extent that FCA was making payments of incentives and subsidies in the form of co-op advertising monies to dealers competing in the relevant markets who submitted false NVDRs, FCA was making payments to competitors of Plaintiffs not on proportionally equal terms in that Plaintiffs refused to engage in the false and illegal scheme to submit false NVDRs.

126.    The payment of the foregoing incentives and subsidies in the form of co-op advertising monies, which payments were not available to Plaintiffs on proportionally equal terms, allowed Competing Dealers in the relevant markets who received such payments to more effectively compete for the retail sales of vehicles than could Plaintiffs in competition with such dealers.

127.    The effect of the foregoing payment of monies not available on proportionally equal terms to Plaintiffs was to injure, destroy, and prevent competition to the advantage of the Competing Dealers in each relevant market.

128.    The foregoing payment of incentives and subsidies, which payments were not available to Plaintiffs on proportionally equal terms, constituted a violation of 15 U.S.C. § 13(d) of the Robinson-Patman Act.

129.    As a direct result of FCA's violation of 15 U.S.C. § 13(d), Plaintiffs have sustained injury to their businesses and property in the form of, among other things, lost retail sales of vehicles and related finance and insurance products, lost profits from vehicle sales, lost profits from the resale of used vehicles which would have been taken in trade on the lost vehicle sales, lost customer goodwill, lost market value as going concerns, lost marketing monies, lost potential future sales of vehicles to repeat customers, and lost profits from warranty and non-warranty sales of service and parts for vehicle owners who tend to have their vehicles serviced at the same dealership where they were purchased.  In addition, Plaintiffs have incurred substantial investigative fees, legal fees, and litigation expenses in an amount to be determined.

WHEREFORE, Plaintiffs respectfully request that judgment be entered against Defendant FCA, granting Plaintiffs the following relief:

(a)    This Court adjudge and decree that Defendant FCA has unlawfully breached Section 2(d) of the Robinson-Patman Act, 15 U.S.C. § 13(d);

(b)    Pursuant to 15 U.S.C. § 15(a), treble the damages that are shown to have been sustained by Plaintiffs by reason of Defendant FCA's above-alleged violations, plus interest, costs, and reasonable attorney's fees; and

(c)    This Court grant Plaintiffs such other further and different relief as the nature of the case may require or as the Court may deem just and proper.

## COUNT IV
### (Substantive Civil RICO Violation—18 U.S.C. § 1962)
### Brought by All Plaintiffs against FCA

130.    Plaintiffs re-affirm, re-allege, and incorporate each allegation and averment in the preceding and succeeding paragraphs as though fully set forth herein.

131.    This is an action for damages based upon the FCA's violation of 18 U.S.C. § 1962.

132.    FCA has knowingly conducted and participated, directly or indirectly, in the conduct of the affairs of the Enterprise (defined below) through a "pattern of racketeering activity" as defined by 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c).  Such racketeering activity consists of repeated violations of the Federal Mail Fraud Statute, 18 U.S.C. § 1341, and of the Federal Wire Fraud Statute, 18 U.S.C. § 1343, based upon at least two separate schemes to defraud Plaintiffs of millions of dollars and other property through the solicitation, preparation, and submission of false vehicle delivery reports, through the manipulation and misuse of market and sales data, and through intentional misrepresentations and omissions of material fact made to Plaintiffs.  These predicate offenses have the same or similar purposes, results, participants, victims, and methods of commission and otherwise are interrelated by distinguishing characteristics and are not isolated events.  Further, FCA's pattern of racketeering has continued over several years as a continuing criminal activity from no later than 2015 (and likely earlier) until at least end of year 2015, and, as far as Plaintiffs know, the present.

133.    Defendant FCA, the Conspiring Dealers, Business Center Directors, and third-party vendors are an association-in-fact "enterprise" (the "Enterprise"), as that term is defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which, affect interstate commerce.

These members of the Enterprise are and have been associated through time, joined in purpose and organized in a manner amenable to hierarchal and consensual decision-making, with each member fulfilling a specific and necessary role to carry out and facilitate its purpose. Specifically, the Enterprise had an identifiable structure with each member and entity fulfilling a specific role to carry out and facilitate its purpose as follows:

a.  FCA induced and cajoled certain of its dealers, with which it had contractual relationships, to submit false NVDRs in return for unearned and illegitimate incentives and payments;

b.  The Conspiring Dealers, which had contractual relationships with FCA, agreed to and did submit false NVDRs in order to gain a competitive advantage over dealers with the Conspiring Dealers and to profit from unearned and illegitimate payments;

c.  Third-party vendors were retained by FCA to submit marketing and sales data that was then manipulated and abused by FCA in order to conceal its schemes, its misconduct, and its price discrimination that favored Conspiring Dealers; and

d.  Certain Business Center Directors, and the district managers conspiring with those Business Center Directors, actively solicited, coerced, and induced the Conspiring Dealers to participate in FCA's schemes and in the price discrimination that injured and harmed Plaintiffs.

134.  The Enterprise had an ongoing organization over a period of years, beginning no later than 2015 (and likely earlier) and continuing until the present.

135.  The Enterprise, including Defendant FCA, functioned as a continuing unit over a period of years, beginning no later than 2015 (and likely earlier) and continuing until the present.

136.  On an ongoing basis, the Enterprise oversaw and coordinated the commission of the schemes to defraud and to harm Plaintiffs, the legitimate and illegitimate activities of its individual members, and the business conduct and financial affairs of its members. The legitimate activities of the Enterprise were to manufacture and to sell automobile vehicles of FCA, to provide legitimate incentives to its network of automobile dealers to make actual and

proper sales of automobile vehicles, and to gather market data for support of the metrics needed to give such incentives to its dealer network.

137.     The Enterprise engaged in, and its activities affected, interstate and foreign commerce.  The activities of the Enterprise directly affected interstate and foreign commerce in the states of Florida, Illinois, Missouri, Pennsylvania, and elsewhere.

138.     The Enterprise is distinct from and has an existence beyond the pattern of racketeering activity described above, in that it employs and contracts with third-party vendors, dealerships, suppliers, advertising firms, and other entities who conduct valid sales, manufacture actual automobile vehicles, and conduct legitimate marketing and research.

139.     Defendant FCA has been employed by or is associated with the Enterprise.

140.     Plaintiffs are direct victims of Defendant FCA's pattern of racketeering, which consisted of the perpetration of two or more predicate acts including mail fraud and wire fraud. These predicate acts occurred over a duration of several years and continue to occur.  Defendant FCA effectuated the pattern of racketeering through at least two schemes to defraud that are described above.

141.     Plaintiffs have been directly injured in their business and property by reason of Defendant's intentional, wanton, and malicious conduct in that Plaintiffs have been deprived of lost revenues, lost profits, and other consequential damages.  Plaintiffs have incurred substantial legal fees and litigation expenses in an amount to be determined.

142.     Based upon Defendant FCA's misrepresentations of material fact and affirmative acts to conceal the schemes to defraud, which are described above, Plaintiffs did not discover and should not have reasonably discovered that their damages were attributable to fraud until sometime in 2015.

143.    FCA's actions providing Conspiring Dealers with price subsidies, payoffs, and preferred allocations were artifices and/or acts of deceit that were intended to deprive Plaintiffs of monies in favor of the Conspiring Dealers who were willing to falsely report sales.

