**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| NAPLETON'S ARLINGTON HEIGHTS MOTORS, INC. f/k/a NAPLETON'S PALATINE MOTORS, INC. d/b/a NAPLETON'S ARLINGTON HEIGHTS CHRYSLER DODGE JEEP RAM, an Illinois corporation; NAPLETON'S RIVER OAKS MOTORS, INC. d/b/a NAPLETON'S RIVER OAKS CHRYSLER DODGE JEEP RAM, an Illinois corporation; CLERMONT MOTORS, LLC d/b/a NAPLETON'S CLERMONT CHRYSLER DODGE JEEP RAM, an Illinois limited liability company; NAPLETON'S NORTH PALM AUTO PARK, INC. d/b/a NAPLETON'S NORTHLAKE CHRYSLER DODGE JEEP RAM, an Illinois corporation; NAPLETON ENTERPRISES, LLC d/b/a NAPLETON'S SOUTH ORLANDO CHRYSLER DODGE JEEP RAM, an Illinois limited liability company; NAPLETON'S MID RIVERS MOTORS, INC. d/b/a NAPLETON'S MID RIVERS CHRYSLER DODGE JEEP RAM, an Illinois corporation; NAPLETON'S ELLWOOD MOTORS, INC. d/b/a NAPLETON'S ELLWOOD CHRYSLER DODGE JEEP RAM, an Illinois corporation, | Case No. 1:16-cv-00403-VMK-SMF |
| Plaintiffs, | |
| v. | |
| FCA US LLC, a Delaware corporation, and FCA REALTY LLC, a Delaware limited liability corporation, f/k/a CHRYSLER GROUP REALTY COMPANY LLC, | |
| Defendants. | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**

## TABLE OF CONTENTS

INTRODUCTION ...........................................................................................................................1

SUMMARY OF ALLEGATIONS ...............................................................................................2

A.   Parties ................................................................................................................................2

B.   Allegations Against FCA ..................................................................................................3

ARGUMENT ..................................................................................................................................3

A.   Governing Law ..................................................................................................................3

B.   Plaintiffs' Civil RICO Claims Should be Dismissed (Counts IV and V)................4

    1.   Plaintiffs Have Failed to Sufficiently Allege "Racketeering Activity" .......5

    2.   Plaintiffs Have Failed to Sufficiently Allege that FCA Conducted the Affairs of a RICO Enterprise ................................................................7

    3.   Plaintiffs Have Failed to Allege a "Pattern" of Racketeering Activity .......9

    4.   Plaintiffs Lack Standing to Pursue a RICO Claim....................................11

C.   Plaintiffs' Antitrust Claims Should Be Dismissed (Counts II and III) .................12

D.   Plaintiffs' Automobile Dealers' Day in Court Act Claim Should Be Dismissed (Count I)................................................................................................16

E.   Plaintiffs' Breach of Contract Claim Should Be Dismissed (Count VIII)............17

F.   Plaintiffs' Common Law Fraud and Negligent Misrepresentation Claims Should Be Dismissed (Counts VI-VII) ...........................................................18

G.   Plaintiffs' Claims Under State Motor Vehicle Franchise and Dealer Acts Should Be Dismissed (Counts IX-XII) ...........................................................20

H.   Plaintiff Arlington Heights' Fraud in the Inducement and Quantum Meruit Claims Against FCAR Should Be Dismissed (Counts XIII and XIV) .............................24

CONCLUSION.............................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*188 LLC v. Trinity Indus., Inc.*,
  300 F.3d 730 (7th Cir. 2002) ....................................................................................2

*Amakua Dev. LLC v. Warner*,
  411 F. Supp. 2d 941 (N.D. Ill. 2006) ......................................................................18

*American Med. Ass'n v. 3Lions Publ'g, Inc.*,
  2015 WL 1399038 (N.D. Ill. Mar. 25, 2015).............................................................9

*Anza v. Ideal Steel Supply Co.*,
  547 U.S. 451 (2006)................................................................................................11

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ....................................................................................... *passim*

*Bachman v. Bear, Stearns & Co.*,
  178 F.3d 930 (7th Cir. 1999) ....................................................................................8

*Bell Atlantic Co. v. Twombly*,
  550 U.S. 544 (2007) ....................................................................................... *passim*

*Borich v. BP, P.L.C.*,
  904 F. Supp. 2d 855 (N.D. Ill. 2012) .....................................................................6, 9

*Boyle v. United States*,
  556 U.S. 938 (2009)...................................................................................................8

*Cabriolet Porsche Audi, Inc. v. American Honda Motor Co.*,
  773 F.2d 1193 (11th Cir. 1985) ..............................................................................22

*Cash & Henderson Drugs, Inc. v. Johnson & Johnson*,
  799 F.3d 202 (2d Cir. 2015)....................................................................................14

*Copans Motors, Inc. v. Porsche Cars N. Am., Inc.*,
  2014 WL 2612308 (S.D. Fla. June 11, 2014) .........................................................22

*Crest Auto Supplies, Inc. v. Ero Mfg. Co.*,
  360 F.2d 896 (7th Cir. 1966) ..................................................................................13

*DBI Invs., LLC v. Blavin*,
  617 F. App'x 374 (6th Cir. 2015) ...........................................................................19

*Dynegy Mktg. & Trade v. Multiut Corp.*,
    648 F.3d 506 (7th Cir. 2011) ............................................................... 14

*Ed Houser Enterprises v. Gen. Motors Corp.*,
    595 F.2d 366 (7th Cir. 1978) ............................................................... 16

*Fidelity Nat. Title Ins. Co. of New York v. Intercounty Nat. Title Ins. Co.*,
    412 F.3d 745 (7th Cir. 2005) ................................................................. 4

*Fitzgerald v. Chrysler*,
    116 F.3d 225 (7th Cir. 1997) ............................................................ 5, 8

*Ford Motor Co. v. Ghreiwati Auto*,
    945 F. Supp. 2d 851 (E.D. Mich. 2013) ............................................... 19

*Gamboa v. Velez*,
    457 F.3d 703 (7th Cir. 2006) ............................................................ 4, 9

*General Motors Corp. v. MAC Co.*,
    247 F. Supp. 723 (D. Colo. 1965) .................................................. 17, 18

*Goode v. PennyMac Loan Servs., LLC*,
    2014 WL 6461689 (N.D. Ill. Nov. 18, 2014) ........................................ 24

*Goodloe v. National Wholesale Co.*,
    2004 WL 1631728 (N.D. Ill. July 19, 2004) ..................................... 13, 14

*Goren v. New Vision Intern., Inc.*,
    156 F.3d 721 (7th Cir. 1998) ................................................................. 6

*Greenberger v. GEICO Gen. Ins. Co.*,
    631 F.3d 392 (7th Cir. 2011) ............................................................... 18

*Guaranteed Rate, Inc. v. Barr*,
    912 F. Supp. 2d 671 (N.D. Ill. 2012) .......................................... *passim*

*H.J. Inc. v. Nw. Bell Tel. Co.*,
    492 U.S. 229 (1989) ............................................................................. 9

*Holmes v. Sec. Inv'r Prot. Corp.*,
    503 U.S. 258 (1992) ........................................................................... 12

*House of Brides, Inc. v. Alfred Angelo, Inc.*,
    2014 WL 64657 (N.D. Ill. Jan. 8, 2014) .............................................. 13

*Hubbard Chevrolet Co. v. General Motors Co.*,
    682 F. Supp. 873 (S.D. Miss. 1987) .................................................... 16

*Jennings v. Auto Meter Prods., Inc.*,
    495 F.3d 466 (7th Cir. 2007) ...............................................................5, 9, 10

*Keck Garrett & Assoc., Inc. v. Nextel Comms., Inc.*,
    517 F.3d 476 (7th Cit. 2008) ...............................................................25

*Kundrat v. Chicago Bd. Options Exch.*,
    2002 WL 31017808 (N.D. Ill. Sept. 6, 2002) ......................................14

*Langone v. Miller*,
    631 F. Supp. 2d 1067 (N.D. Ill. 2009) .................................................25

*Lewis v. Philip Morris Inc.*,
    355 F.3d 515 (6th Cir. 2004) ...............................................................13

*McCauley v. City of Chicago*,
    671 F.3d 611 (7th Cir. 2011) ...............................................................4

*Meier v. Musburger*,
    588 F. Supp. 2d 883 (N.D. Ill. 2008) ...................................................6

*Midwest Grinding Co. v. Spitz*,
    976 F. 2d 1016 (7th Cir. 1992) ............................................................4, 10

*Morgan v. Bank of Waukegan*,
    804 F.2d 970 (7th Cir. 1986) ...............................................................9

*National Council on Comp. Ins., Inc. v. American Int'l Grp., Inc.*,
    2009 WL 466802 (N.D. Ill. Feb. 23, 2009) .........................................12

*Oberoi v. Nehta*,
    2011 WL 1337107 (N.D. Ill. Apr. 6, 2011) .........................................8

*Resource Dealer Grp., Inc. v. Executive Servs., Ltd.*,
    1997 WL 790737 (N.D. Ill. Dec. 18, 1997) .........................................24

*Reves v. Ernst & Young*,
    507 U.S. 170 (1993) .............................................................................7, 8

*Richmond v. Nationwide Cassel L.P.*,
    52 F.3d 640 (7th Cir. 1995) .................................................................7

*RWB Servs., LLC v. Hartford Computer Grp.*,
    539 F.3d 681 (7th Cir. 2008) ...............................................................11

*Sedima, S.P.R.L. v. Imrex Co.*,
    473 U.S. 479 (1985) .............................................................................5

*Shepard v. Lustig*,
    912 F. Supp. 2d 698 (N.D. Ill. 2012) ...................................................................10

*Smith Wholesale Co. v. R.J. Reynolds Tobacco Co.*,
    477 F.3d 854 (6th Cir. 2007) ...........................................................................15

*Stachon v. United Consumers Club, Inc.*,
    229 F.3d 673 (7th Cir. 2000) ........................................................................7, 12

*Sudden Serv., Inc. v. Brockman Forklifts, Inc.*,
    647 F. Supp. 2d 811 (E.D. Mich. 2008)...............................................................18

*TLMS Motor Corp. v. Toyota Motor Distributors, Inc.*,
    1998 WL 182475 (N.D. Ill. Apr. 15, 1998) ....................................................16, 17

*Triumph Packaging Grp. v. Ward*,
    877 F. Supp. 2d 629 (N.D. Ill. 2012) ...................................................................20

*United Food v. Walgreen, Co.*,
    719 F.3d 849 (7th Cir. 2013) ...........................................................................7

*United States v. Turkette*,
    452 U.S. 576 (1981) .......................................................................................8

*Vicom, Inc. v. Harbridge Merch. Servs., Inc.*,
    20 F.3d 771 (7th Cir. 1994) .......................................................................10, 11

*Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*,
    546 U.S. 164 (2006)...........................................................................12, 14, 15

*Wigod v. Wells Fargo Bank, N.A.*
    673 F.3d 547 (7th Cir. 2012) ............................................................................4

*Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Financing Svc's, Inc.*
    536 F.3d 633 (7th Cit. 2008) ...........................................................................4

**State Cases**

*Bero Motors v. General Motors Corp.*,
    2001 WL 1167533 (Mich. Ct. App. Ct. 2, 2001) .................................................19

*Crossroads Ford Truck Sales, Inc. v. Sterling Truck Corp.*,
    943 N.E.2d 646 (Ill. App. Ct. 2010) ...................................................................21

*Federated Capital Servs. v. Dextours, Inc.*,
    2002 WL 868273 (Mich. Ct. App. Apr. 26, 2002) ...............................................20

*Ferrett v. General Motors Corp.*,
    475 N.W.2d 243 (Mich. 1991) ..........................................................................19

*Gates v. Chrysler Corp.*,
   397 So.2d 1187 (Fla. Dist. Ct. App. 1981) ............................................................21

*Huron Tool & Eng'g Co. v. Precision Consulting Servs., Inc.*,
   532 N.W.2d 541 (Mich. Ct. App. 1995) ...............................................................19

*Sherman v. Sea Ray Boats, Inc.*,
   649 N.W.2d 783 (Mich. 2002).................................................................................19

*People v. Villarreal*,
   604 N.E.2d 923 (Ill. 1992)......................................................................................21

**Federal Statutes**

18 U.S.C. § 1341 ...............................................................................................................5

18 U.S.C. § 1343 ...............................................................................................................5

18 U.S.C. § 1961 *et seq*.......................................................................................... *passim*

15 U.S.C. § 1221 *et seq*..............................................................................................16, 17

15 U.S.C. § 13 *et seq*.......................................................................................12, 13, 14, 15

**State Statutes**

FLA. STAT. §§ 320.64, 320.641 .......................................................................................22

815 ILL. COMP. STAT. 710/4, 7.......................................................................................21

MO. REV. STAT. §§ 407.825 ............................................................................................23

63 PA. STAT. ANN. §§ 818.12(b) .....................................................................................24

**Rules**

Fed. R. Civ. P. 8(a) ...........................................................................................................6

Fed. R. Civ. P. 9(b) ................................................................................................ *passim*

Fed. R. Civ. P. 12(b)(1) and (6) .....................................................................................25

**Other Authorities**

14 H. Hovenkamp, Antitrust Law ¶ 2302 (3d ed. 2012) ............................................13

P. Areeda & L. Kaplow, Antitrust Analysis ¶ 602 (5th ed. 1997) ..............................13

## <u>INTRODUCTION</u>

The amended complaint (much like its predecessor filed over two months ago but not served) is deficient and should be dismissed in its entirety: it is replete with conclusory allegations, substitutes vitriol for plausibility, and relies on wholly illogical theories devoid of any legal support.  Plaintiffs' insufficient allegations are all the more puzzling in light of the over 15-year business relationship between FCA and Plaintiffs' common owner, Edward F. Napleton. All seven Plaintiffs are FCA dealers that have sold and serviced Chrysler, Jeep, Dodge, or RAM vehicles for years under dealer agreements that remain in full force and effect.  All of their dealer agreements contain essentially the same "Minimum Sales Responsibility" standard, under which their sales performance is measured.  Similarly, all of the Plaintiffs are eligible to participate, and have participated, in the FCA sales incentive program known as the "Volume Growth Program." Yet each of them now accuses FCA of applying the Minimum Sales Responsibility standard and the Volume Growth Program in "bad faith" in an effort to drive them out of business by "discriminating on price, discriminating on vehicle allocation, and setting [sales] targets using unreasonable methods."  AC ¶7.  Plaintiffs offer no reason why FCA would suddenly embark on a scheme to get rid of seven dealerships after such a long business relationship.

By contrast, the original and amended complaints clearly document Plaintiffs' motivation: Plaintiffs commenced this lawsuit only after FCA notified Plaintiff Arlington Heights of its failure to achieve the minimum level of sales that it had committed to in its dealer agreements. Likewise, Plaintiffs filed the amended complaint only after FCA notified Arlington Heights, for the second time, of its continuing failure to sell the contractually required minimum number of vehicles.  Rather than attempting to correct its sales performance deficiencies, Arlington Heights and one other plaintiff filed this law suit, publicly smearing FCA with baseless accusations of civil RICO and antitrust violations, and then allowing the complaint to sit in the public file for

over six weeks without even attempting service.  When FCA refused to exempt Arlington

Heights from its contractual undertakings, Arlington Heights doubled-down by filing an

amended complaint in which five more Napleton dealers suddenly discovered, after years of

operating as FCA dealers, that they too are allegedly being driven out of business.  All of

Plaintiffs' claims are insufficient in numerous ways, and should be dismissed.

## SUMMARY OF ALLEGATIONS

**A.      Parties[1]**

The plaintiff-dealers ("Plaintiffs") are seven Chrysler, Dodge, Jeep, and RAM

automotive dealers under the common control of Edward F. Napleton ("Napleton").  AC ¶¶13-19;

Compl. ¶13.  The FCA/Napleton business relationship began at least 15 years ago with the

opening of Northlake in 2001, followed by South Orlando in 2005, River Oaks in 2009,

Clermont in 2010, Arlington Heights in 2011, and Mid Rivers and Ellwood in 2013.  All of the

Plaintiffs are to this day selling and servicing FCA vehicles under currently effective Chrysler,

Jeep, Dodge, and RAM Sales and Service Agreements ("Dealer Agreements").  AC ¶¶20, 106,

171.  All of the Dealer Agreements, and their additional terms and conditions, contain essentially

the same provisions, including a standard Minimum Sales Responsibility ("MSR") requirement.[2]

Defendant FCA US LLC ("FCA") is the manufacturer and distributor of Chrysler, Jeep,

---

[1] Plaintiffs are located in four different states:  (i) three in Florida (Clermont Motors, LLC in Clermont ("Clermont"), Napleton's North Palm Auto Park, Inc. in Lake Park ("Northlake"), and Napleton Enterprises, LLC in Kissimmee ("South Orlando")); (ii) two in Illinois (Napleton's Arlington Heights Motors, Inc. in Arlington Heights ("Arlington Heights") and Napleton's River Oaks Motors, Inc. in Lansing ("River Oaks")); (iii) one in Missouri (Napleton's Mid Rivers Motors, Inc. in Saint Peters ("Mid Rivers")); and (iv) one in Pennsylvania (Napleton's Ellwood Motors, Inc. in Ellwood City ("Ellwood")).  AC ¶¶13-19.

[2] A copy of the Arlington Heights Jeep Sales and Service Agreement and Additional Terms and Provisions is attached as Exhibit A to the accompanying Declaration of Robert D. Cultice in Support of Defendants' Motion to Dismiss Plaintiffs' Amended Complaint ("Cultice Decl.").  The exhibits to the Cultice Declaration are referred to in the amended complaint and are central to the Plaintiffs' claims, and are thus properly considered at the motion to dismiss stage.  *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 735 (7th Cir. 2002) (citation omitted).

Dodge, and RAM motor vehicles.  Defendant FCA Realty, LLC f/k/a Chrysler Group Realty

Company, LLC ("FCAR") is a subsidiary of FCA engaged in the real estate business.

**B.      Allegations Against FCA[3]**

The first twelve counts of the amended complaint can be divided into two "schemes" that

FCA allegedly perpetrated against all of the Plaintiffs:  (1) inducing other "unidentified" FCA

dealers to submit false sales reports to FCA in return for Volume Growth Program ("VGP")

incentives, advertising funds, and additional vehicle allocation that are not available to Plaintiffs

(the "VGP Claims") (AC ¶3, 34-55, 75-91); and (2) impairing Plaintiffs' businesses through the

allegedly unfair application of the MSR sales performance standard (the "MSR Claims") (AC ¶6,

56-74).  The alleged false reporting of retail sales by dealers, according to Plaintiffs, benefits

FCA by creating the false appearance to the public and investment community that "FCA's

performance is better than, in reality, it actually is."  *Id.* ¶42; *see also id.* ¶¶2-4.  The unfair MSR

requirements are allegedly imposed by FCA to "induce Plaintiffs to invest substantially in their

dealership facilities" (*Id.* ¶56) and "to terminate Plaintiffs' franchises in the event [they] do not

achieve [MSR] targets set by FCA" (*Id.* ¶6).[4]

## ARGUMENT

**A.      Governing Law**

To survive a motion to dismiss, a complaint "must contain sufficient factual matter . . . to

'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

(quoting *Bell Atlantic Co. v. Twombly*, 550 U.S. 544, 570 (2007)).  Mere "legal conclusions" and

---

[3] This summary is based on the allegations in the amended complaint and should not be construed as an admission of the truth of any of these allegations.

[4] Plaintiff Arlington Heights alleges two causes of action against defendant FCAR (Fraud in the Inducement (Count XIII) and Quantum Meruit (Count XIV)), seeking reimbursement from FCAR for certain repairs that Arlington Heights claims to have made to a dealership facility owned by FCAR and leased to Arlington Heights, including "cracked tile, broken glass, and approximately seventy-eight (78) lighting fixtures in the parking lot."  AC ¶245.

"[t]hreadbare recitals of the elements of a cause of action" are neither legally sufficient nor entitled to the presumption of truth that generally accompanies well-pled allegations. *Iqbal*, 556 U.S. at 678. It is well-settled in the Seventh Circuit that the more complex the case, the more "factual specificity" is required. *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (citation omitted).

Additionally, all of the fraud claims, including the RICO counts, must meet the heightened pleading standard of Fed. R. Civ. P. 9(b), requiring fraud to be pled with particularity. To meet this standard, the Seventh Circuit requires allegations of "the who, what, when, where and how" of the alleged fraud. *Wigod v. Wells Fargo Bank, N.A.* 673 F.3d 547, 569 (7th Cir. 2012) (quoting *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Financing Svc's, Inc.*, 536 F.3d 663, 668 (7th Cir. 2008)); *Guaranteed Rate, Inc. v. Barr*, 912 F. Supp. 2d 671, 684 (N.D. Ill. 2012). This heightened standard "minimize[s] the extortionate impact that a baseless claim of fraud can have on a firm or an individual" and avoids "undue pressure on the defendant to settle the case in order to lift the cloud on its reputation." *Fidelity Nat. Title Ins. Co. of New York v. Intercounty Nat. Title Ins. Co.*, 412 F.3d 745, 748-49 (7th Cir. 2005).

**B.  Plaintiffs' Civil RICO Claims Should be Dismissed (Counts IV and V)**

The Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. § 1961 *et seq.* ("RICO") grants a private right of action to a person "injured in his business or property by reason of a violation of section 1962 . . ." 18 U.S.C. § 1964(c). RICO "does not cover all instances of wrongdoing," but is instead "a unique cause of action that is concerned with eradicating organized, long-term, habitual criminal activity." *Gamboa v. Velez*, 457 F.3d 703, 705 (7th Cir. 2006) (citations omitted). By contrast, Plaintiffs' RICO claim is a classic example of trying to "fit a square peg in a round hole by squeezing garden-variety business disputes into civil RICO actions." *Gamboa*, 457 F.3d at 710 (quoting *Midwest Grinding Co.* v. *Spitz*, 976 F.

