# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| NAPLETON'S ARLINGTON HEIGHTS MOTORS, INC., *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | CASE NO. 1:16-cv-0403 |
| v. | ) ) | Hon. Virginia M. Kendall |
| FCA US, LLC, *et al.*, | ) ) | |
| Defendants. | ) | |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Steve W. Berman
Thomas E. Loeser
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 8th Avenue
Suite 3300
Seattle, WA 98101
(206) 623-7292
steve@hbsslaw.com
tomloeser@hbsslaw.com

David C. Gustman
Jeffery M. Cross
Alexander Vesselinovitch
Dylan Smith
David J. Ogles
FREEBORN & PETERS LLP
311 S. Wacker Drive, Suite 3000
Chicago, IL 60606
(312) 360-6000
dgustman@freeborn.com
jcross@freeborn.com
avesselinovitch@freeborn.com
dsmith@freeborn.com
dogles@freeborn.com

Dated: April 25, 2016

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................. 1

ARGUMENT .................................................................................................... 1

I.     Count I Sufficiently Alleges That FCA Violated The Federal Automobile Dealer Day In Court Act ....................................................... 1

II.    Counts II and III Plausibly Allege That FCA Violated Sections 2(a) and 2(d) of the Robinson-Patman Act ................................... 4

    A.    Plaintiffs sufficiently allege that Competing Dealers in identified markets received incentives and subsidies not functionally available to Plaintiffs ................................................ 5

    B.    Plaintiffs also amply plead injury to competition ......................... 8

        1.    Plaintiffs sufficiently allege diversion of sales ................. 9

        2.    Plaintiffs allege sufficient facts to claim the Morton Salt presumption .............................................................. 9

III.    Plaintiffs Allege Cognizable RICO Claims (Counts IV And V) ............ 10

    A.    The complaint alleges racketeering activity with sufficient detail .................................................................................... 10

    B.    The complaint alleges that FCA directed the affairs of an association-in-fact enterprise ....................................................... 12

    C.    The complaint alleges a pattern of racketeering activity ............ 14

    D.    Plaintiffs have standing to bring these RICO claims .................. 16

IV.    Plaintiffs Have Pled Breach Of The Franchise Agreements (Count VIII) ........................................................................................ 17

V.    Counts IX, X, XI, and XII State Plausible Claims Under State Dealer Statutes ....................................................................... 18

VI.    Plaintiffs Have Adequately Pled Common Law Fraud (Count VI) And Negligent Misrepresentation (Count VII) ....................................... 22

VII.    Claims Against FCAR Are Sufficiently Pled (Counts XIII And XIV) ................................................................................... 24

CONCLUSION ................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>

*Abraham v. Singh*,
480 F.3d 351 (5th Cir. 2007) ............................................................16

*Ajuba Intern., L.L.C. v. Saharia*,
871 F. Supp. 2d 671 (E.D. Mich. 2012).............................................18

*Am. Med. Assn. v. 3Lions Publg., Inc.*,
14 C 5280, 2015 WL 1399038 (N.D. Ill. Mar. 25, 2015) ......................14

*Anza v. Ideal Steel Supply Corp.*,
547 U.S. 451 (2006)........................................................................16, 17

*Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*,
738 N.E.2d 938 (Ill. App. Ct. 2000) *aff'd in part, rev'd in part*, 770 N.E.2d 177 (Ill.
2002) .................................................................................................19

*Bible v. United Student Aid Funds, Inc.*,
799 F.3d 633 (7th Cir. 2015) ..........................................................12, 13

*Borich v. BP, PLC*,
904 F. Supp. 2d 855 (N.D. Ill. 2012) .................................................11

*Boyle v. United States*,
556 U.S. 938 (2009)........................................................................12, 13

*Bridge v. Phoenix Bond & Indem. Co.*,
553 U.S. 639 (2008)........................................................................10, 16

*Chen v. Mayflower Transit, Inc.*,
315 F. Supp. 2d 886 (N.D. Ill. 2004) ...............................................13, 14

*Crest Auto Supplies, Inc. v. Ero Manufacturing Co.*,
360 F.2d 896 (7th Cir. 1966) .............................................................7

*DBI Invs., LLC v. Blavin*,
617 F. Appx 374 (6th Cir. 2015)........................................................24

*Ed Houser Enter. v. Gen. Motors Corp.*,
595 F.2d 366 (7th Cir. 1979) .............................................................4

*Faust Printing, Inc. v. MAN Capital Corp.*,
2006 WL 1719532 (N.D. Ill. June 16, 2006) ......................................22

*Fitzgerald v. Chrysler Corp.*,
116 F.3d 225 (7th Cir. 1997) ..............................................................13

*Fox Motors, Inc. v. Mazda Distrib. (Gulf), Inc.*,
806 F.2d 953 (10th Cir. 1986) ..........................................................2, 4

*FTC v. Morton Salt Co.*,
334 U.S. 37 (1948)............................................................................8, 9

*Gates v. Chrysler Corp.*,
397 So.2d 1187 (Fl. Ct. App. 1981)......................................................21

*Goodloe v. National Wholesale Co.*,
2004 WL 1631728 (N.D. Ill. July 19, 2004)............................................7

*Greenberger v. GEICO Gen. Ins. Co.*,
631 F.3d 392 (7th Cir. 2011) ..............................................................24

*Guaranteed Rate, Inc. v. Barr*,
912 F. Supp. 2d 671 (N.D. Ill. 2012) ...............................10, 11, 12, 15

*H.J. Inc. v. Nw. Bell Tel. Co.*,
492 U.S. 229 (1989)......................................................................14, 15

*Hubbard Chevrolet Co. v. Gen. Motors Corp.*,
682 F. Supp. 873 (S.D. Miss. 1987)......................................................3

*Huron Tool & Eng'g Co. v. Precision Consulting Servs., Inc.*,
532 N.W.2d 541 (Mich. App. 1995)......................................................24

*J.F. Feeser, Inc. v. Serv-a-Portion, Inc.*,
909 F.2d 1524 (3d Cir. 1990)................................................................9

*Junikki Imports, Inc. v. Toyota Motor Co.*,
335 F. Supp. 593 (N.D. Ill. 1971) ........................................................3

*Kalitta Air LLC v. GBSD & Assoc.*,
591 Fed. Appx. 338 (6th Cir. 2014)......................................................15

*Kawasaki Shop of Aurora, Inc. v. Kawasaki Motors Corp., U.S.A.*,
544 N.E.2d 457 (Ill. App. Ct. 1989) ....................................................21

*Kostovetsky v. Ambit Energy Holdings, LLC*,
2016 WL 105980 (N.D. Ill. Jan. 8, 2016)............................................15

*Kundrat v. CBOE*,
2002 WL 31017808 (N.D. Ill. Sept. 6, 2002) ........................................7

*Lewis v. Philip Morris Inc.*,
   355 F.3d 515 (6th Cir. 2004) ....................................................................................8

*Llewellyn-Jones v. Metro Prop. Grp., LLC*,
   22 F. Supp. 3d 760, 779 (E.D. Mich. 2014)...............................................................23

*Mathew v. Chrysler*,
   2014 WL 3418545 (N.D. Cal. July 11, 2014)..............................................................9

*Meier v. Musburger*,
   588 F. Supp. 2d 883 (N.D. Ill. 2008) .......................................................................11

*Midwest Grinding Co. v. Spitz*,
   976 F.2d 1016 (7th Cir. 1992) ..................................................................................15

*Moore v. Fid. Fin. Serv., Inc.*,
   869 F. Supp. 557 (N.D. Ill. 1994) .............................................................................18

*N. Broadway Motors, Inc. v. Fiat Motors of N. Am., Inc.*,
   622 F. Supp. 466 (N.D. Ill. 1984) ...............................................................................3

*Nesbitt v. Regas*,
   No. 13 C 8245, 2015 WL 1331291 (N.D. Ill. Mar. 20, 2015) ...........................14, 16

*Nissan Motor Acceptance Corp. v. Schaumburg Nissan, Inc.*
   1993 WL 360426 (N.D. Ill. Sept. 15, 1993) ................................................................2

*Oberoi v. Mehta*,
   2011 WL 1337107 (N.D. Ill. Apr. 6, 2011) ...............................................................14

*Olson v. Champaign County*,
   784 F.3d 1093 (7th Cir. 2015) ....................................................................................5

*Petrakopoulou v. DHR Intern., Inc.*,
   590 F. Supp. 2d 1013 (N.D. Ill. 2008) ......................................................................25

