# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

NAPLETON'S ARLINGTON HEIGHTS
MOTORS, INC. f/k/a NAPLETON'S
PALATINE MOTORS, INC. d/b/a
NAPLETON'S ARLINGTON HEIGHTS
CHRYSLER DODGE JEEP RAM, an
Illinois corporation; NAPLETON'S RIVER
OAKS MOTORS, INC. d/b/a NAPLETON'S
RIVER OAKS CHRYSLER DODGE JEEP
RAM, an Illinois corporation; CLERMONT
MOTORS, LLC d/b/a NAPLETON'S
CLERMONT CHRYSLER DODGE JEEP
RAM, an Illinois limited liability company;
NAPLETON'S NORTH PALM AUTO
PARK, INC. d/b/a NAPLETON'S
NORTHLAKE CHRYSLER DODGE JEEP
RAM, an Illinois corporation; NAPLETON
ENTERPRISES, LLC d/b/a NAPLETON'S
SOUTH ORLANDO CHRYSLER DODGE
JEEP RAM, an Illinois limited liability
company; NAPLETON'S MID RIVERS
MOTORS, INC. d/b/a NAPLETON'S MID
RIVERS CHRYSLER DODGE JEEP RAM,
an Illinois corporation; NAPLETON'S
ELLWOOD MOTORS, INC. d/b/a
NAPLETON'S ELLWOOD CHRYSLER
DODGE JEEP RAM, an Illinois corporation,

   Plaintiffs,

  v.

FCA US LLC, a Delaware corporation, and
FCA REALTY LLC, a Delaware limited
liability corporation, f/k/a CHRYSLER
GROUP REALTY COMPANY LLC,

   Defendants.

Case No. 1:16-cv-00403-VMK-SMF

## DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

## INTRODUCTION

If there remained any lingering doubt that the Amended Complaint fails to state a claim, that doubt is laid to rest by Plaintiffs' response to Defendants' Motion to Dismiss. Quite simply, Plaintiffs have not, and cannot, remedy the gaping holes in the Amended Complaint, because each of their claims is based on nothing but raw conclusions. One of the most glaring omissions is Plaintiffs' failure—still—to identify a *single* dealer that allegedly submitted a false sales report to FCA in exchange for incentives or additional vehicles. Not only do Plaintiffs fail to provide any argument to remedy this omission, they also cannot identify a single price discrimination case in which this type of unspecified pleading has survived. Likewise, Plaintiffs have not identified a single vehicle or incentive to which they claim they were entitled but did not receive, nor have they provided any information about vehicle sales that were allegedly diverted to other "favored dealers." Furthermore, Plaintiffs continue to engage in group pleading in an effort to bootstrap their claims—ignoring the fact that each individual plaintiff must adequately plead the elements of each claim. These omissions, among others, are fatal to each and every one of their claims. Plaintiffs have already tried their hand at a Complaint *and* an Amended Complaint, and do not even come close to sufficiently pleading their claims. It is time for their fishing expedition to end.

## ARGUMENT

### A.    Plaintiffs' Antitrust Claims Should be Dismissed (Counts II and III)

There is no better illustration of Plaintiffs' failure to satisfy the pleading standard than their futile attempt to defend their Robinson-Patman Act ("RPA") claims. Indeed, the decision in *Mathew Enterprises, Inc. v. Chrysler Group LLC*, 2014 WL 3418545 (N.D. Cal. July 11, 2014), relied on by Plaintiffs, demonstrates just how far below the requisite legal standard Plaintiffs' meager allegations fall. In *Mathew*, the district court identified factual and non-

conclusory allegations in the complaint of a type wholly absent here.

*First*, unlike Plaintiffs, the dealer plaintiff in *Mathew* had no trouble identifying by name its competitors that allegedly were the "favored purchasers." *Id.* at *6-7. *Second*, in stark contrast to Plaintiffs' Amended Complaint, the *Mathew* complaint was found to sufficiently plead a diversion of sales from the allegedly "unfavored" plaintiff to the allegedly "favored purchasers" via non-conclusory allegations that the plaintiff: (i) experienced a significant decrease in sales allegedly caused by the unfair awarding of sales incentives to favored purchasers; (ii) did not qualify for incentives for specified time periods exceeding 16 months as a result of the alleged favoritism in setting sales objectives that the favored purchasers could meet but the plaintiff could not; and (iii) qualified for incentives (in every month but one) and experienced increased sales after the defendant allegedly corrected the manner in which it set sales objectives. *Id.* at *2, *5-7 The plaintiff in *Mathew* further elaborated that when it failed to qualify for incentives, its sales declined to 88 per month while its competitor's increased to 93, but during the period when both the plaintiff and its competitor received incentives, plaintiff averaged 131 sales per month compared to its competitor's 71. *Id.* at *2.

