**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| Napleton's Arlington Heights Motors, Inc. et. al. )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>FCA US LLC, et. al. )<br>)<br>Defendants. )<br>) | No. 16 C 403<br><br>Judge Virginia M. Kendall |

## MEMORANDUM OPINION AND ORDER

Plaintiffs, a group of seven automotive dealers under the common control of Edward F. Napleton ("Napleton"), sued Defendants Fiat Chrysler Automobiles US, LLC ("FCA") and FCA Realty, LLC f/k/a Chrysler Group Realty Company, LLC ("FCAR") (collectively, "Defendants") on federal and state grounds alleging that Defendants took a number of illegal actions to drive the Plaintiffs out of business. Defendants move to dismiss the entirety of Plaintiffs' Amended Complaint. After accepting all well-pleaded allegations in the Amended Complaint as true and drawing all reasonable inferences in Plaintiff's favor, Defendants' motion to dismiss is granted in part. Specifically, the motion is denied with respect to Counts I, II, III, VIII, X, and XII. The motion is granted without prejudice as to Counts IV and V and granted with prejudice as to Counts VI, VII, XIII, and XIV. Finally, the motion is granted in part with regards to Counts IX and XI.

## BACKGROUND

This Court takes the following allegations from the Amended Complaint and treats them as true for the purposes of the Defendants' motion. *See Gillard v. Proven Methods Seminars, LLC*, 388 F. App'x 549, 550 (7th Cir. 2010).

The Plaintiffs are franchisee dealers[1] of Defendant FCA, the seventh largest automobile manufacturer in the world. (Dkt. No. 21 at ¶ 1.) According to the parties' contractual agreements, the Plaintiffs were required to invest substantial capital to start, operate, and maintain dealerships aimed toward marketing and selling vehicles that the FCA[2] (and only the FCA) produces. (*Id*.) To incentivize the appearance of a continual increase in sales volume growth – *i.e.* "the semblance of ever-increasing retail sales by dealers" – the FCA created two incentive programs: 1) the "Volume Growth Program" which provided monies and other benefits to dealers who achieved sales targets that were set by the FCA in its sole discretion; and 2) the "turn and earn" policy through which dealers who sold greater numbers of high demand models were granted priority access to those same models over other competitors. (*Id*. at ¶¶ 2-4.) In addition, the FCA employed the Minimum Sales Responsibility metric ("MSR") through which it measured the sales effectiveness of the dealers. (*Id*. at ¶ 6.) The dealers did not have any input in how the metric was imposed or the methodology underlying the metric. (*Id*.) Plaintiffs allege that through two principle schemes, the FCA solicited fraudulent sales reports from certain dealers ("Conspiring Dealers"), who through posting inflated sales numbers are allocated more high demand vehicles, allowing the Conspiring Dealers to net more sales and divert sales from dealers who refuse to participate in the fraudulent practice, including Plaintiffs (collectively the "Non-Conspiring Dealers"). (*Id*. at ¶ 9.) Plaintiffs further allege that the FCA perpetuated these practices nationwide and the cumulative effect of the conduct caused Plaintiffs millions of dollars in lost sales and business value. (*Id*. at ¶¶ 10-11.)

---

[1] The plaintiff dealers are located in four different states: (i) two in Illinois (Napleton's Arlington Heights and Napleton's River Oaks); (ii) three in Florida (Napleton's Clermont, Napleton's Northlake, and Napleton's South Orlando); (iii) one in Missouri (Napleton's Mid Rivers); and (iv) one in Pennsylvania (Napleton's Ellwood City, Inc.). (Dkt. No. 21 at ¶¶ 13-19.)

[2] The FCA, also commonly known as Chrysler, is a manufacturer and distributor of new and unused Chrysler, Dodge, Jeep, and Ram brand vehicles. (*Id*. at ¶ 22.)

**Scheme One – Scheme to Defraud Dealers and Public by
Reporting Fictitious Vehicle Sales**

Plaintiffs allege that beginning no later than early 2015 and continuing until at least the end of 2015, the FCA and its agents devised and executed a scheme to falsely inflate the reported retail sales of the FCA vehicles.  (*Id*. at ¶ 35.)  As part of this scheme, the FCA[3] provided incentives and subsidies to Conspiring Dealers who posted fraudulently inflated sales numbers through the creation of false New Vehicle Delivery Reports ("NVDRs").  (*Id*. at ¶¶ 35-36.)  The FCA additionally, through the "turn and earn" allocation process, would reward the Conspiring Dealers who transmitted false NVDRs with the FCA's most desirable models, thus enabling the Conspiring Dealers to maximize their competitive edge by receiving more of the desirable vehicles.[4]  (*Id*. at ¶ 37.)  In addition, the FCA allegedly encouraged false reporting of sales by directly rewarding the District Managers and Business Center Directors with monetary and quarterly bonuses tied directly to the number of reported vehicle sales.  (*Id*. at ¶ 40.)  Plaintiffs allege that the FCA benefitted directly from the scheme as the artificial inflation of the monthly sales created the appearance that the FCA was performing at a higher level than it was in reality. (*Id*. at ¶ 42.)

Plaintiffs discovered the FCA's scheme to falsely report sales when an FCA Business Center Director called a Napleton Dealer-Principal offering him $20,000 and extra allocations of high demand vehicles if Napleton's River Oaks falsely reported forty new vehicle sales.  (*Id*. at ¶

---

[3] FCA established a network of business centers ("Business Centers") that was each responsible for various districts that FCA created throughout the country.  Each Business Center was headed by a Business Center Director.  (*Id*. at ¶ 34.)

[4] Plaintiffs allege eight specific instances as proof of the existence of the scheme.  (*See* Dkt. No. 21 at ¶ 38.)  Each of the instances reflects a situation in which FCA requested a dealer or group of dealers to either submit false NVDRs or false reports regarding a number of vehicles.  For example, Plaintiffs allege that on June 1, 2015, an FCA employee and District Manager for portions of the northern Illinois requested that Napleton's River Oaks falsely report 23 vehicles in return for $15,000.  (*Id*. at ¶ 38(a).)  On that same day, the FCA Business Director for the Midwest Region allegedly asked his District Managers to request certain dealers – only those who exceeded their sales targets numbers established by the Volume Growth Program – to submit false NVDRs in return for payment of incentives.  (*Id*. at ¶ 38(b).)

43.)  The Business Director allegedly stated that the monies would be transferred under the guise of co-op payments or advertising support monies, that the scheme was "no harm, no foul,"[5] and that Napleton's River Oaks would only receive the extra vehicles and monies if it falsified its reports.  (*Id*.)  The Napleton Dealer Principal rejected the offer, and despite his subsequent statements to the FCA that its actions were improper, the FCA continued to solicit the Plaintiffs.  (*Id*. at ¶¶ 44-45.)  The FCA would additionally solicit Conspiring Dealers to report false NVDRs at month's end for two reasons: 1) it permitted Business Center Directors to calculate the gap between their bonus target sales and the legitimate sales reported for the month, and then fill the gap through soliciting the required number of fraudulent sales; and 2) the Conspiring Dealers could back out of the sale on the first of the following month, before the factory warranty of the vehicles could be processed and start to run.  (*Id*. at ¶¶ 47-48.)

### Scheme Two – Scheme to Defraud Plaintiffs by Impairing Their Businesses and Depriving them of Monies

From early 2015 to present, Plaintiffs allege that the FCA induced Plaintiffs to invest substantially into the dealership facilities and property while also setting the Plaintiffs' MSR baseline at an unrealistic level based upon the FCA's fraudulent manipulation of market sales data.  (*Id*. at ¶ 56.)  The FCA allegedly perpetuated the scheme by threatening to terminate Plaintiffs' dealership agreements based upon skewed assessments of the Plaintiff's performance against improperly high MSR baselines.  (*Id*.)

All dealers, in order to become a franchise dealership, are required to enter into a Dealer Agreement[6] with the FCA.  (*Id*. at ¶ 58.)  The Agreements require the dealer to use its best

---

[5] The scheme was allegedly "no harm, no foul" because the FCA would permit the dealers to later disavow the false sales, *i.e.* by "backing-out" the NVDRs, even after the FCA had reported and recorded the NVDRs as sales.  (Dkt. No. 21 at ¶ 46.)

