UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NAPLETON'S ARLINGTON HEIGHTS MOTORS, INC. f/k/a NAPLETON'S PALATINE MOTORS, INC. d/b/a NAPLETON'S ARLINGTON HEIGHTS CHRYSLER DODGE JEEP RAM, an Illinois corporation; NAPLETON'S RIVER OAKS MOTORS, INC. d/b/a NAPLETON'S RIVER OAKS CHRYSLER DODGE JEEP RAM, an Illinois corporation; CLERMONT MOTORS, LLC d/b/a NAPLETON'S CLERMONT CHRYSLER DODGE JEEP RAM, an Illinois limited liability company; NAPLETON'S NORTH PALM AUTO PARK, INC. d/b/a NAPLETON'S NORTHLAKE CHRYSLER DODGE JEEP RAM, an Illinois corporation; NAPLETON ENTERPRISES, LLC d/b/a NAPLETON'S SOUTH ORLANDO CHRYSLER DODGE JEEP RAM, an Illinois limited liability company; NAPLETON'S MID RIVERS MOTORS, INC. d/b/a NAPLETON'S MID RIVERS CHRYSLER DODGE JEEP RAM, an Illinois corporation; NAPLETON'S ELLWOOD MOTORS, INC. d/b/a NAPLETON'S ELLWOOD CHRYSLER DODGE JEEP RAM, an Illinois corporation,<br><br>       Plaintiffs,<br><br>  v.<br><br>FCA US LLC, a Delaware corporation<br><br>       Defendant. | Case No. 1:16-cv-00403-VMK-SMF |

**DEFENDANT'S OPPOSITION TO PLAINTIFFS' SECOND MOTION TO COMPEL
DEFENDANT'S RESPONSES TO DISCOVERY REQUESTS**

Plaintiffs' Second Motion to Compel, like the first, is a further example of Plaintiffs' dramatically overbroad view of the scope of this case. What is more, Plaintiffs' motion disregards the multiple categories of documents that FCA has already agreed to produce. Specifically, Plaintiffs' motion seeks to compel documents in response to 10 specific Requests for Production ("RFPs" or "Requests"). In response to each of these Requests, FCA has already agreed to produce those documents that relate to Plaintiffs' claims—what FCA objects to is Plaintiffs' fishing expedition on issues unrelated to and beyond the scope of the allegations of the Amended Complaint. Furthermore, Plaintiffs ask the Court to order a definition of "Competing Dealers" for discovery purposes that is radically overbroad, including dealers that would not be considered a "competitor" under any definition of the term. The Court should deny Plaintiffs' motion.

## ARGUMENT

The claims and defenses contained in the parties' pleadings constitute the touchstone of discovery. The Plaintiffs are seven FCA dealers who operate in markets in the area north of Chicago, Illinois; near Pittsburgh, Pennsylvania; the St. Louis, Missouri area; and central and southern Florida. The Plaintiffs' claims in this lawsuit are based on two "schemes" that they allege caused them injury. The VGP Claim[1] is based on a theory of indirect price discrimination: that FCA charged the Plaintiffs more for vehicles than other "conspiring" dealers by rewarding "conspiring" dealers with additional incentives and/or vehicles, in return for the false reporting of their sales to FCA, benefits that were allegedly not available to the Plaintiffs who claim they refused to report false sales. AC at ¶¶ 3-4. According to the Plaintiffs, this "indirect" price discrimination enabled "conspiring" FCA dealers, whoever they are, to sell their vehicles to

---

[1] For ease of reference, FCA uses the same abbreviations in this brief as in its opposition to Plaintiffs' First Motion to Compel (Dkt. 74).

- 1 -

consumers at lower retail prices than the Plaintiffs' and that retail customers, therefore, were diverted from each of the Plaintiffs to the Plaintiffs' unspecified competitors.

The MSR Claim is based on allegations that FCA's MSR requirement is a "nonnegotiable, one-sided," metric that imposes unfair and draconian terms on Plaintiffs. AC at ¶ 6. This claim arises directly from the failure of certain Plaintiffs, including Arlington Heights and Northlake, to meet the contractually required minimum level of sales.[2] *See* AC at ¶¶ 8, 111.

