**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **NAPLETON'S ARLINGTON HEIGHTS MOTORS, INC., *et al*.** | ) | |
| **Plaintiffs,** | ) | **No. 16 C 403** |
| **v.** | ) | **Judge Virginia M. Kendall** |
| **FCA US LLC, a Delaware corporation, *et al*.,** | ) | **Magistrate Judge Finnegan** |
| **Defendants.** | ) | |

**ORDER**

The Court having heard oral argument and considered the parties' respective positions stated in their April 10, 2017 Supplemental Joint Status Report ("JSR") (Doc. 109), and prior submissions relating to Plaintiffs' pending motions to compel (Docs. 71, 81), rules as follows on the remaining issues raised by those two motions:

1. **ESI Search Terms/Strings:** The parties reported at the April 14, 2017 hearing that they have reached agreement on the ESI search terms/strings to be used by each side, and that each side will use 12-18 search terms/strings on which they have already conducted some testing to confirm their effectiveness to retrieve responsive information. The Court appreciates the parties' efforts to test and improve these search terms/strings prior to their use. The Court directs the parties to continue to monitor the effectiveness of these search terms/strings in eliciting responsive information, and to raise any issues regarding their ineffectiveness at the earliest opportunity, so as to allow for further modifications as needed and prevent delay.

2. **Narrowed Definition of "Competing Dealer":** In its 2/27/2017 Order, the Court directed the parties to meet and confer regarding a narrowed definition of the term "competing dealer" for Plaintiffs' requests seeking information other than data and

information that can be automatically generated. (Doc. 96, ¶ 3(b)). The parties reported in their Supplemental JSR that they have agreed upon a definition that includes the 39 dealers listed on page 5 of that JSR, although Plaintiffs have requested four additional dealers to be included over Defendant FCA's objection. (Doc. 109, at 3, 5). As explained at the April 14 hearing, in view of Plaintiffs' indication that they may seek to add still other dealers to this narrowed definition of "competing dealer" (after receipt and review of certain data forthcoming from FCA (*id*. at 4)), Plaintiffs' request to add four dealers to the currently agreed-upon list of 39 dealers is denied without prejudice. If and when Plaintiffs seek discovery as to more dealers, the parties must address the anticipated incremental probative value of such discovery against the burden. Accordingly, the narrowed definition of the term "competing dealer" for Plaintiffs' requests seeking information other than data and information that can be generated automatically is limited to the 39 dealers listed on page 5 of the parties' Supplemental JSR. (Doc. 109).

3. **ESI Custodians:** The parties reported that FCA has agreed to search the 15 ESI custodians listed on page 22 of their Supplemental JSR, although Plaintiffs have requested that FCA also search the 8 custodians listed on pages 14-15 of that JSR. (Doc. 109, at 14-15, 22). Plaintiffs' request to compel these 8 additional custodians (in addition to the 15 agreed upon) is granted in part and denied in part, as follows:

a. The Court is persuaded of the potential probative value of information in the possession of Reid Bigland (Head of U.S. Sales), Kurt Mitzner (Director of Sales Reporting), Chris Glen (Sales and Operations Manager for Midwest Business Center), and Robert Weaver (Sales Operations Manager for the Southeast Business Center). The Court has insufficient information, however, to resolve FCA's objection that ESI from these individuals would be duplicative of ESI from other custodians it has already agreed to search, or determine whether any such duplication is warranted in view of the burden to FCA of searching these additional custodians. FCA is therefore preliminarily directed to run the agreed search terms/strings for Messrs. Bigland, Mitzner, and Glen for the purpose of determining the number of "hits" and reporting this to Plaintiffs and the Court in a status report to be filed by 5/12/2017.

