**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| NAPLETON'S ARLINGTON HEIGHTS MOTORS, INC. f/k/a NAPLETON'S PALATINE MOTORS, INC. d/b/a NAPLETON'S ARLINGTON HEIGHTS CHRYSLER DODGE JEEP RAM, an Illinois corporation; NAPLETON'S RIVER OAKS MOTORS, INC. d/b/a NAPLETON'S RIVER OAKS CHRYSLER DODGE JEEP RAM, an Illinois corporation; CLERMONT MOTORS, LLC d/b/a NAPLETON'S CLERMONT CHRYSLER DODGE JEEP RAM, an Illinois limited liability company; NAPLETON'S NORTH PALM AUTO PARK, INC. d/b/a NAPLETON'S NORTHLAKE CHRYSLER DODGE JEEP RAM, an Illinois corporation; NAPLETON ENTERPRISES, LLC d/b/a NAPLETON'S SOUTH ORLANDO CHRYSLER DODGE JEEP RAM, an Illinois limited liability company; NAPLETON'S MID RIVERS MOTORS, INC. d/b/a NAPLETON'S MID RIVERS CHRYSLER DODGE JEEP RAM, an Illinois corporation; NAPLETON'S ELLWOOD MOTORS, INC. d/b/a NAPLETON'S ELLWOOD CHRYSLER DODGE JEEP RAM, an Illinois corporation, <br><br> Plaintiffs, <br><br> v. <br><br> FCA US LLC, a Delaware corporation, <br><br> Defendant. | Case No. 1:16-cv-00403-VMK-SMF |

**FCA'S MOTION TO COMPEL PLAINTIFFS' RESPONSES**
**TO FCA'S SECOND SET OF INTERROGATORIES**

I.      Introduction

On August 14, 2015, Edward F. Napleton, the dealer-principal of all seven Plaintiff dealerships in this action, sent FCA US LLC ("FCA") a draft complaint, threatening to sue FCA over what he alleged was FCA's practice of encouraging dealers to falsely report vehicle sales. Now, nearly two years later, Plaintiffs are still unable to provide even the most basic support for their allegations in response to FCA's written discovery requests. Instead, Plaintiffs' responses make clear that they have practically no support for the causes of action remaining in their Amended Complaint, but instead argue that factual support will be forthcoming once FCA is compelled to provide it. And to obtain this factual support, Plaintiffs continue to insist that that FCA is obligated under the discovery rules to engage in an unlimited "nationwide" search for information that Plaintiffs contend will support their claims. Plaintiffs, however, have this exactly backwards: Plaintiffs are required to have factual support for their causes of action before they file a complaint. FCA is entitled to discover what information Plaintiffs relied on, or in the alternative, to a verified response from Plaintiffs that they did not have such information when they filed the Amended Complaint. Accordingly, FCA respectfully requests the entry of an order directing each of the seven Plaintiffs to provide complete responses to FCA's interrogatory requests under Fed. R. Civ. P. 37(a)(3)(B) and/or a representation that they have provided all of the information in each of their possession, custody and control.[1]

---

[1] Pursuant to LR 37.2, counsel for FCA, Felicia Ellsworth, Caitlin Monahan, and Michael Horrell conferred with counsel for Plaintiffs, Jeannie Evans and David Ogles, on May 3, 2017 by telephone regarding Plaintiffs' discovery deficiencies but were unable to reach agreement.

