# Exhibit 3

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

NAPLETON'S ARLINGTON HEIGHTS MOTORS, INC. f/k/a NAPLETON'S PALATINE MOTORS, INC. d/b/a NAPLETON'S ARLINGTON HEIGHTS CHRYSLER DODGE JEEP RAM, an Illinois corporation; NAPLETON'S RIVER OAKS MOTORS, INC. d/b/a NAPLETON'S RIVER OAKS CHRYSLER DODGE JEEP RAM, an Illinois corporation; CLERMONT MOTORS, LLC d/b/a NAPLETON'S CLERMONT CHRYSLER DODGE JEEP RAM, an Illinois limited liability company; NAPLETON'S NORTH PALM AUTO PARK, INC. d/b/a NAPLETON'S NORTHLAKE CHRYSLER DODGE JEEP RAM, an Illinois corporation; NAPLETON ENTERPRISES, LLC d/b/a NAPLETON'S SOUTH ORLANDO CHRYSLER DODGE JEEP RAM, an Illinois limited liability company; NAPLETON'S MID RIVERS MOTORS, INC. d/b/a NAPLETON'S MID RIVERS CHRYSLER DODGE JEEP RAM, an Illinois corporation; NAPLETON'S ELLWOOD MOTORS, INC. d/b/a NAPLETON'S ELLWOOD CHRYSLER DODGE JEEP RAM, an Illinois corporation,

Plaintiffs,

v.

FCA US LLC, a Delaware corporation,

Defendant.

Case No. 1:16-cv-00403-VMK-SMF

**PLAINTIFFS' OBJECTIONS AND ANSWERS**
**TO FCA US LLC'S SECOND SET OF INTERROGATORIES**

Plaintiffs object and answer Defendant FCA US LLC's ("FCA") Second Set of Interrogatories as follows:

## GENERAL OBJECTIONS

1. Plaintiffs object to FCAs Interrogatories to the extent they are premature and seek information that is in the possession and control of FCA. Plaintiffs cannot yet respond fully to many of FCA's interrogatories because Plaintiffs' have not received relevant data and documents that they have requested from FCA. Plaintiffs reserve the right to supplement their responses as discovery continues and as FCA complies with Plaintiffs' requests for production of documents.

2. Plaintiffs object to FCA's definitions and instructions to the extent that they seek to impose obligations on Plaintiffs that exceed those imposed by the Federal Rules of Civil Procedure.

3. Plaintiffs object to FCA's definitions and instructions to the extent that they prematurely ask for opinions or contentions that relate to fact or the application of law to fact. Pursuant to Federal Rule of Civil Procedure 33(a)(2), such interrogatories should wait until discovery is complete, or until a pretrial conference, or some other time as the Court may order.

## SPECIFIC OBJECTIONS AND RESPONSES TO INTERROGATORIES

1. Define the terms "false" and "fraudulent" as used to describe sales, sales reports, and NVDRs in the Amended Complaint, and Identify any Documents and Communications.

**OBJECTION AND ANSWER:** Plaintiffs object to this interrogatory as premature. Discovery is ongoing, and Plaintiffs do not know all of the methods and practices that FCA and certain FCA dealers as yet unknown to Plaintiffs used to submit NVDRs to Chrysler to obtain incentives and bonuses from Chrysler that were not be available to Plaintiffs. Plaintiffs will not have this information until FCA fully responds to current outstanding discovery requests. Subject to these objections, Plaintiffs respond that, in their *First Set of Requests for Production Directed at Defendants,* Plaintiffs defined "False Sales Reports" to mean: "any document or communication that [FCA] or [FCA] dealers use to report and/or track the sale of new vehicles,

including New Vehicle Delivery Reports, that reports or contains data concerning vehicle sales or leases that did not actually occur on the dates or in the period reported." Plaintiffs further respond that the definition of false sales reports includes sales registered "without a specific customer supporting the transaction," as described in FCA's July 26, 2016 press release.

2. Specify the period(s) of time during which each Plaintiff claims to have lost sales and profits caused by any wrongful act by FCA as alleged in the Amended Complaint, including the beginning and/or end date(s) of each period, and Identify any Documents and Communications concerning Your Response.

**OBJECTION AND ANSWER:** Plaintiffs object to this interrogatory as premature. Discovery is ongoing. Plaintiffs do not know at this time the full time period during which they lost sales and profits due to wrongful acts by FCA as alleged in the Amended Complaint. Plaintiffs will not have this information until FCA fully responds to current outstanding discovery requests. At this time, however, based on the limited discovery that Plaintiffs have received to date from FCA, Plaintiff Napleton's Arlington Heights lost sales and profits caused by wrongful acts of FCA in 2014 and 2015, and Plaintiff Napleton's River Oaks lost sales and profits caused by wrongful acts of FCA in 2014 and 2015. Documents concerning the foregoing response include NVDR data produced by FCA at Bates number FCA-Napleton_00002127 and Customer Relationship Management ("CRM") data provided by Plaintiffs at Bates numbers NAP_0003149, NAP_0003151-0003153, and NAP_0003155-0003158.

