IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NAPLETON'S ARLINGTON HEIGHTS MOTORS, INC., *et al.* | ) ) ) |
| Plaintiffs, | ) No. 16 C 403 ) |
| v. | ) Judge Virginia M. Kendall ) |
| FCA US LLC, a Delaware corporation, *et al.*, | ) Magistrate Judge Finnegan ) ) |
| Defendants. | ) |

## ORDER

Now pending before the Court is Defendant FCA's Motion to Compel Plaintiffs' Responses to FCA's Second Set of Interrogatories (Doc. 118) and Plaintiffs' Motion to Set Deadlines for Production of Documents and to Compel Production of Documents Relating to Sales Reporting to the Public (Doc. 120). Having heard oral argument on May 24, 2017, and considered the parties' respective briefs (Docs. 118, 120, 124) and positions stated in their 5/19/2017 Joint Status Report ("JSR") (Doc. 117), the Court rules as follows:

1. **FCA's Motion to Compel:** FCA's motion seeks to compel more complete answers to Interrogatories 1, 2, and 9 of FCA's Second Set of Interrogatories. (Doc. 118). FCA's motion is granted in part and denied in part, as follows:

   a. **Second Set, Int. No. 1**: This interrogatory asks Plaintiffs to define the terms "'false' and 'fraudulent' as used to describe sales, sales reports, and NVDRs in the Amended Complaint," and to identify any documents and communications concerning Plaintiffs' response. (Doc. 118-3, at 2). After raising certain objections, Plaintiffs answered that their discovery requests have defined "False Sales Reports" to mean "any document or communication that [FCA] or [FCA] dealers use to report and/or track the sale of new vehicles, including New Vehicle Delivery Reports, that reports or contains data concerning vehicle sales or leases that did not actually occur on the dates or in the period reported," and that "the definition of false sales reports includes sales registered 'without a specific customer supporting the transaction,' as described in FCA's July 26, 2016 press release." (*Id.*).

FCA argues that these definitions are "facially implausible" because they may describe sales that are neither "false" nor "fraudulent," since "the unwinding of a sale does not ipso facto make it 'false.'" (Doc. 118, at 7-8). Regardless of its plausibility, however, Plaintiffs' interrogatory answer states Plaintiffs' definitions of the terms "false" and "fraudulent" as used to describe sales, sales reports, and NVDRs, both for purposes of Plaintiffs' discovery requests and their contentions in the litigation. To the extent Plaintiffs intend a different or more precise definition of these terms, they should provide that definition in a supplemental answer by 6/16/2017. Barring such supplement, FCA may rely upon these definitions as a statement of Plaintiffs' positions in the litigation.

Regarding the second portion of this interrogatory asking Plaintiffs to identify any related documents (Doc. 118-2, at 7), Plaintiffs did not respond, except insofar as they objected to the interrogatory as premature because discovery is ongoing "and Plaintiffs do not know all of the methods and practices that FCA and certain FCA dealers as yet unknown to Plaintiffs used to submit NVDRs to Chrysler to obtain incentives and bonuses from Chrysler that were not be available [*sic*] to Plaintiffs," and "will not have this information until FCA fully responds to current outstanding discovery requests." (Doc. 118-3, at 2). As the Court explained at the 5/24 hearing, however, Plaintiffs are nevertheless obligated to identify the documents currently in their possession (whether received from FCA or another source) that Plaintiffs contend comprise, constitute, or identify false or fraudulent sales, sales reports, and/or NVDRs. To the extent Plaintiffs currently know of no such documents, they should say that. Plaintiffs are directed to serve such a supplemental answer by 6/16/2017. FCA's motion to compel as to this interrogatory is otherwise denied.

b. **Second Set, Int. No. 2:** This interrogatory asks Plaintiffs to specify "the period(s) of time during which each Plaintiff claims to have lost sales and profits caused by any wrongful act by FCA as alleged in the Amended Complaint," and identify any documents and communications concerning Plaintiffs' response. (Doc. 118-3, at 3). Plaintiffs again objected that the interrogatory is premature because they "do not know at this time the full time period during which they lost sales and profits due to wrongful acts by FCA" and "will not have this information until FCA fully responds to current outstanding discovery requests." (*Id.*). Plaintiffs further answered that two of them (Napleton's Arlington Heights and Napleton's River Oaks) "lost sales and profits caused by wrongful acts of FCA in 2014 and 2015," citing certain NVDR and Customer Relationship Management ("CRM") data. This answer is inadequate in several respects.