144.    FCA fraudulently propped up the value of its stock by utilizing false year-over-year results based on false vehicle-sales reporting, thereby purposefully creating the illusion of financial strength in order to fraudulently induce its dealers, such as Plaintiffs, to invest in dealership improvements and otherwise to contribute ever-increasing capital to their business operations.

145.    FCA representatives on multiple occasions made representations to its dealers, including Plaintiffs, that FCA would treat all of its dealers alike on a level playing field and use their best efforts to make each and every one of its dealers, including Plaintiffs, profitable.  As a result, for instance, Plaintiff Napleton's Arlington Heights invested heavily in moving its CDJR dealership from its facility in Des Plaines, Illinois, and to a brand-new facility that it constructed in Arlington Heights, Illinois; and Plaintiff Napleton's Northlake agreed to renovate its dealership facility.  FCA, in fact, had no intention of honoring this pledge of equal treatment among its dealers.  Instead, FCA intended to and did take actions including, but not limited to, (i) giving preferential subsidies and allocations of vehicles to Conspiring Dealers at the cost of Non-Conspiring Dealers, such as Plaintiffs; and (ii) knowingly and intentionally manipulating Plaintiffs' Minimum Sales Responsibility performance baselines as a means to threaten and coerce dealers in large metropolitan areas, such as Plaintiffs.

146.    FCA knew that its representations of material facts as set forth herein were false and intentionally misrepresented the same.

147.    FCA's actions detailed herein violate 18 U.S.C. §§ 1341 and 1343 in that they used the United States mail, interstate telephone calls and/or electronic correspondence in furtherance of these schemes.

148.    As a result of FCA's actions in violation of 18 U.S.C. § 1962(c), Plaintiffs have suffered damages including, but not limited to, the loss of value of the business as a going concern.

149.    Plaintiffs are direct victims of Defendant FCA's and the Conspiring Dealers' pattern of racketeering, which consisted of the perpetration of numerous predicate acts including mail fraud and wire fraud.  These predicate acts occurred for a duration of several years, and they continue to occur.  Defendant FCA and the Conspiring Dealers effectuated their pattern of racketeering through several schemes to defraud that are described above.

150.    Plaintiffs have been directly injured in their business and property by reason of Defendant FCA's and the Conspiring Dealers' pattern of racketeering in that Plaintiffs have lost retail sales of vehicles and related finance and insurance products, lost profits from vehicle sales, lost profits from the resale of used vehicles which would have been taken in trade on the lost vehicle sales, lost customer goodwill, lost market value as going concerns, lost marketing monies, lost potential future sales of vehicles to repeat customers, and lost profits from warranty and non-warranty sales of service and parts for vehicle owners who tend to have their vehicles serviced at the same dealership where they were purchased.  In addition, Plaintiffs have incurred substantial investigative fees, legal fees, and litigation expenses in an amount to be determined.

WHEREFORE, pursuant to section 18 U.S.C. §§ 1962(c) and 1964(c), Plaintiffs demand entry of a judgment against FCA for treble damages, costs of suit including reasonable attorney's fees, and such other relief as this Court deems just and equitable.

## COUNT V
### (Racketeering Conspiracy—18 U.S.C. §§ 1962(d) and 1964)
### Brought by All Plaintiffs against FCA

151.    Plaintiffs re-affirm, re-allege, and incorporate each allegation and averment in the preceding and succeeding paragraphs as though fully set forth herein.

152.    Since no later than 2015 (and likely earlier), Defendant FCA has willfully combined, conspired, and agreed with Conspiring Dealers and others to violate Title 18, United States Code, Section 1962(c), that is, to conduct and/or participate, directly or indirectly, in the conduct of the affairs of the Enterprise, the activities of which were conducted through a pattern of racketeering activities which are described above, and they agreed with one another that someone would commit at least two predicate acts to accomplish the goals of the conspiracy, all in violation of Title 18, United States Code, Section 1962(d).

153.    The object of this conspiracy was to violate the RICO statute, as described in Count IV above, by participating in a pattern of racketeering activity to perpetrate multiple schemes to defraud Plaintiffs of money, profits, and revenues by means of mail and wire fraud.

154.    As a direct and proximate result of Defendant's and the Conspiring Dealers' conduct and racketeering conspiracy, Plaintiffs were injured in that they have lost retail sales of vehicles and related finance and insurance products, lost profits from vehicle sales, lost profits from the resale of used vehicles which would have been taken in trade on the lost vehicle sales, lost customer goodwill, lost market value as going concerns, lost marketing monies, lost potential future sales of vehicles to repeat customers, and lost profits from warranty and non-warranty sales of service and parts for vehicle owners who tend to have their vehicles serviced at the same dealership where they were purchased.  In addition, Plaintiffs have incurred substantial investigative fees, legal fees, and litigation expenses in an amount to be determined.

155. By reason of this direct injury, Plaintiffs are entitled to receive treble damages, punitive damages, and reasonable attorney's fees under Title 18, United States Code, Section 1964(c).

WHEREFORE, Plaintiffs demand entry of a judgment against FCA for treble damages, costs of suit including reasonable attorney's fees, and such other relief as this Court deems just and equitable.

**COUNT VI**
**(Common Law Fraud)**
**<u>Brought by All Plaintiffs against FCA</u>**

156. Plaintiffs re-affirm, re-allege, and incorporate each allegation and averment in the preceding and succeeding paragraphs as though fully set forth herein.

157. At all relevant times, FCA has advised its dealers, including the Plaintiffs, that its metrics to determine performance and allocation, as well as incentives and subsidies, are applied uniformly, fairly, without bias, and in good faith. FCA well knew that those misrepresentations were material and false.

158. In or around 2013, FCA's Market Representative Manager told the Napleton Dealer-Principal that Napleton's Arlington Heights would have direct and meaningful input into the size and configuration of the market area to be used to determine Napleton Arlington Heights' Minimum Sales Responsibility baseline. FCA well knew that those misrepresentations were material and false.

159. In addition, each of the Plaintiffs continued to invest substantial capital and monies into the operation of their dealerships, promotion, and sales of FCA's vehicle lines, in addition to other investments that, in part, inured to the benefit of FCA, at all relevant times.

160. At all times before the Napleton Dealer-Principal first learned of FCA's schemes, FCA willfully omitted to disclose to Plaintiffs FCA's scheme by which Conspiring Dealers submitted false NVDRs at FCA's behest in order to gain monies and subsidies to which those Conspiring Dealers were not otherwise entitled, and would not be functionally available to Plaintiffs unless Plaintiffs participated in these schemes. Those omissions were of material facts and were willfully concealed by FCA.

161. At all times before the Napleton Dealer-Principal first learned of FCA's schemes, FCA failed to disclose and actively concealed its practice to offer Conspiring Dealers a subsidized lower actual price than the actual price offered and charged to Plaintiffs for the same model vehicle that was similarly equipped. Those omissions by FCA were of material facts and were willfully concealed by FCA.

162. At all relevant times, FCA willfully failed to disclose and actively concealed the market and sales data and information provided to FCA by third-party vendors including Urban Science, which advised that FCA's inclusion of luxury brands was skewering FCA's market metrics. Those omissions by FCA were of material facts and were willfully concealed by FCA.