4

2d 1016, 1025 (7th Cir. 1992); *see Fitzgerald v. Chrysler*, 116 F.3d 225, 227 (7th Cir. 1997)

("danger of [RICO] being applied to situations absurdly remote from the concerns of the statute's

framers"); *Guaranteed Rate*, 912 F. Supp. 2d at 681 ("While Congress never intended RICO to

be employed to allow plaintiffs to turn garden-variety state law fraud cases into RICO claims, the

breadth of RICO's text and lure of treble damages and attorney's fees have proven irresistible to

plaintiff's bent on federalizing such claims.") (citations omitted). To survive a motion to dismiss,

Plaintiffs must plead cognizable injuries to each of their businesses or properties resulting from:

"(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Jennings v.*

*Auto Meter Prods., Inc*., 495 F.3d 466, 472 (7th Cir. 2007) (quoting *Sedima, S.P.R.L. v. Imrex*

*Co.*, 473 U.S. 479, 496 (1985)). Plaintiffs have fallen far short of this standard.

### 1. Plaintiffs Have Failed to Sufficiently Allege "Racketeering Activity"

Plaintiffs' RICO allegations are dead on arrival for the simple reason that they nowhere

allege fraud that was perpetrated *on them*, let alone with the particularity required by Rule 9(b).

Indeed, Plaintiffs engage in little more than general mud-slinging, hoping that something will

stick, without ever showing how their supposed harm was caused by the alleged fraud. For

example, Plaintiffs base their assertion of "racketeering activity" on the predicate acts of mail

and wire fraud under 18 U.S.C. § 1341 and 18 U.S.C. § 1343 (AC ¶132), respectively, yet

nowhere identify fraudulent misrepresentations that caused injury to each of their businesses or

properties. Rather, they allege that FCA misrepresented its financial strength *to the public and*

*investor community* by including allegedly false retail sales in their public announcements. AC

¶¶2, 42, 144. Although they claim that unidentified dealers transmitted fraudulent sales reports

"electronically by mail and by wire transmissions on numerous occasions" (AC ¶54; *see* AC ¶¶9-

10, 35, 37-38, 40, 43-48, 52-53), they readily concede that these sales reports were not

transmitted by FCA to them, but only from other dealers to FCA.

The lack of particularity is glaring. Plaintiffs never say how specific statements, including the allegedly fraudulent sales reports, were false. They never say *who* specifically made the false statements other than a general reference to unidentified "Conspiring Dealers." And they never say when the allegedly false statements were made other than an allusion to a vague time period "[b]eginning no later than early 2015 (and likely earlier)," (AC ¶35), which is wholly insufficient. *See Goren v. New Vision Intern., Inc.*, 156 F.3d 721, 726 (7th Cir. 1998) (must plead RICO with particularity); *Guaranteed Rate*, 912 F. Supp. 2d at 684 (particularity requires the "who, what, when, where, and how" of the allegation). In any event, generalized and conclusory accusations that FCA used mail and interstate wires (AC ¶¶39, 147) or that communications "were transmitted to FCA electronically by mail and by wire transmissions" (AC ¶54) are mere "legal conclusion[s] couched as [] factual allegation[s]" that fall short of even Rule 8(a)'s more lenient pleading standard, let alone the particularity required by Rule 9(b). *Iqbal*, 556 U.S. at 678 (citation omitted); *see Borich v. BP, P.L.C.*, 904 F. Supp. 2d 855, 862 (N.D. Ill. 2012) (allegations that defendants "sent numerous other mail and wires transmissions that will serve as additional predicate acts" are too general to support a RICO claim). Nor is there any allegation that the phone calls Plaintiffs do identify could possibly have furthered the alleged fraudulent scheme. *See Meier v. Musburger*, 588 F. Supp. 2d 883, 906 (N.D. Ill. 2008) (communication that "serves to put the defrauded person on notice of the fraud . . . or discloses the nature of the fraud" does not further a fraudulent scheme).

The allegations of mail and wire fraud in connection with the MSR Claims are even weaker. Plaintiffs fail to identify any mail or wire communications that could be a predicate act in furtherance of the alleged racketeering scheme. Rather, in a single paragraph, they assert that "FCA sent communications by mail and wire transmissions on numerous occasions no later than

2015 (and likely earlier) through 2016, including notice of default letters sent to Plaintiffs from time to time throughout these years, and communications setting forth Plaintiffs' [MSR] baselines." AC ¶74. Such general allegations fall far short of Rule 9(b)'s requirements.

### 2. Plaintiffs Have Failed to Sufficiently Allege that FCA Conducted the Affairs of a RICO Enterprise

Plaintiffs allege that "FCA has knowingly conducted and participated, directly or indirectly, in the conduct of the affairs" of an *enterprise* consisting of "FCA, the Conspiring Dealers, Business Center Directors, and third-party vendors . . . ." AC ¶¶132-33. These allegations fail for several reasons. *First*, Plaintiffs fail to identify adequately the members of the enterprise. *Richmond v. Nationwide Cassel L.P.*, 52 F.3d 640, 645 (7th Cir. 1995) ("a nebulous, open-ended description of the enterprise"—consisting of the defendants, four additional named entities, and "unnamed car dealers"—"does not sufficiently identify this essential element of the RICO offense"). They fail to name *any* of the so-called "Conspiring Dealers," and describe only a single (unnamed) FCA Business Center Director. AC ¶¶35-55, 69, 130-150. By failing to delineate the members of the enterprise—the most basic element of a RICO claim—with anything even approaching particularity, Plaintiffs fail to state a claim. *See Stachon v. United Consumers Club, Inc.*, 229 F.3d 673, 676 (7th Cir. 2000) ("vague allegations of a RICO enterprise made up of a string of participants, known and unknown," insufficient).

*Second*, it is well established that a defendant conducting its own affairs cannot be operating an "enterprise" in violation of RICO. *United Food v. Walgreen, Co.*, 719 F.3d 849, 854 (7th Cir. 2013) (RICO defendant must have "conducted or participated in the conduct of the '*enterprise's* affairs,' not just [its] own affairs") (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993)). The Seventh Circuit has repeatedly made clear that a corporation pursuing its legitimate business through its employees, agents, and subsidiaries is conducting its own affairs,

not those of the separate and distinct enterprise required under RICO. *See Bachman v. Bear, Stearns & Co*., 178 F.3d 930, 932 (7th Cir. 1999) ("A firm and its employees, or a parent and its subsidiaries, are not an enterprise separate from the firm itself." (citations omitted)); *Fitzgerald*, 116 F.3d at 227 ("[W]e cannot imagine . . . applying RICO to a free-standing corporation such as Chrysler merely because Chrysler does business through agents, as virtually every manufacturer does."). *Fitzgerald* is instructive here. In that case, the plaintiffs alleged that Chrysler had committed RICO fraud through three separate "enterprises" consisting of various combinations of Chrysler, its subsidiaries, its dealers, and trusts used to finance warranties. 116 F.3d at 226. *Fitzgerald* found that none of the alleged enterprises were RICO enterprises, where the allegations were wholly unlike the "prototypical RICO case," in which "a person bent on criminal activity seizes control of a previously legitimate firm" to use for his own criminal purposes. *Id.* at 227 (citations omitted).

*Third*, Plaintiffs have failed to plead the "common purpose" of an alleged RICO enterprise. *Boyle v. United States*, 556 U.S. 938, 946 (2009) (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)); *Guaranteed Rate*, 912 F. Supp. 2d at 686-687 ("The existence of a common goal or purpose is an 'essential ingredient' of an association-in-fact enterprise." (citation omitted)). Here, as in *Guaranteed Rate*, the Plaintiffs do not allege that FCA had any interest in the outcome of the alleged schemes beyond its own direct interest in maximizing its vehicle sales revenues, which derive from FCA's sales to its dealers, not from dealers' sales to customers. *See id*. at 687; *see also Reves*, 507 U.S. at 185 ( RICO "liability depends on showing that the defendants conducted or participated in the conduct of the '*enterprise's* affairs,' not just their own affairs") (citing 18 U.S.C. § 1962(c)); *Oberoi v. Nehta*, 2011 WL 1337107, at *4 (N.D.

Ill. Apr. 6, 2011) (no RICO enterprise where defendants merely made their own respective profits and did not share in the profits of the alleged enterprise).

      **3.**      **Plaintiffs Have Failed to Allege a "Pattern" of Racketeering Activity**

To prevent RICO's misuse, courts have sought to define the statute's scope by requiring claimants to establish a sufficiently continuous "pattern" of racketeering activity. *See H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 240-42 (1989); *Gamboa,* 457 F.3d. at 710; *Guaranteed Rate*, 912 F. Supp. 2d at 689. Plaintiffs have failed to do so here. A "pattern of racketeering activity" requires a showing of "at least two acts of racketeering activity." *Borich*, 904 F. Supp. 2d at 860 (citing 18 U.S.C. § 1961). These acts must satisfy the continuity-plus-relationship test: "the predicate acts must be related to one another (the relationship prong) and pose a threat of continued criminal activity (the continuity prong)." *American Med. Ass'n v. 3Lions Publ'g, Inc.*, 2015 WL 1399038, at *4 (N.D. Ill. Mar. 25, 2015) (quoting *Jennings*, 495 F.3d at 473). Continuity can be shown by (1) activity over an extended, but finite, period of time ("close-ended" pattern), or (2) a threat the activity will continue in the future in connection with ongoing activity over a shorter period of time ("open-ended" pattern). *H.J. Inc.*, 492 U.S. at 241.[5] Because the Plaintiffs fail to plead even a single predicate act with the requisite specificity (Section III.B.1, *supra*), they necessarily fail to allege the requisite continuity. *Borich*, 904 F. Supp. 2d at 863. Even if at least two predicate acts are adequately pled, however, Plaintiffs still fail to plead sufficient continuity.