*Phoenix Bond & Indemnity Co. v. Bridge*,
   477 F.3d 928 (7th Cir. 2007) ....................................................................................16

*Reis Robotics USA, Inc. v. Concept Indus., Inc.*,
   462 F. Supp. 2d 897 (N.D. Ill. 2006) ........................................................................23

*Sherman v. Sea Ray Boats, Inc.*,
   649 N.W.2d 783 (Mich. App. 2002)..........................................................................24

*Smith Wholesale Co. v. R.J. Reynolds Tobacco Co.*,
   477 F.3d 854 (6th Cir. 2007) ......................................................................................8

*Suburban Dodge of Berwyn v. Daimlerchrysler Motors Co., LLC*,
  2007 WL 1231646 (Bankr. N.D. Ill. April 24, 2007) .......................................2, 4, 21

*Sudden Service, Inc. v. Brockman Forklifts, Inc.*,
  647 F. Supp. 2d 811 ...........................................................................................24

*Tamayo v. Blagojevich*,
  526 F.3d 1074 (7th Cir. 2008) ............................................................................7

*TLMS Motor Corp. v. Toyota Motor Distrib., Inc.*,
  1998 WL 182475 (N.D. Ill. Apr. 15, 1998) .......................................................3

*U.S. ex rel. Ivanich v. Bhatt*,
  2014 WL 3454227 (N.D. Ill. July 14, 2014)......................................................6

*United Food & Commercial Workers v. Walgreen Co.*,
  719 F.3d 849 (7th Cir. 2013) ............................................................................13

*United States v. Busacca*,
  936 F.2d 232 (6th Cir. 1991) ............................................................................15

*United States v. Segal*,
  248 F. Supp. 2d 786 (N.D. Ill. 2003) ...............................................................15

*United States v. Stodola*,
  953 F.2d 266 (7th Cir. 1992) ............................................................................15

*Vicom, Inc. v. Harbridge Merchant Services*,
  20 F.3d 771 (7th Cir. 1994) ..............................................................................15

*Whitesell Corp. v. Whirlpool Corp.*,
  2009 WL 3270265 (W.D. Mich. Oct. 5, 2009), at *1, 4.....................................23

*Williams v. Duke Energy Int'l, Inc.*,
  681 F.3d 788 (6th Cir. 2012) ..............................................................................7

## STATUTES

815 ILCS 710/4(b) ..........................................................................................20

815 ILCS 710/4(d)(1) ......................................................................................19

815 ILCS 710/4(d)(4) ......................................................................................20

815 ILCS 710/4(e)(2) .......................................................................................19

815 ILCS 710/4(e)(2)-(3).................................................................................19

815 ILCS 710/7................................................................................................21

63 P.S. 818.12(b)(18) ........................................................20

63 P.S. § 818.12(b) ........................................................19

15 U.S.C. § 1221 ........................................................1

15 U.S.C. § 1222 ........................................................1, 4

Fed. R. Civ. P. 8(a) ........................................................12

Fl. Stat. § 320.64(4) ........................................................21

Fl. Stat. § 320.64(6) ........................................................20

Fl. Stat. § 320.64(18) ........................................................19

Fl. Stat. §§ 320.641(3), 320.64(7) ........................................................20

Mo. Rev. Stat. § 407.825(1) ........................................................20

Mo. Rev. Stat. § 407.825(9) ........................................................21, 22

Mo. Rev. Stat. § 407.825(15) ........................................................21

Mo. Rev. Stat. § 407.825(18) ........................................................19

Mo. Rev. Stat. § 407.825(28) ........................................................19

Mo. Rev. Stat. § 407.825(32) ........................................................19

Mo. Rev. Stat. § 407.825(33) ........................................................19

Mo. Rev. Stat. § 407.825(41) ........................................................19

Mo. Rev. Stat. § 407.835(2) ........................................................22

## OTHER AUTHORITIES

HERBERT HOVENKAMP, ANTITRUST LAW ¶ 2333 at 125-26 (3rd ed. 2012)....................................8

## INTRODUCTION

An automobile manufacturer cannot use its immense power in the marketplace to take unfair advantage of franchise dealers. In all interactions with its dealers, and in collecting and disseminating sales and performance metrics, an automobile manufacturer must be forthright, honest and actuated by good faith. This case arises because Defendant FCA US LLC ("FCA"), in conjunction with Defendant FCA Realty ("FCAR"), has violated these basic rules. With deceit, intention, and brazen requests to falsify sales reporting, Defendants have undertaken a patently fraudulent and unfair course of conduct to enrich themselves at Plaintiffs' expense. Defendants' cries that the causes of action in the complaint are implausible and lack foundation in law and fact are wholly detached from reality. In fact, the complaint describes FCA's scheme with discrete and specific allegations of fact that support patent violation of the laws and statutes alleged. Defendants' motion should be denied in its entirety.[1]

## ARGUMENT

### I.      Count I Sufficiently Alleges That FCA Violated The Federal Automobile Dealer Day In Court Act.

The Automobile Dealer Day in Court Act ("ADDCA") prohibits manufacturers from "performing or complying" with their franchise agreements in bad faith. 15 U.S.C. § 1222. Despite its hyperbole, FCA has only two arguments for dismissal of the ADDCA claim (at pp. 16-17): (i) Plaintiffs do not adequately allege "coercion" and thus cannot show bad faith; and (ii) Plaintiffs do not identify a provision "with which FCA did not comply." Both arguments fail.

Bad faith requires an element of "coercion, intimidation, or threats of coercion or intimidation." 15 U.S.C. § 1221. Plaintiffs amply plead coercion even under FCA's narrow definition—"a wrongful demand which will result in sanctions if it is not complied with." For

---

[1] Capitalized terms used herein and not otherwise defined have the meanings set forth in the Amended Complaint (referred to here as the "complaint" or "AC").

example, Plaintiffs allege that FCA demanded that Plaintiffs falsify sales records *or else* it would sanction Plaintiffs by denying them popular vehicles with the intent to harm their business and boost their competitors' businesses. (AC ¶¶ 35-37, 43, 50-52.) FCA admits (at p. 22) that the complaint sets forth "numerous alleged 'threats'" of termination against Plaintiffs' dealerships. (*See* AC ¶¶ 111-12.) Indeed, after Plaintiffs blew the whistle on the false sales reporting (AC ¶¶ 45, 111), FCA threatened to terminate Plaintiffs' dealerships in a "default" letter that explicitly referenced this lawsuit. (AC ¶¶ 111-12.) Retaliation is squarely alleged, and at least a plausible inference here. Because "a manufacturer's principal means of coercion is to threaten to terminate or refuse to renew a franchise," these allegations state a claim under the ADDCA. *Suburban Dodge of Berwyn v. Daimlerchrysler Motors Co., LLC*, 2007 WL 1231646, at *6 (Bankr. N.D. Ill. April 24, 2007).

Additionally, FCA's argument is premature because courts evaluate ADDCA claims only "after a complete record has been established." *Nissan Motor Acceptance Corp. v. Schaumburg Nissan, Inc.* 1993 WL 360426, at *5 (N.D. Ill. Sept. 15, 1993). To make this determination on the pleadings would be counterintuitive because coercion "depends upon the circumstances arising in each particular case and may be inferred from a course of conduct." *Id.* (quoting *Fox Motors, Inc. v. Mazda Distrib. (Gulf), Inc.*, 806 F.2d 953, 959 (10th Cir. 1986)). In particular, "[a]llocating vehicles in a manner which expressly discriminates against a certain class of dealers . . . rises to bad faith when the facts also indicate a design to force dealer termination or achieve some other wrongful objective." *Fox Motors*, 806 F.2d at 960.

The complaint alleges that FCA denied Plaintiffs vehicles with the intent to jeopardize their businesses. (AC ¶¶ 35-37, 50-53, 110-114.) This alone is sufficient to state a claim. *See Fox Motors*, 806 F.2d at 960; *Nissan*, 1993 WL 360426, at *5 (denying motion to dismiss where

dealer alleged Nissan "intentionally discriminated . . . in terms of allocations and marketing support so that the Dealership would be unprofitable"); *N. Broadway Motors, Inc. v. Fiat Motors of N. Am., Inc.*, 622 F. Supp. 466, 471 (N.D. Ill. 1984) ("[A] manufacturer's insistence that a dealer accept an unfair allocation of automobiles may form the basis for a suit under the Dealers Act."). The complaint goes further than these cases by alleging that FCA—motivated by a wrongful objective to report inflated sales—manipulated Plaintiffs' sales requirements to keep them in a perpetual state of default. (AC ¶¶ 1-11, 56-74, 110-114.) FCA then sent "default" letters warning that FCA could terminate Plaintiffs' franchises at any time, while purporting to grant Plaintiffs short "extensions" FCA used as a façade to "monitor" their sales volume performance. (AC ¶¶ 8, 74, 111-12.) FCA intended to and did send Plaintiffs a message: help FCA inflate sales volume, or else FCA will retaliate with termination. (AC ¶¶ 1-11, 110-114.)