Plaintiffs' attempts to defend their claims only underscore their insufficiency. First, they seek to excuse their failure to identify any "favored competitors" by insisting that FCA has this information in its exclusive possession and therefore "well knows" the dealers to which the Plaintiffs are referring. Opp. at 6. This is plainly insufficient. Second, Plaintiffs—just like the plaintiff in *Mathew*—have in their possession substantial information about their own businesses, including at a minimum how many sales they have made over the years, whether their sales have declined significantly in any given period, when they have qualified for sales incentives and when they have not, how much in sales incentives they have received in what periods and

whether these incentives have increased or decreased over time, and how many sales their competitors have made over the same periods. Yet the Amended Complaint is totally devoid of any of these material and essential allegations.

Instead, the Amended Complaint reveals nothing about the identities of the allegedly "favored competitors": "Conspiring Dealers" are tautologically defined as "those that conspired with FCA to falsely report sales" and "Competing Dealers" are labeled as "those located in the markets in which Plaintiffs compete." Opp. at 5; AC ¶¶9, 31. Plaintiffs point to Paragraph 20 of the Amended Complaint for the identities of the markets in which each Plaintiff competes, but that paragraph does nothing more than identify the general location of each Plaintiff's dealership. Opp. at 5. Likewise, Plaintiffs' allegation that "reliable sources have confirmed the false reporting scheme is widespread" is facially inadequate under any pleading standard. *Id*. at 7. Plaintiffs fall far short of pleading even the most basic elements of an RPA claim.[1]

The allegations in Paragraph 38 of the Amended Complaint do nothing to surmount the pleading bar. Plaintiffs contend that their RPA claims are rendered legally sufficient based on allegations that "Plaintiffs themselves" and two other FCA dealers were solicited to submit false sales reports (NVDRs) to FCA in exchange for incentives and subsidies. Opp. at 6-7; AC ¶38. But they nowhere claim that either third party dealer (one of which, Northwestern, is owned by Napleton's brother) ever actually submitted such reports, and nowhere identify these two dealers as "Competing," "Conspiring," or "favored."[2] *See* Opp. at 7; AC at ¶38.

---

[1] Plaintiffs have already demonstrated via their First Set of Requests for Production that they intend to use the lack of specificity in their pleadings to seek massive amounts of discovery, such as data for all dealers nationwide. Plaintiffs' attempt to use this lawsuit as fishing expedition runs counter to the Federal Rules' emphasis on fair notice and proportionality. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

[2] Even if Plaintiffs had alleged that these were competing or conspiring dealers, they are both located in "suburban Chicago" while five of the seven Plaintiffs are located outside of Illinois. *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 522 (6th Cir. 2004) (a plaintiff alleging §13(a) and (d) violations "must show

Unsurprisingly, Plaintiffs have not identified a single reported case where courts have permitted an RPA claim to proceed beyond a motion to dismiss without identifying the favored purchasers that have benefitted from the alleged price discrimination. Plaintiffs argue that the decision in *Williams v. Duke Energy Int'l, Inc*., 681 F.3d 788, 805 (6th Cir. 2012), in which the Sixth Circuit reversed the district court's dismissal of a case including an RPA claim for lack of subject matter jurisdiction, supports their claim. But the *Williams* plaintiffs *did* in fact identify an allegedly favored purchaser *by name* and possessed redacted agreements with other allegedly favored purchasers from which the defendants could determine their identities. *Id.* at 801. *Williams* is thus entirely consistent with the cases from this district, cited by FCA in its opening brief, demonstrating that an RPA claim will be dismissed when the alleged favored purchaser has not been identified.

**B.      Plaintiffs' Civil RICO Claims Should Be Dismissed (Counts IV and V)**

**1.      Plaintiffs Have Failed to Plead An Enterprise Whose Affairs FCA Conducted**

Plaintiffs do everything possible in their opposition brief to squeeze their garden-variety business claims into a civil RICO action. They fail for several reasons. First, despite Plaintiffs' claim that the enterprise members "are identified in the complaint," not one of the so-called "Conspiring Dealers" belonging to the enterprise is described anywhere. Opp. at 12. This alone is fatal to the RICO claims.

In any event, there is no sufficient allegation that FCA somehow transformed itself into the criminal enterprise targeted by the RICO statute, or acted other than as a manufacturer selling automotive vehicles to its dealers at wholesale. FCA cannot direct an enterprise made up of its own employees and agents. *See Bachman v. Bear, Stearns & Co.*, 178 F.3d 930, 932 (7th Cir.

that it competes with the favored purchaser, and the competition must be in the same geographic area").