[6] The parties also refer to the Dealer Agreements as Franchise Agreements.  For clarity's sake, the Court will refer to the agreements as Dealer Agreements solely.

efforts to promote and sell FCA vehicles. The FCA then measures the dealers' performance against the MSR, which it calculates[7] based on a proprietary metric that is completely under its control. (*Id*.) Plaintiffs are not permitted to provide any input into how the MSR or CC Sales Zone are calculated, which Plaintiffs allege render the calculation process completely illusory. (*Id*. at ¶ 59.) Plaintiffs allege one specific example of this scheme. At some point in 2013, Napleton's Arlington Heights invested approximately eighteen million dollars in the land and dealership facility that it currently operates in Arlington Heights, Illinois, based upon the FCA's representations that it would have meaningful input in how the FCA defined its applicable market (and the CC Sales Zone) and calculated its MSR baseline. (*Id*. at ¶¶ 60-61.) However, contrary to those representations, Napleton's Arlington Heights was never provided with any data and was never allowed to participate in the FCA's determinations. (*Id*. at ¶ 62.) Arlington Heights's loss in revenue due to the subsequent creation of an unfair market area was additionally exacerbated when the FCA permitted a competing dealer, Fields Chrysler Jeep Dodge Ram ("Fields"), to relocate into its Arlington Heights's market area, contrary to the FCA's previous representations. (*Id*. at ¶¶ 64-65.) Plaintiffs allege that the FCA knew that its representations were false at the time they were made. (*Id*. at ¶ 65.)

The FCA would deceptively and misleadingly assess Plaintiffs' sales performance against unrealistic MSR baselines as a way to control and intimidate the Plaintiffs, who, by falling short of those baselines, were under threat of termination. (*Id*. at ¶ 66.) For example, the FCA would allegedly compare Plaintiffs' sales of non-luxury sport utility vehicle models against other manufacturers' luxury and non-luxury models in order to artificially inflate the size of the

---

[7] Plaintiffs further allege that the FCA calculates the MSR "by determining the number of new vehicle registrations for FCA's vehicle lines in the geographical market area established by FCA (referred to under the Franchise Agreements as "CC Sales Zones"), and then computing the number of retail sales FCA deems necessary for those vehicle lines to purportedly achieve statewide market share." (*Id*. at ¶ 58) The boundaries of the CC Sales Zones are established by the FCA in its sole discretion. (*Id*. at ¶¶ 58-59.)

market, thus driving down the Plaintiffs' market shares and increasing the likelihood that Plaintiffs would fail to meet their MSR baselines. (*Id*. at ¶¶ 67-68.) Although the Plaintiffs notified the FCA of this flaw in their calculations, the FCA continued to calculate the Plaintiffs' MSR in the same way so as to intimidate the Plaintiffs with termination. (*Id*. at ¶ 72.) Due to this scheme, Plaintiffs lost substantial amounts of sales revenue and profits, among other harms. (*Id*. at ¶ 73.)

## LEGAL STANDARD

A complaint must contain sufficient factual matter to state a claim to relief that is plausible on its face to survive a 12(b)(6) challenge. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible on its face when the complaint contains factual content that supports a reasonable inference that the defendant is liable for the harm. *Id.* The complaint should be dismissed only if the plaintiffs would not be entitled to relief under any set of facts that could be proved consistent with the allegations. *See Visiting Nurses Ass'n of Southwestern Indiana, Inc. v. Shalala*, 213 F.3d 352, 354 (7th Cir. 2000). In making the plausibility determination, the Court relies on its "judicial experience and common sense." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (quoting *Iqbal,* 129 S.Ct. at 1950). For purposes of this motion, this Court accepts all well-pleaded allegations in the complaint as true and draws all reasonable inferences in the non-movant's favor. *See Yeftich v. Navistar, Inc.*, 722 F.3d 911, 915 (7th Cir. 2013).

## DISCUSSION

### I. Count I – Automobile Dealers' Day in Court Act

In Count I of their Amended Complaint, Plaintiffs assert that the FCA violated the Automobile Dealers' Day in Court Act, 15 U.S.C. § 1221 *et seq*. ("ADDCA"). (Dkt. No. 21 at

¶¶ 103-114.)  The ADDCA authorizes automobile dealers to bring suit against "any automobile manufacturer" who has failed "to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise." 15 U.S.C. § 1222.  The ADDCA defines "good faith" as the:

> duty of each party to any franchise … to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats or coercion or intimidation from the other party: *Provided*, That recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith.

15 U.S.C. § 1221(e) (emphasis in original).  The statutory definition of "good faith" is literally construed.  *Lawrence Chrysler Plymouth, Inc. v. Chrysler Corp.*, 461 F.2d 608, 610 (7th Cir. 1972), *cert. denied*, 409 U.S. 981 (1972).  The "failure to exercise good faith within the meaning of the Act has a limited and restricted meaning … It does not mean 'good faith' in a hazy or general way, nor does it mean unfairness."  *Autohaus Brugger, Inc. v. Saab Motors, Inc.*, 567 F.2d 901, 911 (9th Cir.), *cert. denied*, 436 U.S. 946 (1978).  Instead, "an indispensable element of a cause of action under the Dealer Act is a lack of good faith in which coercion, intimidation, and threats thereof exist."  *Ed Houser Enterprises, Inc. v. General Motors Corp.*, 595 F.2d 366, 369 (7th Cir. 1979).  To be successful, "a plaintiff must allege facts showing coercion."  *Ed Houser Enterprises, Inc.*, 595 F.2d at 369; *see also Lawrence Chrysler*, 461 F.2d at 610 ("the existence or nonexistence of 'good faith' must be determined in a context of actual or threatened coercion or intimidation.").

Here, Plaintiffs allege that the FCA violated the ADDCA by demanding that the Plaintiffs submit false NVDRs in bad faith and threatening Plaintiffs with sanctions, including denying them access to popular vehicles and thus hurting the Plaintiffs' bottom line, if the Plaintiffs failed to comply. (Dkt. No. 21 at ¶¶ 35-37, 43, 50-52.)  Plaintiffs also allege that when they blew the

whistle on false reporting,[8] the FCA threatened to terminate the Plaintiffs' dealerships. (*Id.* at ¶¶ 45, 111.) The FCA argues this claim should be dismissed because: (1) Plaintiffs "do not sufficiently allege how FCA failed to perform the terms of the Dealer Agreements," and (2) Plaintiffs insufficiently plead a lack of good faith, which has a limited and specialized meaning under the ADDCA. (Dkt. No. 41-1 at 16.) Despite FCA's contentions, Plaintiffs identified two fraudulent schemes through which FCA harmed and continues to harm them. (Dkt. No. 21 at ¶¶ 34-55, 56-74.) Plaintiffs allege that they were asked to falsify records in exchange for payment of incentives from FCA, which Plaintiffs refused. (Dkt. No. 21 at ¶¶ 38, 44.) Plaintiffs further allege that this fraudulent scheme resulted in the creation of a de facto multiple-tiered pricing system, through which Non-Conspiring Dealers, such as the Plaintiffs, paid FCA significantly more for motor vehicles than did the Conspiring Dealers who complied with FCA's request to falsify records. (Dkt. No. 21 at ¶¶ 50.) Moreover, Plaintiffs allege that FCA induced Plaintiffs to invest in their dealership facilities and properties and then intentionally discriminated against them in terms of setting unachievable MSR levels and threatening termination of their agreements. (Dkt. No. 21 at ¶¶ 56.)

In regards to the failure to exercise good faith element, for coercion or intimidation to exist, the FCA's alleged actions must incorporate a wrongful demand in which sanctions would result from noncompliance. *See, e.g., N. Broadway Motors, Inc. v. Fiat Motors of N. Am., Inc.*, 622 F. Supp. 466, 471 (N.D. Ill. 1984) (collecting cases); *see also Autohaus Brugger, Inc.,* 567 F.2d at 911. Some courts have held that an unfair allocation of automobiles may support a cause of action under the ADDCA. *See e.g. Autohaus Brugger, Inc.,* at 914; *American Motors Sales Corp. v. Semke*, 384 F.2d 192, 195 (10th Cir. 1967). As such, that demand alone, even without

---

[8] Plaintiffs allege that they blew the whistle on the false reporting by both raising the issue to FCA and by filing the present lawsuit. (*See* Dkt. No. 21 at ¶¶ 45, 111.)

considering the alleged requirement that the Plaintiffs falsify records, may meet the elements of coercion or intimidation. In addition, based on the facts alleged, it is plausible that the FCA wrongfully demanded Plaintiffs to falsify their sales records or else be denied popular vehicles, which could result in harm to their businesses. Plaintiffs have alleged that the FCA demanded that they either comply with false reporting or be sanctioned, constituting coercion. (*See, e.g.,* Dkt. No. 52 at 2.) This alleged coercion, combined with the threats to terminate their agreements, is a sufficient cause of action against FCA under the ADDCA.[9] Similarly, the FCA's position that the Plaintiffs failed to allege "any follow-on allegation that their Dealer Agreements were terminated, that FCA even threatened 'termination' as alleged, or that all Plaintiffs even received alleged 'default letters,'" is contrary to the Amended Complaint. (*See* Dkt. No. 21 at ¶¶ 8, 74, 111, 112 (allegations specifically related to receipt of default letters).)