It is on the subject of these claims—price discrimination and failure to satisfy the contractual MSR standard—that Plaintiffs are entitled to seek discovery so long as it is "proportional to the needs of the case[.]" Fed. R. Civ. P. 26(b)(1); *see also Nucap Indus., Inc. v. Robert Bosch LLC*, No. 15 C 2207, 2016 WL 6134539, at *2 (N.D. Ill. Oct. 19, 2016) ("The proponent of a discovery request ordinarily has the burden to show that the request is 'reasonably calculated to lead to the discovery of admissible evidence.'" (quoting *Redwood v. Dobson*, 476 F.3d 462, 469 (7th Cir. 2007))). Courts "must limit the frequency or extent of discovery if it determines that the proposed discovery is outside the scope permitted by Rule 26(b)(1)." *Wheeler v. Radtke*, No. 15-CV-95, 2016 WL 160729, at *1 (E.D. Wis. Jan. 13, 2016) (citing Fed. R. Civ. P. 26(b)(2)(C)(iii)). Here, Plaintiffs are seeking to compel production of documents on a nationwide basis relating to retail sales reported by all FCA's more than 2,400 dealers, despite the fact that this case involves specific price discrimination and MSR claims by seven plaintiffs in specific markets that even Plaintiffs admit in their amended complaint are limited to areas

---

[2] Notably, FCA has not terminated the dealer agreements of any of these dealers but instead has continued to work with them to improve their sales performances, which has resulted in both Plaintiffs Arlington Heights and Northlake dramatically improving their sales performances.

proximate to each of their locations in Chicago, St. Louis, Orlando, Palm Beach, and Pittsburgh. *See* AC at ¶ 20.[3]

**I.      FCA Has Made a Good-Faith Effort to Define What Plaintiffs Appear to Be Seeking and Agreed to Produce Documents in Response.**

Plaintiffs move to compel FCA to respond to their First RFPs 3, 4, and 7, claiming that FCA "objects and refuses to provide 'false sales reports' on the ground that the term is vague and ambiguous." Mot. at 2, 4-5. FCA maintains its objection that Plaintiffs' definition of "False Sales Reports" is in fact indecipherable—Plaintiffs define the word "reports" two different ways,[4] and provide no explanation for what they consider to be a "bone fide sale or lease." (Pls.' Ex. A at 4, ¶ 5).[5] This notwithstanding, however, FCA has produced sales report data for the FCA dealers located in each of the Plaintiffs' contractually-defined Sales Localities (27 non-plaintiff FCA dealers) for the over two-year period from January 1, 2014 through January 12, 2016, which is responsive to Requests 3 and 7. Pls.' Ex. A, Responses to Requests 3 and 7.[6] Furthermore, FCA has proposed a definition of "false sales reports" in its response to Plaintiffs'

---

[3] Plaintiffs' approach to discovery in this case ignores that the Court dismissed or partially dismissed eight counts in their Amended Complaint, including all of their fraud claims and the alleged violations of the RICO statute, on which they relied to support their claims of a nationwide fraudulent scheme. (Dkt. 62). Despite the dismissal of these claims as a matter of law, Plaintiffs continue to argue that FCA is engaged in a fraudulent scheme.

[4] Compare Pls.' Ex. B, at 3, ¶ 6 (". . . REPORTS shall mean any DOCUMENT or COMMUNICATION that YOU or YOUR DEALERS use to report and/or track the sale of new vehicles, including New Vehicle Delivery Reports") with Pls.' Ex. B, at 3, ¶ 7 ". . . REPORTS shall mean any DOCUMENT or COMMUNICATION that YOU or YOUR DEALERS use to report and/or track the sale of new vehicles, including New Vehicle Delivery Reports, *that is not based on or the result of a bona fide sale or lease*") (emphasis added).

[5] References to Plaintiffs' Exhibits are to the exhibits to Plaintiffs' Second Motion to Compel (Dkt. 81). References to FCA's Exhibits are to those submitted herewith.