b. The Court is not persuaded of the probative value, when weighed against the burden to FCA, of searching custodians in FCA Business Centers in which Plaintiffs do not operate. While it understands that Plaintiffs have alleged a nationwide scheme, and has reviewed the cases Plaintiffs have cited for the proposition that information outside a plaintiff's sales territory may be probative of a scheme that injured a plaintiff within its territory, even Plaintiffs' arguments regarding the lesser probative value of ESI militate in favor of focusing such discovery on the areas where Plaintiffs do operate. (*See* Doc. 109, at 12: "The alleged discovery was vast in scope, and the alleged conduct is not easily pinpointed with a few unique search terms. Therefore, using traditional custodian and term searches is like looking for a needle in a haystack."). Moreover, any limitation on ESI discovery by disallowing custodians in other FCA Business Centers is more than offset by the broad discovery the Court has allowed for many of Plaintiffs' requests (relating to 75 dealers for data and automatically generated information and relating to 39 dealers for other requests). In addition, as noted in more detail below, the Court is requiring FCA to produce certain responsive documents related to these other Business Centers if they were produced to the Securities and Exchange Commission ("SEC") or Department of Justice ("DOJ") or collected as part of FCA's internal investigation. Plaintiffs' request for ESI custodians in Business Centers in which they do not operate (Jeff Eschenbach, Steve Yandura, and Bill Potter) is therefore denied.

c. Plaintiffs' request that FCA be required to disclose the name of the FCA "Vice President/executive responsible for the corporate audit function, including any audits of FCA's sales reporting in the wake of this lawsuit and internal and government investigations into FCA's sales reporting." (Doc. 109, at 15). At the April 14 hearing, Plaintiffs also sought the name of "the person at FCA in accounting who is most knowledgeable about the accounting methodology for sales reporting." Plaintiffs complain that FCA has refused to identify such individuals based on a relevance objection, but FCA maintains that it knows of no such FCA employees or positions and has provided organizational charts to assist Plaintiffs in identifying the employees it seeks to designate as ESI custodians. To the extent FCA objects to identifying any potential ESI custodian based on relevance, that objection is overruled. The Court is unable, however, to compel FCA to identify an employee or position unknown to it. Plaintiffs' request to include these two ESI custodians is therefore denied without prejudice, and the parties are directed to meet and confer further regarding their identification. To the extent these custodians cannot be identified, Plaintiffs may serve an interrogatory or 30(b)(6) notice directed at the information sought.

4. **Geographic Scope of Plaintiffs' Document Requests:** The Court's 2/27/17 Order denied the request in Plaintiffs' first motion to compel for a blanket definition of the relevant territory for its requests for production to require nationwide discovery (Doc. 71, at 5-6), and stated that the Court would determine the geographic scope of any disputed

requests on a request-by-request basis. (Doc. 96, ¶ 2(b)). In the parties' 4/10 JSR, Plaintiffs now seek a ruling on the geographic scope of the following requests in Plaintiffs' first and second requests for production: First Set Nos. 1, 3-4, 7, and 9; Second Set Nos. 1-7, and 14. (Doc. 109, at 16 and Ex. A). The Court rules on the geographic scope of each of these requests as follows:

a. **First Set No. 3 and Second Set No. 7:** In the parties' 2/21 JSR, Plaintiffs stated that First Set Request No. 3 (for "Records of all FALSE SALES REPORTS") seeks "documents reflecting the finite set of transactions, including NVDRS, that were subtracted from FCA's sales numbers under its new sales reporting methodology, as described in FCA's July 26, 2016 press release." (Doc. 93, at 3). At the April 14 hearing, however, Plaintiffs clarified that they do not seek the individual NVDRS for this request. That leaves only the documents that formed the factual basis for FCA's 7/26/16 press release, which the Court's 2/27 Order already ordered FCA to produce in response to Second Set Request No. 7, and which FCA has represented it will produce. (Doc. 96, ¶ 2(d); Doc. 109, at 20 n.5). Still, when the Court asked Plaintiffs at the April 14 hearing if they were willing to limit First Set Request No. 3 to the documents sought in Second Set Request No. 7, Plaintiffs declined, but were unable to explain what additional information they seek through First Set Request No. 3.