1

## II. Procedural History

### A. Complaint and Amended Complaint

On January 12, 2016, two of the current Plaintiffs, Napleton's Arlington Heights Motors, Inc. ("Arlington Heights") and Napleton's North Palm Auto Park, Inc. ("Northlake"), filed suit against FCA and FCA Realty LLC ("FCAR"), alleging a host of counts—including violations of civil RICO, the Robinson-Patman Act, the federal Automobile Dealer's Day in Court Act, and the Illinois and Florida state dealer statutes, along with various common law counts of fraud, misrepresentation, breach of contract, and quantum meruit. Dkt. No. 1. This original Complaint was widely reported in the press but never served on FCA. Instead, on March 4, 2016, approximately six weeks later, the original Complaint was succeeded by the Amended Complaint adding five additional plaintiffs and two additional counts under the Missouri and Pennsylvania dealer statutes. Dkt. No. 21 ("Am. Compl."). Plaintiffs' Amended Complaint alleges two supposed "schemes" perpetrated by FCA: (1) a fraudulent and preferential pricing scheme whereby FCA caused "Conspiring Dealers" to falsify sales reports in exchange for kickbacks in the form of subsidies and vehicle allocations, to the detriment of non-conspiring dealers such as Plaintiffs (Am. Compl. ¶¶ 34-55); and (2) a separate scheme to coerce Plaintiffs with baseless threats of termination by manipulating their contractual minimum sales requirements (known as Minimum Sales Responsibilities or "MSR") (*id.* at ¶¶ 56-74). Plaintiffs additionally allege that FCA's Volume Growth Program ("VGP"), which rewards dealers for meeting sales objectives, provided certain "Competing Dealers" with a "competitive advantage" that "was not functionally available to Plaintiffs because of FCA's arbitrary and discriminatory application of [VGP]." Am Compl. ¶¶ 78-91. Plaintiffs seek an unspecified amount of damages and equitable relief.

B.  **Order on Motion to Dismiss**

On March 24, 2016, FCA moved to dismiss the Amended Complaint in its entirety, and Judge Kendall stayed discovery while the motion to dismiss was under consideration. Dkt. Nos. 41, 57. On October 4, 2016, the Court dismissed the RICO, fraud, and misrepresentation claims against FCA, and all claims against FCAR. Dkt. No. 62. In the decision on FCA's motion to dismiss, the Court sustained Plaintiffs' remaining counts based upon, *inter alia*, the fact that Plaintiffs identified two alleged "Conspiring Dealers" in the Amended Complaint (*id.* at 11), and Plaintiffs' allegation that "FCA granted incentives and subsidies to the Conspiring Dealers amounting to more than $800 for each vehicle sold each month" (*id*. at 12) (citing Am. Compl. at ¶¶ 77, 91).

C.  **FCA's Interrogatories**

On November 18, 2016, FCA served its First Set of Interrogatories upon Plaintiffs, seeking basic information, such as a calculation of Plaintiffs' alleged damages—which Plaintiffs had failed to provide as required in their Initial Disclosure—and the identities of the non-Plaintiff dealerships that Plaintiffs alleged were "Conspiring" or "Competing" dealers. After Plaintiffs failed to adequately answer, FCA moved to compel. Dkt. No. 79. On February 27, 2017, the Court partially granted FCA's motion, ordering Plaintiffs to (1) "identify all 'Conspiring' and 'Competing' dealers currently known to Plaintiffs" and (2) "identify the categories of damages Plaintiffs seek in this action." Dkt. No. 96 at 1. The Court further stated that after "reviewing the categories, FCA may serve specific requests for information or documents relevant to claimed damages that it has reason to believe plaintiffs currently possess." *Id.* On March 9, 2017, Plaintiffs identified just five "Conspiring Dealers" in only two of the four states in which the Plaintiffs operate, despite the fact that FCA produced NVDR data for all the FCA dealerships

3

in Plaintiffs' Sales Localities in January 2017.[2]  *See* Ex. 1 (submitted herewith) at Exs. A and B.[3] In response to FCA's request for some measure of the damages Plaintiffs seek, Plaintiffs claimed, without any distinction between the seven individual Plaintiffs, that they had suffered a laundry list of damages, including "profits for lost retail sales[.]"  *Id.* at 3.

On March 15, 2017, FCA served its Second Set of Interrogatories, seeking further basic information, including how Plaintiffs define the terms "false" and "fraudulent" as used in the Amended Complaint, when they claim to have lost sales or profits, and the basis for their claims in the Amended Complaint that FCA's actions have caused an $800 difference between the price of vehicles sold by Plaintiffs and those sold by Conspiring or Competing dealers.  *See* Ex. 2 at Nos. 1, 2, and 9.  Plaintiffs' deficient answers to these interrogatories, submitted herewith as Exhibit 3, have necessitated this further motion to compel.