3. Identify any Vehicle Order(s) that You submitted to FCA but that FCA did not fulfill.

**OBJECTION AND ANSWER:**

Almost every month, Each Plaintiff submits more orders of certain vehicle models than are fulfilled. For example, in April 2017, Plaintiff Napleton's Clermont ordered 62 Jeep Wranglers, but it is only scheduled to receive 12 Jeep Wranglers. FCA's Vehicle Ordering and

Inventory Management (VOIM) system in Dealer Connect does not allow dealers to access historical order data, so Plaintiffs cannot provide more specifics at this time. If and when FCA produces historical order information for Plaintiffs' dealerships, Plaintiffs can then respond with more specifics about the number of vehicle orders submitted each month that were not fulfilled. Plaintiffs object to this interrogatory on the ground that FCA has the best available information to respond to this interrogatory.

4. Identify each Inquiry about purchasing or leasing a Vehicle from any of the Plaintiffs that the Plaintiffs did not have in their inventories or could not obtain from FCA or through dealer trades.

**OBJECTION AND ANSWER:** For certain vehicles in high demand by customers, such as Jeep Wranglers and Jeep Grand Cherokees, Plaintiffs received numerous inquiries about purchasing or leasing particular models or colors of those vehicles that they do not have in their inventories and could not obtain from FCA or through dealer trades. Plaintiffs did not record every such inquiry about purchasing or leasing a Vehicle. Some customers who visited Plaintiffs' dealer showrooms did not provide contact information, and some potential customers never visited the showrooms because they learned from the internet or other sources that Plaintiff did not have their desired vehicle in stock. Furthermore, sometimes, when a Plaintiff did not have a particular model in its inventory, it did not agree to a dealer trade because such a trade would not have been profitable. Plaintiffs did, however, maintain some records responsive to this request in their Customer Relationship Management ("CRM") database. Plaintiffs have produced this data to FCA for the years 2011-2016 at Bates numbers NAP_0003149, NAP_0003151-0003153, NAP_0003155-0003158, and NAP_0063733-0063739.

5. Identify each Person that You claim did not purchase a Vehicle from You, but instead purchased from another FCA dealer, because Your retail price for the Vehicle was higher than the retail offered by the FCA dealer form which the purchase was made, including without limitation, the "at least 36 potential customers" that "initially visited Napleton's and then purchased a vehicle form Sherman in 2014 and 1015" identified on the attached Exhibit A.

Please specify in Your Response the Plaintiff from which the purchase was not made, the other FCA dealer from which the purchase was made.

**OBJECTION AND ANSWER:** Plaintiffs object to this interrogatory as premature because discovery is ongoing. Plaintiffs also object that they cannot know every potential person who would have purchased Vehicles from them but for FCA's misconduct alleged in the Amended Complaint. Certain potential customers may have never visited a Plaintiff dealer because they learned of the price differential through other means, and certain potential customers who visited a Plaintiff dealer may have declined to provide any identifying information. So Plaintiffs may not have complete information to track lost sales. Plaintiffs further object that they cannot fully answer this question without the broader set of NVDR data requested from FCA over a year ago on March 25, 2016. FCA has only recently produced NVDR data for additional FCA dealers and time periods. Plaintiffs will need to review and analyze this data before they can provide a more complete response to this request.

Subject to these objections, and reiterating that they cannot provide a complete response to this request at this time, Plaintiffs respond as follows. When customers visit a Plaintiff dealership, the sales associate or sales manager interacting with the customer tries to capture the customer's contact information in a Customer Relationship Management ("CRM") database. The sales associate or sales manager generally follows up with the customer, and the CRM database includes fields for the sales associate or sales manager to insert comments. If a customer did not purchase a Vehicle from a Napleton's CDJR dealer but instead purchased a Vehicle from another FCA dealer because the Napleton's CDJR price was higher than the price offered by the other FCA dealer, and if the customer informed the Napleton's CDJR sales associate or sales manager of this fact, then that information generally was recorded in the appropriate field in the CRM database. In addition, for customers who did not purchase Vehicles from a Napleton's CDJR

dealership, a third-party vendor, Car Research, attempted to contact such customers to interview them regarding the reason they did not purchase a Vehicle from a Napleton's CDJR dealership. The information learned from such interviews was also generally recorded in the CRM database. Plaintiffs have produced to FCA their CRM databases for the years 2011-2016 at Bates numbers NAP_0003149, NAP_0003151-0003153, NAP_0003155-0003158, and NAP_0063733-0063739.