First, the remaining Plaintiffs are required to verify in an interrogatory answer whether they too claim any lost sales or profits due to FCA's alleged wrongful acts and identify any related documents. Although all Plaintiffs claim not to know yet the full extent of any sales or profits that may have been diverted due to FCA's alleged wrongdoing, and that their sales and profits might have been higher but for FCA' actions, each Plaintiff surely knows and should disclose whether it experienced any decrease in sales or profits that it attributes to FCA's alleged wrongdoing, as well as any sales or profits it currently believes were lost due to FCA's actions. Contrary to Plaintiffs' argument, FCA should not be

2

relegated to an examination of Plaintiffs' financial information (some of which has yet to be produced) to ferret out Plaintiffs' contentions of whether and when they suffered a decrease and/or loss in sales or profits allegedly due to FCA's actions. Alternatively, in the event any Plaintiff currently knows of no decreased or lost sales or profits allegedly due to FCA's actions, it should verify that fact in a supplemental answer, understanding that Plaintiffs may (and should) further supplement their answers if and when such information becomes known. Finally, to the extent any Plaintiff (including Napleton's Arlington Heights and Napleton's River Oaks) responds with a contention of such decreased or lost sales or profits during any period, they should specify the beginning and end dates of such period(s), at a minimum indicating the months during which such decreases and/or losses occurred. Plaintiffs shall provide such supplemental interrogatory answers by 6/16/2017.

c. **Second Set, Int. No. 9:** This interrogatory asks Plaintiffs to "[s]tate the basis for the allegation in paragraphs 77 and 91 of the Amended Complaint concerning the $800 per vehicle difference, including how the number was calculated." (Doc. 118-3, at 8). Plaintiffs answered as follows:

> Paragraphs 77 and 91 relate to different topics. Paragraph 91 of the Amended Complaint states that "the fact of the … price difference between dealers who met Volume Growth Program requirements and Plaintiffs is that the net wholesale prices paid by Competing Dealers who received incentives and subsidies were significantly lower by at least $800 per [new] vehicle or more, than the prices paid by Plaintiffs." This statement is based on a conversation between Ray Czarnik, General Manager of Napleton's River Oaks, and Ralph Jones, area sales manager of FCA, on July 31, 2015 during which Mr. Jones told Mr. Czarnik that the incentive payment for hitting the VGP target was $800 per vehicle sold that month.
>
> The "more than $800" figure alleged in paragraph 77 was based on Plaintiffs' estimate at the time the Complaint was drafted of the cash incentives that FCA paid per vehicle for which an FCA dealers [*sic*] was willing to submit a false NVDR. On May 27 and 28, 2015, Ralph Jones of FCA offered Ray Czarnick and Mo Muhsen of Napleton's River Oaks $20,000 in cash incentive payments in exchange for submitting false NVDRs for 23 vehicles. $20,000 for 23 vehicles comes out to over $800 per vehicle. After fact discovery and expert analysis, Plaintiffs may gain additional information about the types of incentive benefits and the amounts of cash payments that FCA offered to FCA dealers in exchange for submitting false NVDRs.

(*Id.* at 8-9). FCA complains that this answer fails to substantiate Plaintiffs' allegations in paragraphs 71 and 91 of their Amended Complaint that "Conspiring Dealers" (as opposed to Plaintiffs themselves) were offered or received "more than $800 in incentives and subsidies for each vehicle sold each month," and that "the net wholesale prices paid by Competing Dealers who received incentives and subsidies were significantly lower by at least $800 per

3

new vehicle, or more, than the prices paid by Plaintiffs." (Doc. 118, at 9-10). Given that disconnect, FCA argues that "Plaintiffs' response to the Interrogatory appears to concede that they had no basis whatsoever for their sweeping allegation in paragraph 77 of the Amended Complaint," and without such alleged "incentives and subsidies" to any Conspiring Dealer, "Plaintiffs' alleged false reporting scheme does not state a claim under the Robinson-Patman Act." (*Id.*). And to the extent Plaintiffs are unable to identify any such activity, "FCA reserves the right to seek sanctions, including striking the allegation from the pleading, under Fed. R. Civ. P. 37(b)(2)(A)." (*Id.*).