163. At all relevant times, FCA willfully failed to disclose that it was falsely increasing its monthly sales throughout the country to give the appearance of financial strength to its dealers and inducing Plaintiffs to make substantial investments including with respect to their facilities and promotions.

164. At all relevant times, FCA willfully failed to disclose and actively concealed that it was arbitrarily and discriminatorily applying its Volume Growth Program so as to provide incentives and subsidies to Competing Dealers and would not make such incentives and

subsidies functionally available to others, including Plaintiffs. These omissions by FCA were of material facts and were willfully concealed by FCA.

165.    The misrepresentations and omissions of material fact described above were false, misleading, and made by FCA with knowledge of their falsity and with the intent that Plaintiffs would believe, rely, and act upon them, thereby causing Plaintiffs to lose sales revenues and profits.

166.    Plaintiffs did, in fact, believe and rely upon the misrepresentations and omissions described above, and, in doing so, were induced to invest millions of dollars in a state-of-the-art facility in Arlington Heights, Illinois, and to continue to lose revenue and profit on automobile sales at the expense of Conspiring Dealers and Competing Dealers for whom Volume Growth Program subsidies were functionally available.

167.    By reason of the fraudulent misrepresentations and omissions described above, Plaintiffs have been directly damaged, and will continue to be damaged, from lost retail sales of vehicles and related finance and insurance products, lost profits from vehicle sales, lost profits from the resale of used vehicles which would have been taken in trade on the lost vehicle sales, lost customer goodwill, lost market value as going concerns, lost marketing monies, lost potential future sales of vehicles to repeat customers, and lost profits from warranty and non-warranty sales of service and parts for vehicle owners who tend to have their vehicles serviced at the same dealership where they were purchased. In addition, Plaintiffs have incurred substantial investigative fees, legal fees, and litigation expenses in an amount to be determined.

WHEREFORE, Plaintiffs demand entry of a judgment against FCA for damages, including punitive damages, costs of suit including reasonable attorney's fees, and such other relief as this Court deems just and equitable.

## COUNT VII
### (Negligent Misrepresentation)
### Brought by All Plaintiffs against FCA

168.    Plaintiffs re-affirm, re-allege, and incorporate each allegation and averment in the preceding and succeeding paragraphs as though fully set forth herein.

169.    FCA made representations that (i) were representations of material fact, (ii) were made with negligence in ascertaining the truth of the statements by FCA, (iii) did, in fact, induce Plaintiffs to act in reliance on the trust of the statements by FCA, and (iv) caused Plaintiffs damages including, but not limited to, lost retail sales of vehicles and related finance and insurance products, lost profits from vehicle sales, lost profits from the resale of used vehicles which would have been taken in trade on the lost vehicle sales, lost customer goodwill, lost market value as going concerns, lost marketing monies, lost potential future sales of vehicles to repeat customers, and lost profits from warranty and non-warranty sales of service and parts for vehicle owners who tend to have their vehicles serviced at the same dealership where they were purchased.  In addition, Plaintiffs have incurred substantial investigative fees, legal fees, and litigation expenses in an amount to be determined.

WHEREFORE, Plaintiffs demand entry of a judgment against FCA for damages, costs of suit including reasonable attorney's fees, and such other relief as this Court deems just and equitable.

## COUNT VIII
### (Breach of Franchise Agreements)
### Brought by All Plaintiffs against FCA

170.    Plaintiffs re-affirm, re-allege, and incorporate each allegation and averment in the preceding and succeeding paragraphs as though fully set forth herein.

171.    FCA executed Franchise Agreements with each of the Plaintiffs in exchange for valuable consideration.

172.    Plaintiffs have performed all material obligations under their respective Franchise Agreements at all relevant times.

173.    Pursuant to section 14 of the Franchise Agreements, "[FCA] shall use its best efforts to fill accepted orders for specified [FCA] vehicles, parts and accessories." In the event demand exceeds supply of specified FCA vehicles, "[FCA] has the right to allocate such supply in any reasonable manner [FCA] deems fit in any geographical market."

174.    FCA repeatedly breached section 14 of each of the Franchise Agreements when it failed to use best efforts to allocate vehicles to Plaintiffs, and failed to do so in a reasonable manner.  Instead, FCA allocated vehicles to dealers who were provided price subsidies not functionally available to Plaintiffs, and allocated other vehicles as kickbacks to Conspiring Dealers who were willing to engage in FCA's scheme to falsely report vehicle sales.  This wrongful conduct diverted sales from Plaintiffs and eroded the value of Plaintiffs' businesses.

175.    FCA also failed to exercise its discretion under the Franchise Agreements honestly or in good faith, and has actively circumvented the rights these agreements granted to Plaintiffs and the parties' reasonable expectations thereto.

176.    As above, the Franchise Agreements expressly require FCA to use "best efforts" to sell CDJR vehicles to Plaintiffs, and, when demand exceeds supply, to allocate such vehicles to Plaintiffs in a "reasonable" manner.  The Franchise Agreements also protect Plaintiffs' investments in their dealerships by prohibiting termination by FCA unless specific criteria are met.  Plaintiffs are free from termination on the basis of sales volume so long as they meet a

certain Minimum Sales Responsibility, or MSR, and are given the opportunity to cure any deficiencies.

177.    Section 11 of the Franchise Agreement sets forth the formula for Plaintiffs' Minimum Sales Responsibility:

> [T]he ratio of the number of new [FCA] passenger cars and/or trucks registered in the most recent whole or partial calendar year-to-date period for which registration figures are available in the [FCA] Sales Zone in which DEALER is located to the total number of new passenger cars or, if [FCA] deems it appropriate, the total number of those new passenger cars or trucks which [FCA], in its sole discretion, determines to be competitive with any or all of its passenger cars or trucks so registered in that Zone during the same period. The ratio thus obtained will be applied to the comparable category of the total number of new passenger cars or competitive passenger cars and/or trucks, as appropriate, registered during the same period in Dealer's Sales Locality. . . . If DEALER's Sales Locality is shared by one or more other [FCA] dealer(s) of the same line, DEALER's Minimum Sales Responsibility for such line will be the number of new vehicles DEALER must sell in order to achieve DEALER's fair share of the Minimum Sales Responsibility for all such [FCA] dealers in the Sales Locality. . . . [FCA] will determine DEALER's fair share by assessing the relative importance of DEALER's immediate area of influence as compared with the Sales Locality as a whole.

178.    According to FCA, the Minimum Sales Responsibility metric is purportedly designed to compute the number of new vehicle retail sales necessary for each vehicle line to achieve statewide market share in a given sales zone. This metric, however, is far from a strictly objective mathematical formula. Rather, it is comprised of several critical subjective determinations, each of which FCA controls in its sole discretion.

179.    For example, FCA, and only FCA, may (i) designate the sales zone for each of the Plaintiffs (which could expand the area for which Plaintiffs are responsible); (ii) deem which vehicles are "competitive" with the FCA-brand vehicles sold by Plaintiffs (which could increase the number of vehicles Plaintiffs must sell to meet their Minimum Sales Responsibility baselines); and (iii) apportion Plaintiffs' "fair share" of responsibility among Competing Dealers

in the same sales zone (which could heighten Plaintiffs' burdens to achieve FCA's desired sales volume within a zone comprised of multiple FCA dealers).