*First*, Plaintiffs fail to sufficiently allege close-ended or open-ended patterns. Close-ended continuity requires "a series of related predicates extending over a substantial period of

---

[5] The Seventh Circuit also requires consideration of a number of additional factors in evaluating whether the requisite continuity is present, including the number and variety of predicate acts, the number of victims, the presence of separate schemes, and the occurrence of distinct injuries. *See Morgan v. Bank of Waukegan*, 804 F.2d 970, 976 (7th Cir. 1986).

time." *H.J. Inc.*, 492 U.S. at 242. Predicate acts extending "over a few weeks or months" are insufficient. *Id.*; *see Jennings*, 495 F.3d at 474 (10-month time period was "too short to show the necessary continuity for a 'pattern' of racketeering"). At best, Plaintiffs have alleged predicate acts occurring over a several month period, far too short to establish the requisite duration. The only communications alleged in support of either RICO "scheme" span a period of less than nine months—beginning June 1, 2015 at the earliest. AC ¶38. This is insufficient as a matter of law. *See Shepard v. Lustig*, 912 F. Supp. 2d 698, 707-08 (N.D. Ill. 2012) (no pattern of racketeering where plaintiffs claimed that defendants used wires or mail over a period of months but did not allege "a specific predicate act" during that period). Plaintiffs also fail to plead an open-ended pattern, which requires: "(1) a specific threat of repetition, (2) that the predicate acts or offenses are part of an ongoing entity's regular way of doing business, or (3) that the defendant operates a long-term association that exists for criminal purposes." *Midwest Grinding*, 976 F.2d at 1023 (internal quotation marks omitted) (citing *H.J. Inc.*, 492 U.S. at 242). Plaintiffs provide no basis for a threat of repetition. *See Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 783 (7th Cir. 1994) ("A threat of continuity cannot be found from bald assertions such as '[defendant] continues his racketeering activities.'"). Plaintiffs also do not assert—nor could they—that mail or wire fraud constitutes FCA's "regular way of doing business" or that FCA "exists for criminal purposes." *See* AC ¶22 (FCA engaged in business of selling vehicles).

     *Second*, the additional factors considered in this circuit weigh heavily against a finding of continuity. *Jennings*, 495 F.3d at 475 (Seventh Circuit has "repeatedly rejected RICO claims that rely so heavily on mail and wire fraud allegations to establish a pattern"); *Midwest Grinding*, 976 F.2d at 1024 (hundreds of acts of mail fraud lacked continuity when connected to a single

scheme); *see also Vicom*, 20 F.3d at 782 (injuries arising from the same contract and similar predicate acts are not distinct).

### 4. Plaintiffs Lack Standing to Pursue a RICO Claim

RICO is only available where a claimant pleads sufficiently that it was "injured in its business or property *by reason of a violation*" of the RICO statute. *Anza v. Ideal Steel Supply Co.*, 547 U.S. 451, 453 (2006) (emphasis added) (quoting 18 U.S.C. § 1964(c)). In *Anza*, the Supreme Court affirmed the dismissal of a RICO claim because the claimants' asserted harm was not linked causally to the alleged civil RICO violation. 547 U.S. at 459. The same fatal flaw dooms Plaintiffs' claims here. *First*, the causal connection between Plaintiffs' alleged damages and the VGP Claims is far too attenuated to confer standing under RICO, which requires that an injury be "both factually and proximately caused" by a pattern of racketeering activity. *RWB Servs., LLC v. Hartford Computer Grp.*, 539 F.3d 681, 686 (7th Cir. 2008). Without a proximate causal connection, there is no jurisdiction for the Court to hear the claim. *Id.* ("Such a showing proves the plaintiff's standing and is thus jurisdictional.") (citation omitted). The causal chain here is far too attenuated: Plaintiffs claim injury caused by: (1) FCA's solicitation of dealers to submit false sales reports; (2) those dealers then received additional money and more favorable vehicles; (3) that enabled the dealers to lower their effective acquisition cost for vehicles purchased from FCA; (4) that allowed the dealers to undercut Plaintiffs on price; (5) that resulted in more sales and more profits for the dealers; (6) which should have been made by Plaintiffs, who claim to have lost these sales and profits to the dealers that were undercutting them on price. *See* AC ¶¶101, 102. This is precisely the type of causal gymnastics the Supreme Court prohibited in *Anza*, where plaintiffs lacked standing based on allegations that defendants failed to pay taxes and used the savings to undercut the plaintiffs' prices. 547 U.S. at 459-460 ("A court considering the claim would need to begin by calculating the portion of [the defendant's] price

drop attributable to the alleged pattern of racketeering activity. It next would have to calculate the portion of [the plaintiff's] lost sales attributable to the relevant part of the price drop. The element of proximate causation recognized in *Holmes* is meant to prevent these types of intricate, uncertain inquiries from overrunning RICO litigation.") (citing *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258 (1992)).

*Second*, Plaintiffs neglect entirely to plead any theory of damages related to the MSR Claims. Nowhere do they allege how failing to make the minimum number of sales required under their contracts could have caused them to lose "substantial amounts of sales revenue and profits, among other injuries including but not limited to lost goodwill and business value." AC ¶73. Nor could they, as it is undisputed that the Dealer Agreements are all still in effect.[6]

## C.   Plaintiffs' Antitrust Claims Should Be Dismissed (Counts II and III)

The pleading deficiencies in Plaintiffs' antitrust claims are multiple and fatal. The Robinson-Patman Act, 15 U.S.C. § 13 *et. seq.* ("RPA"), provides in Section 13(a) that it shall be unlawful for "any person engaged in commerce . . . to discriminate in price between different purchasers of commodities of like grade and quality . . . where the effect of such discrimination may be substantially to lessen competition . . . or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them." 15 U.S.C. § 13(a). This claim requires four essential elements including sales to buyers (here the Plaintiffs and unidentified other dealers) involving price discrimination between them that had a prohibited effect on competition. *Volvo Trucks N. Am.,*

---

[6] Plaintiffs' RICO conspiracy claim (Count V) fails for the same reasons their substantive RICO claim fails. *National Council on Comp. Ins., Inc. v. American Int'l Grp., Inc.*, 2009 WL 466802, at *16 (N.D. Ill. Feb. 23, 2009) ("[B]ecause [plaintiff] has failed to state a claim under section 1962(c), its RICO conspiracy claim is also deficient."); *see also Stachon*, 229 F.3d 637. Plaintiffs also fail to identify any agreement or co-conspirators to support this claim. They baldly assert that FCA "agreed with Conspiring Dealers" to violate the RICO statute (AC ¶152), but don't even identify the "Conspiring Dealers" with which they claim FCA conspired.

*Inc. v. Reeder-Simco GMC, Inc*., 546 U.S. 164, 176-77 (2006) (citing 15 U.S.C. § 13(a)).

Similarly, Section 13(d) of the Robinson-Patman Act makes it "unlawful for any person . . . to

pay . . . for . . . services or facilities furnished by or through [a] customer in connection with the

[resale] of commodities . . . , unless such payment . . . is available on proportionally equal terms

to all other" competing customers.  15 U.S.C. § 13(d).  Like Section 13(a), Section 13(d) also

requires claimants to plead sufficiently that they compete "with the favored purchaser, and the

competition must be in the same geographic area."  *Lewis v. Philip Morris Inc*., 355 F.3d 515,

522 (6th Cir. 2004); *see Crest Auto Supplies, Inc. v. Ero Mfg. Co*., 360 F.2d 896, 901 (7th Cir.

1966) (parallel section of the RPA regarding the provision of services requires that "there be

competition between the two classes of customers").

      In so-called "secondary-line" cases, such as this one, where the alleged anti-competitive

effect is between buyers of the same product—here the unidentified other FCA dealers and

Plaintiffs that purchase vehicles from FCA—the "hallmark" of price discrimination injury is "the

diversion of sales or profits from a disfavored purchaser to a favored purchaser," *i.e.* from

Plaintiffs to the unidentified other dealers.  *House of Brides, Inc. v. Alfred Angelo, Inc*., 2014 WL

64657, at *8 (N.D. Ill. Jan. 8, 2014) (quoting *Volvo*, 546 U.S. at 177).  The injury to competition

that Congress sought to remedy in these cases is the harm occasioned by powerful buyers, rather

than sellers, and specifically, businesses like large chain store enterprises with the clout to obtain

lower prices for goods than smaller buyers could demand.  *See* 14 H. Hovenkamp, Antitrust Law

¶2302, p. 9-13 (3d ed. 2012); P. Areeda & L. Kaplow, Antitrust Analysis ¶ 602, pp. 908-909 (5th

ed. 1997). These purchasers also must be in competition with one another in their sale of

products to the same group of retail customers in the market area where they compete.  *Goodloe*

*v. National Wholesale Co.*, 2004 WL 1631728, at *9 (N.D. Ill. July 19, 2004) (citing *Kundrat v. Chicago Bd. Options Exch.*, 2002 WL 31017808, at *7 (N.D. Ill. Sept. 6, 2002)).

Plaintiffs' claims under §§ 13(a) and 13(d) fail because they nowhere identify any of the other FCA dealers with whom they allegedly compete, any vehicle sales that they allegedly lost to these unidentified competitors, or any price differential over any period of time that caused Plaintiffs' to lose sales or profits to the allegedly "Conspiring Dealers."

Without identifying the FCA dealers with which each of the Plaintiffs compete, Plaintiffs fail to clear even the threshold of an RPA claim because they have failed to allege sufficiently any price discrimination of which they complain, let alone the essential element of lost sales caused by the price differential. *See Goodloe*, 2004 WL 1631728, at *9 (dismissing RPA claim where complaint alleged "no facts about who [Plaintiff's] putative competitors" were) (citing *Kundrat*, 2002 WL 31017808, at *7). Even if the identity of Plaintiffs' competitors could somehow be gleaned from the amended complaint, Plaintiffs have not sufficiently raised either of the two essential allegations to show a prohibited effect on competition. They allege neither a "diversion of sales of profits from a disfavored purchaser to a favored purchaser" *Volvo*, 546 U.S. at 177, nor "discounts to a competitor over a significant period of time," *Cash & Henderson Drugs, Inc. v. Johnson & Johnson*, 799 F.3d 202, 210 (2d Cir. 2015) (citing *FTC v. Morton Salt Co.*, 334 U.S. 37, 50-51 (1948); *see also Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 522 (7th Cir. 2011) (proof needed to establish secondary-line violation). Plaintiffs again rely on conclusions unsupported by any factual allegations, and rote incantations of the statutory elements, alleging merely that all seven of them (without any differentiation) had sales "diverted to Competing Dealers." AC ¶102.

14

Plaintiffs also fail to allege discounts to a competitor over a significant period of time.[7] Plaintiffs concede that all FCA dealers pay the same wholesale price to purchase their vehicles from FCA. AC ¶75. Instead, Plaintiffs aver that the "effective" price that Competing Dealers paid to FCA was lowered "by at least $800 per new vehicle, or more," because of "incentives and subsidies" and "co-op advertising money" the Competing Dealers received through the VGP that Plaintiffs allege were not available to them. AC ¶¶79, 91, 98, 100.[8] Yet nowhere do Plaintiffs identify *a single instance* of even one of their unnamed competitors receiving these alleged incentives, subsidies, or co-op advertising money, nor do they explain how the "Conspiring Dealers" used the incentives and co-op money that they allegedly received. Similarly, Plaintiffs themselves admit that they participated in the VGP. *See* AC ¶¶85-87. The amended complaint is devoid of even the most basic factual enhancement to support these claims, and does not identify anyone who purchased a vehicle at a competitor in lieu of Plaintiffs based on price, or that customers even knew that different prices were being offered. Simply put, the amended complaint relies solely on conclusory allegations that courts routinely reject as legally insufficient. Rather, the Plaintiffs seek to divert the Court away from the protection of competition that is the primary objective of the RPA. *See Volvo*, 546 U.S. at 181 (allegedly favored purchasers are dealers with little resemblance to large independent department stores or

---

[7] Even assuming Plaintiffs could show price differences over an extended period—which they cannot—price differences resulting from bonus and incentive programs are not only lawful but may be considered procompetitive when they result in "different outcomes based on performance." *Smith Wholesale Co. v. R.J. Reynolds Tobacco Co.*, 477 F.3d 854, 879 (6th Cir. 2007) (citation omitted). As the Supreme Court has explained, "Robinson-Patman does *not* 'ban all price differences charged to different purchasers of commodities of like grade and quality.'" *Volvo*, 546 U.S. at 177 (emphasis added) (citation omitted).