Plaintiff's plainly-stated claim goes to the very heart of the ADDCA's legislative purpose of preventing "manufacturers from relying on their adhesion contracts and using bad faith in coercing dealers out of their franchises." *Junikki Imports, Inc. v. Toyota Motor Co.*, 335 F. Supp. 593, 595 (N.D. Ill. 1971). In support of its arguments, FCA cites *TLMS Motor Corp. v. Toyota Motor Distrib., Inc.*, 1998 WL 182475 (N.D. Ill. Apr. 15, 1998), but that was a case **denying** summary judgment where a manufacturer made "veiled threats" and withheld inventory with the motive to extract financial concessions from the dealer's owner. *Id. at* *9. The pleadings in TMLS stated a cause of action just as they do here, as Plaintiffs have alleged that FCA's acts were intended to wrongfully inflate its own sales volume and drive Plaintiffs out of business. (AC ¶¶ 1-11, 35-37, 50-53, 110-114.) FCA's other cases fair no better. They do not support dismissal at the pleading stage; rather, they were decided on summary judgment, based on a lack of **evidence** that the manufacturer was motivated by an "improper or wrongful" purpose. *See,*

*e.g., Hubbard Chevrolet Co. v. Gen. Motors Corp.*, 682 F. Supp. 873, 876 (S.D. Miss. 1987) (after discovery, dealer could only show that manufacturer's actions were "arbitrary"); *Ed Houser Enter. v. Gen. Motors Corp.*, 595 F.2d 366, 369-371 (7th Cir. 1979) (discriminatory allocation would have been actionable if record on summary judgment showed it was employed as a coercive tactic).

FCA's contention that Plaintiffs did not "allege how FCA failed to perform" (at p. 16) is misguided. FCA cites no authority that dismisses an ADDCA claim on this basis. Nor could it, as the Act does not require Plaintiffs to allege that FCA breached the Franchise Agreements. *See* 15 U.S.C. § 1222 (prohibiting bad faith in "performing" franchise terms); *Daimlerchrysler*, 2007 WL 1231646, at *6 (the ADDCA modifies terms of franchise agreements); *id.* ("[A] demand may be wrongful even if the party has a contractual right to assert it."); *Fox Motors*, 806 F.2d at 959 (manufacturers must comply with terms "in a manner not calculated to force individual dealers out of business"). Plaintiffs allege that FCA performed the Franchise Agreements in bad faith by denying Plaintiffs allocations of popular vehicles (*compare* AC ¶¶ 4, 37, 78-91, 98-100, 174, 192, 208, 225, 241; *with* Def. Ex. A §§ 8, 14), and frustrating Plaintiffs' protections from termination. (*Compare* AC ¶¶ 57-74, 109-112, 175-181; *with* Def. Ex. A §§ 11, 28.)

## II.    Counts II and III Plausibly Allege That FCA Violated Sections 2(a) and 2(d) of the Robinson-Patman Act.

Plaintiffs' price-discrimination claims against FCA arise from two categories of illegal conduct. *First*, FCA provided incentives and subsidies to dealers who compete with Plaintiffs in their relevant markets and who submitted false new vehicle delivery reports ("NVDRs"), while not providing these incentives and subsidies to Plaintiffs (AC ¶¶ 9-10; 35-38; 50-51; 75-77). *Second*, FCA provided incentives and subsidies to Plaintiffs' competitors that were not

functionally available to Plaintiffs because of FCA's arbitrary and discriminatory application of its Volume Growth Program ("VGP") (*Id.* ¶¶ 78-91.)

## A. Plaintiffs sufficiently allege that Competing Dealers in identified markets received incentives and subsidies not functionally available to Plaintiffs.

Contrary to what FCA argues, Plaintiffs have set forth facts sufficient to allow FCA to identify (a) the specific relevant markets and (b) the favored dealers in those markets. Under notice pleading standards and the circumstances of this case, Plaintiffs' allegations are sufficient.

The complaint expressly identifies the market in which each Plaintiff competes. (AC ¶ 20.) Nowhere does FCA challenge these allegations as insufficient to identify relevant markets under the Robinson-Patman Act. Plaintiffs also define (AC ¶ 9) "Conspiring Dealers" as those that conspired with FCA to falsely report sales. (*See also* AC ¶¶ 35, 46-47.) They allege (AC ¶ 76) that FCA provided incentives and subsidies each month to Conspiring Dealers in the markets where each Plaintiff competes, creating a price difference per vehicle in favor of the Conspiring Dealers. Plaintiffs further allege (AC ¶ 77) that the resulting price differences came to more than $800 for each vehicle sold each month. This is ample information for FCA to know which dealers are involved.

Plaintiffs also set forth sufficient facts to identify the Competing Dealers—defined as those located in the markets in which Plaintiffs compete (AC ¶ 31)—that received incentives and subsidies through FCA's discriminatory application of the VGP program. Again, in combination with the description of Plaintiffs' markets (AC ¶ 20), this is plainly sufficient for FCA to determine which dealers are involved and how to respond to the complaint. Later, Plaintiffs allege that the effect of the price differences between dealers who received VGP incentives (favored dealers) and Plaintiffs is that the Competing Dealers who received the VGP incentives paid significantly lower net wholesale prices—at least $800 less per new vehicle. (AC ¶ 91.)

The Seventh Circuit has made clear that the "pleading burden" imposed upon plaintiffs in a given case "should be commensurate with the amount of information available to them." *Olson v. Champaign County*, 784 F.3d 1093, 1100 (7th Cir. 2015) (citation and quotation omitted) (reversing dismissal); *see also U.S. ex rel. Ivanich v. Bhatt*, 2014 WL 3454227, at *2 (N.D. Ill. July 14, 2014) (noting that fraud allegations made on information and belief are permissible where "(1) the facts constituting the fraud are not accessible to the plaintiff and (2) the plaintiff provides the grounds for his suspicions") (citation and quotation omitted).

Here, the information necessary to identify the favored competitors with specificity beyond that already alleged in the complaint rests exclusively in FCA's possession. FCA well knows which specific dealers in the markets identified in paragraph 20 submitted false NVDRs and therefore received incentives and subsidies.[2] A fair reading of the complaint is that (a) FCA's executives know which dealers they approached and caused to submit false NVDRs, the receipt of which confirmed that their requests had been fulfilled;[3] and (b) FCA's executives know which Conspiring Dealers in each relevant market received incentives and subsidies from FCA and beyond the normal incentives and subsidies.[4] The plausibility of plaintiffs' allegations, moreover, is apparent from the face of the complaint, which alleges (AC ¶ 38) that Plaintiffs *themselves* were solicited on five separate occasions to submit false NVDRs in exchange for incentives and subsidies.

---

[2] Similarly, FCA knows the identity of favored dealers in each market who received co-op advertising from FCA as payment for submitting false NVDRs. Such payments form the basis of Plaintiffs' claims under Section 2(d) of the Robinson-Patman Act. (*See also* AC ¶¶ 49, 55, 100, 125-126.)

[3] Plaintiffs specifically allege (AC ¶ 35) that, "FCA, through its employees, executed [the false] NVDR scheme by causing Conspiring Dealers to create false [NVDRs] and transmit such false NVDRs to FCA." (*See also* AC ¶ 54.)

[4] Plaintiffs allege (AC ¶ 36) that, to induce the Conspiring Dealers to participate in the scheme, FCA itself provided incentives and subsidies to those dealers to which they would otherwise not be entitled.