1999).  And it makes no difference to Plaintiffs' alleged schemes whether the market data underlying the MSR calculations is calculated internally at FCA or externally at a vendor, or whether FCA reports sales numbers itself or collects them first from its dealers.  By contrast, in *Chen v. Mayflower Transit, Inc.*, 315 F. Supp. 2d 886 (N.D. Ill. 2004), cited by Plaintiffs, the defendant was "enabled to engage in the alleged racketeering activity in a way that would be impossible if [defendant] had internalized the agent-affiliate function."  *Id.* at 905.  To find here that FCA was directing the affairs of an enterprise made up of its vendors and dealers would simply create an incentive for FCA to calculate market data and sell cars at retail itself to avoid baseless RICO allegations.  This is far afield from the harms the RICO statute sought to address.  *See Fitzgerald v. Chrysler Corp.*, 116 F.3d 225, 227 (7th Cir. 1997) ("We have never heard it suggested that RICO was intended to encourage vertical integration.").[3]

### 2.       Plaintiffs Have Not Pled Sufficient Predicate Acts

Plaintiffs claim to have alleged "at least seven predicate acts of fraudulent conduct" (Opp. at 10, citing AC ¶¶38, 60-62), but only three of those allegations include any reference to use of the wires (only "three phone calls" (Opp. at 11) related to the false sales reporting scheme).[4]  In any event, the alleged communications put several Plaintiffs on notice of the alleged scheme, foreclosing the possibility that the calls could further a scheme to defraud the Plaintiffs.  *See Meier v. Musburger*, 588 F. Supp. 2d 883, 906 (N.D. Ill. 2008).  If Plaintiffs' claim is that they were defrauded, these phone calls cannot be predicate acts.  If Plaintiffs' claim is that these

---

[3] Nor does *Oberoi v. Mehta*, 2011 WL 1337107 (N.D. Ill. Apr. 6, 2011), support Plaintiffs' argument. This Court dismissed the complaint in *Oberoi* because there was no enterprise, relying on the fact that the defendants did not share in the profits from the enterprise.  *Id.* at *4.  Here, Plaintiffs never identify any profits FCA made from the alleged schemes.

[4] *Guaranteed Rate, Inc. v. Barr*, 912 F. Supp. 2d 671, 686 (N.D. Ill. 2012), does not stand for the proposition that unspecific allegations are sufficient to plead a predicate act.  This Court dismissed the RICO count in that case, discounting allegations about the relationship among the defendants made on information and belief, and noting in passing that even if facts were inaccessible to a plaintiff, it must "*at a minimum*, state the grounds for its suspicions." *Id.* at 686 (emphasis added).

phone calls furthered a scheme to defraud others, Plaintiffs are in no position to maintain an action for that alleged scheme. *See Hemi Grp., LLC v. City of New York, N.Y.*, 559 U.S. 1, 10, 15 (2010) (distinguishing *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008) and affirming dismissal of theory based on alleged defrauding of a third party).

With respect to the alleged MSR scheme, Plaintiffs identify (only in a footnote), "notices of default" as the communications in furtherance of the alleged scheme and argue that they do not need to be pled with specificity. *See* Opp. at 11 n.8. This argument is directly contradicted by this court's decision in *Borich v. BP, P.L.C.*, 904 F. Supp. 2d 855 (N.D. Ill. 2012), which noted that even allegations of specific e-mails and mailings are insufficient to plead predicate acts without identification of their content and connection to the alleged scheme. *Id.* at 863. Plaintiffs specifically identify a handful of "notices of default" in their Amended Complaint that were sent to only three of the seven Plaintiffs—all of whom continue operating under their franchise agreements, in one case for more than two years after receiving the first notice. AC at ¶¶111, 211. Given their continued operation, there is no plausible inference that these letters were in furtherance of a scheme to "intimidate Plaintiffs to bow to FCA's will" through fraud. AC at ¶66.

### 3. Plaintiffs Have Not Pled A Pattern of Racketeering Activity

Because Plaintiffs have failed to adequately plead two predicate acts in connection with either the false sales or MSR schemes, there can be no pattern of racketeering activity, providing a further basis for dismissing the RICO claim. *See Borich*, 904 F. Supp. 2d at 860; Br. at 9. But even if qualifying predicate acts were alleged, they are not sufficiently related, nor do they pose a threat of continued criminal activity sufficient to plead a pattern.

Plaintiffs allege open-ended continuity based on their "allegations that FCA's schemes

threaten to continue." Opp. at 15.[5] But merely stating that a continuing threat exists is not sufficient, and Plaintiffs have alleged no facts showing a *specific* continuing threat. *See Vicon, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 783 (7th Cir. 1994) ("bald assertions" that the defendant continues racketeering activity are insufficient). Isolated incidents, even when specifically pled, do not by themselves imply "a danger of recurrence." *Pizzo v. Bekin Van Lines Co*., 258 F.3d 629, 633 (7th Cir. 2001). And a mere economic incentive to commit fraud is insufficient because it "applies to every company in existence." *Peterson v. H & R Block Tax Servs., Inc*., 22 F. Supp. 2d 795, 806 (N.D. Ill. 1998).