Moreover, the FCA's arguments are premature at this stage of the proceedings because determining whether the FCA's behavior constituted coercion would depend "upon the circumstances arising in each particular case and may be inferred from a course of conduct." *Autohaus Brugger, Inc.,* 567 F.2d at 911; *Nissan Motor Acceptance Corp. v. Schaumburg Nissan, Inc.* 1993 WL 360426, at *5 (N.D. Ill. Sept. 15, 1993) (quoting *Fox Motors, Inc. v. Mazda Distrib. (Gulf), Inc.,* 806 F.2d 953, 959 (10th Cir. 1986)). Rather, the FCA's arguments are more appropriate at the summary judgment stage of litigation after evidence is introduced to support or deny the alleged claims. The FCA's sole contention in opposition to this argument is found in a footnote in which it argues that the claim is not premature "as evidenced by the fact that courts regularly dismiss such claims when coercion is not sufficiently plead." (Dkt. No. 53

---

[9] The FCA also contends that the claim must be dismissed because Plaintiffs did not allege that they "even failed to receive a vehicle to which they were entitled." (Dkt. No. 53 at 9.) However, threatened coercion, as the Plaintiffs adequately allege here, is all that is required. *See Northview Motors, Inc. v. Chrysler Motors Corp.,* 227 F.3d 78, 93 (3d Cir. 2000) ("The case law plainly requires actual, or threatened, coercion or intimidation as an element of an ADDCA claim.").

at 9 n. 8.)  Not only does the FCA fail to provide any of the referenced case law, but its position is belied by the fact that the FCA itself cites to cases in the summary judgment posture.  *See, e.g., Ed Houser Enterprises,* 595 F.2d at 366 (appeal for review of summary judgment decision); *TLMS Motor Corp. v. Toyota Motor Distributors, Inc*., 1998 WL 182475, at *6 (N.D. Ill. Apr. 15, 1998) (district court review of motion for summary judgment).  The FCA's motion to dismiss Count I is denied.

## II.  Counts II-III – Robinson-Patman Act Claims (Antitrust claims)

In Counts II and III, Plaintiffs assert that the FCA violated Sections 13(a) and (d) of the Robinson-Patman Act of 1936, codified as part of the Clayton Act, 15 U.S.C. § 13 *et. seq* ("RPA").  (Dkt. No. 21 at ¶¶ 115-129.)

### A.  Count II –Section 13(a)

Section 13(a) of the RPA prohibits sellers from discriminating in price between different purchasers in interstate commerce of products of like grade and quality to the injury or destruction of competition.  15 U.S.C. § 13(a).  Price discrimination may fall within one of three categories: primary, secondary, or tertiary.  *Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164, 176 (2006); *Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 513, 521–22 & n.2 (7th Cir. 2011).[10]  To establish a secondary-line violation, applicable here, four requirements must be met: (1) relevant sales made in interstate commerce; (2) sales were of products of "like grade and quality"; (3) seller discriminated in price between plaintiff and another purchaser; and (4) discrimination may have injured or prevented competition to the

---

[10] Primary-lines cases involve discrimination that injures competition at the level of the discriminating seller and its direct competitors.  Secondary-line cases involve injuries to discriminating seller's customers (here, the Plaintiff dealerships).  Tertiary-line cases involve injury to competition among the customers of differently treated purchasers.  *See Volvo Trucks*, 546 U.S. at 176.

favored purchaser's advantage.[11]  *See Volvo Trucks*, 546 U.S. at 176-77; *see also Dynegy*, 648 F.3d at 522 (citing ABA Section of Antitrust Law, 1 *Antitrust Law Developments* 490 (6th ed. 2007)).  The "competitive injury prong of this showing may be inferred from evidence that a favored competitor received significantly better prices over an extended period of time; the hallmark of such injury is the diversion of sales or profits from a disfavored purchaser to a favored purchaser." *Dynegy,* 648 F.3d at 522 (citing *Volvo Trucks*, 546 U.S. at 177).

Plaintiffs allege that the FCA created a price difference between the vehicles sold to the Plaintiffs and those sold to the Conspiring Dealers through the incentives and subsidies offered to Conspiring Dealers.  (*See* Dkt. No. 21 at ¶¶ 75-76.)  The FCA argues that the allegations in the Amended Complaint are too vague to state a violation of the RPA because Plaintiffs fail to identify any of the other FCA dealers with whom they allegedly compete, any vehicles they lost to these competitors, or any price differences that occurred over a sufficiently long period of time.  (Dkt. No. 41-1 at 13-14.)  However, in reviewing the record, Plaintiffs have alleged sufficient facts to establish a secondary-line RPA violation.

As an initial point, despite the FCA's position to the contrary, the Plaintiffs did indeed identify two Conspiring Dealers in their Amended Complaint.[12]  (*See* Dkt. No. 21 at ¶¶ 38(d), (e) (identifying Sherman Dodge and Northwestern Chrysler Jeep Dodge Ram).)  As such, this case stands in stark contrast to other cases where courts have dismissed RPA complaints on the grounds that a plaintiff only vaguely referred to "similarly situated competitors."  *Cf. Goodloe v.*

---

[11] The FCA does not dispute that the Plaintiffs have sufficiently alleged that the relevant sales took place in interstate commerce or that the sales were of similar products.

[12] In response to the Court noting that these dealers were identified in the Amended Complaint during oral argument, FCA's counsel argued that the Amended Complaint was nevertheless insufficient because it did not mention "that those two dealers are a competing dealer.  [Plaintiffs] don't allege that."  (Dkt. No. 58 at 11:24-14:5.)  However, paragraph 38 of the Amended Complaint states that FCA is in the best position to "identify all those Conspiring Dealers…[n]onetheless, Plaintiffs have independently learned" certain facts, including the existence of the communications between Sherman, Northwestern, and FCA.  (Dkt. No. 21 at ¶ 38.)  Taking all reasonable inferences in the Plaintiffs' favor, the Court infers that Sherman and Northwestern are two of the many Conspiring Dealers referred to in the Amended Complaint.

*Nat'l Wholesale Co., Inc.,* 03 C 7176, 2004 WL 1631728, at *9 (N.D. Ill. July 19, 2004) (Plaintiff's sole allegation involved "similarly situated" competitors and offered no other facts about who they may be); *Kundrat v. Chicago Bd. Options Exch., Inc.,* No. 01–C–9456, 2002 WL 31017808, at *5 (N.D. Ill. Sept. 6, 2002) (RPA claim dismissed because Plaintiff did not allege a second purchaser with whom they were in competition). In addition, Plaintiffs have identified, to the best of their ability given that discovery has yet to occur, the relevant markets in which the Conspiring Dealers operate. (*See* Dkt. No. 21 at ¶¶ 20, 36); *see also Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 801 (6th Cir. 2012) (denying motion to dismiss after holding that "the primary reason that the side agreements and sales to the 'favored' purchasers have not been set forth in detail is because discovery has not taken place and this information rests in the hand of the Defendants…. Nevertheless, Plaintiffs have identified General Motors as one of the favored companies in their pleadings."). Although the FCA focuses on the alleged lack of identification of the Conspiring Dealers in its Reply, *see* Dkt. No. 52 at 2-5, the FCA fails to provide case law that distinguishes this case and indicates that Plaintiffs' geographic allegations and identification of two Conspiring Dealers at this stage of the proceeding are insufficient under the notice pleading standard.

Finally, turning to the price discrimination prongs, Plaintiffs devote a number of paragraphs in their Amended Complaint to alleging that the FCA engaged in price discrimination and that the Plaintiffs were injured due to that discrimination. (Dkt. No. 21 at ¶¶ 75-102.) Specifically, Plaintiffs allege that as a result of both alleged schemes, the FCA granted incentives and subsidies to the Conspiring Dealers amounting to more than $800 for each vehicle sold each month. (*Id.* at ¶¶ 77, 91.) Such allegations are sufficient to show price discrimination. In terms of injury to competition, the FCA contends that Plaintiffs have failed to sufficiently plead either

that there was a diversion of sales or that the *Morton Salt* presumption applies. (Dkt. No. 41-1 at 21); *see Fed. Trade Comm'n v. Morton Salt Co.*, 334 U.S. 37 (1948). The *Morton Salt* presumption is applicable where there is a "proof of a substantial price discrimination between competitors over time." *J.F. Feeser, Inc. v. Serv-A-Portion, Inc.*, 909 F.2d 1524, 1535 (3d Cir. 1990). Here, as discussed above, Plaintiffs have alleged two separate schemes each leading to $800 in price discrimination – and therefore, a $1,600 price difference between the Plaintiffs and those Conspiring Dealers who benefitted from both schemes – over the course of at least one year. (*See* Dkt. No. 21 at ¶¶ 35, 54, 92-97, 102.) Given that one year is a significant period of time, *see J.F. Feeser*, 909 F.2d at 1539, the Plaintiffs' allegations are sufficient under the presumption. The FCA failed to address Plaintiffs' *Morton Salt* contentions for any significant length in its motion to dismiss, reply in support of its motion, and even during oral argument. (*See* Dkt. Nos. 41-1, 53, 58.) As such, the Plaintiffs have sufficiently alleged price discrimination pursuant to the *Morton Salt* presumption.[13]

Accordingly, Plaintiffs have pled enough factual allegations to sustain this claim under Section 13(a).