[6] The only sales data that FCA has agreed to produce that has not yet been produced relates to Plaintiff Ellwood, because FCA was prohibited from producing this information under a Pennsylvania customer privacy statute (63 Pa. Stat. Ann. § 818.12(b)(16)). The parties worked cooperatively to draft an agreed-upon order to allow FCA to produce this information, that the Court has since entered (Order Regarding Disclosure of Non-Party Information (Dkt. 89)), and FCA will supplement its production to include sales data for Ellwood.

Second Set of Requests for Production—to which Plaintiffs have raised no objection—in an effort to define what Plaintiffs appear to be seeking, and that FCA is using in responding to these requests:

> For the purposes of these requests, FCA will disregard the word "false" used in the Plaintiffs' term "False Sales Reports," and re-define the term as "any document or communication that FCA or FCA's dealers use to report and/or track the sale of new vehicles, including New Vehicle Delivery Reports, that reports or contains data concerning vehicle sales or leases that did not actually occur on the dates or in the period reported by an FCA dealer to FCA." FCA does not admit that the materials captured by this definition are in any way "false."

Pls.' Ex. F, Response to Second RFPs at 5, ¶ 4.

FCA has already agreed to conduct searches of Electronically Stored Information ("ESI") related to Plaintiffs' allegation of a "false sales scheme" in Request 4, and has already produced New Vehicle Delivery Report ("NVDR") data sufficient to show sales and unwinds for dealers located in the Relevant Territory during the Relevant Time Period, as defined in FCA's Responses to Plaintiffs' Requests. Pls.' Ex. A at 2, ¶ 6; 5, ¶ 1; Response to Request 4. These documents are fully responsive to Plaintiffs' Requests, and thus it is not clear what further discovery Plaintiffs are seeking.

### A. First RFP 4

With respect to Plaintiffs' First RFP 4, FCA has agreed to run an ESI search using agreed-upon search terms and custodians to identify documents "concerning the alleged 'indicia of a plan to execute and/or conceal a false reporting scheme' as described in subparagraphs (a)-(i) for FCA dealers in the Relevant Territory during the Relevant Time Period." Pls.' Ex. A, Response to Request 4. Pursuant to the Court's Order on February 3, 2017 (Dkt. 84), the parties have exchanged names of proposed custodians and proposed search terms, and are continuing to negotiate in good faith over the appropriate custodians and search terms. Nevertheless, Plaintiffs move to "overrule" FCA's objection that the term "False Sales Reports" is vague and ambiguous.

Given that FCA has already agreed to search for these documents, and Plaintiffs have raised no objection to FCA's definition of what it will search for responsive to this request, it is unclear what, if anything, such a ruling would accomplish.

### B.    First RFP 3

With respect to Plaintiffs' First RFP 3 for "records of all FALSE SALES REPORTS," FCA has already produced NVDR data sufficient to show all new vehicle sales—including those sales that were later unwound—for the Plaintiffs and 27 other non-plaintiff FCA dealers located in the Relevant Territory during the Relevant Time Period, as well as for Sherman Dodge Chrysler Jeep and Napleton's Northwestern Chrysler Jeep Dodge, the two non-Plaintiff FCA dealers identified in the Amended Complaint (though neither dealer is even located in the Relevant Territory). The NVDR data reported by each FCA dealer to FCA shows, among other things: the vehicle identification numbers ("VIN") of all vehicles reported sold by these FCA dealers, the date and time of the sale, purchasing customer information, the model and year of the vehicle, the transaction type, and whether the sale was later unwound.

Plaintiffs, however, now reframe their request to compel FCA to produce "(i) all records for transactions that were subtracted from FCA's sales numbers under its new sales methodology; (ii) all transactions that were reported sold in the final ten days of any calendar month and then unwound or backed out in the first ten days of the following calendar month"; and (iii) all communications related to any of the foregoing transactions (subject to the parties' agreements on search terms and custodians)." Mot. at 3-4. This reframed request should be denied because the substantial NVDR data that FCA has already produced, along with the ESI searches FCA has agreed to conduct, will provide Plaintiffs with documents responsive to these requests.