   Accordingly, because the Court has already ordered the production of the information sought by Second Set Request No. 7 (the information underlying FCA's 7/26/16 press release), and there is no geographic dispute as to that information (rather, the scope is defined by the press release), Plaintiffs' request for a ruling on the geographic scope of First Set Request No. 3 is denied. This is without prejudice to Plaintiffs seeking more documents after receipt and review of the information FCA produces in response to Second Set Request No. 7, and after completing the meet and confer process for any subsequent request for supplemental information.

b. **First Set Nos. 4 and 7:** These requests seek various categories of documents concerning alleged "False Sales Reports." (Doc. 71-1). In the parties' 2/21 JSR, Plaintiffs stated that "Defendant supplemented its responses to first RFP Nos. 4 and 7 and resolved the dispute as to these requests." (Doc. 93, at 3). The information that FCA will produce in response to these requests has thus been agreed upon; both sides have stated that FCA will produce ESI collected by running agreed upon search strings for the agreed upon custodians or those ordered by the Court. (Doc. 92, at 4-5, 7-8; Doc. 109-1, at 2). Despite that agreement, however, Plaintiffs now seek a ruling that these two requests have a nationwide scope. As the Court has now resolved the parties' dispute regarding ESI custodians (*see* Paragraph 3 above), no dispute regarding the geographic scope of these requests remains: FCA is required to produce the ESI agreed upon for these requests collected from the ESI custodians required to be searched for all of Plaintiffs' requests as outlined in Paragraph 3 above.

FCA is further directed to produce such ESI without regard to the geographic territory of any information retrieved. In addition, in searching for responsive documents, FCA must review all materials produced to the SEC and DOJ and collected during FCA's internal investigations referenced in press releases, and FCA must produce documents responsive to First Set Requests No. 4 and 7 regardless of geographic territory. In other words, it may not limit the production to responsive documents from within the geographic scope of Plaintiffs' Sales Localities.[1]

c. **First Set No. 9:** This request seeks documents "sufficient to show monthly new vehicle sales data for each type of Chrysler, Dodge, Jeep and Ram vehicle sold in the United States from January 1, 2012 to the present." (Doc. 71-1). Plaintiffs never before moved to compel on this request, however, leaving the Court with insufficient information regarding the parties' respective positions. The Court has only Plaintiffs' assertion in the 4/10 JSR that this request should be nationwide in geographic scope (Doc. 109-1, at 3), and Plaintiffs' argument at the April 14 hearing that the parties dispute whether the request encompasses both sales reported to FCA by its dealers and sales reported by FCA to the public. Regarding the latter point, Plaintiffs also requested in the parties' 4/10 JSR that the Court "clarify that FCA's sales reporting to the public at the national level is relevant to Plaintiffs' claims in this lawsuit." (Doc. 109, at 16).

It would be inappropriate for this Court to opine on the relevance of evidence to Plaintiffs' claims in the abstract, or to compel FCA to produce information in the absence of a motion to compel to which it has had an opportunity to respond. Plaintiffs' requests for a ruling that First Set Request No. 9 has a nationwide geographic scope, and covers sales reported by FCA to the public, are therefore denied without prejudice to being reasserted after the parties have met and conferred regarding this discovery request. That said, for guidance, the Court reminds both sides that it has allowed discovery outside Plaintiffs' Sales Localities and/or Trade Zones where the burden of production is lessened because the information (such as sales data) can be automatically generated. Here, where Plaintiffs assert that the information can be automatically generated (although FCA has not confirmed this) and the request seeks only documents "sufficient to show" monthly new vehicle sales data (Doc. 109-1, at 3), subject to any burdensomeness arguments by FCA (which the Court does not anticipate),

[1] As noted in the Court's 2/27/2017 Order, when searching for responsive documents from among materials gathered during any internal investigation or for production to the government, FCA "must search the entirety of documents collected" rather than "narrow the universe of such documents by preliminarily searching them for particular custodians and/or search terms and then reviewing for responsiveness only those documents that contain those search terms or involve those custodians." (Doc. 96, at 2-3). The Court now further orders FCA to produce such responsive documents from its internal and government investigation collections without regard to geographic territory. In so ruling, however, the Court requests the parties to work together to eliminate any unnecessary categories of documents that are voluminous and unhelpful. For example, Plaintiffs indicated at the April 14 hearing that they were not seeking all the underlying transactional documents for every vehicle sale. Should the parties be unable to reach agreement regarding reasonable subject matter (as opposed to geographic) limitations even after sampling, they may return to the Court to propose them.

it is likely that the Court would require nationwide information to be produced regarding both sales reported to FCA by its dealers and sales reported by FCA to the public. With the benefit of that guidance, the Court hopes and expects the parties to resolve their dispute regarding this request without court intervention.