Meanwhile, despite failing to provide information supporting the foundation of their claims, Plaintiffs have sought and in some cases succeeded in imposing broad, nationwide discovery on FCA, arguing that it is necessary because finding evidence of FCA's allegedly "vast" conspiracy is "like looking for a needle in a haystack."  Dkt. 109 at 12.  FCA has produced data for the 75 dealers ordered by the Court, including some far removed from where Plaintiffs are located and compete, and has been ordered to review every single document produced to the government or reviewed in internal investigations for responsiveness to Plaintiffs' requests, including for any "indicia of a plan to execute and/or conceal a false

---

[2] FCA produced additional NVDR data for 75 FCA dealers from 2011 through 2016 on April 18, 2017. Plaintiffs have not further supplemented their response despite the Court's order that they be "seasonably supplement[ed] . . . after the production of additional discovery[.]"  Dkt. No. 96 at 2.

[3] Plaintiffs' list of "Competing Dealers" is also hopelessly overbroad—it includes "open points," which are not dealers at all—rather, they are geographic areas identified by FCA as market areas but where no dealer is currently located.  *Id.* at Exs. C and D.

reporting scheme" involving dealers anywhere in the country. FCA continues to comply with its discovery obligations despite Plaintiffs' continued non-responses to basic interrogatories about their claims and alleged damages. Discovery obligations run both ways, and Plaintiffs' inadequate responses should not be sustained.

**III.     Argument**

Prior to filing a complaint, plaintiffs have "an affirmative duty . . . to investigate the facts and the law . . . ." *Bus. Guides, Inc. v. Chromatic Commc'ns Enterprises*, Inc., 498 U.S. 533, 545 (1991). Accordingly, if any existed, Plaintiffs should have had the basic facts supporting their allegations and damages available 16 months ago. FCA is entitled to discovery regarding what exactly Plaintiffs allege (including the factual basis therefore) and how each of the seven individual Plaintiffs claim to have been specifically harmed. *See In re One Bancorp Sec. Litig.*, 134 F.R.D. 4, 8 (D. Me. 1991) ("Consistent with Rule 11 of the Federal Rules of Civil Procedure, Plaintiffs must have some factual basis for the allegations in their complaint. Plaintiffs must answer [Defendant's] interrogatories with such information as they now possess[.]"). FCA therefore seeks an order directing Plaintiffs to answer FCA's discovery fully and completely. Should Plaintiffs fail to supply adequate interrogatory responses, the Court can and should impose sanctions under Fed. R. Civ. P. 37(b)(2)(A). *e360 Insight, Inc. v. Spamhaus Project*, 658 F.3d 637, 643 (7th Cir. 2011) (affirming sanction limiting plaintiffs' damages evidence after repeated failure to adequately answer interrogatories).

### A. Requests for Information about Plaintiffs' Allegations

FCA's Second Interrogatory Nos. 1 and 9 ask Plaintiffs to define terms used in the Amended Complaint, and to state the basis for specific allegations contained therein. Despite the straightforward requests, Plaintiffs' answers are either non-responsive or nonsensical.[4]

#### 1. Second Interrogatory No. 1

FCA's Second Interrogatory No. 1 directs Plaintiffs to "[d]efine the terms 'false' and 'fraudulent' as used to describe sales, sales reports, and NVDRs in the Amended Complaint, and Identify any Documents and Communications concerning Your Response." Ex. 2 at No. 1. Plaintiffs respond that such a request is premature, and then recite the definition of "False Sales Reports" as used in Plaintiffs' Second[5] Set of Requests for Production Directed at Defendants, and reference a July 26, 2016 FCA press release. Ex. 3 at No. 1. Plaintiffs' response is inadequate for three reasons. First, Plaintiffs' objection that the interrogatory is "premature" is unavailing. *See Cambridge Electronics Corp. v. MGA Electronics, Inc.*, 227 F.R.D. 313, 323 (C.D. Cal. 2004). ("The discovery was propounded almost a year after plaintiff moved to amend its complaint. Surely within that time, if not prior to its filing of the amended pleading, plaintiff must have identified some factual basis for the allegations it was making."). This is especially true when the interrogatory directly asks Plaintiffs to define terms "as used . . . in the Amended Complaint." Second, both Plaintiffs' Requests for Production and FCA's press release