To the extent that a customer identified the other FCA dealer from which he or she purchased a Vehicle to the sales associate, sales manager, or Car Research interviewer, that information generally was captured in the CRM database. Additionally, a customer who did not purchase a Vehicle from a Napleton's CDJR dealer and instead purchased from another FCA dealer can in most instances be "matched" using the CRM database and the New Dealer Vehicle Report ("NVDR") data produced by FCA at Bates numbers FCA-Napleton_00002127 and FCA-Napleton_00002282 –00002733. Such a matching method was used to identify the "at least 36 potential customers" that "initially visited Napleton's and then purchased a vehicle from Sherman in 2014 and 2015" identified on Exhibit A attached to FCA's interrogatories. This matching process uses names of customers visiting the Napleton's dealership in Arlington Heights, Illinois based on the CRM database for 2015-2016. The names of such customers shown on the CRM database were then matched to the NVDR data for Sherman Dodge for 2014 and 2015. This list of persons is attached hereto as Exhibit 1. This list represents a small sample of potential results from such a matching process for the full 2011-2016 time period, and drawing on NVDR data from all competing dealers. The list does not include the potential customers of Plaintiffs whose contact information was not captured in Plaintiffs' CRM databases.

In addition, sales associates and sales managers at various Napleton's CDJR dealerships may have specific recollections of customers who did not purchase a Vehicle from a Napleton's CDJR dealer, but instead purchased from another FCA dealer because the retail price for the Vehicle at the Napleton's CDJR dealership was higher than the retail price offered by the competing FCA dealership.

6. Identify each Incentive that You allegedly did not receive because You allegedly refused to submit false reports to FCA.

**OBJECTION AND ANSWER:** Plaintiffs object to this Interrogatory because only FCA knows what cash payments, bonuses, hot vehicle allocations, or other incentives Plaintiffs did not receive because Plaintiffs refused to submit false sales reports to FCA. Plaintiffs further object that this interrogatory is premature as discovery is ongoing, and FCA has not produced requested documents and information that will enable Plaintiffs to respond. Subject to these objections, and based on discovery to date, Plaintiffs respond that Napleton's River Oaks did not receive additional vehicle allocations and $15,000 in incentives from FCA because it refused to submit the 40 false sales reports requested by FCA in June 2015. If Napleton's River Oaks had submitted false sales reports for Jeep Wranglers and Jeep Grand Cherokees in June 2015, it likely would have received additional Jeep Wranglers and Jeep Grand Cherokees in its next allocation. Because Napleton's River Oaks refused to submit false NVDRs in June 2015, it did not receive additional allocations of Jeep Wranglers and Jeep Grand Cherokees in its next allocation. Plaintiff Napleton's Ellwood City did not receive an unknown amount of incentives (including but not limited to cash payments and hot vehicle allocations) from FCA for refusing to submit false NVDRs in November 2015. Plaintiff Napleton's Clermont and/or Napleton's South Orlando did not receive incentives from FCA for refusing to submit false sales reports to FCA in November 2015. Each Plaintiff that did not submit false NVDRs for in-demand

vehicles, such as Jeep Wranglers and Jeep Grand Cherokees, did not receive additional allocations of those hot-selling vehicles.

7. Identify the additional Vehicles that You allegedly did not receive because You allegedly refused to submit false sales reports to FCA.

**OBJECTION AND ANSWER:** See Plaintiffs' response to Interrogatory Number 6 above.

8. Identify the gross and net profit margins on each Vehicle that You sold.

**OBJECTION AND ANSWER:** Plaintiffs object to this Interrogatory because the terms "gross profit margins" and "net profit margins" are not defined. Napleton maintains its gross profit and expenses in the form produced to FCA in dealer financial statements. Dealer financial statements do not show expense breakdowns at an individual vehicle level. Plaintiffs have produced sales journals and general ledgers that include the sales price and purchase price of each vehicle and specific costs that may be attributed to a particular vehicle.

9. State the basis for the allegations in paragraphs 77 and 91 of the Amended Complaint concerning the $800 per vehicle difference, including how the number was calculated.

**OBJECTION AND ANSWER:** Paragraphs 77 and 91 relate to different topics. Paragraph 91 of the Amended Complaint states that "the fact of the … price difference between dealers who met Volume Growth Program requirements and Plaintiffs is that the net wholesale prices paid by Competing Dealers who received incentives and subsidies were significantly lower by at least $800 per no vehicle or more, than the prices paid by Plaintiffs." This statement is based on a conversation between Ray Czarnik, General Manager of Napleton's River Oaks, and Ralph Jones, area sales manager of FCA, on July 31, 2015 during which Mr. Jones told Mr. Czarnik that the incentive payment for hitting the VGP target was $800 per vehicle sold that month.