This Court expresses no view regarding whether Plaintiffs had an adequate basis for their allegations in paragraphs 77 and 91 of their Amended Complaint; the question before this Court is instead whether Plaintiffs' interrogatory answer sufficiently disclosed their basis for those allegations, and the Court finds that it did. While that basis may be circumstantial, Plaintiffs have articulated it sufficiently, and FCA is free to challenge that basis in any way it deems appropriate. FCA's motion to compel as to this interrogatory is therefore denied.

2. **Plaintiffs' Motion to Compel:** Plaintiffs' motion seeks to compel the production of documents in response to Requests 5 and 6 of Plaintiffs' First Set of Requests and Requests 15 and 16 of Plaintiffs' Second Set, and for the Court to impose deadlines for the productions it has already ordered and a final date for producing all outstanding documents. (Doc. 120). Plaintiffs' motion is granted in part and denied in part, as follows:

- a. **First Set, Request No. 5:** This request seeks documents and communications "sufficient to show how unwinding a SALES REPORT affects (i) the sales and financial figures [FCA] report[s] to the investing public or [its] creditors." (Doc. 120-1, at 10. Among other objections, FCA argues that any financial figures it has reported to the public or creditors are irrelevant to Plaintiffs' claims, which instead focus on allegedly false sales reported to FCA by its dealers. (*Id.*; Doc. 124, at 9-11). That objection is overruled. While this Court makes no ruling regarding what information may or may not be admitted in support of Plaintiffs' claims, the Court understands Plaintiffs' contention that the false sales reporting scheme alleged in their Amended Complaint was motivated by FCA's desire to "falsely report year-on-year sales growth to the public" (Doc. 120, at 5); and the Court will therefore allow limited discovery to establish this motive to the extent the burden of producing it does not outweigh the probative value that Plaintiffs urge. Because Request No. 5 is sufficiently narrow – seeking only documents and communications "sufficient to show" (as opposed to all such documents and communications) on a specific issue, *i.e.* "how" unwinding a sales report "affects" the sales and financial figures FCA reports – the Court grants Plaintiffs' motion to compel as to this request (as opposed to the remaining requests discussed below). Indeed, the parties' comments during the 5/24 hearing indicated that documents FCA is already producing in response to other requests (for example, Plaintiffs' Second Set, Request No. 7) might satisfy this request.

4

b. **First Set, Request No. 6:** This request seeks "all documents and communications concerning the allegations in paragraph . . . 42" of Plaintiffs' Amended Complaint. (Doc. 120-1, at 10). Paragraph 42 of Plaintiffs' Amended Complaint alleges as follows:

> FCA directly benefits from this scheme, as it results in the inflation of the number of monthly sales which, in turn, create the appearance that FCA's performance is better than, in reality, it actually is. These false and misleading results are reported on a monthly basis to the public at large and to the investment community. FCA has every reason to continue to conceal this practice as it would not be helpful for the truth to come to light at the same time as FCA may be pursuing mergers and other business opportunities.

(Doc. 21, ¶ 42.) As explained at the 5/24 hearing, Plaintiffs' request (First Set, No. 6) seeking all documents "concerning" these allegations is plainly improper in that it fails to identify any discernible category of documents sought, and instead demands all documents and communications "concerning" a broad array of disputed allegations. Plaintiffs' motion to compel is therefore denied as to this request.

c. **Second Set, Request Nos. 15 and 16:** These requests seek "all documents reflecting or referring" to FCA's "year-on-year" and "month-after-month" vehicle sales, "the reporting" of such sales, "or any plan, policy or idea to increase or avoid the decrease of" such sales. (Doc. 120-2, at 23-24). As explained at the 5/24 hearing, this request is overbroad and unduly burdensome in that it improperly seeks every sales and marketing document in FCA's possession and every document reflecting or referring to them. Plaintiffs' motion to compel is therefore denied as to this request, without prejudice to seeking more specific information through narrower requests tailored to the issues raised by Plaintiffs' claims.