180.    FCA has repeatedly abused its discretion dishonestly, unfairly, and in bad faith to inflate each of the Plaintiffs' Minimum Sales Responsibility baselines to arbitrarily high levels, thus frustrating Plaintiffs' bargained-for rights under the Franchise Agreement.  As detailed above, FCA established sales zones far beyond the reasonable reach of Plaintiffs' business. FCA, acting against the independent advice of JD Power and Urban Science, has deemed Luxury Brands to be "competitive" with the vehicles that Plaintiffs sell, further inflating the Minimum Sales Responsibility that FCA asserts Plaintiffs must achieve.  And FCA has assigned Plaintiffs a "fair share" among competing CDJR dealers that fails to take into account the wrongful subsidies, allocations, and kickbacks FCA knowingly provides to dealers in direct competition with Plaintiffs.  FCA's other underhanded and coercive conduct, detailed above and below, further evinces its bad faith and dishonesty in frustrating Plaintiffs' performance.

181.    Plaintiffs reasonably expected that the Franchise Agreements would permit them to fairly compete against other CDJR dealers.  Instead, FCA breached (and continues to breach) the Franchise Agreements when it actively, underhandedly, and dishonestly stacked the deck against Plaintiffs, diverting sales and vehicle allocations that Plaintiffs otherwise would have earned.  FCA's conduct has rendered meaningless Plaintiffs' protections from termination under the Franchise Agreement, eroding the value and threatening the existence of Plaintiffs' businesses, among other injuries including lost retail sales of vehicles and related finance and insurance products, lost profits from vehicle sales, lost profits from the resale of used vehicles which would have been taken in trade on the lost vehicle sales, lost customer goodwill, lost market value as going concerns, lost marketing monies, lost potential future sales of vehicles to

repeat customers, and lost profits from warranty and non-warranty sales of service and parts for vehicle owners who tend to have their vehicles serviced at the same dealership where they were purchased. In addition, Plaintiffs have incurred substantial investigative fees, legal fees, and litigation expenses in an amount to be determined.

182. In addition to injuries Plaintiffs have already sustained, there currently exists a dispute among the parties regarding FCA's Minimum Sales Responsibility methodology, and whether FCA may terminate the Franchise Agreements notwithstanding its conduct frustrating Plaintiffs' performance. The uncertainty regarding this dispute continues to injure Plaintiffs by eroding the value of their businesses and providing FCA means to coerce and cajole Plaintiffs.

183. Plaintiffs would be irreparably harmed if FCA were allowed to terminate the Franchise Agreements, as this action would destroy Plaintiffs' businesses. Termination of the Franchise Agreements would implicate Plaintiffs' interests in real property—namely, the dealership locations themselves.

WHEREFORE, Plaintiffs demand entry of a judgment against FCA for

(a)   Damages resulting from FCA's breaches, in an amount to be determined at trial;

(b)   A declaration that Plaintiffs are not in default of the Franchise Agreements and that FCA has no basis to terminate such Franchise Agreements;

(c)   An injunction barring FCA from terminating the Franchise Agreements;

(d)   An injunction barring FCA from allocating vehicles in any unreasonable manner;

(e)   An injunction barring FCA from determining or setting any component of Minimum Sales Responsibility arbitrarily, discriminatorily, or in bad faith;

(f)     Costs of suit including reasonable attorney's fees; and

(g)     Such other relief as this Court deems just and equitable.

**COUNT IX**
**(Violation of Illinois Motor Vehicle Franchise Act—815 ILCS 710 *et seq.*)**
**Brought by Napleton's Arlington Heights and Napleton's River Oaks against FCA**

184.    Plaintiffs re-affirm, re-allege, and incorporate each allegation and averment in the preceding and succeeding paragraphs as though fully set forth herein.

185.    Napleton's Arlington Heights and Napleton's River Oaks (collectively, the "Illinois Plaintiffs") are each "motor vehicle dealers" as that term is defined under the Illinois Motor Vehicle Franchise Act.

186.    FCA is a "franchiser" as that term is defined under the Illinois Motor Vehicle Franchise Act.

187.    Each of the Franchise Agreements entered into by and between FCA and the respective Illinois Plaintiffs is a "franchise" as that term is defined under the Illinois Motor Vehicle Franchise Act.

188.    Section 710/4(b) of the Illinois Motor Vehicle Franchise Act provides that it is unlawful for a manufacturer and/or distributor, such as FCA, "to engage in any action with respect to a franchise which is arbitrary, in bad faith or unconscionable and which causes damage to any of the parties or to the public."

189.    As set forth in more detail above and below, FCA's conduct with respect to the Illinois Plaintiffs' franchises was arbitrary, in bad faith, and/or unconscionable and caused damage to the Illinois Plaintiffs or to the public.

190.    Section 710/4 further provides, in pertinent part, that it is unlawful for FCA:

(d)(1)   to adopt, change, establish or implement a plan or system for the allocation and distribution of new motor vehicles to motor vehicle

- 50 -

dealers which is arbitrary or capricious or to modify an existing plan so as to cause the same to be arbitrary or capricious;

\*\*\*

(d)(4)  to coerce, or attempt to coerce, any motor vehicle dealer to enter into any agreement with such manufacturer, distributor, wholesaler, distributor branch or division, factory branch or division, or wholesale branch or division, or officer, agent or other representative thereof, or to do any other act prejudicial to the dealer by threatening to reduce his allocation of motor vehicles or cancel any franchise or any selling agreement existing between such manufacturer, distributor, wholesaler, distributor branch or division, or factory branch or division, or wholesale branch or division, and the dealer. . . .

\*\*\*

(e)(2)  to offer to sell or lease, or to sell or lease, any new motor vehicle to any motor vehicle dealer at a lower actual price therefor than the actual price offered to any other motor vehicle dealer for the same model vehicle similarly equipped or to utilize any device including, but not limited to, sales promotion plans or programs which result in such lesser actual price or fail to make available to any motor vehicle dealer any preferential pricing, incentive, rebate, finance rate, or low interest loan program offered to competing motor vehicle dealers in other contiguous states;

(e)(3)  to offer to sell or lease, or to sell or lease, any new motor vehicle to any person, except a wholesaler, distributor or manufacturer's employees at a lower actual price therefor than the actual price offered and charged to a motor vehicle dealer for the same model vehicle similarly equipped or to utilize any device which results in such lesser actual price . . .

191.    FCA's actions amount to a wrongful preferential pricing scheme prohibited under 815 ILCS 710/4(e)(2)-(3).  Specifically, the Volume Growth Program and the wrongful scheme to falsify NVDRs of Competing Dealers were each devices, subsidies, and/or sales promotion plans that resulted in FCA selling and/or leasing new vehicles of the same model to other dealers and persons for a lesser (or subsidized) actual price than FCA sold or leased such vehicles to the Illinois Plaintiffs.

- 51 -

192.    Also as a result of these schemes, FCA unlawfully adopted, implemented, or modified a plan or system for the allocation and distribution of new motor vehicles to the Illinois Plaintiffs which is or has become arbitrary and capricious.  FCA allocated vehicles to dealers who were provided price subsidies not functionally available to Illinois Plaintiffs, and allocated other vehicles as kickbacks to Conspiring Dealers who were willing to engage in FCA's scheme to falsely report vehicle sales.  This wrongful conduct diverted sales from Illinois Plaintiffs and eroded the value of the Illinois Plaintiffs' businesses.  In furtherance of FCA's schemes, FCA also coerced or attempted to coerce the Illinois Plaintiffs into entering into an agreement to falsify NVDRs and subsequently back out those reports in exchange for advertising and/or co-op monies and favorable allocations, acts that were or would have been prejudicial to the Illinois Plaintiffs, by threatening to reduce the Illinois Plaintiffs' allocation of motor vehicles via its withholding of favorable vehicle allocations from Illinois Plaintiffs if they did not acquiesce to FCA's coercive demands.