[8] While Plaintiffs' RPA count speaks only of "Competing Dealers" (AC ¶¶115-129), they also assert that "Conspiring Dealers in the markets in which Plaintiffs compete" received incentives from the Volume Growth Program "disguise[ed] . . . as items such as co-op or advertising support monies." AC ¶¶55, 77. Because Plaintiffs do not identify any of the "Conspiring" or "Competing" dealers, it is impossible to determine from the pleading what, if any, overlap there is between the alleged groups. Similarly, Plaintiffs engage in "group pleading" without even trying to differentiate their claims. This is not a class action, but instead a law suit brought by seven different Plaintiffs that all must meet their individual pleading burdens.

chain operations with buying clout).

**D.    Plaintiffs' Automobile Dealers' Day in Court Act Claim Should Be Dismissed (Count I)**

The Automobile Dealers' Day in Court Act, 15 U.S.C. § 1221 *et seq.* ("ADDCA"), grants a right of action to automotive dealers to recover damages sustained by reason of an automotive manufacturer's failure "to act in good faith in performing or complying with any of the terms or provisions of the franchise." 15 U.S.C. § 1222. Plaintiffs' ADDCA claim is insufficient because they (i) fail to adequately identify terms of the Dealer Agreements with which FCA did not comply, and (ii) have not pled lack of good faith sufficiently, which has a limited and specialized meaning under the ADDCA.

*First*, Plaintiffs do not sufficiently allege how FCA failed to perform the terms of the Dealer Agreements. Instead, they levy a host of conclusory and sweeping allegations, for example claiming that "FCA has regularly threatened Plaintiffs' businesses on the pretext of letters of default alleging that Plaintiffs have fallen short of their Minimum Sales Responsibility baselines" (AC ¶111), but stop there without any follow-on allegation that their Dealer Agreements were terminated, that FCA even threatened "termination" as alleged, or that all Plaintiffs even received alleged "default letters."

Plaintiffs do not sufficiently allege that FCA failed to perform contractual terms without "good faith," which is defined under the ADDCA as "freedom from coercion, intimidation, or threats of coercion or intimidation." 15 U.S.C. § 1221(e); *see Ed Houser Enterprises v. Gen. Motors Corp.*, 595 F.2d 366, 369 (7th Cir. 1978). "Coercion" or "intimidation" under the ADDCA "requires a wrongful demand which will result in sanctions if it is not complied with." *TLMS Motor Corp. v. Toyota Motor Distributors, Inc.*, 1998 WL 182475, at *6 (N.D. Ill. Apr. 15, 1998) (quoting *Hubbard Chevrolet Co. v. General Motors Corp.*, 682 F. Supp. 873, 876 (S.D.

16

Miss. 1987)).  Plaintiffs must allege an ultimatum—a threat to do this or else—before there can be "coercion" as defined under the ADDCA.  *Id.*

Plaintiffs allege no facts that would support this kind of ultimatum.  Even a statement by FCA threatening termination would not be unlawful coercion where FCA seeks to hold Plaintiffs to their MSR obligation.  Ex. B ¶11; *see General Motors Corp. v. MAC Co*., 247 F. Supp. 723, 726 (D. Colo. 1965) ("[A] manufacturer is not prohibited from enforcing just and reasonable contract provisions even though the same appear burdensome to dealers.").  Nor is there any allegation that FCA threatened to coerce Plaintiffs to take an action that they did not want to take, and in any event, Plaintiffs claim that they *refused* to falsely report their sales and therefore did not engage in the action that they claim is unlawful.[9]

### E.  Plaintiffs' Breach of Contract Claim Should Be Dismissed (Count VIII)

Plaintiffs' allegations of breach of Sections 11 (MSR) and 14 (vehicle orders) of the Dealer Agreements are legally insufficient.  With respect to Section 11 (MSR), Plaintiffs insist that "[b]eginning no later than 2015, and likely earlier," FCA set "unrealistic and unachievable [MSR] baselines for Plaintiffs in order to directly control and intimidate Plaintiffs to bow to FCA's will under the constant threat of the termination of their dealerships . . . ."  AC ¶66.  Plaintiffs, however, never disclose the MSR "baselines" that they claim were too high, let alone describe what FCA was trying to force them to do.  Nor do Plaintiffs allege how they were damaged by the mere setting of these supposedly "unrealistic and unachievable levels," since none of the Plaintiffs' Dealer Agreements has been terminated for Plaintiffs' failure to meet their MSR requirements (or otherwise).  AC ¶¶13-20, 56.

---

[9] Like their insufficient allegations under civil RICO and the RPA, Plaintiffs also have failed to identify any damages they sustained "by reason of" FCA's failure to act in good faith in performing or complying with any term of the Dealer Agreements.  15 U.S.C. § 1222.

Plaintiffs fare no better with their claim that FCA repeatedly breached Section 14 of the Dealer Agreements by failing "to use best efforts to allocate vehicles to Plaintiffs, and fail[ing] to do so in a reasonable manner." AC ¶174. Plaintiffs again fail to provide any factual enhancement to their conclusory claim, and don't even cite the correct contractual provision on which they rely. Section 14, which is entitled "Orders," makes clear that FCA is only obligated to ship vehicles after Plaintiffs submit orders and those orders are accepted by FCA. Ex. A ¶14. And, even then, FCA "has the right to allocate such supply in any reasonable manner FCA deems fit in any geographical area" if demand for vehicles exceeds their supply. *Id.* Plaintiffs do not even try to fit their allegations to this contractual language, and make no legally sufficient allegation of breach, or damages caused by a breach. *See* AC ¶¶173-76.

## F. Plaintiffs' Common Law Fraud and Negligent Misrepresentation Claims Should Be Dismissed (Counts VI-VII)

Plaintiffs' common law fraud and negligent misrepresentation claims fail as a matter of law because they are nothing more than "breach-of-contract allegations dressed up in the language of fraud," and should be dismissed for the same reasons that Plaintiffs' breach of contract claim fails to state a claim. *See Greenberger v. GEICO Gen. Ins. Co.*, 631 F.3d 392, 395 (7th Cir. 2011); *Sudden Serv., Inc. v. Brockman Forklifts, Inc.*, 647 F. Supp. 2d 811, 815 (E.D. Mich. 2008); *compare* AC ¶¶157, 160-62, 164, *with* AC ¶¶174-75, 180-81. In any event, Plaintiffs' fraud allegations are far too vague and conclusory to satisfy Rule 9(b)'s heightened pleading standard, and Plaintiffs' negligent misrepresentation claim consists of a single conclusory paragraph without a single fact alleged in support (AC ¶169).

Plaintiffs' fraud and negligent misrepresentation claims are also barred by Michigan's economic loss doctrine, because the parties agreed on the application of Michigan law in the event of a dispute concerning the Dealer Agreements. Ex. A ¶42; *Amakua Dev. LLC v. Warner*,

411 F. Supp. 2d 941, 955 (N.D. Ill. 2006) ("[T]ort claims that are dependent upon the contract are subject to a contract's choice of law provisions."). "Generally, under Michigan law, a plaintiff '[may] not maintain an action in tort for nonperformance of a contract.'" *DBI Invs., LLC v. Blavin*, 617 F. App'x 374, 381 (6th Cir. 2015) (quoting *Ferrett v. General Motors Corp.*, 475 N.W.2d 243, 247 (Mich. 1991)). Michigan courts have allowed some exceptions to the economic loss doctrine, but as relates to torts sounding in fraud, only for fraud in the inducement. *Id.* at 381-82. And even then, the fraudulent inducement must be "extraneous to the alleged breach of contract" and "address[] a situation where the claim is that one party was tricked into contracting." *Huron Tool & Eng'g Co. v. Precision Consulting Servs., Inc.*, 532 N.W.2d 541, 544-46 (Mich. Ct. App. 1995) (quotation omitted). Plaintiffs make no such allegations here. Their claims are instead based squarely on performance of contractual provisions relating to performance metrics and vehicle allocation, and never so much as hint at the type of pre-contract fraud that would qualify as an exception to the economic loss doctrine.

Likewise, the fraudulent and negligent omission or concealment claims are barred by the economic loss doctrine because Michigan law bars such a claim "unless a duty, separate and distinct from the contractual obligation, is established." *Sherman v. Sea Ray Boats, Inc.*, 649 N.W.2d 783, 789 (Mich. 2002). Michigan does not, however, recognize a fiduciary duty between manufacturer and dealer. *Ford Motor Co. v. Ghreiwati Auto*, 945 F. Supp. 2d 851, 869 (E.D. Mich. 2013) ("[A]mple authority [exists] in Michigan that no fiduciary relationship exists between a manufacturer and a dealership.") (citing *Bero Motors v. General Motors Corp.*, 2001 WL 1167533 (Mich. Ct. App. Oct. 2, 2001). For omission claims like the ones alleged here (AC ¶¶160-64) to be cognizable they must arise from an affirmative duty to speak and provide accurate information. Lacking a duty here, the claim necessarily fails.

Even if these legal barriers are ignored, Plaintiffs' fraud and negligent misrepresentation claims remain legally insufficient. For example, Plaintiffs allege that "[i]n or around 2013," an unidentified FCA "Market Representation Manager" allegedly told the "Napleton Dealer-Principal that Napleton's Arlington Heights would have direct and meaningful input into the size and configuration of the market area to be used to determine [Arlington Heights' MSR] baseline," knowing that the representation was false. AC ¶158. But even assuming that such a statement was made, that the speaker, time, and location had been sufficiently identified, and that the statement qualifies as a "misrepresentation," the Arlington Heights Dealer Agreements bar the claims as a matter of law. If the alleged misrepresentation "in or around 2013" were made before the May 17, 2013 effective date of the Dealer Agreements, these claims would be barred by the integration and "no-reliance" provisions (Ex. A ¶6), and if the alleged misrepresentation were made after the May 17, 2013 effective date, the claims would be barred by the "no oral modification" provision (Ex. A ¶7). *See Federated Capital Servs. v. Dextours, Inc.*, 2002 WL 868273, at *1 (Mich. Ct. App. Apr. 26, 2002) (no-reliance clause "[b]y its plain terms . . . negates the reliance element necessary to prevail on a claim of fraud"); *Triumph Packaging Grp. v. Ward*, 877 F. Supp. 2d 629, 647 (N.D. Ill. 2012) ("So-called 'no-reliance' clauses . . . preclude fraudulent inducement claims because they inherently disprove reasonableness."). Either way the alleged fraud and negligent misrepresentation claims are legally insufficient and should be dismissed.