Moreover, FCA simply ignores that Plaintiffs specifically identify (AC ¶ 38) two additional dealers in the Northern Illinois market—Northwestern and Sherman—that were also asked to submit false NVDRs in return for incentives and subsidies. And reliable sources have confirmed the false reporting scheme is widespread. (AC ¶ 36.) At this **pre-discovery** phase, given the illicit and secret nature of FCA's acts, any greater specificity is neither plausible nor required. The level of specificity of the complaint goes far beyond what could reasonably be expected and it is more than enough to put FCA on notice of what Plaintiffs allege they did, when they did it, where they did it, who they did it with, and how they did it.[5]

The Sixth Circuit rejected an argument essentially identical to the argument FCA makes here. *See Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788 (6th Cir. 2012). There, the defendants argued that Robinson-Patman Act claims were properly dismissed because, among other reasons, the plaintiffs "d[id] not allege the identity of the 'favored' or 'disfavored' purchasers." *Id.* at 801. The court disagreed and remanded the case, reasoning that the "primary reason" that the agreements and sales with the favored purchasers were not pleaded with specificity was that "***discovery has not taken place and this information rests in the hand of the Defendants***." *Id.* (emphasis added). The same is true here.

None of the cases FCA cites (at p. 14) supports its argument that more specificity is required. In *Goodloe v. National Wholesale Co.*, 2004 WL 1631728 (N.D. Ill. July 19, 2004), the court faced an unopposed motion to dismiss the filing of a *pro se* plaintiff with "an extensive history of failed federal litigation." *Id.* at *2. The complaint made only conclusory allegations of price discrimination and "no facts about who his putative competitors [were]." *Id.* at *9. The

---

[5] *Twombly* did not change the rule that the Court must "construe the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded facts alleged, and drawing all possible inferences in [the plaintiff's] favor." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008).

complaint here includes facts sufficient to allow FCA to identify the favored competitors. In *Kundrat v. CBOE*, 2002 WL 31017808, at *7 (N.D. Ill. Sept. 6, 2002), the complaint failed to allege an anticompetitive effect or even a general description of a favored competitor. In *Crest Auto Supplies, Inc. v. Ero Manufacturing Co.,* 360 F.2d 896 (7th Cir. 1966), the court affirmed dismissal where the plaintiff alleged neither a competitive effect nor competition in any sense.

Contrary to what FCA suggests, *Lewis v. Philip Morris Inc*., 355 F.3d 515 (6th Cir. 2004), does not even address the sufficiency of a Robinson-Patman claim under Rule 12(b)(6). In *Lewis*, the court **reversed** an order of summary judgment for the defendant due to issues of fact about whether the plaintiffs were in competition with other entities. *Id.* at 533.

**B.        Plaintiffs also amply plead injury to competition.**

As a threshold matter, FCA cites (at p. 13) the treatise of Professor Herbert Hovenkamp to suggest that the Robinson-Patman Act does not apply to the type of conduct alleged in this case. This citation is deeply misleading. Professor Hovenkamp makes clear in his treatise that, even though Congress's original focus was on discounts demanded by large dealers, the federal courts have taken the view that a rebate offered by a manufacturer can cause injury to competition. *See* 14 HERBERT HOVENKAMP, ANTITRUST LAW ¶ 2333 at 125-26 (3rd ed. 2012). That is exactly the type of injury that Plaintiffs have alleged here.[6]

The case law provides a Robinson-Patman plaintiff with two alternative methods to allege injury to competition: (1) alleging a diversion of sales, or (2) reliance on the *Morton Salt* presumption by showing a significant price reduction over a substantial period of time. *See FTC*

---

[6] FCA also cites (at p. 15 n.7) *Smith Wholesale Co. v. R.J. Reynolds Tobacco Co*., 477 F.3d 854 (6th Cir. 2007), for the unremarkable proposition that manufacturer bonus and incentive programs may be procompetitive. *Smith Wholesale* has no application here. There, the district court granted summary judgment after the close of discovery finding that the discounts **were** functionally available to the plaintiffs. *Id.* at 860. Here, at the pleading stage, Plaintiffs have plausibly alleged that the incentives and subsidies flowing to the favored dealers were not functionally available to them. (*See* AC ¶¶ 3; 7; 9; 36-38; 43; 50-52; 75-102; 118-120; 125-126.)

*v. Morton Salt Co.*, 334 U.S. 37 (1948). Here, Plaintiffs allege facts sufficient to establish competitive injury under either method.

### 1.   Plaintiffs sufficiently allege diversion of sales.

The complaint squarely pleads a diversion of sales to the favored competitors in each market for each Plaintiff. Plaintiffs allege that FCA and the favored dealers knew and ***intended*** that the false NVDR scheme and VGP incentives would establish a competitive advantage over non-favored dealers by creating a price difference per vehicle sold each month. (*See* AC ¶¶ 1-11, 50-52, 76, 80, 84). The resulting harm is plausibly established by factual allegations that considerable price competition exists in each market (AC ¶ 93), that retail prices were a substantial factor in each purchaser's choice of dealer (AC ¶ 94), and that slim profit margins made the net wholesale price an important competitive factor. (AC ¶ 95.) Notably, in *Mathew v. Chrysler*, 2014 WL 3418545, at *7 (N.D. Cal. July 11, 2014), the court concluded that the plaintiff had adequately pled a diversion of sales resulting from FCA's application of its VGP program in California. Here, too, Plaintiffs allege unambiguously that sales were diverted to the favored competitive dealers. (AC ¶¶ 101-102.)

### 2.   Plaintiffs allege sufficient facts to claim the *Morton Salt* presumption.

Plaintiffs are also entitled to the *Morton Salt* presumption of injury to competition. That presumption requires a plaintiff to plead facts establishing a significant price reduction over a substantial period of time, which Plaintiffs do here. (AC ¶¶ 92-97.) In paragraphs 77 and 91, Plaintiffs allege that the price differences, both for the incentives and subsidies flowing from the false NVDR program and for the incentives and subsidies flowing from the arbitrary and discriminatory VGP program, amounted to a significant $800 per vehicle for each set of incentives and subsidies. Favored dealers that received both sets of incentives and subsidies paid $1600 less per car than Plaintiffs.

Further, Plaintiffs allege that the false NVDR scheme lasted at least a year. (AC ¶¶ 35, 54, 102.) A one-year period of price discrimination is sufficient to plead a "significant period of time" under the *Morton Salt* presumption. *See, e.g., J.F. Feeser, Inc. v. Serv-a-Portion, Inc.*, 909 F.2d 1524, 1539 (3d Cir. 1990). Accordingly, Plaintiffs adequately plead significant price discrimination over a significant period of time.

## III. Plaintiffs Allege Cognizable RICO Claims (Counts IV And V).

The complaint alleges a pattern of racketeering activity that is open-ended and predicated on mail and wire fraud schemes. In particular, FCA solicited its dealers in various regions through the mail and the wires to submit false sales reports in return for cash and favorable vehicle allocations, also through the mail and the wires, which enabled FCA's managers and the company to report inflated sales performance. FCA punished non-compliant dealers with threats of termination and discriminatory pricing. This was no ordinary fraud. FCA only perpetrated this fraudulent activity through others outside of FCA who were associated with the enterprise.

### A. The complaint alleges racketeering activity with sufficient detail.

FCA declares (at p. 5) that the RICO counts fail because "they nowhere allege fraud that was perpetrated *on them*, let alone with the particularity required by Rule 9(b)." This contention contradicts governing Supreme Court precedent. "[A] plaintiff asserting a RICO claim predicated on mail fraud need not show, either as an element of its claim or as a prerequisite to establishing proximate causation, that it relied on the defendant's alleged misrepresentations." *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 661 (2008).

The allegations of the fraudulent schemes more than satisfy Rule 9(b)'s requirements. Plaintiffs allege at least seven predicate acts of fraudulent conduct.[7] *Cf. Guaranteed Rate, Inc. v.*

---

[7] AC ¶¶ 38(a)-(b) (alleging that on June 1, 2015, FCA and its District Manager solicited Plaintiff Napleton's River Oaks to report false vehicle sales and that this FCA District Manager admitted that

*Barr*, 912 F. Supp. 2d 671, 685 (N.D. Ill. 2012) (finding that RICO complaint alleged three predicate acts with the level of required particularity). FCA complains (at p. 6) that Plaintiffs fail to identify the times and dates of mailings and wire transmission with exactness. But the complaint specifically identifies by date at least three phone calls (*i.e.*, wire transmissions) in furtherance of the schemes. (AC ¶¶ 38(c), 38(g)-(h), 43.) FCA cites (at p. 6) *Meier v. Musburger*, 588 F. Supp. 2d 883, 906 (N.D. Ill. 2008), for the proposition that a communication providing "notice of the fraud" cannot further a fraudulent scheme. Unlike in *Meier*, however, the calls alleged here solicited participation in—and thus were in furtherance of—FCA's scheme to falsely inflate vehicle sales.