Contrary to Plaintiffs' argument, whether an alleged scheme has a "built-in ending point" is not dispositive, but is only "[o]ne consideration" of open-ended continuity. *Kalitta Air, LLC v. GSBD & Assoc.*, 591 F. App'x 338, 344 (6th Cir. 2014) (citation omitted). The other cases cited by the Plaintiffs are inapposite: *Kostovetsky v. Ambit Energy Holdings LLC*, 2016 WL 105980, at *6 (N.D. Ill. Jan. 8, 2016), involved fraudulent misstatements that were the defendants' "standard marketing pitch" and "part of their ongoing business . . . ." And *United States v. Busacca,* 936 F.2d 232, 234, 238 (6th Cir. 1991), involved a convicted embezzler appealing a jury verdict who had repeatedly dispensed checks to himself out of union welfare and pension funds he controlled.

### 4.    Plaintiffs Have Failed to Plead Harm By Reason of a RICO Violation

Plaintiffs also fail to causally connect their alleged harm with the alleged RICO violation. Simply put, they fail to plead that they were harmed *by reason of* a RICO violation, and therefore they lack standing under the statute as a matter of law. *See Anza v. Ideal Steel Supply Co.*, 547 U.S. 451, 453 (2006). Without identifying bonus or incentive payments to other dealers, or any vehicles that were provided to other dealers or denied to them, Plaintiffs cannot show that they

---

[5] Plaintiffs do not argue that there is a close-ended scheme. Opp. at 10, 14-15.

lost sales or profits. Indeed, not one of the Plaintiffs even alleges that its sales declined

significantly, or that it failed to qualify for incentives and additional vehicle allocations over any

specified period of time.

Even assuming that such facts were adequately pled, there is no sufficient causal chain to

connect any lost sales or profits to the alleged RICO activity. Contrary to Plaintiffs' claim that

"*Anza* is inapposite" (Opp. at 16), Plaintiffs' damages theory relies on the exact speculative

causal chain that *Anza* proscribed. *See* 547 U.S. at 459; Br. at 11-12. As in *Anza*, the Plaintiffs'

competitors "could have lowered [their] prices for any number of reasons unconnected to the

asserted pattern of fraud," and Plaintiffs' lost sales "could have resulted from factors other than

[the] alleged acts of fraud." *See* 547 U.S. at 458-59. Here, Plaintiffs alleged lost sales and

profits are potentially attributable to multiple causes—including Plaintiffs' own

underperformance—unconnected to FCA's alleged solicitation of false sales reports.[6]

Consequently, the "speculative nature" of such a damages theory is legally inadequate because it

would require the Court to engage in "intricate, uncertain inquiries" to determine what portion of

the lost sales and profits are connected to the alleged RICO activity. *Id.* at 459-60.[7]

## C. Plaintiffs' Automobile Dealers' Day in Court Act Claims Should Be Dismissed (Count I)

Plaintiffs' inability to state a claim under the Automobile Dealers' Day in Court Act

("ADDCA") is also laid bare by the arguments Plaintiffs chose to make in response to FCA's

motion to dismiss. Plaintiffs have entirely failed to plead lack of good faith or coercion, but

rather than admit this, they instead attempt to rewrite the Amended Complaint via their

---

[6] That Plaintiffs' lost sales and profits are subject to multiple causes also distinguishes this case from *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008), where the Court found that there were "no independent factors that account for respondents' injury . . . ." *Id.* at 658.

[7] If anything, the causal chain here is even more speculative than in *Anza*, which involved only *a single plaintiff and competitor*, because it requires that *all seven* Plaintiffs plead sales lost to unidentified competitors. 547 U.S. at 453.

opposition, "paraphrasing" facts that appear nowhere in the actual pleading. First, Plaintiffs'

brief suggests that their Amended Complaint "allege[s] that FCA demanded that Plaintiffs falsify

sales records or else it would sanction Plaintiffs by denying them popular vehicles with the intent

to harm their business and boost their competitors' businesses." Opp. at 2 (citing AC ¶¶ 35-37,

43, 50-52). None of the cited paragraphs claim that FCA threatened to sanction Plaintiffs for not

falsifying sales records, nor do they allege that they ever failed to receive a vehicle to which they

were entitled. *See Epps Chevrolet Co. v. Nissan N. Am., Inc.*, 99 F. Supp. 3d 692, 705-06 (E.D.

Ky. 2015) (ADDCA claim dismissed where "[n]owhere does the complaint allege that

[defendant] rendered an ultimatum to [plaintiff] or affirmatively undertook to intimidate the

dealership); *Northgate Motors, Inc. v. Gen. Motors Corp.*, 111 F. Supp. 2d 1071, 1079-80 (E.D.