## B. Count III – Section 13(d)

Section 13(d) prohibits sellers from offering payments to purchasers that are unavailable on "proportionally equal terms to all other customers competing in the distribution of such products or commodities." 15 U.S.C. § 13(d). Plaintiffs allege that the FCA's making

---

[13] Having found that Plaintiffs sufficiently allege competitive injury through the *Morton Salt* presumption, the Court need not assess the diversion of sales element at length. However, the Court expresses doubt that Plaintiffs have alleged sufficient facts to show that the alleged discrimination caused a diversion of sales as Plaintiffs have failed to state facts showing their monthly revenue or sales declined during the same period of time as the incentive program. *See, e.g., Mathew Enter., Inc. v. Chrysler Grp. LLC*, No. 13-CV-04236-BLF, 2014 WL 3418545, at *7 (N.D. Cal. July 11, 2014) (Court denying motion to dismiss similar claim where, unlike here, the plaintiff specifically alleged the value of lost incentives ($1.1 million in volume growth incentives to $26,200 after loss of incentives), and demonstrated that its monthly sales declined by a specific amount without the benefit of the subsidies while the conspiring dealer's sales increased "during that same period when it reaped the benefits of the incentive program.").

"payments of incentives and subsidies" to the Conspiring Dealers violated Section 13(d) as those same payments were not available to Plaintiffs on proportionally equal terms, thus injuring competition to the advantage of Conspiring Dealers in each relevant market. (Dkt. No. 21 at ¶¶ 123-129.) This supposed inequity allegedly resulted in injury to Plaintiffs' businesses and properties in the form of among other things lost retail sales and lost profits. (*Id*. at ¶ 129.)

For the same reasons discussed with regards to Count II, Plaintiffs have presented sufficient allegations to support this claim. It is wholly plausible that the incentives and subsidies offered to the Competing Dealers injured competition between Plaintiffs and the Dealers because, as Plaintiffs allege, it allowed the Dealers to "more effectively compete for the retail sales of vehicles than could Plaintiffs in competition with such dealers." (Dkt. No. 21 at ¶ 126.) Given that the FCA does not present any contentions separate and apart from those related to Count II, the FCA's motion to dismiss Count III is also denied.

## III. Counts IV, V – RICO Claims

In Counts IV and V, Plaintiffs allege that the FCA violated the Racketeer Influence and Corrupt Organization Act, 18 U.S.C. § 1961 *et. seq.* ("RICO"). (Dkt. No. 21 at ¶¶ 131-155.) More specifically, in Count IV, Plaintiffs allege that the FCA substantively violated Section 1962(c). In Count V, Plaintiffs allege that the FCA violated Sections 1962(d) and 1964 by conspiring to commit racketeering activity.[14] Under § 1962(c), it is unlawful for any "person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of

---

[14] Although the Seventh Circuit has yet to examine whether Rule 9(b)'s heightened standard applies to every element of a RICO claim, the Seventh Circuit has "explicitly applied the Rule 9 standard to RICO's enterprise elements." *Richmond v. Nationwide Cassel L.P.*, 52 F.3d 640, 644 (7th Cir. 1995). Accordingly, "this Court applies the traditional Rule 8 standard to the non-fraud elements of the RICO claims, and the stricter Rule 9(b) standard to the underlying allegations of fraud-based racketeering activity within those claims (here, the mail and wire fraud predicates themselves)." *See, e.g., Menzies v. Seyfarth Shaw LLP*, No. 15 C 3403, 2016 WL 3854626, at *2 (N.D. Ill. July 15, 2016).

such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). "Thus, in order to establish a violation of § 1962(c), Plaintiff must allege: (1) conduct; (2) of an enterprise; (3) through a pattern; (4) of racketeering activity." *See, e.g., Menzies*, 2016 WL 3854626, at *7 (citing *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)). Similarly, because Section 1962(d) forbids conspiring to violate Section 1962(a-c), "the overall objective of the RICO conspiracy claim often mirrors the underlying RICO substantive claim." *See, e.g., id.* "Hence, as to § 1962(d), Plaintiff must establish that each Defendant joined an agreement to participate in 'an endeavor which, if completed, would satisfy all of the elements' of a substantive violation of RICO…." *See, e.g., id.* (quoting *Brouwer v. Raffensperger, Hughes & Co.*, 199 F.3d 961, 964 (7th Cir.2000)). In response, the FCA argues that Plaintiffs lack standing to bring their RICO claims. (Dkt. No. 41-1 at 18-19.) In addition, the FCA contends that the Plaintiffs have failed to sufficiently allege (1) racketeering activity, (2) that FCA conducted the affairs of a RICO enterprise, and (3) a pattern of racketeering activity. (*Id.* at 12-18.)

## A. Standing

The Court first considers the FCA's jurisdictional contention. "[A] RICO plaintiff 'only has standing if, and can only recover to the extent that, he has been injured in his business or property by [reason of] the conduct constituting the violation.'" *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 279 (1992) (quoting *Sedima*, 473 U.S. at 496). In meeting that requirement, a plaintiff must show that the defendant's violation was both a proximate and but for cause of her injury. *See Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457 (2006). The reasons for the proximate cause requirement are numerous:

> The direct-relation requirement avoids the difficulties associated with attempting
> "to ascertain the amount of a plaintiff's damages attributable to the violation, as

distinct from other, independent, factors," *Holmes,* 503 U.S., at 269; prevents courts from having "to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries," *ibid.;* and recognizes the fact that "directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely," *id.* at 269-70.

*Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 654–55 (2008) (footnote omitted, citations altered).  Relying primarily on *Anza*, the FCA contends that the Plaintiffs have failed "to connect any lost sales or profits to the alleged RICO activity." (Dkt. No. 53 at 9.)  Plaintiffs allege that they have been "directly injured in their business and property by reason of Defendant FCA's and the Conspiring Dealers' pattern of racketeering in that Plaintiffs have lost retail sales of vehicles and related finance and insurance products, lost profits from vehicle sales, lost profits from the resale of used vehicles which would have been taken in trade on the lost vehicle sales, lost customer goodwill," among a number of other injuries. (Dkt. No. 21 at ¶ 150.)

However, as the Court already alluded to in regard to the RPA diversion of sales issue, *see supra* n. 13, Plaintiffs have failed to allege sufficient facts to show that their alleged harm was in fact caused by the FCA's alleged racketeering activity.  As the FCA, relying on *Anza* and *Holmes*, argued in its briefing, Plaintiffs have failed to meet the proximate cause requirement because their alleged harm could have resulted by factors *other* than the alleged acts of fraud. (*See* Dkt. No. 53 at 9); *Anza*, 547 U.S. at 458-59 (reversing Court of Appeals and finding that plaintiff failed to show proximate cause at the motion to dismiss stage in part because the alleged damages could be caused by "some remote action": "National, however, could have lowered its prices for *any number of reasons unconnected to the asserted pattern of fraud*.  It may have received a cash inflow from some other source or concluded that the additional sales would justify a smaller profit margin.  Its lowering of prices in no sense required it to defraud the state tax authority.") (emphasis added).  Here, Plaintiffs argue that they suffered from a number of

harms, including failure to receive incentives and lost sales, because they refused to participate in the alleged schemes. However, Plaintiffs have failed to allege sufficient facts to show that the FCA's alleged acts are what proximately *caused* their harm as opposed to other possible causes. For example, based on the allegations, it is possible that the Plaintiffs did not receive various incentives simply because they were not meeting their sales benchmarks – indeed, Plaintiffs have not alleged specific facts to show that their sales numbers were meeting expectations and those numbers suddenly dropped after the introduction of FCA's scheme and Plaintiffs' decisions to not participate in it. Furthermore, it is entirely possible that Plaintiffs were not allocated the popular vehicles because they did not actually need those vehicles – again, because Plaintiffs have not alleged that they suffered from a shortage of the popular vehicles and that the shortage caused harm to their bottom line, it is entirely possible that they were not allocated popular vehicles because they still had many on the lot.