First, with respect to category (i), and based on the plain language of the July 26, 2016 FCA press release on which the Plaintiffs rely, FCA did not "subtract" any sales reports by FCA

dealers, let alone any sales reports that FCA believed were "false," in connection with the revised retail sales reporting methodology described therein. Mot. at 2-3. Indeed, the press release nowhere mentions the subtraction of false sales reports as can be gleaned by even a quick reading of the document. Rather, as the press release describes, FCA changed its methodology for presenting monthly retail sales reported to FCA by its dealers. Pls.' Ex. C at 4. Specifically, again as detailed in the press release, FCA changed the manner in which it presented dealer retail sales that are later unwound, which as the press release explains can happen for a variety of legitimate reasons. Pls.' Ex. C at 3 ("These unwinds may, and in fact do, occur for a number of reasons including: inability of the retail customer to finalize financing for the purchase or a change in customer preferences, among others"). Under its previous methodology, FCA counted a retail sale once at the time of the initial sale (*i.e.* when a dealer submitted a NVDR to FCA), regardless of whether that sale was later unwound and the vehicle subsequently resold. Under the revised methodology announced in the July 26, 2016 press release, if a retail sale is unwound, FCA now nets out any unwinds that occurred prior to the end of the month and adds in any sales of previously unwound cars that were resold during that month. Pls.' Ex. C at 4.[7] Under either the old or the new method, a reported dealer retail sale is only counted once. In any event, FCA has *already produced* the NVDR data for 34 Plaintiff and non-plaintiff FCA dealers located in the Relevant Territory during the Relevant Time Period, which shows which sales were unwound, and from which the Plaintiffs can conduct their own analyses.

---

[7] Specifically, the press release notes that "[d]ealer reported sales (derived from the NVDR system) will be the sum of:
- All sales recorded by dealers during that month net of all unwound transactions recorded to the end of that month (whether the original sale was recorded in the current month or any prior month); plus
- All sales of vehicles during that month attributable to past unwinds that had previously been reversed in determining monthly sales (in the current month or prior months)."

Second, with respect to category (ii), the sales data that FCA already has produced shows retail sales (including dates) that were reported sold and then unwound for the Plaintiffs and non-plaintiff dealers in the Relevant Territory during the Relevant Time Period. In fact, the "unwind" is specifically designated in the data produced. Plaintiffs' motion to compel FCA to further respond to this Request is therefore moot, or at a minimum redundant in light of the information already produced by FCA.

Third, with respect to category (iii), FCA has already agreed to conduct a search of ESI, subject to the parties' agreement on custodians and search terms, including by searching for documents reflecting "indicia of a plan to execute and/or conceal a false reporting scheme" in response to RFP 4. To the extent Plaintiffs seek to have FCA search ESI for documents or communications concerning each transaction that was unwound or counted in a different month, this is both functionally impractical, and certainly not proportional to the needs of the case. Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case."). Such a search would require identifying thousands of transactions—which, as explained above and in FCA's opposition to Plaintiffs' first motion to compel (Dkt. 74 at 7-10, 14-15), have no connection to Plaintiffs' indirect price discrimination claims merely because they were unwound or counted differently under FCA's revised reporting methodology—and then crafting individual search terms and reviewing documents for a connection to each transaction.

**C.     First RFP 7**

Plaintiffs seek to compel documents and communications concerning "False Sales Reports" involving Sherman CDJR; Northwestern CDJR; Glendale CDJR; Royal Gate CDJR; and South County CDJR. Mot. at 5. Again, FCA has already produced sales data from all of these dealers, showing the sales reports submitted by these dealers, including unwinds, during

the Relevant Time Period. FCA has further agreed in a Supplemental Response to RFP 7 to conduct an ESI search using agreed-upon search terms and custodians for documents concerning the alleged "indicia of a plan to execute and/or conceal a false reporting scheme" as described in First RFP 4 for dealers in the Relevant Territory during the Relevant Time Period, as well as for Sherman and Northwestern, which encompasses all of the information sought in this Request. *See* FCA Ex. A, Supplemental Response to Request 7. Accordingly, it is unclear what further categories of documents Plaintiffs believe they are entitled to, and FCA believes the motion to compel as to this request is now moot.