d. **Second Set No. 14:** This request seeks documents using or relating to the term "unnatural acts." (Doc. 71-2). The Court's 2/27 Order directed FCA to "produce documents using this term to the extent responsive to any other document request regarding which Defendants are also required to produce documents," and "to report to Plaintiffs the number of documents located that use the term 'unnatural acts' that were withheld as non-responsive." (Doc. 96, ¶ 2(a)). Plaintiffs now assert that this request should be deemed nationwide in scope, and that FCA should be required to search the custodians agreed upon or ordered by the Court "plus additional custodians FCA knows are likely to have responsive documents." (Doc. 109-1, at 7). As the Court has now resolved the parties' dispute regarding ESI custodians (*see* Paragraph 3 above), FCA is required to produce the documents using the phrase "unnatural acts" retrieved from those custodians to the extent they are responsive to any other request regarding which FCA is required to produce documents, and to report to Plaintiffs the number of documents using this phrase that are withheld if any (the Court may decide to view these *in camera*). To the extent any documents containing this term were produced to the SEC or DOJ, or were gathered during FCA's internal investigation, they must be produced regardless of custodian and geographic territory.

e. **First Set No. 1 and Second Set Nos. 1-6:** Plaintiffs' request for nationwide discovery in response to First Set No. 1 and Second Set Nos. 1-6 is denied as moot, as Plaintiffs' motion to compel as to these requests is denied as explained in Paragraphs 5 and 6 below.

5. **Internal Investigation Documents (First Set Request No. 1, Second Set Request No. 6):** The Court's 2/27 Order granted Plaintiffs' motion to compel as to one of Plaintiffs' three requests for documents relating to an "internal investigation" by FCA into alleged false sales reporting (Second Set Request No. 7),[2] but reserved ruling on the remaining two "internal investigation" requests (First Set Request No. 1 and Second Set No. 6) pending receipt from FCA of a supplemental affidavit with additional information. (Doc. 96, ¶ 2(d)). The Court has now reviewed Defendant's Supplemental Affidavit in

[2] Second Set, Request 7 sought "All DOCUMENTS, regardless when created, that form the factual basis for any and all statements made in YOUR press release of July 26, 2016." (Doc. 71-2, at 15).

Opposition to Plaintiffs' Motion to Compel (Doc. 97) and rules on Plaintiffs' motion to compel with respect to First Set Request No. 1 and Second Set Request No. 6 as follows:

a. **First Set Request No. 1:** In this request, Plaintiffs seek production of all documents and communications that FCA "reviewed and/or uncovered when it 'carried out an investigation of the facts' with respect to 'allegations of false sales reporting,'" as stated in FCA's "January 14, 2016 press release." (Doc. 71-1). There is no dispute that the 1/14/16 press release referenced in this request refers to an investigation that FCA conducted regarding Plaintiffs' allegations of "false sales reporting" that led to the instant lawsuit. (Doc. 81-2, at 21). There is also no dispute that FCA undertook that investigation after Plaintiffs sent FCA a draft complaint in August 2015. (Doc. 97-1). Affidavits of Christopher J. Zammit, Senior Staff Counsel in the Office of General Counsel of FCA US LLC, demonstrate that FCA undertook that investigation at his direction and retained outside counsel (from the Wilmer Hale firm) to assist him in reviewing relevant documents to investigate Plaintiffs' claims and to provide legal advice in anticipation of the litigation that ensued. (*Id.*) Of course, individual documents collected and reviewed during that investigation are not insulated from production to Plaintiffs, and FCA has not claimed otherwise. As the Court stated in its 2/27 Order, to the extent any individual document is responsive to Plaintiffs' other requests regarding which FCA is required to produce documents, it must be produced or logged individually as appropriate. (Doc. 96, ¶ 2(d)). Request No. 1, however, is problematic because it would require FCA to divulge which specific documents FCA's counsel made a decision to review when carrying out the investigation, and produce those documents as a collection. Since the Court is satisfied that the investigation by outside counsel was carried out in anticipation of litigation, FCA is entitled to work product protection for that information. Moreover, since FCA is producing individual documents to the extent they are responsive to Plaintiffs' other requests (addressing any "substantial need" Plaintiffs may have for the information within the documents), FCA need not identify and produce as a collection the documents that its outside counsel reviewed during the internal investigation.