---

[4] Plaintiffs interrogatory responses were originally due on April 14, 2017, but Plaintiffs sought, and FCA agreed to, a two-week extension to that deadline. When Plaintiffs served their interrogatory responses on the April 28, 2017, the responses contained no party verification as required by Fed. R. Civ. P. 33(b), but instead were signed only by counsel. Plaintiffs served a revised version including a verification from Bruce Etheridge on May 2, 2017.

[5] Plaintiffs' response inaccurately states that the definition is from Plaintiffs' First Set of Requests for Production Directed at Defendants; the quoted language actually comes from their *Second* Set of Requests for Production.

referenced in the response came *after* Plaintiffs filed their Amended Complaint, and therefore cannot possibly reflect what Plaintiffs intended the terms "false" and "fraudulent" to have meant when they filed the Amended Complaint. Third, Plaintiffs completely ignore the request to identify any documents and communications concerning their response.

FCA is entitled to know what Plaintiffs mean by their allegation that FCA encouraged dealers to submit "false" or "fraudulent" sales, sales reports, and NVDRs, which they make repeatedly throughout the Amended Complaint. *See, e.g.*, Am. Compl. at ¶¶ 9-10, 35, 37-38, 40, 43-48, 52-55, 76-77, 89, 101-102, 110, 125, 174, 192, 208, 225, 241. As the Seventh Circuit has recognized, allegations involving fraud must be specifically pled because of the undue pressure they can exert on a defendant. *See Fid. Nat. Title Ins. Co. of N.Y. v. Intercounty Nat. Title Ins. Co.*, 412 F.3d 745, 748-749 (7th Cir. 2005) (specificity is required under Rule 9(b) "to minimize the extortionate impact that a baseless claim of fraud can have on a firm or an individual" because "[t]he requirement that fraud be pleaded with particularity compels the plaintiff to provide enough detail to enable the defendant to riposte swiftly and effectively if the claim is groundless. It also forces the plaintiff to conduct a careful pretrial investigation and thus operates as a screen against spurious fraud claims.").

Here, and particularly where Plaintiffs' fraud-based claims have been dismissed, FCA's ability to fashion its defenses is unfairly hampered by Plaintiffs' refusal to say exactly what they mean by "false" or "fraudulent" in connection with retail sales reports submitted by dealers to FCA. This definition has been a moving target throughout this litigation, with the Plaintiffs propounding various and ever-changing theories of their allegations. *See, e.g.*:

- Plaintiffs' First Set of Requests for Production: "false sales report" means "any document or communication [FCA] or [FCA] dealers use to report and/or track the sale

7

of new vehicles, including New Vehicle Delivery Reports, that is not based on or the result of a bona fide sale or lease."

- Plaintiffs' Second Set of Requests for Production: "false sales report" means "any document or communication [FCA] or [FCA] dealers use to report and/or track the sale of new vehicles, including New Vehicle Delivery Reports, that reports or contains data concerning vehicle sales or leases that did not actually occur on the dates or in the period reported."

- Motion to Compel, Dkt. No. 81 at 3-4: "Plaintiffs request that the Court compel FCA to produce (i) all records for transactions that were subtracted from FCA's sales numbers under its new sales methodology; (ii) all transactions that were reported sold in the final ten days of any calendar month and then unwound or backed out in the first ten days of the following calendar month; and (iii) all communications related to any of the foregoing transactions (subject to the parties' agreements on search terms and custodians)."

- Hearing Transcript, Feb. 2, 2017, at 36:1-3: "We want the set of unwound sales. They know exactly what they are because they removed them from the restatement. We want that set."

- Joint Status Report, Dkt. 93 at 3: In Plaintiffs' First Request for Production No. 3, "Plaintiffs specifically seek documents reflecting the finite set of transactions, including NVDRs, that were subtracted from FCA's sales numbers under its new sales reporting methodology, as described in FCA's July 26, 2016 press release[.]"