The "more than $800" figure alleged in paragraph 77 was based on Plaintiffs' estimate at the time the Complaint was drafted of the cash incentives that FCA paid per vehicle for which an FCA dealers was willing to submit a false NVDR. On May 27 and 28, 2015, Ralph Jones of FCA offered Ray Czarnick and Mo Muhsen of Napleton's River Oaks $20,000 in cash incentive payments in exchange for submitting false NVDRs for 23 vehicles. $20,000 for 23 vehicles comes out to over $800 per vehicle. After fact discovery and expert analysis, Plaintiffs may gain additional information about the types of incentive benefits and the amounts of cash payments that FCA offered to FCA dealers in exchange for submitting false NVDRs.

10. State the basis for your allegations in the Amended Complaint, including paragraphs 56 and 66, that MSR was set at "unrealistic and unachievable" levels that caused harm to each Plaintiff.

**OBJECTION AND ANSWER:** The bases for Plaintiffs' allegation that MSR was set at "unrealistic and unachievable" levels that caused harm to Plaintiffs are laid out in paragraphs 56-74 of the Amended Complaint. The allegation is further based on the knowledge and experience of Mr. Ed Napleton and his discussions and interactions with the managers of each Plaintiff dealer.

To further support its allegations on this point, Plaintiffs have requested discovery from FCA regarding the MSR for Plaintiffs and the components and methodology used to calculate the MSR for Plaintiffs and other FCA dealers.

11. Identify all Vehicle Sales made by You where You were required to reduce Your retail price for a Vehicle to match or better the retail price offered by any other FCA dealer. Please specify in Your Response the other FCA dealer and the retail price that it offered.

**OBJECTION AND ANSWER:** Plaintiffs object to this Interrogatory as unduly burdensome in requesting identification of ***"all"*** Vehicles Sales where Plaintiffs' reduced their price …. Plaintiffs reduce their retail price for vehicles to match or better the retail price offered

by another FCA dealer on a daily basis. This happens so often that Plaintiffs do not keep records of such occurrences in the ordinary course of business. Plaintiffs may have recorded some examples of this practice in their CRM database, but these recorded examples would be dwarfed by the number of times this practice occurs. Plaintiffs have produced their CRM data to FCA for the years 2011-2016 at Bates numbers NAP_0003149, NAP_0003151-0003153, NAP_0003155-0003158, and NAP_0063733-0063739. Transactions in the CRM database noting that the sale price was lower than the Manufacturer Suggested Retail Price ("MSRP") indicate that Plaintiffs reduced their price for some reason, which could have been to match or better the retail price offered by another FCA dealer or for some other reason.

Dated: April 28, 2017

Respectfully submitted,

The Napleton Plaintiffs

By: */s/ Jeannie Evans*

Jeannie Y. Evans
HAGENS BERMAN SOBOL SHAPIRO LLP
455 N. Cityfront Plaza Drive, Suite 2410
Chicago, Illinois 60611
Telephone: (708) 628-4949
Facsimile: (708) 628-4950
jeannie@hbsslaw.com

Steve W. Berman
Thomas E. Loeser
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 8th Avenue
Suite 3300
Seattle, WA 98101
(206) 623-7292
steve@hbsslaw.com
toml@hbsslaw.com

David C. Gustman
Jeffery M. Cross
Alexander Vesselinovitch
Dylan Smith
David J. Ogles
FREEBORN & PETERS LLP
311 S. Wacker Drive, Suite 3000
Chicago, IL 60606
(312) 360-6000
dgustman@freeborn.com
jcross@freeborn.com
avesselinovitch@freeborn.com
dsmith@freeborn.com
dogles@freeborn.com

**CERTIFICATE OF SERVICE**

The undersigned, an attorney, certifies that she caused the foregoing *Plaintiffs Objections and Answers to FCA US LLC's Second Set of Interrogatories* to be served on counsel of record via electronic mail on April 28, 2017.

*/s/ Jeannie Evans*
Attorney for Plaintiffs

**VERIFICATION**

I, Bruce Etheridge, Chief Operating Officer of the Napleton Dealership Group, hereby declare under penalty of perjury that the facts stated in the foregoing *Plaintiffs Objections and Answers to FCA US LLC's Second Set of Interrogatories* are true and correct to the best of my knowledge, information, and belief.

Dated: May 2, 2017

Bruce Etheridge
On behalf of the Napleton Plaintiffs

**CERTIFICATE OF SERVICE**

The undersigned, an attorney, certifies that she caused the foregoing *Plaintiffs Objections and Answers to FCA US LLC's Second Set of Interrogatories* to be served on counsel of record via electronic mail on May 2, 2017.

*/s/ Jeannie Evans*
Attorney for Plaintiffs