In that regard, as directed at the 5/24 hearing, Plaintiffs should first review Request No. 4 from their First Set of Requests (Doc. 120-1, at 8-9), which (though itself fairly broad) seeks sales information related specifically to the scheme Plaintiffs allege, and regarding which the parties already reached an agreement. (Doc. 93, at 3). As the Court understands from Plaintiffs' comments at the 5/24 hearing that the documents being produced in response to Request No. 4 may provide the information Plaintiffs sought to capture with Request Nos. 15 and 16, Plaintiffs should defer further motion practice on this issue until they have received and reviewed those documents, and completed the meet and confer process regarding any subsequent request for information.

d. **Deadlines for Production of Documents:** Plaintiffs' motion to compel also asks the Court to set deadlines for FCA to produce the documents that the Court has already ordered to be produced, and to set a deadline for the completion of

5

document productions by both sides. Specifically, Plaintiffs ask that FCA be required to produce all documents addressed in the Court's 2/27 and 4/26 Orders (Docs. 96, 114) by 6/7/2017, and that both sides be required to complete their document productions by 7/14/2017. (Doc. 120, at 2). The Court agrees with Plaintiffs that a quicker turnaround should be required on the documents responsive to Plaintiffs' Second Set, Request No. 7 required by the Court's 2/27 Order, given that this request seeks a narrow category of documents (those "that form the factual basis for any and all statements" in FCA's July 26, 2016 press release), and that the Court ordered the production of those documents three full months ago. That said, because FCA maintains that these documents were not previously gathered and are being collected and reviewed for privilege from a very large volume of materials that Plaintiffs seek (Doc. 124, at 14; Doc. 124-1, ¶ 4), the Court will allow FCA until 6/30/2017 to produce them.

Plaintiffs' request for an expedited date for producing the remaining documents addressed in the Court's 2/27 and 4/26 Orders, and a 7/14 deadline for both sides to complete all document productions, is denied. As the Court has repeatedly noted, Plaintiffs' document requests in this case have been overbroad and far-ranging, and FCA's Opposition to Plaintiffs' motion to compel and related Declaration now demonstrate that even the narrower requests that the Court has allowed have predictably required FCA to review hundreds of thousands of documents, in addition to 46,000 additional documents required by the parties agreed upon ESI search terms. (Doc. 124, at 8, 15; Doc. 124-1, at ¶¶ 3-4).

Moreover, although Plaintiffs are free to complete their own document productions by 7/14/2017 in an effort to expedite the litigation, the parties' 5/19 JSR demonstrates that Plaintiffs themselves have been unable to make significant progress with their document productions to date, even though far less information has been requested of them. As of that report, Plaintiffs had not completed the production of their financial information (which has been requested for several months) or begun producing any ESI (despite a commitment to begin their ESI searches immediately after the 4/14/2017 status hearing). (Doc. 117, at 5; Doc. 114, ¶¶ 8-9). Accordingly, given the substantial productions remaining to be made by both sides, the parties are directed to meet and confer regarding a reasonably expeditious schedule for prioritizing, staging, and completing their respective document productions, and to state their respective positions on that issue in their next filed JSR, due on 6/30/2017. *See infra* Paragraph 3(d).

3. **Joint Status Report Issues:** Finally, the Court rules on the following additional issues and developments discussed in the parties' 5/19/21017 JSR (Doc. 117), which were also addressed at the 5/24 hearing.

a. **ESI Custodian Robert Weaver:** The Court's 4/26 Order directed FCA to run the agreed search terms/strings for, among others, the Sales and Operations Manager for FCA's Midwest Business Center (Chris Glenn) "for the purpose of determining the number of 'hits' and reporting this to Plaintiffs and the Court" in a later status report. (Doc. 114, ¶ 3(a)). As the Court explained at the 4/14 hearing, that information was then to be used to allow the parties to argue, and for the Court to determine, whether both Mr. Glenn and another individual in a comparable position in a different Business Center (Robert Weaver, Sales and Operations Manager for the Southeast Business Center) should be included as custodians, given the burden of doing so in light of the number of "hits" generated for Mr. Glenn. Rather than merely reporting the number of "hits" generated for Mr. Glenn, however, FCA's 5/12/2017 Status Report stated its agreement "in the interest of compromise and to minimize disputes that would require the Court's intervention," to include Mr. Glenn and others as custodians. (Doc. 116). As a result, neither the parties nor the Court had occasion to assess the burden of adding Mr. Weaver as an additional custodian, and Plaintiffs now ask the Court to require FCA to similarly run the agreed search terms/strings for Mr. Weaver to make that determination.