193.    In addition, FCA has unlawfully imposed unreasonable restrictions on the Illinois Plaintiffs' assertion of legal or equitable rights, thereby violating 815 ILCS 710/7.

194.    FCA conducts an incentive program called the Customer First Award for Excellence (the "Customer First Program").  Generally, dealers are eligible when they meet objective and subjective criteria based on customer satisfaction, facility evaluations, and completed sales training.

195.    The Customer First Program provides important marketing benefits for dealers, including recognition on FCA websites, designation on "Find a Dealer" pages, press release material, and the dealer's ability to use the Customer First Program logo in its marketing.

196.    In 2016, FCA wrongfully promulgated rules that disqualify any participant from the Customer First Program who "engages in litigation with FCA US during the certification period," and further provides that any dealer engaging in litigation "will have its certification withdrawn and will be disqualified from receiving all further recognition and events relating to the certification."

197.    This unreasonable restriction on the Illinois Plaintiffs' rights to assert their legal and equitable rights has no rational connection to the sales, facility, and training goals the program is designed to incentivize.

198.    Each of FCA's wrongful actions resulted in damage to Illinois Plaintiffs, including but not limited to lost retail sales of vehicles and related finance and insurance products, lost profits from vehicle sales, lost profits from the resale of used vehicles which would have been taken in trade on the lost vehicle sales, lost customer goodwill, lost market value as going concerns, lost marketing monies, lost potential future sales of vehicles to repeat customers, and lost profits from warranty and non-warranty sales of service and parts for vehicle owners who tend to have their vehicles serviced at the same dealership where they were purchased.  In addition, Illinois Plaintiffs have incurred substantial investigative fees, legal fees, and litigation expenses in an amount to be determined.  If allowed to continue, FCA's actions will result in further loss of the Illinois Plaintiffs' money or property.

199.    Each of FCA's wrongful actions were and are willful and wanton.

WHEREFORE, pursuant to 815 ILCS 710/4, 815 ILCS 710/7, and 815 ILCS 710/13, the Illinois Plaintiffs demand entry of a judgment against FCA for

(a)    Treble damages in an amount to be determined at trial;

(b)      An injunction restraining FCA from engaging or continuing to engage in the unfair methods of competition or deceptive acts or practices declared unlawful under 815 ILCS 710/4 or 815 ILCS 710/7;

(c)      A declaration that the incentive plan provision conditioning eligibility on whether a dealer is in active litigation is unlawful, null, void, and of no legal effect;

(d)      An injunction barring FCA from implementing or enforcing any provision purporting to restrict the Illinois Plaintiffs' right to bring a lawsuit against FCA;

(e)      An injunction barring FCA from implementing the Volume Growth Program or any similar program;

(f)      An injunction barring FCA from falsifying sales reports or taking any steps in furtherance of any such scheme;

(g)      Costs of suit including reasonable attorney's fees; and

(h)      Such other relief as this Court deems just and equitable.

**COUNT X**
**(Violations of Florida Automobile Dealers Act—Section 320.64, Florida Statutes)**
**<u>Brought by Napleton's Clermont, Napleton's Northlake,</u>**
**<u>and Napleton's South Orlando against FCA</u>**

200.    Plaintiffs re-affirm, re-allege, and incorporate each allegation and averment in the preceding and succeeding paragraphs as though fully set forth herein.

201.    FCA is a "licensee" as that term is defined under Sections 320.60-320.70, Florida Statutes (the "Florida Automobile Dealers Act").

202.    Each of Plaintiffs Napleton's Clermont, Napleton's Northlake, and Napleton's South Orlando (collectively, the "Florida Plaintiffs") are "licensed motor vehicle dealers" as that term is defined under the Florida Automobile Dealers Act.

203.    The Franchise Agreements entered into by and between FCA and each of the Florida Plaintiffs are each "franchise agreements" of licensed motor vehicle dealers under the Florida Automobile Dealers Act.

204.    Section 320.64 of the Florida Automobile Dealers Act, in pertinent part, provides a licensee is prohibited from committing the following acts, among others:

> (4)    The applicant or licensee has indulged in any illegal act relating to his or her business.
>
> ***
>
> (6)    The applicant or licensee has coerced or attempted to coerce any motor vehicle dealer to enter into any agreement with the licensee.
>
> ***
>
> (18)    The applicant or licensee has established a system of motor vehicle allocation or distribution or has implemented a system of allocation or distribution of motor vehicles to one or more of its franchised motor vehicle dealers which reduces or alters allocations or supplies of new motor vehicles to the dealer to achieve, directly or indirectly, a purpose that is prohibited by ss. 320.60-320.70, or which otherwise is unfair, inequitable, unreasonably discriminatory, or not supportable by reason and good cause after considering the equities of the affected motor vehicles dealer or dealers.

205.    FCA has violated each of these express statutory demands, and, in each case, FCA's acts will, can, or have adversely and pecuniarily affected each of the Florida Plaintiffs.

206.    As set forth in detail above, FCA has committed wire and mail fraud, in addition to other illegal activities, by engaging in a scheme to falsify and inflate the reports of new vehicle sales in Florida and elsewhere.

207.    Furthermore, as set forth in detail above, in furtherance of its scheme to falsify sales reports, FCA attempted to coerce the Florida Plaintiffs into entering into an agreement to falsify NVDRs and subsequently back out such NVDRs in exchange for advertising and/or co-op monies and favorable allocations.

208.    FCA has also unlawfully established a system for the allocation and distribution of motor vehicles to the Florida Plaintiffs which is unfair, inequitable, unreasonably discriminatory, or not supportable by reason and good cause after considering the equities of the Florida Plaintiffs.  FCA allocated vehicles to dealers who were provided price subsidies not functionally available to Florida Plaintiffs, and allocated other vehicles as kickbacks to Conspiring Dealers who were willing to engage in FCA's scheme to falsely report vehicle sales. This wrongful conduct diverted sales from Florida Plaintiffs and eroded the value of florida Plaintiffs' businesses.

209.    Each of FCA's wrongful actions resulted in damage to the Florida Plaintiffs, including but not limited to lost retail sales of vehicles and related finance and insurance products, lost profits from vehicle sales, lost profits from the resale of used vehicles which would have been taken in trade on the lost vehicle sales, lost customer goodwill, lost market value as going concerns, lost marketing monies, lost potential future sales of vehicles to repeat customers, and lost profits from warranty and non-warranty sales of service and parts for vehicle owners who tend to have their vehicles serviced at the same dealership where they were purchased.  In addition, the Florida Plaintiffs have incurred substantial investigative fees, legal fees, and litigation expenses in an amount to be determined.  If allowed to continue, FCA's actions will result in further loss of the Florida Plaintiffs' money or property.