## G. Plaintiffs' Claims Under State Motor Vehicle Franchise and Dealer Acts Should Be Dismissed (Counts IX-XII)

Plaintiffs' claims under the Florida, Illinois, Missouri, and Pennsylvania motor vehicle franchise and dealer acts are purely conclusory and devoid of any factual enhancement, based on the same VGP and MSR Claims discussed above, and if found sufficient, would render

meaningless the plausibility standard established in *Twombly* and *Iqbal*. The Illinois-based Plaintiffs assert violations of six sections of the Illinois Motor Vehicle Franchise Act: 815 ILL. COMP. STAT. 710/4(b), 4(d)(1), 4(d)(4), 4(e)(2), 4(e)(3), and 7. AC ¶¶184-99. Section 4(d)(1) prohibits arbitrary or capricious allocation of new motor vehicles, but Plaintiffs rely only on the conclusory allegation that unidentified "Conspiring Dealers" received more favorable allocations of unspecified vehicles at unspecified times. AC ¶¶37, 110, 143, 145, 180-81, 192. These unsupported allegations are insufficient as a matter of law. *See Crossroads Ford Truck Sales, Inc. v. Sterling Truck Corp.*, 943 N.E.2d 646, 655 (Ill. App. Ct. 2010) *aff'd*, 959 N.E.2d 1133 (dismissing conclusory claims brought under 815 ILL. COMP. STAT. 710/4(d)(1)). Section 4(d)(4) prohibits manufacturers from coercing dealers through threats to reduce a dealer's vehicle allocation or to terminate the dealer's franchise agreement. But as discussed in Section III.D, *supra*, Plaintiffs have utterly failed to allege any threats made against them. Sections 4(e)(2) and 4(e)(3) prohibit manufacturers from offering to sell or lease new motor vehicles at a "lower actual price" than the price provided to other dealers. Yet, as discussed in Section III.C, *supra*, Plaintiffs admit that all dealers pay the same wholesale price for new vehicles, do not identify any allegedly favored dealers, and do not cite to a single instance of any subsidies or promotional money paid to another dealer. Lastly, Plaintiffs allege that the rules of FCA's "Customer First Program" violate Section 7 of the act (AC ¶¶228-31), yet fail to allege that they were ever restricted or prevented from participating in the program.[10]

---

[10] The claims should be dismissed for the additional reason that Section 4(b) is a general prohibition against "any action with respect to a franchise which is arbitrary, in bad faith or unconscionable" and should be dismissed under the "fundamental rule of statutory construction that where there exists a general statutory provision and a specific statutory provision, either in the same or another act, which both relate to the same subject, the specific provision controls and should be applied." *See People v. Villarreal*, 604 N.E.2d 923, 928 (Ill. 1992).

The same pleading insufficiencies infect the claims under the Florida statute. The Florida-based Plaintiffs allege FCA violated four sections of the Florida Automobile Dealers Act: FLA. STAT. §§ 320.64(4), 320.64(6), 320.64(7), and 320.64(18). AC ¶¶200-17. First, Plaintiffs rely on their allegations of "wire and mail fraud" to support their claim that FCA committed an "illegal act" in violation of Section 320.64(4) (AC ¶¶204, 206), which Florida courts have interpreted as applying only to acts that carry criminal penalties, *Gates v. Chrysler Corp*., 397 So.2d 1187, 1190 (Fla. Dist. Ct. App. 1981). But as discussed in Section III.B.1, *supra*, Plaintiffs have failed to allege any acts of wire or mail fraud with the required specificity. Second, Section 320.64(6) prohibits coercion or attempted coercion of dealers. But as discussed in Section III.D, *supra*, Plaintiffs have failed to allege anything approaching the required coercion. *See Cabriolet Porsche Audi, Inc. v. American Honda Motor Co*., 773 F.2d 1193, 1210 (11th Cir. 1985) (beneficial offer "does not amount to coercion" under the ADDCA and Florida Automobile Dealers Act). Third, Section 320.64(18) prohibits unfair distribution of vehicles between "similarly situated dealer[s]." *See Copans Motors, Inc. v. Porsche Cars N. Am., Inc.*, 2014 WL 2612308, at *4 (S.D. Fla. June 11, 2014). Yet Plaintiffs fail to identify *any* similarly situated dealer, much less any facts about the allegedly favorable distribution. Lastly, Section 320.64(7) prohibits a manufacturer from threatening to cancel a franchise agreement unfairly, *i.e.*, when termination is not permitted by the franchise agreement, is not for a material breach of the franchise agreement, is not done in good faith, is not for good cause, or is not done in a uniform manner. *See* FLA. STAT. § 320.641. But Plaintiffs admit that the Florida franchise agreements are still in effect despite numerous alleged "threats," which were admittedly based on Plaintiffs' failure to meet their contractually obligated MSR score. AC ¶¶211-12.

Plaintiff Mid Rivers' claims under the Missouri Motor Vehicle Franchise Practices Act are similarly deficient. In typical shotgun fashion, the amended complaint lists violations of eight sections of the Missouri Motor Vehicle Franchise Practice Act: MO. REV. STAT. §§ 407.825(1) (prohibiting "conduct which is capricious or not in good faith or unconscionable"); 407.825(9) (prohibiting "unreasonable standards of performance"); 407.825(18) (prohibiting refusal to sell "reasonable quantities" of motor vehicles to dealers); 407.825(28) (prohibiting failure to make "practically available" incentives and rebates that are offered to other franchisees in Missouri); 407.825(32) (prohibiting incentives unless they are offered to all franchisees and any incentive "based on the sale of an individual vehicle is not increased for meeting a performance standard"); 407.825(33) (prohibiting "unreasonably discriminating" between dealers with respect to, *inter alia*, "marketing programs" and "dealer recognition programs"); 407.825(40) (prohibiting performance standards that may have an unfair "material impact" on dealers); and 407.825(41) (prohibiting unfair allocation systems). AC ¶220-21. Rather than pleading factual support for these claims, the amended complaint merely claims that "FCA has violated each of these express statutory demands" (AC ¶221) and recites the statutory elements: VGP imposes "unreasonable standards of performance" and "unlawfully offers incentives and promotional benefits" (AC ¶¶223-24); FCA has not made incentives available to Mid Rivers "that it has made to other franchisees . . . within Missouri," has refused to sell Mid Rivers "reasonable quantities" of motor vehicles, has "unreasonably discriminated among its franchisees in programs providing assistance to franchisees," and has "established or implemented a plan or system for the allocation of new motor vehicles that is not fair, reasonable and equitable" (AC ¶225); and that MSR is an "unreasonable performance standard" that "violates several prohibitions in the MVFPA" (AC ¶226). Yet Plaintiffs never identify the

23

quantity of vehicles FCA offered Mid Rivers, which other franchisees received any supposed assistance, or why the system for allocating vehicles was not fair, reasonable, and equitable.

Plaintiff Ellwood's claims under the Pennsylvania Board of Vehicles Act are another retread of the same vague and conclusory allegations. Ellwood asserts violations of two sections of the act: 63 PA. STAT. ANN. §§ 818.12(b)(12) (prohibiting unfair allocation of vehicles) and 818.12(b)(18) (prohibiting differences in the prices that dealers pay for vehicles if not based on an incentive program available to Pennsylvania dealers on a "proportionately equal basis"). AC ¶239. Plaintiffs claim FCA's vehicle allocation was not fair to Ellwood, but they once again do not explain how. AC ¶241. They claim the alleged scheme to falsely report vehicle sales diverted sales from Ellwood, but they do not specify how many or to whom. *Id.* And they claim dealers who participated in FCA's alleged scheme benefited, but they do not identify who these dealers were. *Id.*

**H.     Plaintiff Arlington Heights' Fraud in the Inducement and Quantum Meruit Claims Against FCAR Should Be Dismissed (Counts XIII and XIV)**

Plaintiff Arlington Heights does not sufficiently plead fraud in the inducement against FCAR, which requires both a false statement and reasonable reliance on such statement. *See Resource Dealer Grp., Inc. v. Executive Servs., Ltd.*, 1997 WL 790737, at *2 (N.D. Ill. Dec. 18, 1997) (citation omitted). Fraud in the inducement, like all other fraud claims, must satisfy the heighted pleading standard of Rule 9(b). *Goode v. PennyMac Loan Servs., LLC*, 2014 WL 6461689, at *6 (N.D. Ill. Nov. 18, 2014). Arlington Heights' assertion that it was deceived into paying for repairs to a dealership facility that it subleased from FCAR by "FCAR's representations . . . that it would be fully reimbursed for all of its out-of-pocket expenses" (AC ¶¶246, 249) fails to satisfy this heightened pleading requirement. The amended complaint does not allege who made the representations, when they were made, how they were made, or what

24

precisely the representations were.  *Id.*  Even if a false representation was adequately pled,

Arlington Heights cannot show reasonable reliance since the sublease between FCAR and

Arlington Heights explicitly obligates Arlington Heights to pay for such repairs, negating any

possible claim of reliance by Arlington Heights.  Cultice Decl. Ex. B ¶9 (sublease

acknowledging that Arlington Heights would "*at its own expense*, put, place, and keep the

Premises, including, but not limited to, landscaping and plate glass, in the same order and repair

as when the Premises was delivered to Tenant, and Tenant shall promptly make any and all

repairs or replacements necessary for that purpose . . . .") (emphasis added); *id.* ¶36 (integration

clause noting that sublease "contains the entire agreement between the parties as to the Premises

and shall not be modified in any manner except by an instrument in writing . . . .").

     As to quantum meruit, Arlington Heights must prove, among other things, that  "no

contract existed to prescribe payment" for the repairs Arlington Heights claims to have made,

and that the repairs were to FCAR's benefit.  *Langone v. Miller*, 631 F. Supp. 2d 1067, 1071

(N.D. Ill. 2009) (citations omitted).  This claim fails, however, because a sublease governs the

relationship between Arlington Heights and FCAR (*see* AC ¶244; Cultice Decl. Ex. B), making

recovery under this quasi-contractual theory unavailable.  "Under Illinois law, a party cannot

recover on a quantum meruit theory when an actual contract governs the parties' relations."  *Id.*

(citing *Keck Garrett & Assoc., Inc. v. Nextel Comms., Inc.*, 517 F.3d 476, 487 (7th Cir. 2008)).

<u>**CONCLUSION**</u>

     The Court should dismiss the amended complaint in its entirety for failure to state claims

upon which relief may be granted pursuant to Fed. R. Civ. P. 12(b)(1) and (6) and failure to

plead the circumstances relating to fraud with the particularity required by Fed. R. Civ. P. 9(b).