Moreover, where facts are inaccessible, a plaintiff may state the grounds for "its suspicions." *Guaranteed Rate*, 912 F. Supp. 2d at 686 (citations omitted). Here, Plaintiffs' detailed allegations rise well above "suspicion," and strongly support the inference that FCA solicited dealers throughout the country to falsify sales reports. That misconduct necessarily involved use of interstate mails and wires. FCA has exclusive access to the details of its false reporting scheme, such as the precise dates and times of the wires and mailings to dealers in addition to Plaintiffs, and the identities of all the dealer-participants.[8] (AC ¶¶ 38, 54, 74.)

---

FCA's Business Center Director had directed other District Managers of FCA to perpetrate same fraudulent conduct); AC ¶¶ 38(c), 43-44 (on June 30, 2015, FCA's Business Center Director for Midwest Region and FCA district manager solicited manager of Napleton's River Oaks to submit false vehicle sales records in exchange for cash incentives); AC ¶ 38(d) (FCA solicited executive at Sherman Dodge to submit false sales reports); AC, ¶ 38(e) (FCA solicited Northwestern dealership near Chicago to submit false sales reports); AC ¶ 38(g) (FCA sales manager for Orlando, Florida area telephoned manager of several Plaintiff dealerships asking him to submit false vehicle sales reports in exchange for co-op money or extra allocation of popular vehicles); AC ¶ 38(h) (FCA sales representative from Mid-Atlantic Business Center telephoned general manager of Plaintiffs' Ellwood City dealership); AC ¶¶ 60-62 (Plaintiffs Napleton's Arlington Heights made business decisions based upon misrepresentations made to Plaintiffs' principal by FCA's market representative manager in 2013).

[8] FCA cites *Borich*, in which the plaintiffs alleged only that defendants "sent numerous other mail and wire transmissions that will serve as additional predicate acts." *Borich v. BP, PLC*, 904 F. Supp. 2d 855, 862 (N.D. Ill. 2012). The *Borich* complaint did not describe how the e-mails or mailings related to a

**B.      The complaint alleges that FCA directed the affairs of an association-in-fact enterprise.**

FCA contends (at pp. 7-9) that Plaintiffs do not sufficiently allege that FCA conducted the affairs of a RICO enterprise. As this Court has recognized, the Supreme Court has defined a RICO enterprise broadly ever since its 2009 decision in *Boyle. See Guaranteed Rate*, 912 F. Supp. 2d at 686 (citing *Boyle v. United States*, 556 U.S. 938, 948 (2009)). Here, the complaint describes an association-in-fact enterprise, which "does not require any structural features beyond 'a purpose, relationships among those associated with the enterprise, and longevity sufficient to pursue the enterprise's purposes.'" *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 655 (7th Cir. 2015) (quoting *Boyle*, 556 U.S. at 946).[9]

The crux of FCA's argument (at pp. 7-8) is that the members of this association-in-fact are not identified, and FCA is not alleged to have been operating the affairs of that enterprise. The association-in-fact enterprise, however, is described in detail in the complaint, and the relationships among those associated with it are spelled out as well. (AC ¶¶ 133-35.) The complaint also adequately alleges that the sole RICO defendant, FCA, conducted, used, and participated in the affairs of this enterprise. (AC ¶ 132.) Those who are associated-in-fact with the enterprise are identified in the complaint as FCA, its business center directors and district managers, third-party vendors (Urban Science and J.D. Power), and the Conspiring Dealers. (AC ¶¶ 36, 38, 40, 43, 64, 69, 133.) And the complaint specifically alleges that the scheme occurred nationwide according to sources within FCA. (AC ¶¶ 36, 38(b), 38(f).)

---

fraudulent scheme. *Id*. at 863. Here, the connection between the fraudulent schemes and the use of mailings and wire transmissions is described explicitly. (AC ¶¶ 35-39, 43, 54, 74.) Among other mailings and wirings, both schemes were perpetrated, in part, by the mailing of letters, known as notices of default, from FCA to Plaintiffs that threatened to terminate their dealer relationships with FCA. (*Id*. at ¶¶ 74, 111, 211.)

[9] The applicable pleading standard for a RICO enterprise is Fed. R. Civ. P. 8(a), not Rule 9(b). Here, the allegations of an enterprise meet both standards.

FCA contends (at p. 8) that no common goal or purpose is alleged for the enterprise. Not so. The enterprise's common purposes are alleged in detail, and its legitimate and illegitimate aspects are described. (AC ¶¶ 132, 133, 136.) Even though *Boyle* no longer requires a detailed structure for the RICO enterprise, such a structure is set forth in the complaint. (AC ¶ 133.)

FCA argues (at pp. 7-8) that a RICO defendant cannot operate the affairs of the enterprise if it only conducts its own affairs. (citing *Fitzgerald v. Chrysler Corp.*, 116 F.3d 225, 226-27 (7th Cir. 1997); *United Food & Commercial Workers v. Walgreen Co.*, 719 F.3d 849, 853-54 (7th Cir. 2013).) The allegations here are more expansive and far-reaching than in the cases FCA cites. The fact that other participants in an enterprise are deemed "agents" or "affiliates" of FCA does not preclude Plaintiffs from bringing their RICO claims. *See, e.g., Chen v. Mayflower Transit, Inc.*, 315 F. Supp. 2d 886, 902-03 (N.D. Ill. 2004). As the court in *Fitzgerald* recognized, a manufacturer can use its dealers or other agents or affiliates in such a way as "to characterize the assemblage as a RICO enterprise." *Chen*, 315 F. Supp. 2d at 902 (citing *Fitzgerald*, 116 F.3d at 228); *see also Bible*, 799 F.3d at 656-57 (distinguishing *United Food & Commercial Workers*, 719 F.3d at 854-55, on ground that complaint there "failed to allege 'that officials from either company involved themselves in the affairs of the other'").

The enterprise here is not simply FCA by another name. The relationship between FCA and the other participants in the enterprise, including the Conspiring Dealers and third-party vendors, is not employer-employee or parent-subsidiary. Rather, the complaint alleges (AC ¶¶ 34-39, 138) that FCA and the enterprise each play distinct roles within the schemes. *Chen*, 315 F. Supp. 2d at 903 (plaintiff produced evidence that RICO defendant and enterprise each played distinct roles within scheme). Unlike in *Fitzgerald*, the complaint here alleges that FCA did not deal with its dealers or Plaintiffs in merely the "ordinary way." *Id.* at 904 (citing

*Fitzgerald*, 116 F.3d at 228). There is nothing ordinary about a manufacturer that rewards its dealers for submitting false sales reports and threaten to terminate them if they do not comply. There is nothing usual about the manufacturer that abuses market data from third-party vendors to injure those dealers who refuse to play along. (AC ¶¶ 69-72, 133.) By working through the enterprise, FCA was enabled to engage in its racketeering activity in a way that would have been impossible if FCA had acted alone. *Chen*, 315 F. Supp. 2d at 905. Neither FCA nor its co-schemers merely "played a fungible role that could have been performed by outsiders." *Nesbitt v. Regas*, 2015 WL 1331291, *8 (N.D. Ill. Mar. 20, 2015).

FCA shared in the benefits and profit of the enterprise, as did other participants. *Cf. Oberoi v. Mehta*, 2011 WL 1337107, *4 (N.D. Ill. Apr. 6, 2011). The Conspiring Dealers were awarded by cash and allowances through participation in the enterprise, and FCA profited by reporting inflated sales. (AC ¶ 42.) The schemes also conferred a competitive advantage on the Conspiring Dealers and rewarded FCA's district directors and sales managers with a record of inflated sales performance. (AC ¶¶ 47-53.) Finally, the complaint alleges that FCA directed and controlled the enterprise at all times. (AC ¶¶ 35-42, 45-49, 52, 55-58, 66-69, 74, 132-33, 139.)

C.       **The complaint alleges a pattern of racketeering activity.**

FCA asserts (at pp. 9-11) that "Plaintiffs fail to sufficiently allege close-ended or open-ended patterns" of racketeering activity. To the contrary, Plaintiffs allege a classic open-ended pattern of racketeering activity. *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 237-39 (1989).