Wis. 2000) (ADDCA claims dismissed where "neither [claim] includes an allegation of

coercion"); *see also Weber v. Am. Motors Sales Corp.*, 1986 WL 9775, at *3-4 (N.D. Ill. Sept. 4,

1986) (ADDCA claim dismissed where allegations of coercive conduct were conclusory).[8]

Tellingly, instead of attempting to offer a single example of such a threatened "sanction" related

to vehicle allocation, Plaintiffs reference "default" letters from FCA that they (incorrectly)

characterize as threatening termination.[9] Opp. at 2. Of course, allegedly threatening termination

is not the same thing as allegedly denying vehicles. The fact is that the Amended Complaint

does not allege that FCA threatened Plaintiffs in any way in relation to the VGP scheme.[10]

---

[8] Contrary to Plaintiffs' claim, Defendants' motion to dismiss the ADDCA claim is not "premature," as evidenced by the fact that courts regularly dismiss such claims when coercion is not sufficiently pled. Opp. at 2. The single case Plaintiffs' cite in support of this erroneous argument, *Nissan Motor Acceptance Corp. v. Schaumburg Nissan, Inc.*, 1993 WL 360426 (N.D. Ill. Sept. 15, 1993), pre-dates *Twombly*.

[9] Even if the "default" letters were somehow related to Plaintiffs' false sales reporting claim, they only allege that letters were sent to *three* of the seven Plaintiffs. AC at ¶111, 211. FCA is not alleged to have threatened four of the seven Plaintiffs with anything.

[10] The cases Plaintiffs cite are easily distinguishable. In *Fox Motors, Inc. v. Mazda Distrib. (Gulf), Inc.*, a case on appeal from a jury verdict, the court found not only that the jury could reasonably have inferred that the defendants' allocation system was designed to compel termination, but also that defendant had

In the same vein, Plaintiffs rewrite their alleged MSR scheme in attempt to plead coercion, stating that "FCA—motivated by a wrongful objective to report inflated sales—manipulated Plaintiffs' sales requirements to keep them in a perpetual state of default." *Id.* at 3. There is no allegation in the pleadings that FCA threatened to manipulate Plaintiffs' sales requirements if they would not engage in false sales reporting. And the suggestion that because the Plaintiffs refused to report false sales, FCA decided to manipulate sales requirements that would impact all dealers defies logic.

**D.      Plaintiffs' Breach of Contract Claim Should Be Dismissed (Count VIII)**

Plaintiffs' breach of contract claim continues to fail, despite their unsuccessful attempts to rehabilitate it by citing new provisions of the Dealer Agreements and misstating others, mischaracterizing FCA's arguments, and citing inapposite cases. Plaintiffs claim FCA breached Section 11 (MSR) of the Dealer Agreements by unfairly setting unachievable MSR and diverting sales and vehicle allocations to other dealers. AC ¶¶177, 180-81. But Plaintiffs offer nothing more than the conclusory allegation that the MSR standard was unfairly applied in support of this argument—never bothering to explain how the standard is unfair, how it was unfairly applied, and when each Plaintiff met, or failed to meet, it.[11] And given that no Plaintiff has been

---

"threatened to terminate [plaintiff] and other dealers if they did not refrain from contemplating legal action in response to the allocation system." 806 F.2d 953 (10th Cir. 1986). In *N. Broadway Motors, Inc. v. Fiat Motors of N. Am., Inc.*, the court *dismissed* two ADDCA claims, noting in dicta that one of the two claims described conduct that may give rise to an ADDCA claim where defendant alleged that it was *required to accept* cars and parts it did not want and that had plaintiff refused to accept the cars, cause for termination might exist. 622 F. Supp. 466, 472 (N.D. Ill. 1984). Regarding the other ADDCA count, the court noted that the plaintiff could not maintain a price discrimination claim where there was "no suggestion that an either-or demand was made such that sanctions would result upon noncompliance." *Id.* at 472-73.

[11] In an attempt to avoid the heightened pleading standards of *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atl. Co. v. Twombly*, 550 U.S. 522 (2007), which they cannot meet, Plaintiffs rely on *Moore v. Fid. Fin. Servs., Inc.*, 869 F. Supp. 557, 560-63 (N.D. Ill. 1994) for the proposition that "[n]either vagueness nor lack of details constitute sufficient grounds alone to dismiss a complaint under Rule 12(b)(6)." Opp. at 18. *Moore*, however, predates *Iqbal* and *Twombly*, and describes the less-rigorous pleading standard that those cases supplanted.

terminated, Plaintiffs' allegation that FCA "frustrate[ed] Plaintiffs' protection from termination and the fruits of their bargain" rings especially hollow. Opp. at 18.