The case of *James Cape & Sons Co. v. PCC Const. Co.*, 453 F.3d 396, 403 (7th Cir. 2006) proves instructive. In that case, the plaintiff brought civil RICO charges against its competitors alleging that they had rigged bids for state construction contracts. The Seventh Circuit affirmed the district court's dismissal of the claim in part because "[a] court could never be certain whether Cape would have won any of the contracts that were the subject of the conspiracy 'for any number of reasons unconnected to the asserted pattern of fraud.'" *Id.*, 453 F.3d at 403 (quoting *Anza*, 547 U.S. at 458-59). The Court reasoned that "[i]t is entirely possible that Defendants would have won some bids absent the bid-rigging scheme, even if making less profits in the meantime." *Id.* Similarly here, it is entirely possible, based on the facts alleged (or more poignantly, the lack of such allegations), that the Plaintiffs would have lost sales or not received allocations of popular vehicles for any number of reasons, including their own

underperformance. Plaintiffs have simply not alleged sufficient facts to show that prior to the introduction of the schemes they were meeting their benchmarks and that once they refused to participate in the schemes, they suddenly were not. Indeed, the Court itself questioned Plaintiffs on this issue during oral argument. (*See* Dkt. No. 58 at 95:3-6 (Court stating to Plaintiffs' counsel: "I think what [FCA's counsel] said, rather, was you have no way of proving that the lost sales go to [the alleged RICO violation]…Maybe you're just a bad salesman.").) In response, Plaintiffs' counsel first argued that FCA's position was too demanding because this case is "at the pleading stage, and we do plausibly allege injury resulting from this." (*Id*. at 95:7-8.) However, that contention is inadequate as both the *Anza* and *James Cape* courts applied their analyses at the pleading stage, clearly indicating that more is required than what is alleged here. Second, Plaintiffs, relying on *Bridge*, argue that because the number of vehicles is finite, it was a "'foreseeable and natural consequence' of FCA's scheme that Plaintiffs received fewer popular (and profitable) models of vehicles for resale." (Dkt. No. 52 at 23-24 (citing *Bridge*, 553 U.S. at 658).) However, *Bridge* is entirely distinguishable from *Holmes*, *Anza*, and this case because in *Bridge* "there [were] no independent factors that account[ed] for respondents' injury…." *Bridge*, 553 U.S. at 658. Here, as discussed above, there are a multitude of independent factors that could have led to the Plaintiffs' alleged harms. Similarly, even if it were the case that Plaintiffs did indeed receive fewer popular vehicles to sell due to the scheme, they nevertheless failed to allege that they suffered harm because they have not plead with any factual enhancement that they were experiencing a shortage of popular vehicles and thus were losing out on sales due to the scheme.[15] Accordingly, because Plaintiffs have not shown that their injuries were

---

[15] During oral argument, Plaintiffs' counsel alluded to additional harms that the Plaintiffs suffered due to the scheme: "And we also allege, Judge, in terms of the damages, there are all sorts of things that flow from lost sales that when you don't get a car at a sale, you're not doing – probably getting the subsequent resale, you're not getting the repairs, and so forth. That's down the line, I admit." (Dkt. No. 58 at 96:1-5.) Even setting aside the proximate

proximately caused by the alleged schemes, their substantive RICO claim is dismissed (Count IV).

Similarly, because the Plaintiffs do not have standing to bring a substantive RICO claim and because their RICO conspiracy claim is based on the same facts, *see* Dkt. No. 21 at ¶ 153 ("[t]he object of this conspiracy was to violate the RICO statute, as described in Count IV above…"), their RICO conspiracy claim similarly fails and is dismissed (Count V). *See, e.g., Nat'l Council on Comp. Ins., Inc. v. Am. Int'l Grp., Inc.*, No. 07 C 2898, 2009 WL 466802, at *16 (N.D. Ill. Feb. 23, 2009) ("In the instant case, AIG's RICO conspiracy claim is based on the same facts alleged in their section 1962(c) claim. Consequently, because AIG has failed to state a claim under section 1962(c), its RICO conspiracy claim is also deficient."); *Menzies*, 2016 WL 3854626, at *18 ("Given the fatal absence of continuity (or its threat) in the underlying RICO claim, the RICO conspiracy count cannot stand, and it is thus dismissed without prejudice.").

## IV. Counts VI, VII – Common Law Fraud and Negligent Misrepresentation

In Counts VI and VII, Plaintiffs assert that the FCA fraudulently misrepresented and omitted facts related to the schemes causing various harms to the Plaintiff, including through lost profits. (*See* Dkt. No. 21 at ¶¶ 156-169.) In relation to Count VI, to assert a claim of common-law fraud under Illinois law, Plaintiffs must prove five elements: "(1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from the reliance on the statement." *Massuda v. Panda Express, Inc.*, 759 F.3d 779, 783 (7th Cir. 2014) (quoting *Tricontinental Indus., Ltd. v.*

---

cause issues (including the inherent difficulty in calculating such damages), Plaintiffs allegations are inadequate as they fail to provide any actual instance where they were unable to sell a specific car or model that could have led to those "down the line" harms *due* to the scheme. Such information – shortages, inability to receive a specific model type, etc. – would be in the Plaintiff's possession. The lack of factual enhancement is damning to the Plaintiffs' civil RICO claims under *Anza* and *Bridge*.

*PricewaterhouseCoopers, LLP*, 475 F.3d 824, 841 (7th Cir. 2007)). In addition, "[w]hile Rule 9(b) 'does not require a plaintiff to plead facts that if true would show that the defendant's alleged misrepresentations were indeed false, it does require the plaintiff to state 'the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff.'" *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 737 (7th Cir. 2014) (quoting *Uni*Quality, Inc. v. Infotronx, Inc.,* 974 F.2d 918, 923 (7th Cir. 1992)). For Count VII, in order to state a claim "for negligent misrepresentation under Illinois law, a party must allege: (1) a false statement of material fact; (2) carelessness or negligence in ascertaining the truth of the statement by the party making it; (3) an intention to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; (5) damage to the other party resulting from such reliance; and (6) a duty on the party making the statement to communicate accurate information." *See Tricontinental Industries, Ltd*, 475 F.3d at 833-34. FCA argues that both counts must be dismissed as they are (1) barred by the Michigan economic loss doctrine and (2) legally insufficient. (Dkt. No. 41-1 at 25-27.)

FCA first argues that the Plaintiffs' allegations are barred by Michigan's economic loss doctrine, which prohibits tort recovery and limits remedies to damages where a plaintiff's losses are purely economic. *See, e.g., Republic Ins. Co. v. Broan Mfg. Co.*, 960 F. Supp. 1247, 1249 (E.D. Mich. 1997) (citing *Neibarger v. Universal Cooperatives,* 439 Mich. 512, 515, 486 N.W.2d 612 (1992)). At the same time, "[n]ot all tort claims…are barred by the existence of a contract. Rather, [] courts [applying Michigan law] must inquire whether the legal duty allegedly violated by a defendant 'arise[s] separately and distinctly from a defendant's contractual obligations.'" *DBI Investments, LLC v. Blavin*, 617 F. App'x 374, 381 (6th Cir.

2015) (*Loweke v. Ann Arbor Ceiling & Partition Co., LLC*, 489 Mich. 157, 809 N.W.2d 553, 559 (2011)). The FCA contends that Plaintiffs' claims are nothing more than breach of contract claims "masquerading" as fraud and negligent misrepresentation claims, and therefore must be dismissed pursuant to Michigan law, which is the governing law for the Dealer Agreements. (Dkt. No. 53 at 12; Dkt. No. 58 at 49:18-23.) Plaintiffs do not dispute that the Dealer Agreements are governed by Michigan law, but posit that their fraud claims, which include allegations of inducement "to make capital investments and enter other agreements," fall outside of the scope of the Dealer Agreements and therefore are not governed by the economic loss doctrine. (Dkt. No. 52 at 29.) In addition, Plaintiffs argue that their fraudulent inducement allegations are an exception to the economic loss doctrine and therefore are not barred by the doctrine. *See DBI Investments*, 617 F. App'x at 381 ("Michigan courts recognize fraudulent inducement as an exception to the economic loss doctrine.").