## II.     Public Sales Reporting and Warranties

Plaintiffs' motion also seeks to compel FCA to produce additional documents in response to their First RFP 5, which seeks documents sufficient to show how unwinding a sales report affects (i) the sales and financial figures FCA reports to the investing public and creditors; (ii) the bonuses FCA pays to certain employees; and (iii) the warranties for new vehicles initially reported as sold. Mot. at 4-5; Pls.' Ex. A, Response to Request 5. FCA has agreed to search for, and produce documents, if any, concerning how a dealer's unwinding of a sale may affect bonuses paid to FCA employees, but has objected to the other two categories relating to FCA's public sales and financial reporting and new vehicle warranties as irrelevant and not proportional to the needs of the case. Pls.' Ex. A, Response to Request 5.

As with so many of the other requests included with Plaintiffs' two motions to compel, their request for documents about sales reports to the investing public and warranty information is nothing more than a fishing expedition seeking documents unrelated to the parties' claims and defenses in this action. *See* Def.'s Opp'n to Pls.' Mot. to Compel Def.'s Resps. to Disc. Req. (Dkt. 74) at 8-15 (objecting to requests for documents concerning government investigations and press releases unconnected to Plaintiffs' claims). Plaintiffs have not filed an investor class action

based on public sales reporting by FCA, nor have they filed a consumer class action based on warranties relating to FCA vehicles. Rather, they have alleged that local FCA dealer competitors of the Plaintiffs, located in the same markets where each of the Plaintiffs operate, received benefits that were not available to the Plaintiffs and, in effect, enabled these other unidentified FCA dealers to sell their vehicles to consumers at lower retail prices than the Plaintiffs could meet. FCA's public sales reporting and warranty policies are not relevant to Plaintiffs' claims in this case and their motion to compel production on this request should be denied.

### III. "Competing" Dealers

For RFPs where Plaintiffs have limited their requests to documents concerning "Competing Dealers,"—*i.e.*, First RFPs 8 and 11-12 and Second RFPs 2, 4-5, and 13—Plaintiffs seek an order compelling FCA to produce documents related to any dealer that either sold three vehicles to customers residing in a Plaintiff's trade zone, or where a Plaintiff sold three cars to any customer residing in that a dealer's trade zone, in any calendar year since 2011. Mot. at 6.[8] In addition to requesting sales ***data*** for all of the dealers included in Plaintiffs' overbroad definition of "Competing Dealers," Plaintiffs also seek documents and communications that would require costly ESI searching that would be unduly burdensome and not proportional to the claims made by the Plaintiffs in this case. *See* FCA Ex. A, Supplemental Response to Request 8 (agreeing to conduct an ESI search for documents concerning the VGP in connection with dealers located in the Relevant Territory during the Relevant Time Period). Indeed, the Plaintiffs'

---

[8] Over two weeks after FCA produced data pursuant to the Court's order on February 6, 2017 (Dkt. 84), and despite the Court's request that the parties meet and confer on this definition after FCA produced the requested data, Plaintiffs did not provide a revised proposed definition of "Competing Dealers" until February 21, 2017, mere hours before the filing of this opposition and the date for filing the status report suggested by the Court. Plaintiffs' new definition includes any dealer that has sold five or more vehicles per calendar year since January 1, 2011 into Plaintiff Ellwood's trade zone, and any dealer that has sold 10 or more vehicles per calendar year since January 1, 2011 into any of the other Plaintiff's trade zones. While FCA is continuing to assess Plaintiffs' newest proposal, FCA's initial review suggests this proposal is also wildly overbroad, including dealers that do not conceivably "compete" with any of the Plaintiffs.