The Court also concludes that FCA did not waive such work product protection by announcing in a press release the bare fact that the investigation had been conducted and the alleged claims were unfounded. *Robinson v. Morgan Stanley*, No. 06 C 5158, 2010 WL 1050288, at *4 (N.D. Ill. Mar. 17, 2010) (no waiver of work product from "disclosure of the fact that defendants conducted an investigation overseen by counsel and that counsel's conclusion was that [plaintiff's] charges were unfounded") (citing *In re Vecco Instruments, Inc. Sec. Litig.*, No. 05 MD 1695, 2007 WL 210110, at *2 (S.D.N.Y. Jan. 25, 2007) (no waiver of work product from press release that "summarized the findings and conclusions" of internal investigation but "did not quote, paraphrase or reference any of the specific documents at issue in support of its conclusions," because such a "limited disclosure does not constitute waiver of the work product privilege")). Finally, to the extent Plaintiffs contend that FCA waived any work product protection for documents provided to the SEC or DOJ during a

government investigation (Doc. 71, at 14), this issue will be addressed on a document by document basis.[3]

Plaintiffs' motion is therefore denied as to First Set Request No. 1 for the collection of documents that FCA reviewed and/or uncovered in its investigation of Plaintiffs' allegations, as referenced in the 1/14/16 press release.

b. **Second Set Request No. 6:** This request seeks all documents that FCA "reviewed, uncovered, or identified as relevant as part of any internal 'investigation into the reporting of vehicle unit sales to end customers in the U.S.'" (Doc. 71-2). There is no dispute that the phrase "investigation into the reporting of vehicle unit sales to end customers in the U.S." in this request is quoted from a 7/18/16 FCA press release stating that FCA was then cooperating with an SEC investigation "into the reporting of vehicle unit sales to end customers in the U.S." (Doc. 74-7). The Court understands from Mr. Zammit's Affidavits and the explanation of FCA's counsel during the April 14 hearing that, after receiving an inquiry from the SEC on 2/2/2016, FCA retained separate outside counsel (the Sullivan & Cromwell firm) to gather information and respond to that SEC investigation, which followed the internal investigation into Plaintiffs' allegations conducted from August 2015 to January 2016. (Docs. 91-1 and 97-1). Plaintiffs similarly refer to FCA's efforts to respond to and cooperate in the SEC's investigation as an "internal investigation," and Plaintiffs' Second Set Request No. 6 seeks the collection of documents that FCA reviewed, uncovered, or identified as relevant during that effort.

The Court denies the motion to compel such documents since FCA would be required to divulge the identity of all documents that its outside counsel "reviewed, uncovered, or identified as relevant" in the course of any internal investigation spawned by the SEC inquiry and produce them as a collection of materials. Here again, the Court is persuaded that the work product doctrine protects disclosure of which documents FCA's outside counsel—retained in response to an ongoing SEC inquiry (apparently spawned by Plaintiffs' lawsuit)—felt were worthy of review and so identified as "relevant." As with Request No. 1, however, FCA must produce individual documents from this collection if responsive to Plaintiffs' other requests, identify on a privilege log any document that is withheld as privileged, and indicate on that privilege log if the document was produced to the government.[4]

[3] In the unlikely event that FCA decides to withhold as privileged a document that has been produced to the government, FCA must note the production to the government on the privilege log.

[4] It is also worth noting the relationship between this Request No. 6 and Plaintiffs' Second Set Requests Nos. 1-5 which are addressed next in this Order. Request No. 6 seeks the documents that FCA reviewed, uncovered, or identified as relevant in connection with the government investigation(s), whereas Nos. 1-5 seek documents and information that FCA exchanged with the government in connection with its investigation(s). The Court thus has the same concerns about the scope of Request No. 6 as it has with respect to Request Nos. 1-5, as addressed in Paragraph 6 below.

6. **Government Investigation Documents (Second Set Request Nos. 1-5):** Before turning to the five discovery requests related to government investigations, some background is helpful. As noted, Plaintiffs sent a draft Complaint to FCA in August 2015, and filed the actual complaint five months later in January 2016. Plaintiffs have served numerous requests to produce documents believed to be relevant to the claims and defenses, describing the subject matter or content of those documents. Not long after the lawsuit was filed (and then reported in the media as well as in FCA's own press release), FCA received an inquiry from the SEC in February 2016 and later from the DOJ. In their Second Set of Requests for Production, Plaintiffs supplemented their written discovery with five requests seeking to learn what the government is investigating and how, and production of *all* the documents FCA has been required to produce the government (so far). While both sides describe such requests (at least in part) as "cloned discovery", they disagree about whether such discovery is permissible here.