- Hearing Transcript, April 14, 2017, at 46:10-12: "Well, in our complaint, it's that if you had paid them money or cars to report a sale that didn't happen. That's what we're alleging."; *id.* at 59:9-11: "We're just asking for summary reporting of the number of unwinds that they chose to remove from their new national sales reporting methodology."

A number of these contentions are facially implausible: the unwinding of a sale does not ipso facto make it "false," and FCA's July 26, 2016 press release did not "subtract" sales numbers. FCA's Second Interrogatory No. 1 poses a simple question, and FCA is entitled to a verified response. Because Plaintiffs have failed to provide one, FCA asks this Court to compel a proper response.

    2.    *Second Interrogatory No. 9*

FCA's Second Interrogatory No. 9 directs Plaintiffs to "[s]tate the basis for the allegation in paragraphs 77 and 91 of the Amended Complaint concerning the $800 per vehicle difference,

8

including how the number was calculated." Ex. 2 at No. 9. Paragraph 77 of the Amended Complaint alleges that "[t]he incentives and subsidies paid to Conspiring Dealers in the markets in which Plaintiffs compete who submit false NVDRs amount to more than $800 in incentives and subsidies for each vehicle sold each month." Indeed, Judge Kendall explicitly relied on this very allegation in denying FCA's motion to dismiss the Plaintiffs' RPA claims. Dkt. 62 at 12 ("Plaintiffs allege that as a result of both alleged schemes, the FCA granted incentives and subsidies to the Conspiring Dealers amounting to more than $800 for each vehicle sold each month. (*Id*. at ¶¶ 77, 91.) Such allegations are sufficient to show price discrimination.").

Remarkably, Plaintiffs' response to the Interrogatory appears to concede that they had no basis whatsoever for their sweeping allegation in paragraph 77 of the Amended Complaint. Plaintiffs explain that this number is an "estimate" based on a single alleged offer by an FCA employee to pay one of the *Plaintiffs* $20,000 to submit "false NVDRs for 23 vehicles. $20,000 for 23 vehicles comes out to over $800 per vehicle." Ex. 3 at No. 9. Plaintiffs say nothing about any other so-called Conspiring Dealers in the markets where they compete, or how a single alleged offer could result in "$800 in incentives and subsidies *for each vehicle sold each month*" by those Conspiring Dealers, as Plaintiffs claimed in their pleading. Am. Compl. ¶ 77 (emphasis added). In particular, Plaintiffs do not mention either of the two "Conspiring Dealers" that Judge Kendall cited in the portion of the decision sustaining Plaintiffs' Robinson-Patman Act claim—Sherman Dodge and Northwestern Chrysler Jeep Dodge Ram. Dkt. No. 62 at 11. Without such "incentives and subsidies" to *any* Conspiring Dealer, much less the only two non-Plaintiffs dealers mentioned anywhere in the Amended Complaint, Plaintiffs' alleged false reporting scheme does not state a claim under the Robinson-Patman Act. Accordingly, FCA respectfully requests that the Court order Plaintiffs to provide an adequate answer to the Interrogatory.

9

Should Plaintiffs be unable to provide such an answer, FCA reserves the right to seek sanctions, including striking the allegation from the pleading, under Fed. R. Civ. P. 37(b)(2)(A).

**B.     Request for Information About When Plaintiffs Were Allegedly Damaged**

In accordance with the Court's direction in its order of February 27, 2017, Dkt. 96 at 1, FCA has also served additional discovery requests attempting to ascertain Plaintiffs' basis for alleging that they have lost sales and profits or have otherwise been damaged by FCA's alleged actions. While Plaintiffs continue to claim that damages calculations are premature and that they are working to provide their underlying financial data, and FCA has accordingly withheld moving to compel more complete responses to many of its discovery requests based on Plaintiffs' representations that they are making good-faith efforts to provide FCA with the financial information that is necessary for FCA's defense, Plaintiffs' failure to even articulate *when* they were harmed is unavoidably deficient.