   FCA resists this request, arguing that "Plaintiffs' continued requests to add more custodians in a vacuum, before receiving any documents to suggest that any one particular custodian is 'key to their case' would only serve to increase the already substantial review burden borne by FCA in this litigation, without regard to the marginal value that including additional custodians would bring." (Doc. 117, at 8). The Court is sympathetic. But as explained in its 4/14 Order, given that Mr. Weaver is a Sales and Operations Manager in one of the Business Centers where Plaintiffs operate, the Court is persuaded that he may have probative information, and the Court therefore requires a basis to determine whether it would be unduly burdensome to include him as a custodian. (Doc. 114, ¶ 3). Accordingly, FCA is directed to run the agreed search terms/strings to determine the number of "hits" for Mr. Weaver, and if it continues to dispute adding him as a custodian, report that information to Plaintiffs and the Court by 6/16/2017. In so ruling, however, the Court notes that FCA's report of the significant volume of documents collected by running the agreed search terms/strings for the 18 custodians that FCA is already obliged to include makes it highly unlikely that the Court would require any additional custodians beyond Mr. Weaver. (*Id.*; Doc. 124-1, ¶ 3).

b. **Mutual Rolling Document Productions:** The parties commit in their 5/19 JSR to making mutual rolling document productions "at least every 3 weeks," beginning three weeks from the date of that report. (Doc. 117, at 2). The Court thus understands that the parties' next document productions will be made by 6/9/2017, if not before. The Court expects the parties to work together to prioritize in these productions the materials of greatest interest to the other side and most needed to prepare for depositions in the case.

7

    c. **Number and Timing of Depositions:** The parties' 5/19 JSR foreshadows a dispute about the number and timing of depositions to be taken in the case, with Plaintiffs anticipating "a large number of depositions," while FCA notes that the "presumptive limit" is ten per side under Fed. R. Civ. P. 30(a)2)(A)(i). (Doc. 117, at 2, 5 n.3; Doc. 120, at 4: "Plaintiffs must conduct numerous depositions of FCA employees and third parties"). On the other hand, Plaintiffs also remind the Court of the November 3, 2017 fact discovery cut-off in the case and the need to commence depositions sufficiently before that deadline. (Doc. 117, at 2-3). Given the limited time remaining and the large volume of documents remaining to be produced, the parties should bear that deadline in mind when formulating their positions regarding the number of depositions they wish to take, and consider, among other options, their ability to commence at least some depositions before both sides' documents are fully produced. With these factors in mind, the parties are directed to confer regarding the number and identification of party and non-party witnesses they seek to depose, and particularly any non-party witnesses who may need to be located and subpoenaed.

    d. **Periodic Joint Status Reports:** The parties also commit in their 5/19 JSR to file periodic joint status reports every six weeks, beginning six weeks from the date of that report. (*Id.*). Accordingly, the parties shall file their next JSR by 6/30/2017. In addition to any issues the parties seek to raise, that report should address the parties' positions regarding a proposed document production schedule (*see supra* Paragraph 2(d)), and any disputed deposition issues (*see supra* Paragraph 3(c)).

4.     Per the Court's 5/25/2017 Minute entry, a status is scheduled for 7/11/2017 at 10:45 a.m., shortly after the parties' next JSR is due to be filed. In furtherance of the parties' suggestion at the 5/24 hearing, they should confer regarding an agreed deadline for filing and briefing any motions to be argued during that status hearing and future status hearings, in order to give the parties and the Court sufficient time to address and consider them.

ENTER:

Dated: May 30, 2017

*Sheila Finnegan*
SHEILA FINNEGAN
United States Magistrate Judge