210. FCA has also violated Section 320.64(7) of the Florida Automobile Dealers Act with respect to Napleton's Northlake and Napleton's South Orlando, and its conduct will or can adversely and pecuniarily affect these dealerships. Section 320.64(7) provides that FCA shall not "threaten[] to discontinue, cancel, or not to renew a franchise agreement of a licensed motor vehicle dealer, where the threatened discontinuation, cancellation, or nonrenewal, if implemented, would be in violation of the provisions of s. 320.641." Section 320.641(3) of the Act, in turn, bars licensees from initiating any "unfair" termination, cancellation, or nonrenewal, defining "unfair" to mean:

> if it is not clearly permitted by the franchise agreement; is not undertaken in good faith; is not undertaken for good cause; or is based on an alleged breach of the franchise agreement which is not in fact a material and substantial breach; or, if the grounds relied upon for termination, cancellation, or nonrenewal have not been applied in a uniform and consistent manner by the licensee.

211. FCA engaged in bad faith conduct with respect to Napleton's Northlake and Napleton's South Orlando, routinely threatening to terminate the Franchise Agreements for these dealerships. FCA has repeatedly made these threats and has done so in writing no fewer than four (4) times against Napleton's Northlake (on January 3, 2014; December 29, 2014; July 24, 2015; and November 4, 2015) and at least twice against Napleton's South Orlando (June 17, 2015 and November 4, 2015). These threats are based on FCA's allegations that Napleton's Northlake and Napleton's South Orlando have failed to meet one-hundred percent (100%) of the Minimum Sales Responsibility metric set by FCA, and that Napleton's Northlake's dealership facilities are purportedly in need of "urgent" repair.

212. The Franchise Agreements, however, do not specify a particular Minimum Sales Responsibility baseline for Napleton's Northlake or Napleton's South Orlando to achieve. FCA has vested itself with discretion to set the significant components of Minimum Sales

Responsibility, including these dealerships' respective sales zones, competitive markets, and "fair shares" of sales responsibility among other dealers in their respective sales zones.

213.    As detailed above, FCA has repeatedly abused its discretion dishonestly, unfairly, and in bad faith to inflate the Minimum Sales Responsibility for Napleton's Northlake and Napleton's South Orlando to unachievable levels, thus frustrating these dealerships' bargained-for rights under the Franchise Agreement, and manufacturing a basis to threaten them with termination.  As detailed above, FCA established sales zones far beyond the reasonable reach of these dealerships' businesses.  FCA, acting against the advice of Urban Science, has deemed Luxury Brands to be "competitive" with the vehicles that these dealerships sell, further inflating their Minimum Sales Responsibility baselines.  And FCA has assigned these dealerships a "fair share" among competing CDJR dealers that fails to take into account the wrongful subsidies, allocations, and kickbacks FCA knowingly provides to dealers in direct competition with Napleton's Northlake and Napleton's South Orlando.  FCA's other underhanded and coercive conduct, detailed above and below, further evinces its bad faith and dishonesty in frustrating these dealerships' performance, and thereafter wrongfully threatening termination.

214.    Moreover, Napleton's Northlake undertook to renovate its dealership facility, having no obligation to do so as a direct result of the bad faith coercive conduct of FCA. Notwithstanding that FCA has acknowledged the fact that it has undertaken improvements to its facility, it has done nothing to account for these facts in setting Minimum Sales Responsibility, and its threats of termination continue unabated.

215.    FCA's threats of termination are not in good faith or for good cause and have not been applied in a uniform and consistent manner by FCA.

216. Because the termination threatened by FCA violates section 320.641, Florida Statutes, FCA's threat constitutes a violation of section 320.64(7) of the Florida Automobile Dealers Act.

217. As a result of FCA's illegal conduct, Napleton's Northlake and Napleton's South Orlando have already suffered damages including, but not limited to, lost market value as going concerns. In addition, Florida Plaintiffs have incurred substantial investigative fees, legal fees, and litigation expenses in an amount to be determined. These dealerships will each suffer further irreparable harm if FCA is permitted to terminate their Franchise Agreements.

WHEREFORE, pursuant to sections 320.695 and 320.697 of the Florida Automobile Dealers Act, the Florida Plaintiffs demand entry of a judgment against FCA for:

(a) Treble damages in an amount to be determined at trial;

(b) A declaration that the Florida Plaintiffs are not in default of their Franchise Agreements and that FCA has no basis to terminate their Franchise Agreements;

(c) An injunction barring FCA from terminating or threatening termination of the Franchise Agreements for the Florida Plaintiffs;

(d) An injunction barring FCA from determining or setting any component of Minimum Sales Responsibility arbitrarily, discriminatorily, or otherwise in bad faith;

(e) Costs of suit including reasonable attorney's fees; and

(f) Such other relief as this Court deems just and equitable.

## COUNT XI
### (Violations of the Missouri Motor Vehicle Franchise
### Practice Act—MO. Rev. Stat. § 407.825)
### Brought by Napleton's Mid Rivers against FCA

218.　Plaintiffs re-affirm, re-allege, and incorporate each allegation and averment in the preceding and succeeding paragraphs as though fully set forth herein.

219.　FCA and Napleton's Mid Rivers, a dealership located in Missouri, are parties to a Franchise Agreement, which is a "franchise" or "franchise agreement" as defined under the Missouri Motor Vehicle Franchise Practice Act or "MVFPA" (MO. Rev. Stat. § 407.810, *et seq*.).　FCA is a franchisor that, on information and belief, obtained or renewed its license after August 28, 2010.　Napleton's Mid Rivers is a franchisee under the MVFPA.

220.　Section 407.825(1) of the MVFPA provides that it is unlawful for a franchisor such as FCA "[t]o engage in any conduct which is capricious or not in good faith or unconscionable and which causes damage to a motor vehicle franchisee or to the public . . . "　As set forth in more detail above and below, FCA unlawfully engaged in conduct that was capricious or in bad faith or unconscionable, and this conduct caused damage to Napleton's Mid Rivers or to the public.

221.　Section 407.825 further provides that it is unlawful for FCA to commit the following acts:

> (9)　To impose unreasonable standards of performance upon a motor vehicle franchisee or to require, attempt to require, coerce or attempt to coerce a franchisee to adhere to performance standards that are not applied uniformly to other similarly situated franchisees.

> (18)　To fail or refuse to offer to sell to all franchisees for a line-make reasonable quantities of every motor vehicle sold or offered for sale to any franchisee of that line-make.

(28)    To fail to make practically available any incentive, rebate, bonus, or other similar benefit to a franchisee that is offered to another franchisee of the same line-make within this state.

(32)    Offering rebates, cash incentives, or other promotional items for the sale of a vehicle by its franchisees unless: the same rebate, cash incentive, or promotion is offered to all of its franchisees of the same line-make; and any rebate, cash incentive, or promotion that is based on the sale of an individual vehicle is not increased for meeting a performance standard.

(33)    Unreasonably discriminating among its franchisees in any program that provides assistance to its franchisees, including internet listings, sales leads, warranty policy adjustments, marketing programs, and dealer recognition programs.

(40)    Establishing any performance standard or program for measuring franchisee performance that may have a material impact on a franchisee that is not fair, reasonable, and equitable, or applying any such standard or program to a franchisee in a manner that is not fair, reasonable, and equitable.

(41)    Establishing or implementing a plan or system for the allocation, scheduling, or delivery of new motor vehicles, parts, or accessories to its franchisees that is not fair, reasonable, and equitable or modifying an existing plan or system so as to cause the plan or system to be unreasonable, unfair, or inequitable.