Dated: March 24, 2016        Respectfully submitted,

       */s/ Robert D. Cultice*
       Robert D. Cultice *(admitted pro hac vice)*
       Felicia H. Ellsworth *(admitted pro hac vice)*
       Caitlin W. Monahan *(admitted pro hac vice)*
       WILMER CUTLER PICKERING HALE AND DORR LLP
       60 State Street
       Boston, MA 02109
       (617) 526-6000
       robert.cultice@wilmerhale.com
       felicia.ellsworth@wilmerhale.com
       caitlin.monahan@wilmerhale.com

       Randall L. Oyler
       Owen H. Smith
       Brandon C. Prosansky
       BARACK FERRAZZANO KIRSCHBAUM &
       NAGELBERG LLP
       200 West Madison Street
       Suite 3900
       Chicago, IL 60606
       (318) 984-3100
       randall.oyler@bfkn.com
       owen.smith@bfkn.com
       brandon.prosansky@bfkn.com

       ***Attorneys for Defendants.***

# **ADDENDUM**[1]

**Other Authorities**

14 H. Hovenkamp, Antitrust Law ¶ 2302, p. 9-13 (3d ed. 2012)

P. Areeda & L. Kaplow, Antitrust Analysis ¶ 602, pp. 908-909 (5th ed. 1997)

---

[1] Pursuant to the Court's Case Management Procedures, Defendants include in this Addendum authority unpublished in the West National Reporter System and unavailable on Westlaw that is cited in Defendants' Memorandum of Law in Support of their Motion to Dismiss Plaintiffs' Amended Complaint.

ASPEN PUBLISHERS

**Herbert Hovenkamp**
*Ben V. & Dorothy Willie*
*Professor of Law*
University of Iowa College
   of Law

**Volume XIV**
**Third Edition**

# Antitrust Law

## An Analysis of Antitrust Principles and Their Application





Wolters Kluwer
Law & Business

This publication is designed to provide accurate and authoritative information in regard to the subject matter covered. It is sold with the understanding that the publisher is not engaged in rendering legal, accounting, or other professional services. If legal advice or other professional assistance is required, the services of a competent professional person should be sought.

—From a *Declaration of Principles* jointly adopted by a Committee of the American Bar Association and a Committee of Publishers and Associations

Copyright © 2012 CCH Incorporated. All Rights Reserved.

No part of this publication may be reproduced or transmitted in any form or by any means, including electronic, mechanical, photocopying, recording, or utilized by any information storage or retrieval system, without written permission from the publisher. For information about permissions or to request permissions online, visit us at *www.aspenpublishers.com/licensing/default.aspx*, or a written request may be faxed to our permissions department at 212-771-0803.

Published by Wolters Kluwer Law & Business in New York.

Wolters Kluwer Law & Business serves customers worldwide with CCH, Aspen Publishers and Kluwer Law International products.

Printed in the United States of America

ISBN 978-0-7355-6428-2 (Set)
978-1-4548-1122-0 (Vol. XIV)

1 2 3 4 5 6 7 8 9 0



MIX
Paper from
responsible sources
FSC
www.fsc.org
FSC® C012752

¶2302. **The Robinson-Patman Act: A Brief Historical Overview**

As passed by Congress in 1914, original §2 of the Clayton Act prohibited anticompetitive price "discrimination," but the concern was limited almost entirely to a form of predatory pricing. The fear was that larger firms were engaging in local, or geographic, price cutting. They would sell "their goods, wares, and merchandise at a lesser price in the particular communities where their rivals are engaged in business than at other places," with the result that the smaller rivals would be driven from the market.[1] Having created a monopoly in that place, the giant firm would then target another market that currently had viable rivals and repeat the process, thus growing its monopoly and knocking down small businesses like dominoes. Original §2 of the Clayton Act provided:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly to discriminate in price between different purchasers of commodities, which commodities are sold for use, consumption, or resale within the United States or any territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, where the effect of such discrimination may be to substantially lessen competition or tend to create a monopoly. *Provided*, that nothing herein contained shall prevent discrimination in price between purchasers of commodities on account of differences in the grade, quality or quantity of the commodity sold, or that makes only due allowance for differences in the cost of selling or transportation, or discrimination in price in the same or different communities made in good faith to meet competition: And *provided further*, that nothing herein contained shall prevent persons engaged in selling goods, wares, or merchandise in commerce from selecting their own customers in bona fide transactions and not in restraint of trade.[2]

---

¶2302.  n.1.  H.R. Rep. No. 627, 63d Cong., 2d Sess. 9 (1914).
2.  38 Stat. 730 (1914). The "subsidy" theory of predatory pricing on which §2 of the Clayton Act was based had been in the literature for a generation. See F.J. Stimson, Trusts, 1 Harv. L. Rev. 132, 134 (1887):

Take the Philadelphia Gas, for instance (and the name is purposely misquoted), a company which owns gas-works in a hundred cities. Say that in two of these are competing works, and that the gas costs the company sixty cents a thousand; a price at which the competing company can also live. The Philadelphia company puts its price in those two cities down to ten cents a thousand, and charges its patrons sixty-one cents in the other ninety-eight cities. The profits of the Philadelphia company remain the same, but its only two remaining rivals are ruined.

In sum, the concern of the original §2 of the Clayton Act was entirely with what we today would call "primary-line" price discrimination. That form of price discrimination is treated with the general antitrust rules covering predatory pricing in Chapter 7.[3]

But the Great Depression and considerable advances in both the technologies and theories of distribution[4] caused Congress in the 1930s to become concerned with a different sort of price discrimination. It is difficult for us today to appreciate the extent to which Congress and some of its most powerful constituencies in the Depression regarded the American chain store as a "public enemy."[5] In fact, the growth of modern chain store distribution methods displaced thousands of small, single-store operations. While the economies of multistore distribution methods are numerous and varied, the proponents of the Robinson-Patman Act amendments focused on one thing: the perceived ability of large chain store operations such as the Great Atlantic and Pacific Tea Co. (A&P) to obtain lower prices for the goods that it purchased than smaller buyers were able to match.[6]

Original §2 was believed not to reach the type of discrimination caused by chain store buying power because the perceived victims of price discrimination under the original statute were rivals of the price-discriminating seller. By contrast, the victims of the type of price discrimination that chiefly concerned Congress in the 1930s were the "disfavored" purchasers — that is, those charged a higher price by the price-discriminating seller. Initially the courts interpreted original §2 according to its congressional intent — to apply only to injury to the defendant's competitors.[7]

---

3. See ¶745.

4. On the development of modern distribution methods such as chain store retailing, see Alfred D. Chandler, The Visible Hand: The Managerial Revolution in American Business 285-372 (1977); Joseph Palamountain, The Politics of Distribution (1955); Mansel G. Blackford & K. Austin Kerr, Business Enterprise in American History (3d ed. 1994). On the development of franchising, see Thomas S. Dicke, Franchising in America: The Development of a Business Method, 1840-1980 (1992). See also Herbert Hovenkamp, The Antitrust Enterprise: Principle and Execution ch. 8 (2005).

5. For examples, see Hearings Before the Antitrust Subcommittee of the House Judiciary Committee on Bills to Amend Sections 2 and 3 of the Clayton Act, 74th Cong., 1st Sess. (1935); FTC, Chain Stores: Final Report on the Chain-Store Investigation (1934), S. Doc. No. 4, 74th Cong., 1st Sess. (1935). The legislative history of the Robinson-Patman Act is collected in 4 Earl Kintner, The Legislative History of the Federal Antitrust Laws and Related Statutes ch. 6 (1980). See also 1 ABA Section of Antitrust Law, Monograph #4, The Robinson-Patman Act: Policy and Law 5-19 (1980).

6. See Corwin D. Edwards, The Price Discrimination Law 8-10 (1959).

7. National Biscuit Co. v. FTC, 299 F. 733, 738-739 (2d Cir.), cert. denied, 266 U.S. 613 (1924) (refusing to condemn secondary-line injury where there was no intent or likelihood of driving a competitor out of business and creating a monopoly); Mennen Co. v. FTC, 288

But the Supreme Court overruled these interpretations and opted for a broader construction that recognized at least some customer injury as actionable.[8] Nevertheless, the original statute was thought to be largely ineffective, because it was interpreted by the courts to permit rather trivial differences in products to justify large discriminations in price.[9]

The revised statute eliminated the quantity discount provision in the original statute and replaced the provision with the much narrower "cost justification" defense that we have today.[10] Perhaps most important from the viewpoint of Congress and the most powerful interest groups supporting the statute,[11] the revised Act condemned those who received unlawful discriminations in price as well as those who granted them. The central "evil" targeted by the Robinson-Patman Act was the *buying* power of large chain stores such as A&P. Sellers of commodities for resale were often regarded as powerless; they were induced to sell to the big chains at lower prices because of the latter's overwhelming volume. After varied but largely unsuccessful attempts to organize buying cooperatives to compete with the large chains, or to use boycotts or blacklists directed at their suppliers, the well-organized smaller retailers were successful in obtaining some state legislation, which generally addressed the problem through statutes prohibiting the chains from opening additional stores. But these statutes were struck down.[12] Other state statutes imposed taxes on chain stores, with the tax rate rising as the number of stores increased. While the statutes were generally upheld,[13] they

F. 774, 779 (2d Cir.), cert. denied, 262 U.S. 759 (1923) (§2 designed to prevent great corporations from enlarging a monopoly by charging low prices in competitive towns; nothing in legislative history suggesting coverage of secondary-line injury). These developments are recounted in more detail in Frederick M. Rowe, Price Discrimination Under the Robinson-Patman Act 6-7 (1962); and Edwards, supra, at 5-8.

8. *George Van Camp & Sons Co. v. American Can Co.*, 278 U.S. 245, 253-254 (1929) (adopting a form of secondary-line injury in which effect of defendant's price discrimination among distributors was to force disfavored distributor out of business).

9. *Goodyear Tire & Rubber Co. v. FTC*, 101 F.2d 620 (6th Cir.), cert. denied, 308 U.S. 557 (1939).

10. See ¶2351.

11. On the identity and influence of these interest groups, particularly the various associations of wholesale grocers, see Hugh C. Hansen, Robinson-Patman Law: A Review and Analysis, 51 Fordham L. Rev. 1113, 1123 (1983); Joseph Palamountain, The Politics of Distribution 62-68, 160-170, 235-253 (1955).

12. See FTC, Chain Stores: Final Report on the Chain-Store Investigation (1934), S. Doc. No. 4, 74th Cong., 1st Sess. 78 (1935).

13. See Palamountain, supra, at 162.; and see *Louis K. Liggett Co. v. Lee*, 288 U.S. 517 (1933) (upholding a state tax that was graduated according to the number of stores owned by the defendant); *Great Atl. & Pac. Tea Co. v. Maxwell*, 284 U.S. 575 (1931) (per curiam) (similar); *State Bd. of Tax Commrs. v. Jackson*, 283 U.S. 527 (1931) (similar).

were not particularly effective. Significantly, a state could tax stores within its own boundaries, but not elsewhere. Then the small retailers turned to Congress,[14] whose first response was the Codes of Fair Competition, passed as part of the National Industrial Recovery Act during the first New Deal.[15] Those provisions, which the Supreme Court eventually struck down,[16] were particularly hostile toward vertical integration into retailing.[17] The codes attempted to preserve traditional schemes of manufacturer-intermediary-retailer sale and resale distribution as it had existed for centuries. The codes also sought to limit quantity discounts, discounts to large buyers who agreed to perform certain "functions" for themselves, such as stocking and promotion, and limitations on sellers' ability to reduce price in order to compensate for the elimination of brokers.