This is not a "garden-variety" claim of fraud. Rather, Plaintiffs allege complex schemes of mail and wire fraud that directly injured several auto dealers and that threaten to continue into the foreseeable future. As explained above, the complaint describes in detail at least seven instances of fraudulent conduct that form part of the larger pattern of racketeering activity; those

acts are all related and threaten to persist into the future. (AC ¶¶ 38, 43-44, 60-62, 69, 74.)[10] Particularly in the context of an open-ended scheme, these specific allegations are more than sufficient to make out a pattern of racketeering activity. *United States v. Stodola*, 953 F.2d 266, 270 (7th Cir. 1992) (for a pattern, plaintiff need only show multiple predicates within a single scheme that were related) (citing *H.J.*, 492 U.S. at 237); *United States v. Segal*, 248 F. Supp. 2d 786, 793 (N.D. Ill. 2003) (citing *Stodola*, 953 F.2d at 270).

The schemes alleged are not inherently terminable, and they do not pose a natural ending date.[11] To the contrary, the schemes describe past conduct that by their nature project into the future with a threat of repetition. *See Kostovetsky v. Ambit Energy Holdings, LLC*, 2016 WL 105980, *6 (N.D. Ill. Jan. 8, 2016) (open-ended continuity present when, among other scenarios, "a specific threat of repetition exists") (internal quotations and citation omitted). The complaint is rife with allegations that FCA's schemes threaten to continue. (AC ¶¶ 45, 63, 66, 72, 74, 132, 134-36, 140, 149.) As a result, open-ended continuity of the pattern of racketeering has been more than sufficiently alleged. *See, e.g.*, *Kalitta Air LLC v. GBSD & Assoc.*, 591 Fed. Appx. 338, 344-345 (6th Cir. 2014) (the requisite threat of continuity exists even when number of related predicates may be small and may occur close together in time if the acts include a specific threat of repetition); *United States v. Busacca*, 936 F.2d 232, 237 (6th Cir. 1991) (six predicate acts

---

[10] There is nothing speculative about these acts and they are explicitly described. At least seven predicate acts are plausibly set forth in the complaint. *Cf. Am. Med. Assn. v. 3Lions Publg., Inc.*, 14 C 5280, 2015 WL 1399038, at *4 (N.D. Ill. Mar. 25, 2015) (pattern "overly speculative" because predicate acts not "plausibly allege[d]").

[11] FCA's reliance on *Vicom* and *Midwest Grinding* is misplaced. In *Vicom*, there was a "natural end point" to the racketeering activity that occurred long before the filing of the lawsuit. *Vicom, Inc. v. Harbridge Merchant Services*, 20 F.3d 771, 783 (7th Cir. 1994). In *Midwest Grinding*, the racketeering activity ended when the defendant left his employment with plaintiff several years before the filing of the complaint; there was no threat of repetition for the predicate acts to continue. *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1023 (7th Cir. 1992). This Court similarly found that there was no open-ended continuity where "there is no specific threat of repetition because the alleged scheme has come to its natural end." *Guaranteed Rate,* 912 F. Supp. 2d at 693. Here, the pattern of racketeering activity has not ended, and it shows every sign of continuing well into the future.

committed in span of two-and-a-half months was sufficient for open-ended continuity when manner of activity was capable of repetition); *see also Abraham v. Singh*, 480 F.3d 351, 356 (5th Cir. 2007) (victimization would have continued if lawsuit was not filed).[12]

### D. Plaintiffs have standing to bring these RICO claims.

Relying on *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006), FCA argues (at pp. 11-12) that Plaintiffs' alleged damages are too attenuated to confer standing under RICO. To the contrary, Plaintiffs were the direct victims of FCA's pattern of racketeering activity.[13] Plaintiffs did not receive the cash or other monetary incentives that were given to Conspiring Dealers, did not receive extra allocations of popular vehicles, and were threatened with termination by FCA at least in part because they refused to submit false vehicle sales reports.[14] (AC ¶¶ 11, 50, 51, 64, 66, 68, 73, 140-41, 143-44, 148, 150, 154-55.)

*Anza* is inapposite. Here, the complaint alleges that, as an integral component of the scheme to falsely inflate sales figures, FCA rewarded Conspiring Dealers to the detriment of Plaintiffs, who were unwilling to participate in the schemes. For example, Plaintiffs allege that FCA rewarded Conspiring Dealers with favorable allocations of popular vehicles. Because the number of vehicles is finite, it was a "foreseeable and natural consequence" of FCA's scheme

---

[12] Because the complaint adequately alleges both an underlying RICO violation and an agreement to participate in this violation, Count V necessarily states a claim for RICO Conspiracy. *See Nesbitt*, 2015 WL 131291, at *17 ("Unlike the substantive RICO claim . . . a RICO conspiracy claim does not need to identify with particularity the two predicate acts, but only needs to allege an agreement that two predicate acts would occur.").

[13] FCA is also wrong (at p. 12) that the Minimum Sales Responsibility scheme does not state direct injury. (AC ¶ 73.)

[14] To the extent FCA claims first-party reliance is necessary to confer RICO standing, the Supreme Court has held otherwise. *Bridge*, 553 U.S. at 649-50. Because the mail fraud statute "defines a fraudulent *scheme*, rather than a particular false statement, as the crime," "it is unnecessary to show that the false statement was made to the victim." *Phoenix Bond & Indemnity Co. v. Bridge*, 477 F.3d 928, 932 (7th Cir. 2007). In any event, Plaintiffs were direct recipients of at least some of the alleged fraudulent misrepresentations and omissions. (AC ¶¶ 38, 43-45, 56, 60-62, 74.)

that Plaintiffs received fewer popular (and profitable) models of vehicles for resale. *Bridge*, 553 U.S. at 658. That direct injury is more than enough to confer RICO standing. This case is thus unlike *Anza*, in which the cause of the plaintiff's harms was "a set of actions . . . ***entirely distinct*** from the alleged RICO violation." *Anza,* 547 U.S. at 458 (emphasis added).

## IV. Plaintiffs Have Pled Breach Of The Franchise Agreements (Count VIII).

Plaintiffs have adequately pled two independent claims for breach of contract. ***First***, FCA is required to allocate vehicles to Plaintiffs in a "reasonable manner" under section 14 of the Franchise Agreement.[15] (Def. Ex. A § 14.). FCA does not dispute that Plaintiffs allege FCA failed to allocate vehicles in a reasonable manner. Instead, it avers that FCA is "only obligated to ship vehicles after Plaintiffs submit orders and those orders are accepted by FCA," relying solely on the fact that section 14 is entitled "Orders." (*Id.*)

But as FCA well knows, the title of section 14 is irrelevant, as "[t]he titles appearing in this [franchise agreement] have been inserted for convenient reference only and do not in any way affect the construction, interpretation or meaning of the text." (Def. Ex. A § 41.) By contrast, the final sentence of section 14 clarifies that FCA must employ a "reasonable manner" for allocating vehicles "[n]otwithstanding" the previous text in the section that does refer to orders. (*Id*. § 14.)

The requirement to allocate vehicles in a "reasonable manner" is also consistent with section 8, which guarantees plaintiffs the "right, subject to the provisions of this agreement, to purchase . . . vehicles." (*Id.* § 8.) FCA's interpretation of the Franchise Agreement clashes with section 8, as it would allow FCA to withhold vehicles from Plaintiffs by simply choosing not to

---

[15] Plaintiffs support this conclusion with facts showing that FCA actively diverted vehicles to further their false reporting scheme and two-tier pricing scheme, which are manifestly unreasonable manners of allocating vehicles. (AC ¶¶ 7-11, 35-44, 50-52, 75-100.)

"accept" any of their orders, rendering illusory their "right" to purchase vehicles. (*Compare* Def. Ex. A. § 8 *with* Def. Br. 18.) Because Plaintiffs' interpretation of the Franchise Agreement's requirements is reasonable (and FCA wholly fails to support its own interpretation with analysis), dismissal is inappropriate. *Ajuba Intern., L.L.C. v. Saharia*, 871 F. Supp. 2d 671, 689 (E.D. Mich. 2012) (applying Michigan law).