Plaintiffs' claim that FCA violated Section 14 (vehicle orders) of the Dealer Agreements suffers from the same deficiencies. Plaintiffs argue that FCA has not disputed the allegations that vehicles are not distributed reasonably, and that FCA's argument "rel[ied] solely" on the title of Section 14. Opp. at 17. To the contrary, FCA relies on the contract's language that "[a]ll orders are subject to acceptance by" FCA, which "shall use its best efforts to fill accepted orders" to show Plaintiffs have fallen short of pleading breach or that FCA acted unreasonably. Cultice Decl. Ex. A ¶14; Br. at 18. The Amended Complaint does not even allege that any Plaintiff failed to receive a single vehicle, let alone that FCA did not "use its best efforts" to complete orders.

Lacking facts to salvage its vehicle orders claims, Plaintiffs can only attempt to distract and mislead. For the first time, Plaintiffs cite to "Section 8" of the Dealer Agreements, which they claim gives them the "right, subject to the provisions of this agreement, to purchase . . . vehicles."[12] Opp. at 17. But this brings Plaintiffs no closer to adequately pleading breach because it does not implicate vehicle orders or allocation. Rather, the section simply gives dealers "the non-exclusive right" to buy vehicles manufactured for sale within the United States and to sell those vehicles within the United States. Cultice Decl. Ex. A ¶4. Plaintiffs similarly mischaracterize the final sentence of Section 14 of the Dealer Agreements by arguing it "clarifies that FCA must employ a 'reasonable manner' for allocating vehicles '[n]otwithstanding' the previous text in the section that does refer to orders." Opp. at 17. However, the final sentence is not aimed clarification, but instead at explaining FCA's obligations if dealer demand exceeds

_____

[12] The language Plaintiffs cite is actually found in Section 4 of the Dealer Agreements. Cultice Decl. Ex. A ¶4.

FCA's supply.[13]

**E.**    **Plaintiffs' Common Law Fraud and Negligent Misrepresentation Claims Should Be Dismissed (Counts VI-VII)**

As with their other claims, Plaintiffs ignore the core insufficiencies of their common law fraud and negligent misrepresentation pleadings in their opposition.  Plaintiffs' fraud claims are simply masqueraded breach-of-contract claims, and fail for the same reasons the breach of contract claims fail.  These claims are also prohibited by Michigan's economic loss doctrine, and fall far short of Rule 9(b)'s requirements.

Plaintiffs' ostrich-like attempt to escape the import of Michigan's economic loss doctrine by flatly asserting, without any support, that Michigan law does not apply is unsuccessful.  Opp. at 22.  Michigan law applies because "tort claims that are dependent upon the contract are subject to a contract's choice of law provisions," and there is no dispute that the Dealer Agreements are governed by Michigan law.  *See Amakua Dev. LLC v. Warner*, 411 F. Supp. 2d 941, 955 (N.D. Ill. 2006) (citation omitted).  Plaintiffs next claim that they were actually alleging fraud in the inducement, an exception to Michigan's economic loss doctrine.  Opp. at 23-24. This argument fails because the exception for fraudulent inducement applies only where the alleged conduct is "extraneous to the alleged breach of contract" and "addresses a situation where the claim is that one party was tricked into contracting."  *Huron Tool & Eng'g Co. v. Precision Consulting Servs., Inc.*, 532 N.W.2d 541, 544-46 (Mich. Ct. App. 1995) (quotation omitted).  Plaintiffs make no allegations whatsoever relating to any pre-contract fraud—rather, their allegations relate to vehicle sales, allocation, and performance metrics, based entirely on the Dealer Agreements.

---

[13] The final sentence of Section 14 states:  "Notwithstanding the foregoing, in the event that the demand exceeds supply of specified [FCA] vehicles, DEALER acknowledges that [FCA] has the right to allocate such supply in any reasonable manner [FCA] deems fit in any geographical market."  Cultice Decl. Ex. A ¶14.

Even without such fatal pleading deficiencies, Plaintiffs' claims would be further barred by either the Dealer Agreements' integration or "no-reliance" clauses or their "no oral modification" provisions.[14] Plaintiffs suggest that "courts will not typically enforce non-reliance clauses unless they were negotiated by 'sophisticated' parties." Opp. at 23. It strains credulity to suggest that Plaintiffs are not sophisticated parties—Mr. Napleton's "family has been in the automotive business continuously since 1931" and his "dealership group currently owns and operates franchises out of twenty-seven dealership facilities . . . with approximately $1.1 billion dollars in annual sales." *See* Aff. of Edward Napleton at ¶20, *N. Am. Auto. Servs., Inc. v. Long Island Auto. Grp., Inc.*, No. 2:14-cv-04258 (E.D.N.Y. dismissed Dec. 16, 2014), ECF No. 7.