However, Plaintiffs' allegations, even if they are not as neatly categorized as "based squarely on performance of contractual provisions relating to performance metrics and vehicle allocation" as the FCA contends, *see* Dkt. No. 41-1 at 26, are nevertheless "interwoven" with the Dealer Agreements and representations made therein. *DBI Investments*, 617 F. App'x at 382. For example, Plaintiffs contend that they were fraudulently induced to "invest significant capital in a new Illinois dealership," *see* Dkt. No. 52 at 29, but also clearly allege that they did so *based* on representations made in or related to provisions in the Dealer Agreements. (*See* Dkt. No. 21 at ¶¶ 59-60 (alleging that Arlington Heights invested approximately $18,000,000 in land and a new dealership facility based on representations that they would have meaningful input with regard to the "FCA's definition of its [Plaintiff's] applicable market and the establishment of a reasonable [MSR] baseline" – measures defined and addressed in the Dealer Agreements); *see*

*also* Dkt. No. 58 at (49:18-50:16 (the FCA's counsel referencing specific paragraphs in the Dealer Agreements that underlie the fraud claims: "The plaintiffs, interesting, at one point in time say: Well, MSR is not a contractual term. It is. It's in paragraph 11.").) Although Plaintiffs also reference other statements that FCA and its representatives made, *see* Dkt. No. 21 at ¶ 61, Plaintiffs' claim that the FCA misrepresented Plaintiffs' abilities to have meaningful input in various performance metrics and competition issues that "concern[] the operation of a contract provision with which both parties were directly familiar." *DBI Investments*, 617 F. App'x at 382. As such, Plaintiffs allegations relate directly to the Dealer Agreements, which are governed by Michigan law and therefore by the state's economic loss doctrine.

Plaintiffs contention that their fraudulent inducement allegations survive because fraudulent inducement is an exception to the economic loss doctrine is also flawed because that exception "'addresses a situation where the claim is that one party was tricked into contracting' and is 'based on pre-contractual conduct which is, under the law, a recognized tort.'" *Id.* at 382-83 (quoting *Huron Tool & Eng'g Co. v. Precision Consulting Servs., Inc.*, 209 Mich. App. 365, 532 N.W.2d 541, 544 (1995)). Here, Plaintiffs had access to the Dealer Agreements and were fully aware of the obligations that each party carried pursuant to the Agreements. Given that Plaintiffs are sophisticated parties – their arguments to the contrary fail as they have been in the car dealership business for nearly a century – it is implausible that they were tricked into contracting. (*See* Dkt. No. 53 at 12.)

Similarly, having found that the alleged misrepresentations[16] are intertwined with the contractual terms laid out in the Dealer Agreements, any representations made prior to the

---

[16] Another issue implicit in this holding is that Plaintiffs fail to provide the specifics underlying the alleged misrepresentations. For example, Plaintiffs' argument that they were induced to "make capital investments and enter other agreements" is factually deficient in that it fails to provide any detail regarding what those other

Agreements' May 17, 2013 effective date would be barred by the "no-reliance" provision while any representations made after the effective date would be barred by the "no oral modification" provision in the Agreements. (*See* Dkt. No. 41-3 at §§ 6, 7); *see Federated Capital Servs. v. Dextours, Inc.*, No. 228208, 2002 WL 868273, at *1 (Mich. Ct. App. Apr. 26, 2002) ("In any event, pursuant to the terms of the lease agreement, defendants expressly disclaimed any reliance on any statements or representations made by plaintiff. By its plain terms, the agreement negates the reliance element necessary to prevail on a claim of fraud."). Plaintiffs argue that such non-reliance clauses are not typically enforced "unless they were negotiated by 'sophisticated' parties." (Dkt. No. 52 at 30.) However, as discussed above, given that Mr. Napleton's family has been in the automotive business for nearly a century, any argument that the Plaintiffs are unsophisticated is rejected outright.

Accordingly, Counts VI and VII are dismissed.

## V. Count VIII – Breach of Contract Claim

Under Illinois law, the elements of a breach of contract claim are "(1) offer and acceptance, (2) consideration, (3) definite and certain terms, (4) performance by the plaintiff of all required conditions, (5) breach, and (6) damages." *Association Benefit Services, Inc. v. Caremark RX, Inc*., 493 F.3d 841, 849 (7th Cir. 2007) (quoting *MC Baldwin Fin. Co. v. DiMaggio, Rosario & Veraja, LLC*, 845 N.E.2d 22, 30 (2006)). Plaintiffs allege that the FCA breached Sections 11 and 14 of the Dealer Agreements. (Dkt. No. 21 at ¶¶ 174, 177.) Specifically, Plaintiffs allege that the FCA breached Section 11, which sets forth the formulation of the MSR metric, by abusing its discretion and raising the Plaintiffs' MSR baselines "to arbitrarily high levels." (*Id*. at ¶¶ 177-180.) In terms of Section 14, Plaintiffs argue that the FCA

---

misrepresentations were, who made them, and when they were made, among other issues. Such allegations fall well short of the Rule 9(b) standard. *See Camasta*, 761 F.3d at 737.

violated its contractual duty to allocate vehicles in a "reasonable manner" by allegedly allocating "vehicles to dealers who were provided price subsidies not functionally available to Plaintiffs, and allocated other vehicles as kickbacks to Conspiring Dealers who were willing to engage in FCA's scheme to falsely report vehicle sales." (*See* Dkt. No. 41-3 at § 14; Dkt. No. 21 at ¶ 174.) In moving to dismiss the claim, the FCA argues that the allegations are conclusory and devoid of factual support. (Dkt. No. 41-1 at 24-25.)

With regards to Section 11, FCA contends that the allegations are insufficient because Plaintiffs never disclose the MSR baselines that they claim were too high nor how they were damaged by the allegedly unachievable levels. (*See* Dkt. No. 53 at 10 ("But Plaintiffs offer nothing more than the conclusory allegation that the MSR standard was unfairly applied in support of this argument – never bothering to explain how the standard is unfair, how it was unfairly applied, and when each Plaintiff met, or failed to meet it.").) However, such details are not necessary under the notice pleading standard, and Plaintiffs' allegations have sufficiently set forth their claim that the FCA arbitrarily created MSR baselines with the goal of threatening the Plaintiffs into compliance with the FCA's alleged schemes. *Int'l Mktg., Ltd. v. Archer-Daniels-Midland Co., Inc.*, 192 F.3d 724, 733 (7th Cir. 1999) ("The only function the pleadings must serve is to give notice of the claim; the development of legal theories and the correlation of facts to theory come later in the process."). Additionally, the facts alleged are sufficient to state a breach of contract claim as there is no dispute that there was a valid contract with definite and certain terms (elements 1-3), Plaintiffs performed their obligations under the contract (element 4), FCA allegedly breached the contract by setting the MSR baselines at levels that were unreachable (element 5), and Plaintiffs suffered from impaired business value, a loss of goodwill, and a loss of profits due to the breach (element 6). (*See* Dkt. No. 21 at ¶¶ 181-83.) The FCA's

position that the Plaintiffs failed to provide how the MSR baseline was created and how it was unfairly applied is, as the Plaintiffs contend, seeking too much as Plaintiffs could not know that information at this pre-discovery stage. (*See* Dkt. No. 52 at 18.) In any event, to support their allegation of FCA setting the MSR baseline at arbitrary levels, Plaintiffs allege that the FCA included luxury brands in its analysis to determine the baseline despite recommendations from independent entities – JD Power and Urban Science – that the inclusion of such vehicles would create faulty baselines. (*See* Dkt. No. 21 at ¶ 180.) Such allegations are sufficient at this stage.

The FCA also contends that the Section 14 claim must be dismissed because Plaintiffs failed to provide sufficient factual enhancement and because the FCA did not, in any event, breach the parties' contracts by allocating vehicles because it was "only obligated to ship vehicles after Plaintiffs submit[ed] orders and those orders [were] accepted by FCA." (Dkt. No. 41-1 at 25.) In support of its position, the FCA contends that the Amended Complaint does not even include allegations that the FCA "did not 'use its best efforts' to complete orders." (Dkt. No. 53 at 12.) Yet, the Plaintiffs specifically made such allegations. (*See, e.g.,* Dkt. No. 21 at ¶ 174 ("FCA repeatedly breached section 14 of each of the Franchise Agreements when it failed to use best efforts to allocate vehicles to Plaintiffs, and failed to do so in a reasonable manner…This wrongful conduct diverted sales from Plaintiffs and eroded the value of Plaintiffs' businesses.").) Moreover, and despite the FCA's position at oral argument, Plaintiffs have sufficiently alleged two separate schemes and linked them to the FCA's alleged breach of the Dealer Agreements. (*See, e.g.,* Dkt. No. 58 at 68:1-9 (in response to the Court asking what facts are alleged to show that the FCA failed to use its best efforts to allocate vehicles, Plaintiffs' counsel referring to the "same essential facts" of the two schemes.).) Finally, to the extent that the parties' dispute boils down to a contractual interpretation question regarding ambiguity in the

Dealer Agreements, such an issue is best resolved at the summary judgment stage. *See Cent. States, Se. & Sw. Areas Pension Fund v. Waste Mgmt. of Michigan, Inc.*, 674 F.3d 630, 634–35 (7th Cir. 2012) ("Contract interpretation lends itself to resolution by summary judgment because 'the determination of whether a contract is ambiguous is a matter of law.'") (quoting *Barnett v. Ameren Corp.,* 436 F.3d 830, 833 (7th Cir. 2006)).