definition of a relevant market is so expansive it would include dealers that clearly do not compete with any Plaintiff under any reasonable definition of "competitor." Plaintiffs' original 3-sale definition swept in not only dealers in each dealer's large Sales Locality, as defined in the dealer agreements under which most of the Plaintiffs have operated for years, but certain non-plaintiff dealers located over 1,000 miles away. For example, both Chrysler J D Paramus (located in New Jersey) and Braun CDJR (located in Indiana) sold 3 or more cars that were registered in Plaintiff Northlake's (located in Lake Park, Florida) trade zone in 2015. Pls.' Ex. D at 14. The idea that these dealers over 1,000 miles and numerous states away "compete" with Northlake is nonsensical, and their inclusion in Plaintiffs' proposed definition shows just how radically overbroad it is. What is more, Plaintiffs' proposal is based on absolute number of sales—failing to account for the very different size and number of sales of the seven Plaintiff dealers. Plaintiffs' sweeping definition of "competitors" has no basis in fact or in law, and should be rejected.[9]

Plaintiffs' only support for their far-reaching definition is that they will need data "to use the Elzinga-Hogarty Test for geographic markets," which they described to the Court at the last hearing as a test "accepted by the Seventh Circuit." Mot. at 7 (citing *Fed. Trade Comm'n v. Advocate Health Care Network*, 841 F.3d 460, 469 (7th Cir. 2016)). Plaintiffs' description of the *Advocate Health Care* case as accepting the Elzinga-Hogarty theory for purposes of a price discrimination case like the one pleaded by the Plaintiffs is simply incorrect. The case has nothing to do with Plaintiffs' claims here, and it does not reflect that the Seventh Circuit has "accepted" the test. First, far from accepting the Elzinga-Hogarty test, *Advocate Health Care* emphasized that, even in the hospital merger context, courts have questioned the viability of this

---

[9] Moreover, Plaintiffs maintain this definition despite their continued refusal to identify even a *single* specific competitor in response to FCA's Interrogatories. FCA Ex. B at 4-5; *see also* Mot. to Compel Pls.' Resps. to Disc. (Dkt. 79) at 5-6.

test. 841 F.3d at 471-72 (7th Cir. 2016) (noting that heavy reliance on the test in the 1990s produced "relatively large geographic markets" that led courts to "adjust their approaches to the problem," and that such an "adjustment is necessary"); *see also Federal Trade Comm'n v. Penn State Hershey Medical Center*, 838 F.3d 327, 340 (3d Cir. 2016) ("empirical research demonstrated that utilizing patient flow data to determine the relevant geographic market resulted in overbroad markets with respect to hospitals"); *Evanston Northwestern Healthcare Corp.*, F.T.C. No. 9315, 2007 WL 2286195, at *65-66 (Aug. 6, 2007) (finding persuasive testimony by Dr. Kenneth Elizinga, after whom the theory is named, that "application of the [Elzinga-Hogarty] test to patient flow data would identify overly broad geographic markets"). Furthermore, *Advocate Health Care* does not even address price discrimination claims under the RPA or state franchising acts, but instead deals with whether a proposed hospital merger would violate Section 7 of the Clayton Act by lessening competition in a "section of the country." 841 F.3d at 464 (quoting 15 U.S.C. § 18). Plaintiffs have cited to no case involving the RPA—and FCA has found none—where the Elzinga-Hogarty analysis has been employed, let alone accepted, by the Seventh Circuit. In short, Plaintiffs have not identified a single case supporting the application of the Elzinga-Hogarty Test to a price discrimination case, and certainly no credible basis for applying a manufactured "three sale rule" to the definition of an appropriate market for the claims that they have made in this case. Their proposed definition is so broad and over-reaching that one wonders whether the information sought here even relates to this case.

By contrast, FCA has proposed as the relevant territory each Plaintiff's contractually-defined Sales Locality under which each Plaintiff agreed to operate and which includes 27 non-plaintiff FCA dealers located in geographic proximity to each Plaintiff, plus the Sherman and Northwestern dealerships (because they are mentioned in the Amended Complaint, although they

are not close enough to the relevant Plaintiffs to be included in their Sales Localities).[10] The 34 Plaintiff and non-plaintiff dealers in the six Sales Localities offered by FCA is more than fair, particularly when compared with the Plaintiffs' counterfactual proposal.