In resolving this dispute, the Court is mindful of the overall objective of securing the "just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1. For several reasons, the Court finds under the facts and circumstances presented here that the requests for cloned discovery are unnecessary and would lead to more motion practice and greater expense. First, the discovery to be cloned is from government investigations that followed the filing of Plaintiffs' lawsuit and are still ongoing and not public. Second, the parties disagree as to whether these government investigations are co-extensive with Plaintiffs' claims in this lawsuit or are dissimilar in some respects. Hence they also disagree as to whether *all* documents that FCA produced to the government necessarily are relevant. To resolve this dispute, the Court would be required to gain an understanding of what the government is investigating and assess (after hearing argument from the parties) whether each category of documents requested by and produced to the

government is relevant and discoverable in this case. It would not be enough to examine the document requests alone, since these often are quite broad but then narrowed during subsequent negotiations (at least preliminarily and on the condition that all documents are preserved). In other words, the Court likely would need to examine communications between FCA and the government regarding what is and is not being produced in response to any subpoena. Not surprisingly, as the government pursues leads and develops information, the scope of the ongoing investigation may expand, contract, or shift, and new document requests may issue. In the end, after much time and effort by all concerned, this Court most likely would determine that some categories of documents that FCA produced to the government (so far) are relevant (depending on their content) and others are not.

Third, there is no reason Plaintiffs cannot simply and directly request the categories of documents that they believe to be relevant to their claims, and indeed already have done so. This obviates the need for the parties to engage in discovery about what categories of documents the SEC and DOJ have (or will) request in their ongoing investigations, and then litigate which of these categories are relevant in this civil lawsuit. Finally and importantly, documents that FCA produced to the government are not insulated from production if responsive to Plaintiffs' other discovery requests seeking documents based on their content. In fact, to assure that any properly discoverable information is produced to Plaintiffs from the collection of documents previously produced to the government, the Court's 2/27 Order required FCA to search the entirety of the collection, rather than employing search terms and custodians that would narrow the universe of what is examined for responsiveness. (Doc. 96, ¶ 2(e); Doc. 109, at 20).[5]

[5] At the April 14, 2017 hearing, Plaintiffs argued that FCA should be required to produce any responsive information found in this collection of documents (as well as the collection of any documents gathered as part of an internal investigation) "without geographic limitation." (Doc. 109, at 13). As noted previously in this Order, the Court has in large part agreed to this broader approach,

For all of these reasons, the Court is not persuaded that cloned discovery is warranted or would result in efficiencies here. Instead, the Court agrees with the analysis in *Midwest Gas Servs., Inc. v. Indiana Gas Co*., No. IP 99-690, 2000 WL 760700, at *1 (S.D. Ind. Mar. 7, 2000), that the better course is for the requesting party to seek relevant documents based on their content -- not because they were produced to the government:

> "Cloned discovery", requesting all documents produced or received during other litigation or investigations, is irrelevant and immaterial unless the fact that particular documents were produced or received by a party is relevant to the subject matter of the instant case. The plaintiffs in this Cause have not shown that the fact that any particular document was produced by the defendant to the D.O.J. or received by defendant from the D.O.J. is relevant to the subject matter of this Cause. Instead, the plaintiffs are interested in the content of documents and for that they must make proper requests describing the information in which they are interested. The plaintiffs' counsel must do their own work and request the information they seek directly.

Against this backdrop, the Court now examines each of Plaintiffs' discovery requests relating to the government investigation, in turn.

a. **Plaintiffs' Second Set Request No. 1:** This request seeks "All DOCUMENTS, regardless when created, that YOU have provided to any governmental entity as part of any "investigation into the reporting of vehicle unit sales to end customers in the U.S." (Quoting from FCA's 7/18/16 release). Plaintiffs contend that all of these documents are clearly relevant based on their understanding of the scope and nature of the government investigations which is informed by media reports as well as FCA's press release (on July 18, 2016) that said the investigation was of the "reporting of vehicle unit sales to end customers in the U.S."