   *1.     Second Interrogatory No. 2*

FCA's Second Interrogatory No. 2 asks for the time periods when "each Plaintiff claims to have lost sales and profits caused by any wrongful act by FCA as alleged in the Amended Complaint, including the beginning and/or end date(s) for each period[.]" Ex. 2 at No. 2. In response, Plaintiffs state only that two Plaintiffs—Arlington Heights and River Oaks—lost sales and profits "in 2014 and 2015." Ex. 3 at No. 2. There is no mention of the other five Plaintiffs at all. Instead, Plaintiffs object that the interrogatory is "premature" because "[d]iscovery is ongoing." *Id.* But Interrogatories must be answered with any information within Plaintiffs' current possession, custody, or control; it is not sufficient to point to ongoing discovery. *Kraft Americas, LP v. Oldcastle Precast, Inc.*, 2013 WL 12125759 at *5 (C.D. Cal. 2013). And when "a plaintiff has made allegations in a complaint of loss of income in its business because of

wrongful conduct, it must be assumed that the plaintiff is in a position to furnish details." *Harlem River Consumers Co-op, Inc. v. Associated Grocers of Harlem*, 64 F.R.D. 459, 464 (S.D.N.Y. 1974). Judge Kendall specifically noted in dismissing Plaintiffs' RICO claims that facts about Plaintiffs alleged lost profits are uniquely and already within Plaintiffs' possession. Dkt. No. 62 at 18 n.15 ("During oral argument, Plaintiffs' counsel alluded to additional harms that the Plaintiffs suffered," including the inability to obtain profits from selling trade-ins and making repairs, but "Plaintiffs allegations are inadequate as they fail to provide any actual instance where they were unable to sell a specific car or model that could have led to those 'down the line' harms due to the scheme. Such information – shortages, inability to receive a specific model type, etc. – would be in the Plaintiff's possession.").

If Plaintiffs have no information to support an allegation that any of the other five Plaintiffs lost sales or profits caused by the allegations in the Amended Complaint at any time, Plaintiffs must admit as much, and FCA can then seek appropriate relief. *See Atl. Recording Corp. v. Raleigh*, No. 4:06-CV-1708(CEJ), 2008 WL 5234762, at *1 (E.D. Mo. Dec. 15, 2008) (when information is unavailable to answer an interrogatory, "defendant must say so under oath in a supplement to her answer to the interrogatory and must describe the efforts she has made to obtain the information"). Similarly, if Plaintiffs have nothing further to add about the about the time periods when Arlington Heights and River Oaks are alleged to have lost sales and profits beyond sometime "in 2014 and 2015," FCA is entitled to a clear statement to that effect. FCA asks that a response be compelled accordingly.

## IV. Conclusion

For the foregoing reasons, FCA respectfully requests that the Court grant its Motion to Compel Plaintiffs' Responses to FCA's Second Set of Interrogatories under Fed. R. Civ. P. 37(a)(3)(B).

Dated: May 19, 2017

Respectfully submitted,

*/s/ Robert D. Cultice*

*Of Counsel*:

Robert D. Cultice *(admitted pro hac vice)*
Felicia H. Ellsworth *(admitted pro hac vice)*
Caitlin W. Monahan *(admitted pro hac vice)*
Michael J. Horrell *(admitted pro hac vice)*
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000
robert.cultice@wilmerhale.com
felicia.ellsworth@wilmerhale.com
caitlin.monahan@wilmerhale.com
michael.horrell@wilmerhale.com

Randall L. Oyler
Owen H. Smith
Brandon C. Prosansky
Katherine A. Neville
BARACK FERRAZZANO KIRSCHBAUM & NAGELBERG LLP
200 West Madison Street
Suite 3900
Chicago, IL 60606
(318) 984-3100
randall.oyler@bfkn.com
owen.smith@bfkn.com
brandon.prosansky@bfkn.com
katie.neville@bfkn.com

***Attorneys for Defendant***

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that this document filed through the CM/ECF system will be served upon counsel for Plaintiffs electronically through the CM/ECF system on May 19, 2017.

*/s/ Robert D. Cultice*
Robert D. Cultice *(admitted pro hac vice)*
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6000
Fax: (617) 526-5000
robert.cultice@wilmerhale.com