222.    FCA has violated each of these express statutory demands.

223.    The Volume Growth Program, as designed and as applied, imposes unreasonable standards of performance on Napleton's Mid Rivers. The Volume Growth Program has a material impact on Napleton's Mid Rivers and is a performance standard or program for measuring franchisee performance that is not fair, reasonable, and equitable.

224.    The Volume Growth Program unlawfully offers incentives and promotional benefits to franchisees by increasing the incentives and benefits that franchisees can receive based on meeting a performance standard set by FCA. Moreover, due to the arbitrary nature of the Volume Growth Program targets and discriminatory and punitive nature of the Clawback

Penalty, FCA has required and continues to require Napleton's Mid Rivers to adhere to performance standards in the Volume Growth Program that FCA does not set uniformly among similarly situated dealers.

225.     FCA's wrongful and fraudulent scheme to solicit and cause Conspiring Dealers to falsify NVDRs in exchange for providing Conspiring Dealers monies and allocations of high-demand vehicles also violates the MVFPA.  As a result of FCA's unlawful Volume Growth Program and false reporting schemes, FCA has failed to make practically available incentives, rebates, bonuses, or other similar benefits to Napleton's Mid Rivers that it has made to other franchisees of the same line-make within Missouri.  Also as a result of these schemes, FCA (i) failed or refused to offer to sell to Napleton's Mid Rivers reasonable quantities of every motor vehicle it sold or offered for sale to any franchisee of FCA; (ii) unreasonably discriminated among its franchisees in programs providing assistance to franchisees (including advertising and co-op support programs); and (iii) established or implemented a plan or system for the allocation of new motor vehicles that is not fair, reasonable, and equitable.

226.     Moreover, the Minimum Sales Responsibility metric is a performance standard that—if not met—may have a material impact on Napleton's Mid Rivers, and violates several prohibitions in the MVFPA.  FCA has repeatedly abused its discretion dishonestly, unfairly, and in bad faith to inflate Napleton's Mid Rivers' Minimum Sales Responsibility baseline to arbitrarily high levels.  As detailed above, FCA established unreasonable sales zones; has deemed Luxury Brands to be "competitive" with the vehicles that Napleton's Mid Rivers sells; and assigned Napleton's Mid Rivers a "fair share" among competing CDJR dealers that fails to take into account the wrongful subsidies, allocations, and kickbacks FCA knowingly provides to its Competing Dealers.  FCA's other underhanded and coercive conduct, detailed above and

below, further evinces its bad faith and dishonesty in imposing an unreasonable performance standard or program for measuring Napleton's Mid Rivers' performance that it also fails to apply uniformly to all similarly situated franchisees.

227.    In addition, FCA has imposed unreasonable restrictions on Napleton's Mid Rivers' ability to assert legal or equitable rights.

228.    FCA conducts an incentive program called the Customer First Award for Excellence (the "Customer First Program").   Generally, dealers are eligible when they meet objective and subjective criteria based on customer satisfaction, facility evaluations, and completed sales training.

229.    The Customer First Program provides important marketing benefits for dealers, including recognition on FCA US brand websites, designation on "Find a Dealer" pages, press release material, and the dealer's ability to use the Customer First Program logo in its marketing.

230.    In 2016, FCA wrongfully promulgated rules that disqualify any participant from the Customer First Program who "engages in litigation with FCA US during the certification period," and further provides that any dealer engaging in litigation "will have its certification withdrawn and will be disqualified from receiving all further recognition and events relating to the certification."

231.    This unreasonable restriction on Napleton's Mid Rivers' rights to assert its legal and equitable rights has no rational connection to the sales, facility, and training goals the program is designed to incentivize.

232.     Each of FCA's wrongful actions resulted in damage to Napleton's Mid Rivers, including but not limited to lost retail sales of vehicles and related finance and insurance products, lost profits from vehicle sales, lost profits from the resale of used vehicles which would

have been taken in trade on the lost vehicle sales, lost customer goodwill, lost market value as going concerns, lost marketing monies, lost potential future sales of vehicles to repeat customers, and lost profits from warranty and non-warranty sales of service and parts for vehicle owners who tend to have their vehicles serviced at the same dealership where they were purchased. In addition, Plaintiff has incurred substantial investigative fees, legal fees, and litigation expenses in an amount to be determined. If allowed to continue, FCA's actions will result in further loss of Plaintiff's money or property.

233. Each of FCA's wrongful actions were and are willful.

234. In addition, FCA willfully violated a "franchise" as that term is defined under the MVFPA when it breached its Franchise Agreement with Napleton's Mid Rivers through its actions and omissions, as detailed above. Pursuant to section 407.835 of the MVPFA, Napleton's Mid Rivers is entitled to actual damages, injunctive relief, and expenses of litigation (including attorney's fees) where FCA is liable for damages resulting from a violation of a franchise, and may be awarded punitive damages for any willful violation.

WHEREFORE, pursuant to section 407.835 of the MVFPA, Plaintiff Napleton's Mid Rivers demands entry of a judgment against FCA for:

(a) Damages in an amount to be determined at trial;

(b) Punitive damages in an amount to be determined at trial;

(c) An injunction restraining FCA from engaging or continuing to engage in the unfair methods of competition or deceptive acts or practices declared unlawful under the MVFPA;

(d)     A declaration that the incentive plan provision conditioning eligibility on whether a dealer is in active litigation is unlawful, null, void, and of no legal effect;

(e)     An injunction barring FCA from implementing or enforcing any provision purporting to restrict Plaintiff's right to bring a lawsuit against FCA;

(f)     An injunction barring FCA from implementing the Volume Growth Program or any similar program;

(g)     An injunction barring FCA from falsifying sales reports or taking any steps in furtherance of any such scheme;

(h)     An injunction barring FCA from setting any component of Minimum Sales Responsibility in any unreasonable manner;

(i)     Costs of suit including reasonable attorney's fees; and

(j)     Such other relief as this Court deems just and equitable.

## COUNT XII
### (Violations of the Pennsylvania Board of Vehicles Act—63 P.S. § 818.12)
### Brought by Napleton's Ellwood City against FCA

235.    Plaintiffs re-affirm, re-allege, and incorporate each allegation and averment in the preceding and succeeding paragraphs as though fully set forth herein.

236.    Plaintiff Napleton's Ellwood City is a new vehicle dealer under the Pennsylvania Board of Vehicles Act ("Board of Vehicles Act," 63 P.S. § 818.1 *et seq*.).

237.    FCA is a manufacturer and/or distributor as those terms are defined under the Board of Vehicles Act.

238.    FCA and Napleton's Ellwood City, a dealership located in Pennsylvania, are parties to a Franchise Agreement, which is a "franchise" as that term is defined under the Board of Vehicles Act.

239.    Section 818.12(b) of the Board of Vehicles Act provides that it shall be a violation for any manufacturer, distributor, field representative, officer, agent, or any representative whatsoever to:

> (12)    Operate a system for the allocation of new vehicles which is not reasonable or fair to a new vehicle dealer; [or]
>
> ***
>
> (18)    Vary the price charged to any of its new vehicle dealers, which has the effect of causing a difference in the price of any similarly equipped new vehicle to its new vehicle dealers or to the ultimate purchaser. This paragraph shall not be construed to prevent the offering of incentive programs or other discounts if the incentive or discounts are available to all competing new vehicle dealers of the same line-make in this Commonwealth on a proportionately equal basis.