In today's antitrust era, with its heightened concerns of preserving productive efficiency, it is difficult to understand how Congress could be so opposed to cost savings in distribution. But at the time the elimination of a broker or other link in the distribution chain was regarded as an affirmative evil because it enabled the large firm who had reduced its distribution costs to undersell the numerous small firms who could not attain similar cost savings. Clearly, the class targeted for protection was not consumers, who benefitted from the chains' success; rather, the class comprised the various small businesses and intermediaries who lost market share, profits, or in some cases their entire businesses as a result of more efficient distribution methods.

14.   See Frederick M. Rowe, Price Discrimination Under the Robinson-Patman Act 3-5 (1962); Carl H. Fulda, Food Distribution in the United States, The Struggle Between Independents and Chains, 99 U. Pa. L. Rev. 1051 (1951). Associations of wholesale grocers serving smaller stores also tried self-help in the form of boycotts of those selling to the chains at low prices, but these associations were pursued by the government enforcement agencies. See *Arkansas Wholesale Grocers' Assn. v. FTC*, 18 F.2d 866 (8th Cir. 1927) (condemning grocers' association boycott of suppliers who sold to chain store retailers at the same price as they sold to the defendant wholesalers, thus limiting the latters' markup and placing their own purchaser/retailers at a disadvantage); *United States v. Southern Cal. Wholesale Grocers' Assn.*, 7 F.2d 944 (S.D. Cal. 1925) (similar, Justice Department suit).

15.   48 Stat. 195 (1933).

16.   *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935).

17.   On the hostility of contemporary economists and policy makers toward vertical integration, see Herbert Hovenkamp, Enterprise and American Law, 1836-1937, ch. 25 (1991). See especially Arthur R. Burns, The Decline of Competition: A Study of the Evolution of American Industry 428-430, 460-461 (1936), which identified vertical integration as one of the principal sources of monopoly in the United States.

Acting together with the states, Congress also responded with "fair trade" legislation: the Miller-Tydings Act,[18] under which Congress provided a federal antitrust immunity for state-authorized resale price maintenance.[19] The intent of that statute was not to encourage the development of more efficient distribution processes — something that we think of as a rationale for resale price maintenance today[20] — but rather to ensure that chain stores would be required to sell "fair trade" goods for at least as high a price as the smaller independents were charging.

Since the New Deal period our thinking about large organizations with centralized distribution has changed considerably. Most significantly, we have seen the rise of modern franchising in the fast food markets and numerous other markets. The Robinson-Patman Act seems not merely quaint but also positively harmful to competition, particularly when it is used to upset the distribution systems of firms operating in competitive markets. As a result there have been many calls for its modification or repeal.[21]

# 23B
# Technical and "Jurisdictional" Requirements

One thing that the following Paragraphs acknowledge is the tendency in Robinson-Patman cases for courts to use the word "jurisdiction" broadly when they are really speaking of statutory or prudential limitations on the reach of the statute, particularly its limitations to practices that are "in" commerce rather than simply

---

18. 50 Stat. 693 (1937). The McGuire Act, 66 Stat. 631 (1952), added the exemption to the Federal Trade Commission Act. The developments are recounted very briefly in ¶¶217, 218.

19. See Hearings on H.R. 4995, H.R. 5062, and H.R. 8442 Before the House Comm. on the Judiciary, 74th Cong., 1st Sess. 27-28 (1935).

20. See ¶1611.

21. E.g., United States Dept. of Justice, Report on the Robinson-Patman Act (1977); Report of Nixon Task Force on Productivity and Competition, H.R. Rep. No. 91-1617, 91st Cong., 2d Sess. 27 (1969) (Stigler Report); White House Report on Antitrust Policy, H.R. Rep. No. 91-1617, 91st Cong., 2d Sess. 13 (1970) (Neal Report). See also Robert H. Bork, the Antitrust Paradox: A Policy at War with Itself, ch. 20 (1978; rev. ed. 1993); Richard A. Posner, The Robinson-Patman Act: Federal Regulation of Price Differences (1976); Robert H. Bork, The Place of Antitrust Among National Goals, in The Impact of Antitrust on Economic Growth 9 (1966) (the "Typhoid Mary" of antitrust). See generally Herbert Hovenkamp, The Robinson-Patman Act: Unfinished Business, 68 Antitrust L.J. 125 (2000).

ocument #: 41-1 Filed: 03/24/16 Page 43 of 47 PageID #:236

# ANTITRUST ANALYSIS

Problems, Text, Cases

Fifth Edition

## PHILLIP AREEDA

Late Langdell Professor of Law
Harvard University

## LOUIS KAPLOW

Professor of Law
Harvard University

*Formerly published by*
*Little, Brown and Company*



ASPEN LAW & BUSINESS
A Division of Aspen Publishers, Inc.

Copyright © 1997 by The President and Fellows of Harvard College.

All rights reserved. No part of this publication may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopy, recording, or any information storage and retrieval system, without permission in writing from the publisher. Request for permission to make copies of any part of this publication should be mailed to:

Permissions
Aspen Law & Business
1185 Avenue of the Americas
New York, NY 10036

Printed in the United States of America

Library of Congress Cataloging-in-Publication Data

Areeda, Phillip.
    Antitrust analysis : problems, text, cases / Phillip Areeda,
Louis Kaplow. — 5th ed.
        p.      cm.
    Includes index.
    ISBN 1-56706-566-X (casebound)
    1. Antitrust law — United States — Cases.      I. Kaplow,
Louis.      II. Title.
KF1648.A7      1997
343.73'0721 — dc21                                97-27101
                                                        CIP

Damage issues are not necessarily distinctive. In primary-line cases, the plaintiff must prove the loss of profits resulting from the defendant's unlawfully low price. What may be distinctive is the secondary-line damage issue. Because, as we shall see, secondary-line illegality may follow simply from the existence of a price discrimination, it had sometimes been suggested that the disfavored buyer's damage is the excess it paid the seller above the lower price paid by the competing favored buyer, but the Supreme Court has settled the issue by insisting on more particular proof of injury.[24] For example, the plaintiff might show that the favored purchaser actually used the buying preference to draw sales or profits from the plaintiff.

**602.    The development of §2.** (a) *The original provision.* The Supreme Court has explained that §2(a), "when originally enacted as part of the Clayton Act in 1914, was born of a desire by Congress to curb the use by financially powerful corporations of localized price-cutting tactics which had gravely impaired the competitive position of other sellers."[25] The House Judiciary Committee had explained that §2(a) was expressly designed to forbid

> a common and widespread unfair trade practice whereby certain great corporations and also certain smaller concerns, which seek to secure a monopoly . . . by aping the methods of the great corporations, have . . . [sold] at a less price in the particular communities where their rivals are engaged in business than at other places throughout the country.[26]

(b) *Background of the 1936 legislation.*[27] Clayton Act §2, as originally enacted, was understood to be concerned mainly or even exclusively with price discrimination's effects upon the seller's competitors. Although the Court came to hold buyer-level competition within the statute's protection, the original enactment immunized quantity discounts and thus seemed impotent to control the granting of preferential prices to mass buyers. The mass-buying chain stores and mail order houses grew greatly after World War I and seemed to imperil independent businesses. The chains often purchased directly from manufacturers, dispensed with ordinary whole-

---

24. J. Truett Payne v. Chrysler Motors Corp., 451 U.S. 557 (1981). See Allen Pen Co. v. Springfield Photo Mount Co., 653 F.2d 17 (1st Cir. 1981); Distributing Corp. v. Singer Co., 543 F. Supp. 1033 (D. Kan. 1982) (summary judgment for defendant on damages; preferred buyer failed to capture any sales and plaintiff's sales and profits rose).

25. *Anheuser-Busch,* note 11, at 543.

26. H.R. Rep. No. 627, 63d Cong., 2d Sess. 8 (1914).

27. See generally Rowe, note 3, at 3-10 (political background), 11-23 (broad legislative history).

salers, and undersold independent retailers. The traditional merchants, threatened with extinction, fought back. While many states acted by imposing special taxes on chain stores, the Federal Trade Commission undertook an extensive investigation of the chain store problem.

The Commission concluded[28] that the independents would continue to lose ground as long as the chains continued to offer lower prices to consumers. Because the chains' competitive advantage was partly attributed to discriminatory concessions from suppliers,[29] the FTC proposed that §2 be tightened. The Robinson-Patman enactment exceeded the Commission's recommendations and

> superimposed more stringent prohibitions on the existing framework of §2 of the Clayton Act, expressly enumerated conspicuous types of secret concessions, and penalized the discriminatory discounts on which mass buyers were suspected to thrive. The design of the Robinson-Patman amendments was to facilitate proof of the substantive violation while narrowing the availability of statutory exceptions for justifying price differentials challenged under the Act.[30]

These attitudes were prevalent in the 1930s. Competition was often seen to threaten the survival of small businesses and even of all businesses. We have already seen some evidence of this in the Supreme Court's *Appalachian Coals* decision[31] and in the enactment of fair trade legislation.[32] Other legislation, such as the Motor Carrier Act of 1935,[33] which subjected the emerging and highly competitive trucking industry to regulated price fixing and entry, reflected similar concerns.

(c) *Other antitrust statutes compared.* Unlike the open-ended Federal Trade Commission Act §5 and the Sherman Act, Clayton Act §2, §3, and §7 each address a specific practice. In its original form, §2's coverage and effects clause paralleled that of the other Clayton Act provisions, but the 1936 amendments widened its effects clause and added several more categorical provisions (to be examined in Section D) that are not found elsewhere in antitrust legislation.

---

28. Federal Trade Commission, Final Report on the Chain Store Investigation, S. Doc. No. 4, 74th Cong., 1st Sess. 85-86 (1935).

29. M. Adelman, Price Discrimination as Treated in the Attorney General's Report, 104 U. Pa. L. Rev. 222, 232 (1955), said that the FTC's own data showed that gains from preferential prices accounted for only 15 percent of the chains' price advantage, the rest being attributable to operational efficiencies.

30. Report of the Attorney General's National Committee to Study the Antitrust Laws 156 (1955).

31. See ¶208.

32. See ¶405.

33. 49 Stat. 543.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the CM/ECF system will be served upon

counsel for Plaintiffs electronically via the CM/ECF system on March 24, 2016.

*/s/ Robert D. Cultice*
Robert D. Cultice *(admitted pro hac vice)*
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6000
Fax: (617) 526-5000
robert.cultice@wilmerhale.com