*Second,* FCA also breached the Franchise Agreements by diverting Plaintiffs' sales to competitors and manipulating MSR baselines, thus frustrating Plaintiffs' protection from termination and the fruits of their bargain. (AC ¶¶ 175-183.) FCA contends (at p. 17) that Plaintiffs should have "disclosed the MSR 'baselines' that they claim were too high." FCA's argument is nothing more than a request for a more definite statement, a procedure disfavored in this District. *Moore v. Fid. Fin. Serv., Inc.*, 869 F. Supp. 557, 560-63 (N.D. Ill. 1994) ("Neither vagueness nor lack of details constitute sufficient grounds alone to dismiss a complaint under Rule 12(b)(6)."). The argument is also misguided because Plaintiffs challenge the bad faith *methodology* underpinning these baselines (including FCA's failure to account for its own wrongful sales diversion). (AC ¶¶ 180-81.) Plaintiffs' allegations are sufficient to put FCA on notice of this theory, especially in light of the fact that the MSRs are set by FCA, not Plaintiffs. (AC ¶¶ 178-79.) FCA also argues (at p. 17) that no damages are alleged because termination has not occurred, but Plaintiffs allege that FCA's breach impaired business value, goodwill, and profits. (AC ¶¶ 181-82.) And FCA ignores Plaintiffs' claims for prophylactic injunctive and declaratory relief. (AC ¶¶ 182-83; *id.* at pp. 49-50.)

## V.    Counts IX, X, XI, and XII State Plausible Claims Under State Dealer Statutes.

Plaintiffs' allegations state plausible violations of multiple state-law dealer protection statutes. This section addresses FCA's boilerplate contentions according to FCA's bad acts:

**Unreasonable Vehicle Allocation—Counts IX (IL), X (FL), XI (MO), and XII (PA).**
Illinois, Florida, Missouri, and Pennsylvania each prohibit any system or plan for allocating vehicles that is arbitrary, unfair, inequitable, or unreasonable.[16] FCA's system violates these statutes because it diverts vehicles to Competing Dealers (1) to further FCA's false reporting scheme; and (2) to further FCA's discriminatory "turn and earn" policy. (AC ¶¶ 4, 37, 78-91, 98-100, 174, 192, 208, 225, 241.)

FCA argues that Plaintiffs did not identify dealers that received favorable allocations. FCA cites no authority requiring dealers to identify the ***beneficiaries*** of an unreasonable vehicle allocation system. To the contrary, these statutes require only that Plaintiffs allege an unreasonable "system" or "plan" of vehicle allocation, and they have done so. *See, e.g.*, 815 ILCS 710/4(d)(1); *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 738 N.E.2d 938, 944 (Ill. App. Ct. 2000) *aff'd in part, rev'd in part*, 770 N.E.2d 177 (Ill. 2002) (reversing damages but affirming liability). And as argued in Section I above, Plaintiffs have sufficiently alleged that FCA diverted vehicles to Competing Dealers. (*See also* AC ¶¶ 35-38, 110, 174, 192, 208, 225, 241.)

**Discrimination—Counts IX (IL), XI (MO), and XII (PA).** FCA has diverted cash, vehicles, and other benefits from Plaintiffs to competitors, thereby affording these competitors a lower "actual price" for FCA vehicles than is "practically available" to Plaintiffs. 815 ILCS 710/4(e)(2); Mo. Rev. Stat. § 407.825(28). FCA's discrimination—as more fully described in Section II above—constitutes actionable discrimination in Illinois, Missouri, and Pennsylvania.[17]

---

[16] 815 ILCS 710/4(d)(1) ("arbitrary or capricious"); Fl. Stat. § 320.64(18) ("unfair," "inequitable," "unreasonably discriminatory" or lacks "reason and good cause"); Mo. Rev. Stat. § 407.825(41) ("unreasonable, unfair, or inequitable"); 63 P.S. § 818.12(b) ("not reasonable or fair").

[17] 815 ILCS 710/4(e)(2)-(3) (programs that result in "lower actual price" to competitors and/or their customers); Mo. Rev. Stat. § 407.825(18) (discrimination in allocating vehicles); Mo. Rev. Stat. § 407.825(28) (failure to make bonus or benefit to one dealer "practically available" to another); Mo.

(*See also* AC ¶¶ 78-102.) FCA again insists that Plaintiffs must identify dealers who received preferential treatment, but cites no authority for such requirement, ignores the dealers Plaintiffs do identify (AC ¶¶ 38 (d)-(e)), and fails to address the inference that discovery will reveal others. (AC ¶¶ 35-38, 43-47, 54.)

**Threatened Termination and Coercion—Counts IX (IL) and X (PA).** An "attempt to coerce" dealers into any agreement is unlawful in Florida and Illinois. Fl. Stat. § 320.64(6); 815 ILCS 710/4(d)(4). Plaintiffs allege that FCA actually reduced and "threaten[ed] to reduce [Plaintiffs] allocation of motor vehicles," 815 ILCS 710/4(d)(4), and threatened termination, *id.,* to coerce Plaintiffs to agree to report false sales and to increase sales volume. (AC ¶¶ 3-11, 35-38, 43-45, 50-51, 56-74, 78-91, 98-100, 111-12, 178-181.) In Florida, it is unlawful for manufacturers to "threaten" to discontinue a dealer's franchise without good faith, good cause, or a uniform application of the franchise terms. Fl. Stat. §§ 320.641(3), 320.64(7). FCA admits (at p. 22) that Plaintiffs allege "numerous alleged 'threats'" of termination lacking good faith or good cause. (*See* AC ¶¶ 111-12, 211.) As allegations of "threatened" termination are sufficient, FCA's contention (at p. 22) that Plaintiffs franchises are "still in effect" is irrelevant.

**Arbitrary, Bad Faith, or Unconscionable Acts—Counts IX (IL) and XI (MO).** Any act that is "arbitrary, in bad faith or unconscionable" and damages a dealer is unlawful in Illinois and Missouri. 815 ILCS 710/4(b); Mo. Rev. Stat. § 407.825(1) (formulated as "capricious or not in good faith or unconscionable").

FCA does not dispute that Plaintiffs sufficiently allege arbitrary, bad faith or unconscionable conduct. It does not even challenge the Missouri claim, and thus Count XI

---

Rev. Stat. § 407.825(32) (providing increased cash incentives to competitors based on meeting performance standard); Mo. Rev. Stat. § 407.825(33) ("unreasonably discriminating" in any program that provides assistance to dealers); 63 P.S. 818.12(b)(18) ("causing a difference in the price" to new dealers or ultimate purchaser).

cannot be dismissed. For the Illinois statute, FCA argues (at p. 21 n.10) only that the Court should ignore section 710/4(b) because it is a "general prohibition" contained within a statute that also outlaws specific acts. The case law contradicts this contention, as courts permit claims solely under section 710/4(b) to proceed even where claims under other subsections are dismissed. *See Daimlerchrysler*, 2007 WL 1231646, at *10; *see also Kawasaki Shop of Aurora, Inc. v. Kawasaki Motors Corp., U.S.A.*, 544 N.E.2d 457, 464 (Ill. App. Ct. 1989).

**Restriction on Litigation—Counts IX (IL) and XI (MO).** Under both Illinois and Missouri law, manufacturers cannot impose restrictions on a dealer's right to bring litigation. 815 ILCS 710/7; Mo. Rev. Stat. § 407.825(15). FCA's "Dealer First Program," which disqualifies dealers from receiving important benefits from FCA if they are in active litigation against FCA, is such a restriction. (AC ¶¶ 193-198, 227-232.) FCA does not argue otherwise, instead asserting that Plaintiffs did not allege injury from this policy. But Plaintiffs do allege this conduct caused injury. (AC ¶¶ 198, 232.) Moreover, Plaintiffs seek an injunction barring enforcement of these provisions and a declaration that these provisions are void. (AC at pp. 53-54, 64-65.)

**Illegal Activity—Count X (FL).:** The complaint sets forth FCA's "illegal acts" of federal mail and wire fraud. (AC ¶¶ 34-74.) Fl. Stat. § 320.64(4). FCA concedes (at p. 22) that an illegal act is simply "one subject to criminal penalties." *Gates v. Chrysler Corp.*, 397 So.2d 1187, 1190 (Fl. Ct. App. 1981). Mail and wire fraud carry criminal penalties. As discussed in Section III.A above, these allegations are well-pled under Rule 9(b). (*Cf.* Def. Br. 22.)

**Unreasonable Standards of Performance—Count XI (MO).** In Missouri, manufacturers shall not "impose unreasonable standards of performance" upon a dealer. Mo. Rev. Stat. § 407.825(9). Plaintiffs allege in detail how FCA uses the MSR baselines and VGP to impose "unreasonable" sales performance standards due to FCA's manipulation, arbitrariness,

bad faith, and discriminatory conduct. (AC ¶¶ 56-74, 78-91.) FCA's lone response is that Plaintiffs must identify a "similarly situated dealer" to obtain relief. But FCA misreads the statute; section 407.825(9) bars *either* an "unreasonable standard" *or* a standard not uniformly applied to other dealers. Plaintiffs have at least sufficiently alleged the former.