**F.     Plaintiffs' Claims Under State Motor Vehicle Franchise and Dealer Acts Should Be Dismissed (Counts IX-XII)**

Plaintiffs' brief fails to correct the Amended Complaint's pleading insufficiencies in the state motor vehicle franchise and dealer act claims, which remain a jumble of conclusory allegations that frequently rely on separate, though similarly insufficient, claims. The core of Plaintiffs' state claims, as is true of the entire Amended Complaint, is alleged price discrimination. Yet, Plaintiffs fail to allege basic facts, such as a single competitor who received preferential treatment. Plaintiffs attempt to sidestep this requirement with respect to the price discrimination claims (Counts IX, XI, XII) by incorrectly arguing that the Amended Complaint identifies the implicated dealers. Opp. at 19-20. As explained *supra* at Section A, it does not. Plaintiffs also rely entirely on conclusory allegations for their insufficiently pled claims of threats and coercion[15] (Counts IX, X), arbitrary, bad faith, or unconscionable acts (Counts IX,

---

[14] It is impossible to determine which provision would actually apply because Plaintiffs do not specify whether the alleged misstatements occurred before or after the Dealer Agreements' effective dates, *see* AC ¶158, illustrating just how far Plaintiffs' pleadings fall from satisfying Rule 9(b).

[15] Even if Plaintiffs had sufficiently identified threats of termination, the claims under Florida law would still fail because the statute prohibits only "unfair" threats. *See* Fl. Stat. §§ 320.64(7), 320.641(3). The

XI), restrictions on litigation (Counts IX, XI), and unreasonable standards of performance (Count

XI). On other occasions, Plaintiffs point to insufficient allegations elsewhere in their pleading to

support their state claims. *See, e.g.*, Opp. at 19 (pointing to ADDCA allegations to support its

unreasonable vehicle allocation (Counts IX, X, XI, and XII) allegations brought under Illinois,

Florida, Missouri, and Pennsylvania laws).[16] Plaintiffs cannot bootstrap insufficient arguments

from one count to provide factual support for other counts of their deficient complaint. As a

result, their allegations of illegal activity (Count X), which relies on insufficient RICO pleading

(Opp. at 21), and breach of contract (Count XI), which depends upon inadequate common law

contract claims (Opp. at 22), also fail.

## G. Plaintiff Arlington Heights' Fraud in the Inducement and Quantum Meruit Claims Against FCAR Should be Dismissed (Counts XIII and XIV)

Plaintiffs' quantum meruit claim fails for the simple reason that a contract—a sublease—

governs the relationship between Plaintiffs and FCAR, which is an absolute bar to recovery

under the extra-contractual theory of quantum meriut. *Langone v. Miller*, 631 F. Supp. 2d 1067,

1071 (N.D. Ill. 2009). The sublease is clear that Plaintiffs must perform necessary repairs at

their own expense. Cultice Decl. Ex. B ¶9. In an effort to avoid that clear provision, Plaintiffs

attempt to rebrand as "improvements" what the Amended Complaint called "repairs." *Compare*

Opp. at 24-25 *with* AC ¶ 251-52. To the extent there is any meaningful distinction between

"repairs" and "improvements" for purposes of the sublease, Plaintiffs did not plead it, nor do

---

only "threats" alleged are based on Plaintiffs' failures to meet their contractually obligated MSR—which cannot be "unfair." *See* AC ¶¶211-12.

[16] Plaintiffs acknowledge that they have not identified any dealers who "received favorable allocations," but in attempt to avoid basic pleading requirements, they claim that the statutes require only that they "allege an unreasonable 'system' or 'plan' of vehicle allocation." *See* Opp. at 19. The case they cite to support that proposition is inapposite. *See Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 738 N.E.2d 938, 942 (Ill. App. Ct. 2000), *aff'd in part, rev'd in part*, 770 N.E.2d 177 (Ill. 2002) (post-verdict appeal that does not address pleading where "the main thrust of [the] action [was] that there was a shortage of vehicles during the period involved and that defendants did not allocate vehicles as they were supposed to during this period of shortage").

they even attempt to explain what that may be.

As to fraud in the inducement, Plaintiffs mischaracterize FCAR's argument. Contrary to Plaintiffs' claim, FCAR does not argue that there is no reasonable reliance because the sublease contains an integration clause. *See* Opp. at 25. Rather, FCAR argues that Plaintiffs fail to satisfy Rule 9(b) because they do not specify the details of the alleged representations. Br. at 24-25. And even if they did, Plaintiffs cannot show reasonable reliance because the sublease explicitly obligates Plaintiffs to pay for repairs. Br. at 25.

## CONCLUSION

For the foregoing reasons, as well as the reasons stated in Defendants' memorandum in support of their Motion to Dismiss, the Court should dismiss the Amended Complaint in its entirety for failure to state claims upon which relief may be granted pursuant to Fed. R. Civ. P. 12(b)(1) and (6) and failure to plead the circumstances relating to fraud with the particularity required by Fed. R. Civ. P. 9(b).