Accordingly, the FCA's motion to dismiss Count VIII is denied.

## VI. Counts IX-XII – Motor Vehicle Franchise and Dealer Acts Claims

In Counts IX to XII, individual Plaintiffs allege that the FCA violated a variety of state-law dealer protection statutes.

### A. Count IX – Violation of Illinois Motor Vehicle Franchise Act – 815 ILCS 710 *et seq.*

Napleton's Arlington Heights and Napleton's River Oaks (collectively, the "Illinois Plaintiffs") contend that the FCA violated §§ 710/4(b), 4(d)(1)(4), 4(d)(4), (e)(2)-(3), and (7) of the Illinois Motor Vehicle Franchise Act ("MVFA"). (Dkt. No. 21 at ¶¶ 184-199.) Section 710/4(b) prohibits a manufacturer and/or distributor from engaging "in any action with respect to a franchise which is arbitrary, in bad faith or unconscionable and which causes damage to any of the parties or to the public." *Id.* Illinois Plaintiffs allege that the "FCA's conduct was arbitrary, in bad faith, and/or unconscionable and as a result caused damage to them or to the public." (Dkt. No. 21 at ¶ 189.) Illinois Plaintiffs further invoke Sections 710(d)(1),(4), (e)(2)-(3) positing that "the Volume Growth Program and the wrongful scheme to falsify NDVRs of Competing Dealers were each devices, subsidies, and/or sales promotion plans that resulted in FCA selling and/or leasing new vehicles of the same model to other dealers and persons for a lesser (or subsidized) actual price that FCA sold or leased such vehicles to Illinois Plaintiffs." (Dkt. No. 21 at ¶ 191.) As a result of these schemes, Illinois Plaintiffs allege that the value of

their businesses decreased and sales were diverted from them. (Dkt. No. 21 at ¶ 192.) Lastly, Illinois Plaintiffs allege a violation of 815 ILCS 710/7 in which the FCA unlawfully imposed unreasonable restrictions on their assertion of legal or equitable rights by wrongfully promulgating rules that disqualify any participant from the Customer First Program if they engage in litigation with the FCA. (Dkt. No. 21 at ¶¶ 194-197.) The FCA argues that the claim must be dismissed because the allegations are conclusory and because Plaintiffs "have utterly failed to allege any threats made against them." (Dkt. No. 41-1 at 28.)

As an initial point, other courts have found similar alleged schemes sufficient in stating a claim under MVFA. *See, e.g., Nissan Motor*, 1993 WL 360426, at *4 (Denied motion to dismiss in which plaintiffs alleged a "scheme in which defendant engaged in fraudulent and deceptive acts including (1) refusing to allocate vehicles to SNI as promised; (2) establishing and implementing an arbitrary and capricious allocation system; (3) diverting popular new model vehicles to the Remarketing Program in 1989; and (4) imposing unreasonable site restrictions on plaintiffs …."); *Knauz Continental Autos, Inc. v. Land Rover North America, Inc.*, 842 F. Supp. 1034, 1039 (N.D. Ill. Nov. 10, 1993) (denied motion to dismiss where Dealer alleged an arbitrary incentive program). In addition, the Court has already rejected a number of the arguments that the FCA raises in opposition to the claim, including that Plaintiffs failed to identify implicated dealers or that they insufficiently pled claims of threats or coercion. (*See, supra*, § I. II(A).) On the other hand, the FCA is correct that although Plaintiffs allege that the FCA's "Customer First Program" may violate Section 7 of the MVFA, they fail to allege that they "were ever restricted or prevented from participating in the program." (Dkt. No. 41-1 at 28.) Indeed, in reviewing the Complaint, Plaintiffs fail to allege that they were actually harmed by the FCA's alleged Section 7 violation. As such, the Section 7 portion of this claim is dismissed.

The motion to dismiss Count IX is denied except with respect to the Section 7 allegation.

## B. Count X – Violation of Florida Automobile Dealers Act - §320.64

Plaintiffs Napleton's Clermont, Northlake, and South Orlando (collectively, the "Florida Plaintiffs") allege that the FCA violated Section 320.64 of the Florida Automobile Dealers Act ("FADA"). The Florida Plaintiffs allege the FCA violated the express statutory demands, adversely affecting each of the Plaintiffs: (1) wire and mail fraud involving the falsification and inflation of NDVRs in Florida, constituting an illegal activity in violation of § 320.64(4); (2) coercion, violating § 320.64(6); and (3) unfair allocation and distribution system of motor vehicles, violating § 320.64(18). (Dkt. No. 21 at ¶¶ 205-07.) Plaintiffs Napleton's Northlake and Napleton's South Orlando also allege a violation of Section 7, claiming the FCA threatened termination in bad faith. (Dkt. No. 21 at ¶¶ 210-15.) Under the FADA, "[a] system of distribution is unfair in violation of § 320.64(18) if it, without good reason, distributes a benefit to a dealer that it does not distribute to another, similar situated dealer." *See, e.g., Copans Motors, Inc. v. Porsche Cars North America Inc*., No. 14-60413, 2014 WL 2612308, at *4 (S.D. Fla. June 11, 2014). A benefit may be financial and "[a] similarly situated dealer is one that, under its franchise agreement, sells the same line-make in the same market." *See, e.g*., *id*. at *4-*5.

The FCA presents similar contentions with respect to the Plaintiffs' FADA claims, arguing that these allegations lack the required specificity and further fail to identify any similarly situated dealers. (Dkt. No. 41-1 at 29.) As stated *supra*, Plaintiffs sufficiently allege facts to plausibly show the existence of two separate schemes – or system of distribution – through which the FCA unfairly provided benefits to Conspiring Dealers and not to the Florida Plaintiffs. Given those allegations, and also the fact that this case is still pre-discovery, Plaintiffs

have plausibly alleged the existence of an unfair allocation and distribution system of motor vehicles. In terms of identifying Conspiring Dealers in Florida, while it is true that the Plaintiffs do not specifically identify the dealers by name, they do provide enough information to the FCA to allow the FCA to identify the dealers. (*See* Dkt. No. 21 at ¶ 20 (identifying geographic regions where the relevant dealers are located, specifically "Palm Beach County, Florida (for Napleton's Northlake); the greater Orlando, Florida area (for Napleton's Clermont and Napleton's South Orlando…").) It certainly stands to reason that the FCA, given the geographical limitations of the allegations, should be able to identify through a review of its records the relevant dealerships with which it conducts business in those regions. Indeed, the FCA has failed to provide, and the Court has not found, any case indicating that identification based on region is insufficient to survive a motion to dismiss under Florida law. Furthermore, as to the alleged violations of § 320.64(7), Napleton's Northlake and Napleton's South Orlando allege sufficient facts stating how many times and at what times they were threatened with termination for failing to comply with the MSR metric. (Dkt. No. 21 at ¶ 211.)

### C. Count XI – Violations of the Missouri Motor Vehicle Franchise Practice Act – MO. Rev. Stat. §407.825

Plaintiff Napleton's Mid Rivers alleges the FCA violated various subsections of the Missouri Motor Vehicle Franchise Practice Act ("MVFPA"), Mo. Ann. Stat. § 407.810 *et seq.* Specifically, Mid Rivers alleges that the FCA violated Sections 407.825(1) (prohibiting capricious conduct or conduct not done in good faith), 407.825(9) (prohibiting the imposition of unreasonable standards of performance on a franchisee), 407.825(18) (prohibiting failure to sell "reasonable quantities" of motor vehicles as offered to any franchisee of that line-make), 407.825(28) (prohibiting failure to make "practically available" any incentive or similar benefit offered to other franchisees), 407.825(32) (prohibiting failure to offer rebates, cash incentives or

other promotional items), 407.825(33) (prohibiting unreasonable discrimination amongst its franchisees in any program that provides assistance to the franchisees), 407.825(40) (prohibiting the establishment of a performance standard or program for measuring performance that is not fair, reasonable, or equitable), and 407.825(41) (prohibiting the establishment or implementation of a system for the allocation of vehicles that is not fair, reasonable, or equitable).  (Dkt. No. 21 at ¶¶ 220-21; *see also* Dkt. No. 41-1 at 30.)