## IV. Other RFPs

Plaintiffs also seek to compel additional documents in response to a number of other RFPs—First RFPs 8, 10, 11, and 12 and Second RFPs 15 and 16—for which FCA has again already agreed to produce documents. Mot. at 8-13, Pls.' Ex. A and F.

### A. First RFP 8 – VGP

Plaintiffs' First RFP 8 seeks documents and communications relating to the VGP of Plaintiffs and unidentified non-plaintiff competing FCA dealers. Mot. at 8. FCA has supplemented its response to clarify that it will conduct an ESI search using agreed-upon search terms and custodians concerning VGP of Plaintiffs and other non-plaintiff dealers located in the Relevant Territory during the Relevant Time Period. FCA Ex. A, Supplemental Response to Request 8. This should satisfy any concerns about this RFP raised by Plaintiffs in their motion to compel, which are now moot because FCA has agreed to produce the relevant communications Plaintiffs are seeking. Mot. at 8-9.

### B. First RFP 10 – MSR

Plaintiffs' First RFP 10 seeks documents related to Plaintiffs' Minimum Sales Responsibility. Mot. at 9. FCA has supplemented its response to clarify that it will search for and produce non-privileged communications, if any, using agreed-upon search terms and custodians, concerning Plaintiffs' Minimum Sales Responsibility during the period beginning

---

[10] Contrary to Plaintiffs' claims that the Fields dealership is not included in FCA's definition of Relevant Territory (Mot. at 6-7), that dealership was in fact located in Plaintiff Arlington Heights's Sales Locality during the Relevant Time Period, and thus is included in FCA's definition—and FCA has already produced NVDR data for the dealership.

January 1, 2013. FCA Ex. A, Supplemental Response to Request 10. With respect to "'analysis or opinions from Urban Science or JD Power and Associates' related to FCA's calculation of Plaintiffs' MSR," Mot. at 9, to the extent such analyses are related to Plaintiffs' MSR, any responsive, nonprivileged documents will be captured by FCA's supplemental response.

### C. First RFP 11 – Other Incentives

Plaintiffs' First RFP 11 seeks documents sufficient to show (i) the incentives, monies and subsidies that FCA paid to Plaintiffs and competing dealers on a monthly basis; (ii) the "accounts under which [FCA] distributed such incentives, monies, and subsidies"; and (iii) why FCA distributed or withheld such incentives, monies, and subsidies and why FCA chose to do so under certain accounts. In response, FCA has agreed to produce documents sufficient to show the VGP program rules, how VGP sales objectives for dealers in the Relevant Territory and Relevant Time Period were determined, and any VGP incentives received by dealers located in the Relevant Territory during the Relevant Time Period. Additionally, FCA agreed to produce documents sufficient to describe the co-operative advertising program(s) available to FCA dealers in the Relevant Territory during the Relevant Time Period and documents sufficient to show any co-operative advertising payments received by dealers in the Relevant Territory during the Relevant Time Period. Pls.' Ex. A, Response to Request 11. Plaintiffs insist that this is inadequate because they are seeking documents about "*all* incentive payments, including co-op and advertising monies, VGP incentive benefits, incentives to report fictitious sales, vehicle allocations, and other such benefits," including "accounts under which incentives were distributed." Mot. at 10.