   FCA, on the other hand, argues that the government investigations are not co-extensive with the Plaintiffs' claims in this lawsuit, and even assuming overlap, "the scope of those investigations and the Plaintiffs' case is manifestly dissimilar." (Doc. 74, at 11). It thus contends that these requests "indiscriminately seeking documents related to any 'investigation into the reporting of vehicle unit sales to end customers in the U.S.' . . . fail for being overbroad, irrelevant, and not proportionate to the needs of the case," and "violate the directive of Fed. R. Civ. P. 26 and 34 to pose requests for specific categories of documents relevant to the claims or defenses of any party to the litigation." (*Id*. at 10-11).

---

despite granting a more than reasonable scope for Plaintiffs' other discovery requests (relating to 75 dealers for data and automatically generated information, and 39 dealers for other requests).

It is impossible to know the extent of overlap between the claims in this lawsuit (brought by a small group of FCA dealers who claim to have been competitively disadvantaged by FCA's preferential treatment of other dealers that FCA allegedly solicited to report falsely high sales) and any governmental investigation (reportedly focused on the inaccuracy of FCA's reports of vehicle sales to the public). Government investigations are not public and remain that way until and unless claims or charges are filed or the investigations are closed.[6] For reasons discussed earlier, the Court disagrees with Plaintiffs that a request for *all* documents provided to the government as part of an ongoing investigation--even one that may have been spawned by Plaintiffs' lawsuit--is proper or that such cloned discovery makes practical sense here. Since the fact that FCA produced a particular document to the government is not relevant, the more efficient method of completing discovery is for Plaintiffs to simply request the information that they believe to be relevant regardless of whether the documents containing such information were or were not produced to the government. The motion to compel as to Request No. 1 is denied.

b. **<u>Plaintiffs' Second Set Request No. 2:</u>** This request is more detailed than Request No. 1, and different in that it seeks several broad categories of documents "provided to any governmental entity" but not necessarily in the ongoing investigation referenced in FCA's press release. The request seeks:

> All DOCUMENTS, regardless when created, that YOU provided to any governmental entity (including any grand jury) concerning (1) SALES REPORTS, (ii) FALSE SALES REPORTS, (iii) the Volume Growth Program, (iv) Minimum Sales Responsibilities, (v) any of the PLAINTIFFS, (vi) any of the COMPETING DEALERS, (vii) Reid Bigland, (viii) Sergio Machionne, (ix) any of the individuals identified in the parties' Initial Rule 26(a) disclosures exchanged on March 25, 2016, (x) the activities of the Business Centers in Illinois, Florida, Missouri, Pennsylvania, and Colorado, (xi) incentives that YOU or YOUR employees offered to any dealer to sell vehicles, report vehicles as sold, or unwind any vehicles reported as sold, (xii) YOUR "turn and earn" program or any program that rewarded past sales with inventory of popular vehicles, (xiii) any cooperative advertising program, (xiv) the unwinding of any SALES REPORT, and (xv) the accuracy of the unit sales and revenues that YOU reported to the public.

---

6 This is explained on the SEC's website as follows:

> (SEC) investigations are conducted confidentially to protect evidence and reputations. Important documents could be destroyed if an investigation is publicly announced, so confidential treatment may help to preserve key evidence in a case. A confidential process also protects the reputations of companies and individuals where the SEC finds no wrongdoing by the firm or the individuals that were the subject of the investigation. As a result, the SEC generally will not confirm or deny the existence of an investigation unless and until it becomes a matter of public record. *** An investigation becomes public when the SEC files an action in court or through an administrative proceeding.

https://www.sec.gov/fast-answers/answersinvestghtm.html (last visited 4/25/2017)

Defendants asserted numerous objections to this request, including that it seeks *all* documents produced to any governmental entity concerning each person identified in the Rule 26(a) disclosures (as well as Reid Bigland and Sergio Machionne) without regard to the content of those documents. Notwithstanding the objections, however, FCA has agreed to produce non-privileged materials if "responsive to Plaintiffs' other specific requests regardless of whether those documents have been produced to a governmental entity outside of a grand jury proceeding." FCA added that it "objects to the production of documents solely because they may have been produced to a governmental entity." (Doc. 1-2 at 11).