240.    FCA has violated both of these express statutory commands.  As detailed above, the Volume Growth Program has the effect of causing a difference in the price of any similarly equipped new vehicle to new vehicle dealers or to the ultimate purchaser, to the detriment of Napleton's Ellwood City.  The Volume Growth Program is not functionally or actually available to all competing new dealers on a proportionately equal basis.

241.    Moreover, FCA has unlawfully operated a system for the allocation of new vehicles which is not reasonable or fair to Napleton's Ellwood City.  FCA allocated vehicles to dealers who were provided price subsidies not functionally available to Napleton's Ellwood City, and allocated other vehicles as kickbacks to Conspiring Dealers who were willing to engage in

FCA's scheme to falsely report vehicle sales. This wrongful conduct diverted sales from Plaintiff and eroded the value of Plaintiff's business.

242. Each of FCA's wrongful actions resulted in damage to Napleton's Ellwood City, including but not limited to lost retail sales of vehicles and related finance and insurance products, lost profits from vehicle sales, lost profits from the resale of used vehicles which would have been taken in trade on the lost vehicle sales, lost customer goodwill, lost market value as going concerns, lost marketing monies, lost potential future sales of vehicles to repeat customers, and lost profits from warranty and non-warranty sales of service and parts for vehicle owners who tend to have their vehicles serviced at the same dealership where they were purchased. In addition, Plaintiff has incurred substantial investigative fees, legal fees, and litigation expenses in an amount to be determined. If allowed to continue, FCA's actions will result in further loss of Plaintiff's money or property.

WHEREFORE, pursuant to sections 818.12 and 818.29 of the Pennsylvania Board of Vehicles Act, Plaintiff Napleton's Ellwood City demands entry of a judgment against FCA for:

(a) Damages in an amount to be determined at trial;

(b) An injunction restraining FCA from engaging or continuing to engage in the unfair methods of competition or deceptive acts or practices declared unlawful under 63 P.S. § 812.12;

(c) An injunction barring FCA from implementing the Volume Growth Program or any similar program;

(d) An injunction barring FCA from falsifying sales reports or taking any steps in furtherance of any such scheme;

(e) Costs of suit including reasonable attorney's fees; and

(f)     Such other relief as this Court deems just and equitable.

## COUNT XIII
### (Fraud in the Inducement)
**Brought by Napleton's Arlington Heights against FCAR**

243.    Plaintiffs re-affirm, re-allege, and incorporate each allegation and averment in the preceding and succeeding paragraphs as though fully set forth herein.

244.    Plaintiff Napleton's Arlington Heights acquired substantially all of the assets of that CDJR new and used motor vehicle sales and service facility commonly referred to as Advantage Chrysler Jeep Dodge, located at 77 Rand Road, Des Plaines, Illinois 60005 (the "Dealership Location").  Napleton's Arlington Heights subleased the Dealership Location from FCAR and occupied the Dealership Location in connection with its business operations as the successor franchisee.

245.    In connection with its occupancy of the Dealership Location, Napleton's Arlington Heights made certain repairs to the Dealership Property including, but not limited to, replacing cracked tile, broken glass, and approximately seventy-eight (78) lighting fixtures in the parking lot of the Dealership Location (hereinafter collectively referred to as "Dealership Repairs").

246.    At no time was Napleton's Arlington Heights legally obligated to make such repairs.  Rather, FCAR fraudulently induced Napleton's Arlington Heights to make the subject repairs based upon FCAR's representations, upon which Napleton's Arlington Heights relied, that it would be fully reimbursed for all of its out-of-pocket expenses in connection with the Dealership Repairs including, but not limited to, the replacement of the approximately seventy-eight (78) lighting fixtures.

- 68 -

247.    Napleton's Arlington Heights had no legal obligation to make any of the Dealership Repairs.

248.    The foregoing representations made by FCAR that Napleton's Arlington Heights would be reimbursed for its out-of-pocket expenses for the Dealership Repairs (i) were representations of fact, (ii) were false and material, (iii) were made with FCAR's knowledge of its falsity or with reckless disregard of whether same was true or false, (iii) were made by FCAR with the intent that it should be acted upon by Napleton's Arlington Heights; and (iv) upon which Napleton's Arlington Heights justifiably relied thereupon.

249.    FCAR engaged in a scheme to defraud and, in furtherance thereof, made misrepresentations with the intent to induce Napleton's Arlington Heights to rely upon those misrepresentations.  FCAR's misrepresentations deceived Napleton's Arlington Heights, which relied upon FCAR's foregoing statements of fact to its detriment.

        WHEREFORE, Plaintiff Napleton's Arlington Heights demands entry of a judgment against FCAR for damages, costs of suit including reasonable attorney's fees, punitive damages, and such other relief as this Court deems just and equitable.

### COUNT XIV
### (Quantum Meruit)
### Brought by Napleton's Arlington Heights against FCAR

250.    Plaintiffs re-affirm, re-allege, and incorporate each allegation and averment in the preceding and succeeding paragraphs as though fully set forth herein.

251.    Plaintiff Napleton's Arlington Heights performed the Dealership Repairs for the benefit of FCAR.  The Dealership Repairs were not gratuitous, and FCAR accepted the Dealership Repairs.  No contract existed between Plaintiff, Napleton's Arlington Heights, and FCAR for the payment of the Dealership Repairs.

252. It would be unjust to permit FCAR to retain the benefits of the Dealership Repairs, and Plaintiff Napleton's Arlington Heights is entitled to the reasonable value of the work performed.

WHEREFORE, Plaintiff Napleton's Arlington Heights demands entry of a judgment against FCAR for damages, costs of suit including reasonable attorney's fees, and such other relief as this Court deems just and equitable.

## Jury Trial Demand

Plaintiff hereby demands trial by jury of all matters so triable.

Dated: March 4, 2016

Respectfully submitted,

Napleton's Arlington Heights Motors, Inc.
Napleton's River Oaks Motors, Inc.
Clermont Motors, LLC
Napleton's North Palm Auto Park, Inc.
Napleton Enterprises, LLC
Napleton's Mid Rivers Motors, Inc.
Napleton's Ellwood Motors, Inc.

By: /s/ David C. Gustman
David C. Gustman (ARDC #3124377)
Jeffery M. Cross (ARDC #547980)
Alexander Vesselinovitch (ARDC #3122893)
Dylan Smith (ARDC #6298703)
David J. Ogles (ARDC #6309823)
Freeborn & Peters LLP
311 S. Wacker Drive, Suite 3000
Chicago, IL  60606
(312) 360-6000
dgustman@freeborn.com
jcross@freeborn.com
avesselinovitch@freeborn.com
dsmith@freeborn.com
dogles@freeborn.com

Kevin M. Hyde (ARDC #6286452)
Assistant General Counsel
Napleton Auto Group
1 E. Oak Hill Drive, Suite 100
Westmont, IL  60559
(630) 530-3955
kevin@napleton.com

Leonard A. Bellavia
Steven H. Blatt
Bellavia Blatt & Crossett, P.C.
200 Old County Road
Mineola, NY  11501
(516) 783-3000
(PRO HAC VICE)