**Breach of Contract—Count XI (MO).** In Missouri, punitive damages, litigation expenses, and injunctive relief are available for a manufacturer's willful breach of a franchise agreement. Mo. Rev. Stat. § 407.835(2). Since Plaintiffs have stated a claim for willful breach of contract (*see* Section IV above), and there is no separate challenge to Plaintiffs' claim under this subsection, there is no basis to dismiss Count XI. (AC ¶ 171-83, 234.)

## VI. Plaintiffs Have Adequately Pled Common Law Fraud (Count VI) And Negligent Misrepresentation (Count VII).

Counts VI and VII state claims for fraud and negligent misrepresentation, respectively, arising from FCA's deceptive conduct. FCA argues (at pp. 18-20) that the non-reliance and merger clauses within the Franchise Agreements preclude Plaintiffs' fraudulent inducement claims, and that Michigan's economic loss doctrine precludes any remaining claims.

Each of FCA's arguments fail because they incorrectly assume that Plaintiffs were solely induced to "enter into the Franchise Agreements," when in fact the complaint alleges that FCA induced Plaintiffs to make capital investments and enter other agreements. (AC ¶¶ 159, 163, 166-67.) Thus, Plaintiffs' fraud claims (i) do not overlap with claims for breach of the Franchise Agreements, (ii) are not subject to Michigan law, and (iii) do not implicate the merger and non-reliance clauses. To illustrate, FCA induced Plaintiffs to invest significant capital in a new Illinois dealership, which required Plaintiffs to enter into a sublease governing the properties. (AC ¶¶ 60-63, 166, 244.) Unlike the Franchise Agreements, the sublease lacks a non-reliance clause and is governed by Illinois (not Michigan) law. *See* Def. Ex. B § 39; *Faust Printing, Inc.*

*v. MAN Capital Corp.*, 2006 WL 1719532, at *6 (N.D. Ill. June 16, 2006) (Illinois' economic loss rule does not apply to allegations of intentional fraud).

Further, all of Plaintiffs' fraud claims involve an element of fraudulent inducement. (AC ¶¶ 157-167.) FCA concedes (at p. 19) that the economic loss doctrine does not apply to such claims. *See Llewellyn-Jones v. Metro Prop. Grp., LLC*, 22 F. Supp. 3d 760, 779 (E.D. Mich. 2014). FCA's lone defense to these fraud claims fails because, as above, Plaintiffs' claims cannot be shoehorned within the merger and non-reliance clauses, at least not as a matter of law. Even if they were relevant here, reliance is a question of fact and courts do not enforce these clauses at the pleadings stage. *See Reis Robotics USA, Inc. v. Concept Indus., Inc.*, 462 F. Supp. 2d 897, 910 (N.D. Ill. 2006). Further, courts will not typically enforce non-reliance clauses unless they were negotiated by "sophisticated" parties. *Cf. Whitesell Corp. v. Whirlpool Corp.*, 2009 WL 3270265, at *3 (W.D. Mich. Oct. 5, 2009), at *1, 4 (synthesizing case law). The complaint alleges the opposite: that the Franchise Agreement containing these clauses is a "contract of adhesion" resulting from FCA's "substantial economic leverage," not an arms-length negotiation between sophisticated commercial equals. (AC ¶¶ 1-11.)

Even assuming Michigan law applied to all of Plaintiffs' fraud claims (it does not), the "economic loss doctrine" still would not apply. Simply stated, the doctrine "prohibits a party to a contract from bringing tort claims that are ***factually indistinguishable*** from breach of contract claims." *Llewellyn-Jones*, 22 F. Supp. 3d at 778 (emphasis added). By contrast, the fraud claims here are separate and beyond the Franchise Agreement. The "essence of the claim here is that [FCA's] efforts to conceal the [false reporting and market data manipulation] interfered with the conventional market forces in a manner that is beyond the power of the law of contracts to protect." *Id.* FCA's contentions stretch the economic loss doctrine beyond its limited purpose to

avoid bailing out "parties who could have anticipated losses caused by failed performance and negotiated an appropriate response." *Id.*

FCA's authorities are inapposite because they all involve simple breach of contract cases where the quality of goods or services fell short of explicit contractual terms.[18] None of these cases addresses facts where one party has extra-contractually manipulated the entire market in which the other party competes through deceptive trade practices, affirmatively represented it was not doing so, and then concealed that fact, as Plaintiffs allege here. (AC ¶¶ 157-167.)

## VII.    Claims Against FCAR Are Sufficiently Pled (Counts XIII And XIV).

Counts XIII and XIV set forth quantum meruit and fraud claims to recover expenses that Napleton's Arlington Heights incurred to improve and repair its facilities in reliance on FCAR's representations that these expenses would be "fully reimbursed." (AC ¶ 246.) FCAR raises only one defense to the quantum meruit claim (at p. 25), attaching a sublease agreement that it claims is a "contract exist[ing] to prescribe payment" for the Dealership Repairs. This argument must be rejected because it contradicts the complaint. (AC ¶ 251 ("No contract existed between Plaintiff, Napleton's Arlington Heights, and FCAR for the payment of the Dealership Repairs").) Moreover, as FCAR concedes (at p. 25), the sublease governs only expenses "to keep the Premises…in the *same* order and repair as when the Premises *was delivered to Tenant*." (Ex. B

---

[18] *Cf. DBI Invs., LLC v. Blavin*, 617 F. Appx 374, 378 (6th Cir. 2015) (representations recited by the complaint "essentially summarize the pertinent provisions" of the contract); *Huron Tool & Eng'g Co. v. Precision Consulting Servs., Inc.*, 532 N.W.2d 541, 546 (Mich. App. 1995) (fraudulent representations concerned "the quality and characteristics of the software system sold by defendants" and were "indistinguishable from the terms of the contract"); *Sherman v. Sea Ray Boats, Inc.*, 649 N.W.2d 783, 784 (Mich. App. 2002) (UCC governed defective product claim, not tort law, and plaintiff did not assert fraud or misrepresentation); *Greenberger v. GEICO Gen. Ins. Co.*, 631 F.3d 392, 399 (7th Cir. 2011) (dismissing state consumer fraud act claim where allegations were "nothing more than restatements of the claimed breach of contract" promising to restore vehicle to pre-loss condition); *Sudden Service, Inc. v. Brockman Forklifts, Inc.*, 647 F. Supp. 2d 811, 816 (dismissing silent fraud claim because plaintiffs conceded that defendants' duty to disclose arose solely from the contract).

¶ 9 (emphasis added).) The subject matter of the sublease does not extend to expenses made to improve the Premises after delivery.

Count XIII also states a claim for fraudulent inducement. FCAR argues (at p. 25) that there is no reasonable reliance because the sublease referenced above contains an integration clause. This argument fails because integration clauses cannot preclude reliance as a matter of law in Illinois. *Petrakopoulou v. DHR Intern., Inc.*, 590 F. Supp. 2d 1013, 1017 (N.D. Ill. 2008); *see* Def. Ex. B ¶ 39 (choosing Illinois law). FCAR also argues (at p. 24) that Count XIII falls short of Rule 9(b) pleading standards. FCAR is incorrect: Plaintiff has provided sufficient facts to identify what the representation was, who made it, and when it was made. (AC ¶¶ 245-251.)

## CONCLUSION

Plaintiffs respectfully request that the Court deny Defendants' Motion to Dismiss the Amended Complaint in its entirety. Should the Court grant any part of Defendant's motion, Plaintiffs request that any such order of dismissal be without prejudice and with leave to amend.

Respectfully submitted,

The Napleton Plaintiffs

By: /s/   David C. Gustman

Steve W. Berman
Thomas E. Loeser
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 8th Avenue
Suite 3300
Seattle, WA 98101
(206) 623-7292

David C. Gustman
Jeffery M. Cross
Alexander Vesselinovitch
Dylan Smith
David J. Ogles
FREEBORN & PETERS LLP
311 S. Wacker Drive, Suite 3000
Chicago, IL 60606
(312) 360-6000

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that this document filed through the CM/ECF system will be served upon counsel for Defendants electronically through the CM/ECF system on April 25, 2016.

By: /s/ David J. Ogles