Dated: May 3, 2016

Respectfully submitted,

/s/ Robert Cultice

*Of Counsel*:

Robert D. Cultice *(admitted pro hac vice)*
Felicia H. Ellsworth *(admitted pro hac vice)*
Caitlin W. Monahan *(admitted pro hac vice)*
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000
robert.cultice@wilmerhale.com
felicia.ellsworth@wilmerhale.com
caitlin.monahan@wilmerhale.com

Randall L. Oyler
Owen H. Smith
Brandon C. Prosansky
BARACK FERRAZZANO KIRSCHBAUM &
NAGELBERG LLP
200 West Madison Street
Suite 3900
Chicago, IL 60606
(318) 984-3100
randall.oyler@bfkn.com
owen.smith@bfkn.com
brandon.prosansky@bfkn.com

**Attorneys for Defendants**

# <u>ADDENDUM</u>[1]

**Other Authorities**

Aff. of Edward Napleton, *N. Am. Auto. Servs., Inc. v. Long Island Auto. Grp., Inc.*, No. 2:14-cv-04258 (E.D.N.Y. dismissed Dec. 16, 2014), ECF No. 7.

---

[1] Pursuant to the Court's Case Management Procedures, Defendants include in this Addendum authority unpublished in the West National Reporter System and unavailable on Westlaw that is cited in Defendants' Reply in Support of their Motion to Dismiss Plaintiffs' Amended Complaint.

Bellavia Blatt Andron & Crossett, P.C.
200 Old Country Road – Suite 400
Mineola, New York 11501
(516) 873-3000
Attorneys for Plaintiffs

SUPREME COURT OF THE STATE OF NEW
YORK - COUNTY OF SUFFOLK

NORTH AMERICAN AUTOMOTIVE SERVICES,
INC., D/B/A ED NAPLETON DEALERSHIP
GROUP, EFN AMITYVILE PROPERTY, LLC,
and EFN HUNTINGTON PROPERTY, LLC,

                    Plaintiffs,

            vs.                                                        **AFFIDAVIT**

LONG ISLAND AUTOMOTIVE GROUP, INC.,
MMS-HM, INC., JAGUAR LAND ROVER
NORTH AMERICA, LLC, AND MANUEL
KADRE

                    Defendants,

STATE OF ILLINOIS)
            ss.:
COUNTY OF DUPAGE)

        I, EDWARD NAPLETON, having been duly sworn, under penalty of perjury, aver the

following statements to be true, to the best of my knowledge, information and belief:

        1.      That I am a principal of the plaintiff entities, North American Automotive

Services, Inc. d/b/a Ed Napleton Dealership Group ("NAAS"), EFN Amityville Property, LLC,

and EFN Huntington Property, LLC (collectively, the Plaintiffs") and, as such, I am fully

familiar with the facts and circumstances stated herein.

4124224.1

occur regardless of whether the Court delays a sale by granting Plaintiffs a preliminary injunction pending litigation of the underlying action.  In contrast, as stated above, the assignment to a third-party of these invaluable and unique assets will forever foreclose Plaintiffs from buying these dealerships, or any reasonable equivalents of them.

17.     Thus, the requested injunctive relief is necessary to keep the status quo thereby preserving Plaintiffs' rights under the parties' written agreements until such time as the Court can determine the merits of the Plaintiffs' claims.

18.     Stated otherwise, the balance of hardships tip decidedly toward Plaintiffs, the parties' requesting preliminary relief. Without injunctive relief, the assets of the Marubeni Defendants will be transferred to Kadre or a third party.  This fact is not in dispute.

19.     Based upon the above facts and well settled law, a balancing of hardships in this case also clearly favors granting a preliminary injunction in order to preserve the status quo. Accordingly, Plaintiffs' application should be granted in its entirety.

### BACKGROUND FACTS

20.     I am the principal owner of plaintiff NAAS, an automobile dealership group. My family has been in the automotive business continuously since 1931. My dealership group currently owns and operates franchises out of twenty-seven dealership facilities (27 rooftops) with approximately $1.1 billion dollars in annual sales.  Plaintiffs EFN Huntington and EFN Amityville are two legal entities that were incorporated to be the holding companies for that real property utilized by the Marubeni Defendants in connection with their Jaguar Land Rover dealerships in Huntington, New York as well as their consolidated corporate operations in Amityville, New York.

6

74.     No prior application for the relief requested herein has been made to this or any other Court.

EDWARD NAPLETON

Sworn to before me this
9th day of July 2014

NOTARY PUBLIC

OFFICIAL SEAL
DIANE WICK
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:04/08/18

25

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the CM/ECF system will be served upon counsel for Plaintiffs electronically via the CM/ECF system on May 3, 2016.

*/s/ Robert Cultice*
Robert D. Cultice *(admitted pro hac vice)*
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6000
Fax: (617) 526-5000
robert.cultice@wilmerhale.com