As with the other state law claims, the FCA's primary contention in support of its motion to dismiss is that the allegations lack specificity.  (Dkt. No. 41-1 at 30.)  However, Mid Rivers has stated a cause of action under MVFPA based on their allegations concerning the scheme to falsify NVDRs, the arbitrary MSR metric, and the unreasonable standards of performance imposed by the Volume Growth Program.  (Dkt. No. 21 at ¶¶ 218-234).  *Stone Motor Co. v. General Motors Corp.* proves instructive.  293 F.3d 456, 465 (8th Cir. 2002).  In that case, the Court denied a motion to dismiss because "Stone Motor's allegations identified delays in association with the delivery of specific vehicles, the refusal by GM to process orders, and the refusal by GM to supply Stone Motor with more popular models 'in comparable numbers to those supplied to other Chevrolet–Geo dealers of the same or similar size and/or in the same geographic region.'"  *Id.* at 464-65.  The Court held that requiring "more of Stone Motor under a Rule 12(b)(6) analysis would be to ignore the minimal standards inherent in our system of notice pleading."  *Id.* at 465.  Here, Mid River has identified a geographic region and has also alleged that it was denied access to the popular models pursuant to the two alleged schemes.[17]  However, consistent with the Court's finding above with regards to the Illinois Plaintiffs, Mid River has

---

[17] Importantly, the FCA has not provided, and the Court has not found, any case law requiring that specifics of the type required to plead a civil RICO claim are necessary for state a claim under these state statutes.  As such, while the allegations regarding, for example, denial of access to popular models are insufficient to establish a civil RICO claim as discussed above, they are sufficient for the state law claims.

failed show that it was harmed by the FCA's "Dealer First Program" which allegedly restricted the Plaintiffs' ability to litigate claims. Plaintiffs cite to paragraph 232 of their Amended Complaint in contending that they suffered harm, but nothing in that paragraph alleges that Plaintiffs were in fact barred from bringing litigation and therefore harmed by the FCA's violation of Section 407.825(15). As such, the motion to dismiss is denied as to Count XI with the exception of the Section 407.825(15) claim.

### D. Count XII – Violations of the Pennsylvania Board of Vehicles Act – 63 P.S. § 818.12

Plaintiff Napleton's Ellwood City asserts violations of two sections of the Pennsylvania Board of Vehicles Act, ("BVA") 63 PA. STAT. ANN. §§ 818.12(b)(12) (prohibiting unfair allocation of vehicles) and 818.12(b)(18) (prohibiting a price differences on similarly equipped new vehicles). (Dkt. No. 21 at ¶ 239.) The FCA argues Napleton's Ellwood City's allegations are vague and conclusory. (Dkt. No. 41-1 at 31-32.) Again, at this stage of the proceedings, Ellwood City's allegations are sufficient to state a claim. For example, Napleton's Ellwood City asserts that the Volume Growth Program, which was not functionally or actually available to all competing new dealers, had the effect of creating a price difference, constituting a violation of § 818.12(b)(18). Furthermore, Ellwood City alleges the FCA allocated vehicles to dealers who were provided price subsidies not functionally available to them and allocated other vehicles as kickbacks to Conspiring Dealers who engaged in the falsification scheme, constituting a violation of § 818.12(b)(12). (Dkt. No. 21 at ¶¶ 240-241.) The FCA fails to provide any case law in support of its position that Ellwood City must have identified the specific number of vehicle sales that were diverted, to whom they were diverted, and the specific names of those dealerships. Based on these allegations, Napleton's Ellwood City has plausibly stated a cause of action against the FCA, and the motion to dismiss Count XII is denied.

## VII. Counts XIII-XIV – Arlington Height's Fraud in Inducement and Quantum Meruit Claims against FCAR

Finally, Defendant FCAR moves to dismiss Plaintiff Napleton's Arlington Height's fraud in inducement and quantum meruit claims. "Fraudulent inducement is a form of common-law fraud." *See, e.g., Res. Dealer Grp., Inc. v. Executive Servs., Ltd.*, No. 97 C 4343, 1997 WL 790737, at *2 (N.D. Ill. Dec. 18, 1997) (quoting *Lagen v. Balcor Co.,* 274 Ill.App.3d 11, 17, 210 Ill.Dec. 773, 653 N.E.2d 968 (2d Dist. 1995)). "To state a cause of action for common-law fraud, a party must plead that the opposing party: (1) made a false statement of material fact; (2) with knowledge or belief that the statement was false; (3) with an intention to induce the party to act; (4) the party reasonably relied on the truth of the statement; and (5) the party was damaged as a result of this reliance." *See, e.g., id.* Here, although Arlington Heights does allege that it was "fraudulently induced…to make the subject repairs based upon FCAR's representations," it fails to provide any details regarding who made those representations, when they were made, how they were made, and even what the representations were to any level of specificity. (*See* Dkt. No. 41-1 at 31-32; *see also* Dkt. No. 21 at ¶¶ 245-251 (fraudulent inducement count alleging minimal facts: "Rather, FCAR fraudulently induced Napleton's Arlington Heights to make the subject repairs based upon FCAR's representations, upon which Napleton's Arlington Heights relied, that it would be fully reimbursed for all of its out-of-pocket expenses in connection with the Dealership Repairs including, but not limited to, the replacement of the approximately seventy-eight (78) lighting fixtures").) In response to the motion to dismiss, Arlington Heights, rather than pointing to any alleged facts in their Complaint, asserts that "FCAR is incorrect: Plaintiff has provided sufficient facts to identify what the representation was, who made it, and when it was made" and cites to the same inadequate paragraphs in the Amended Complaint. (Dkt. No. 52 at 32.) Such allegations do not meet the requisite Rule 9(b)

standard.  *See Camasta*, 761 F.3d at 737; *see also, e.g., Goode v. PennyMac Loan Servs., LLC*, No. 14 C 01900, 2014 WL 6461689, at *6 (N.D. Ill. Nov. 18, 2014) ("Under Rule 9(b), a plaintiff alleging fraud must state *with particularity* the circumstances constituting fraud or mistake.  This require[s] the plaintiff to state the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff.") (internal citations and quotations omitted).

Turning to Count XIV, "[q]uantum meruit is a quasi-contract doctrine that allows the Court to imply the existence of a contract in order to prevent injustice."  *See, e.g., Langone v. Miller*, 631 F. Supp. 2d 1067, 1071 (N.D. Ill. 2009) (citing *Hayes Mech., Inc. v. First Indus.*, 351 Ill.App.3d 1, 285 Ill.Dec. 599, 812 N.E.2d 419, 426 (2004)).  "Under Illinois law, a party cannot recover on a quantum meruit theory when an actual contract governs the parties' relations."  *See, e.g., id.* (citing *Keck Garrett & Assoc., Inc. v. Nextel Comms., Inc.*, 517 F.3d 476, 487 (7th Cir. 2008)).  FCAR moves to dismiss Arlington Heights's claim on the grounds that its alleged repair payments are governed by a sublease between the parties.  (*See* Dkt. No. 41-1 at 32; *see also* Dkt. No. 41-4 at § 9 (sublease section titled "Repairs, Maintenance, and Environmental Indemnity.").)  Arlington Heights contends that FCAR's position must be rejected because (1) the sublease contradicts the complaint and (2) the sublease governs repairs, whereas Arlington Heights actually paid for improvements.  (Dkt. No. 52 at 31-33.)

First, the fact that the sublease, which is indisputably a contract between the parties and includes a provision covering repairs to the dealership, contradicts the Amended Complaint counsels in favor of dismissal of this claim as, "the plaintiff in a quantum meruit case must *plead and prove* that no contract existed prescribing payment for the services at issue."  *See, e.g.,*

*Langone*, 631 F. Supp. 2d at 1072 n. 2 (additionally rejecting Plaintiff's argument that the existence of a contract is an affirmative defense that could not be raised at the motion to dismiss stage) (emphasis added).  The fact that a contract exists and contradicts the Amended Complaint only makes Arlington Heights's claim implausible.  Second, though Arlington Heights argues that it spent money on improvements in its briefing, its Amended Complaint only refers to repairs, which fall squarely within the purview of the sublease.  (*See* Dkt. No. 21 at ¶¶ 250-52.) As Arlington Heights may not amend its Amended Complaint "in response to the motion to dismiss," its second counterargument is also rejected.  *See, e.g.*, *Wooley v. Jackson Hewitt, Inc.*, 540 F. Supp. 2d 964, 972 (N.D. Ill. 2008) (citing *Thomason v. Nachtrieb*, 888 F.2d 1202, 1205 (7th Cir.1989) ("[I]t is a basic principle that the complaint may not be amended by the briefs in opposition to a motion to dismiss....")).  Accordingly, Counts XIII and XIV are dismissed.

## CONCLUSION

For the reasons set forth above, the Defendants' motion to dismiss is granted in part. Specifically, the motion is denied with respect to Counts I, II, III, VIII, X, and XII.  The motion is granted without prejudice as to Counts IV and V and granted with prejudice as to Counts VI, VII, XIII, and XIV.  Finally, the motion granted in part with regards to Counts IX and XI. Discovery shall proceed on the Counts set forth in this order and the parties shall appear at the previously set status conference for a detailed schedule.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date:  10/4/2016