Requests for discovery under Rule 34 "must describe with reasonable particularity each item or category of items . . . ." Fed. R. Civ. P. 34(b)(1)(A). "The test for reasonable particularity is whether the request places a party upon reasonable notice of what is called for

- 13 -

and what is not." *Ye v. Cliff Veissman, Inc.*, No. 14-CV-01531, 2016 WL 950948, at *2 (N.D. Ill. Mar. 7, 2016) (quoting *Bruggeman ex rel. Bruggeman v. Blagojevich*, 219 F.R.D. 430, 436 (N.D. Ill. 2004)) (internal quotations omitted). Plaintiffs have failed to provide any such particularity, instead demanding that FCA produce documents related to all "benefits" provided to dealers. FCA has already agreed to produce documents related to VGP, co-op advertising, allocation, and indicia of false sales reporting uncovered through ESI searching. Pls.' Ex. A, Responses to Requests 4, 8, 11-12; *see* FCA Ex. A, Supplemental Responses to Requests 7, 8, 10. The Plaintiffs' allegations in their Amended Complaint identify no other form of incentives allegedly provided to encourage so-called false sales reporting, and Plaintiffs have declined to identify any such additional methods when the parties met and conferred on this issue. Accordingly, Plaintiffs' vague and non-specific request is improper, not relevant, or disproportionate to the claims that they have pled, and should be denied.

### D. First RFP 12 – Allocation

Plaintiffs' First RFP 12 seeks documents related to the allocation of vehicles to Plaintiffs and Competing Dealers. FCA has agreed to produce documents sufficient to both describe the method of allocation and to show the actual allocation of vehicles to dealers in the Relevant Territory during the Relevant Time Period. Nevertheless, Plaintiffs seek to compel "how and why [FCA] withheld or did not provide additional vehicles to any Plaintiff or Competing Dealer."

It is impossible to tell what additional documents Plaintiffs seek, because FCA's agreement to produce documents sufficient to show how vehicles are allocated is sufficient to show both how vehicles are allocated and how vehicles are *not* allocated. Plaintiffs have failed to articulate what additional category of documents they believe they are entitled to, and their request should therefore be denied.

      **E.**      **Second RFPs 15 and 16 – "Year-on-Year" and "Month-after-Month" Sales**

Plaintiffs' Second RFPs 15 and 16 seek *all* documents reflecting or referring to "year-on-year" or "month-on-month" vehicle sales, as well as any plan or idea to increase them. FCA has agreed to produce documents sufficient to show year-on-year and month-on-month vehicle sales during the Relevant Time Period, and objected to the rest of Plaintiffs' request as overbroad, irrelevant, not proportional to the needs of the case, and as imposing an undue burden on FCA.

The request is unduly burdensome on its face. FCA is a sales organization; one of its primary purposes is to sell vehicles. A request for all documents related to any "plan" or "idea" to sell more vehicles could encompasses tens of thousands of documents and substantial volumes of data. Such a request is disproportionate and not relevant to Plaintiffs' claims in this case, and should be denied.

## CONCLUSION

For the foregoing reasons, FCA requests the Court deny Plaintiffs' Second Motion to Compel.

Dated: February 21, 2017          Respectfully submitted,

                                            */s/ Robert D. Cultice*
                                            *Of Counsel*:

                                            Robert D. Cultice *(admitted pro hac vice)*
                                            Felicia H. Ellsworth *(admitted pro hac vice)*
                                            Caitlin W. Monahan *(admitted pro hac vice)*
                                            WILMER CUTLER PICKERING HALE AND DORR LLP
                                            60 State Street
                                            Boston, MA 02109
                                            (617) 526-6000
                                            robert.cultice@wilmerhale.com

felicia.ellsworth@wilmerhale.com
caitlin.monahan@wilmerhale.com

Randall L. Oyler
Owen H. Smith
Brandon C. Prosansky
Katherine A. Neville
BARACK FERRAZZANO KIRSCHBAUM &
NAGELBERG LLP
200 West Madison Street
Suite 3900
Chicago, IL 60606
(318) 984-3100
randalloyler@bfkn.com
owen.smith@bfkn.com
brandon.prosansky@bfkn.com
katie.neville@bfkn.com

***Attorneys for Defendant FCA US LLC***

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the CM/ECF system will be served upon counsel for Plaintiffs electronically via the CM/ECF system on February 21, 2017.

/s/ *Robert D. Cultice*
Robert D. Cultice *(admitted pro hac vice)*
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6000
Fax: (617) 526-5000
robert.cultice@wilmerhale.com