This Court agrees that the fact that a document was “provided to any governmental entity” does not make it relevant to the claims and defenses in this lawsuit. Since it is the content of a document that determines relevancy here, Plaintiffs must serve requests that describe that content with reasonable particularity, as they have done in other requests to which FCA is responding. Plaintiffs’ Second Set Request No. 2 is therefore denied as written.

c. **Plaintiffs' Second Set Request Nos. 3-5:** These requests seek all “subpoenas, requests for information, or civil investigative demands” (No. 3), and all documents reflecting or referring to “any interview or testimony” (No. 4) and “any raid, search, or seizure” (No. 5) conducted by a government entity involving FCA, its employees or any competing dealer “as part of any investigation into the reporting of vehicle unit sales to end customers in the U.S.” (Doc. 71-2). Among other objections, FCA again asserts that these requests seek cloned discovery and fail to describe with reasonable particularity items or categories of items relevant to the claims or defenses of any party. This Court agrees.

In essence, Requests Nos. 3-5 appear to seek discovery not about the claims and defenses in this lawsuit but about the details of the ongoing government investigations on the apparent assumption that anything the government is seeking, doing, learning is necessarily relevant in this lawsuit. For example, Request No. 4 is broad enough that it covers even documents relating to requested interviews that never occurred. Plaintiffs certainly may seek interviews or testimony in which particular topics were discussed that are relevant in this lawsuit. As drafted, however, this request instead asks for any interview or testimony in the government’s investigation regardless of what was said. Similarly, Request No. 5 seeks all documents referring to raids, searches and seizures without regard to whether the documents contain any particular information. Finally, Request No. 3 seeks to learn what documents the government has decided to request from FCA (so far), asking for all subpoenas, requests for information, and civil investigative demands to FCA or its employees.

> This Court denies without prejudice Plaintiffs' motion to compel production of the documents sought in Requests 3, 4, and 5. As written, the requests are overbroad and fail to specify the content of the documents that would render them relevant. As noted, some of the requests appear to be designed to learn how the SEC and DOJ are conducting their ongoing investigations and what decisions they are making (i.e., who is being interviewed, required to testify or raided, and what documents are being sought). Plaintiffs are well-represented and filed a detailed (30 page) complaint before the government investigations ever began. Given the tight discovery deadline in this matter (a deadline that Judge Kendall has said is unlikely to be extended) and in the absence of a concrete and persuasive theory of relevancy regarding the government's investigative decisions, the Court declines to allow what appears to be satellite and unnecessary discovery concerning these non-public investigations.

7. **FCA's Discovery Responses:** The Court noted at the April 14 hearing that several of FCA's discovery responses commit to producing "relevant, nonprivileged information" (Docs. 71-1 and 71-2), which the Court finds unacceptably vague. FCA's counsel responded by explaining that this phrase was meant to be synonymous with "responsive nonprivileged information," which the Court finds acceptable.

8. **Plaintiffs' Price, Inventory, and Financial Information:** In the parties' April 10 JSR, and at the April 14 hearing, FCA asked the Court to compel Plaintiffs to produce their price and inventory information dating back to 2011, and to produce their financial information, which they have so far produced only in PDF "Honda" forms, in an alternative electronic format. (Doc. 109, at 20-21). Plaintiffs responded that they are in the process of producing the pricing and inventory data, and are exploring the possibility of producing their financial information in another format. (*Id*. at 16-17). The Court directs the parties to meet and confer regarding the "Honda" form issue, but notes again that it cannot compel a party to produce information that does not exist, or compel a party to produce information in a format in which it is not kept.

9. **Mutual Rolling Productions and Supplemental Joint Status Reports:** At the April 14 hearing, FCA requested, and Plaintiffs agreed, that Plaintiffs immediately begin their ESI searches using the agreed upon search terms/strings and the agreed upon custodians, and promptly begin producing their responsive ESI on a rolling basis. The Court directs both sides to coordinate mutual rolling productions of responsive ESI, documents, and other information, and to meet and confer upon a schedule for filing additional Joint Status Reports to apprise the Court of their progress.

ENTER:

Sheila Finnegan

SHEILA FINNEGAN
United States Magistrate Judge

Dated: April 26, 2017