UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NAPLETON'S ARLINGTON HEIGHTS MOTORS, INC. f/k/a NAPLETON'S PALATINE MOTORS, INC. d/b/a NAPLETON'S ARLINGTON HEIGHTS CHRYSLER DODGE JEEP RAM, an Illinois corporation; NAPLETON'S RIVER OAKS MOTORS, INC. d/b/a NAPLETON'S RIVER OAKS CHRYSLER DODGE JEEP RAM, an Illinois corporation; CLERMONT MOTORS, LLC d/b/a NAPLETON'S CLERMONT CHRYSLER DODGE JEEP RAM, an Illinois limited liability company; NAPLETON'S NORTH PALM AUTO PARK, INC. d/b/a NAPLETON'S NORTHLAKE CHRYSLER DODGE JEEP RAM, an Illinois corporation; NAPLETON ENTERPRISES, LLC d/b/a NAPLETON'S SOUTH ORLANDO CHRYSLER DODGE JEEP RAM, an Illinois limited liability company; NAPLETON'S MID RIVERS MOTORS, INC. d/b/a NAPLETON'S MID RIVERS CHRYSLER DODGE JEEP RAM, an Illinois corporation; NAPLETON'S ELLWOOD MOTORS, INC. d/b/a NAPLETON'S ELLWOOD CHRYSLER DODGE JEEP RAM, an Illinois corporation,<br><br>      Plaintiffs,<br><br>  v.<br><br>FCA US LLC, a Delaware corporation,<br><br>      Defendant. | Case No. 1:16-cv-00403-VMK-SMF |

**PLAINTIFFS' SUPPLEMENTAL RESPONSE TO FCA's MOTION TO COMPEL**

Pursuant to this Court's 7/12/2017 Order, Plaintiffs submit this Supplemental Response to FCA's 6/30/2017 Motion to Compel.

### I. Plaintiffs have fully responded to FCA's Interrogatory 2-2, based on their knowledge, information, and belief at this early stage of discovery.

Federal Rule of Civil Procedure 33 requires a party responding to an interrogatory to answer "fully in writing under oath." (FRCP 33(b)(3)) Plaintiffs fully responded to FCA's Interrogatory 2-2 to the best of their knowledge and belief at this stage in the litigation, and stated their intent to supplement their response after FCA produces relevant documents and Plaintiffs conduct expert analysis. Have Plaintiffs adequately responded to Interrogatory 2-2?

In its Second Set of Interrogatories, Number 2, Defendant FCA asked the Plaintiff car dealerships to specify the time periods during which they claim to have lost sales and profits caused by Defendant's alleged misconduct, and to identify relevant documents.[1] Based on discovery to date, Plaintiffs fully responded with a detailed three-page answer, identifying the time periods during which each Plaintiff claims to have lost sales and profits, and identifying relevant documents. Unsatisfied, Defendant filed a motion to compel Plaintiffs to provide further information – information which will not be available until Defendant and certain third parties produce necessary documents, and Plaintiffs have a chance to review the documents and conduct expert analysis. Plaintiffs response to Interrogatory 2-2 is adequate at this stage in the litigation.

Before ruling on Defendant's motion to compel, this Court ordered Plaintiffs to file a supplemental response to Defendant's motion "providing a description of the methodology for the various damages theories and the specific data and information required from FCA and/or any non-parties that the expert must examine to support each such theory," and stating "the factual

---

[1] FCA's Second Set of Interrogatories, Number 2, states: "Specify the period(s) of time during which each Plaintiff claims to have lost sales and profits caused by any wrongful act by FCA as alleged in the Amended Complaint, including the beginning and/or end date(s) of each period, and Identify any Documents and Communications concerning Your Response."

bases for each damage theory in sufficient detail to allow FCA to identify and undertake discovery needed to respond." (Doc. 144(1)(a))  Plaintiffs supplement their 7/7/2017 Response (Doc. 141) as follows.

Discovery is far from complete, and the methodologies Plaintiffs employ to support their damages theory may change as discovery progresses.  But based on discovery to date, Plaintiffs' damages theory is currently based on the "but for" model.  But for FCA's conduct, Plaintiffs would have sold more vehicles and earned greater profits than they in fact did given their risk, investment, opportunity cost, and market conditions.

The factual basis for this "but for" damage model known by Plaintiffs at this time is as follows: FCA employees approached certain dealers to request that the dealers report unsold vehicles as sold or leased in return for incentives and subsidies from FCA, with the understanding that the dealers would unwind such sales or lease reports but still receive or keep the benefits from FCA. Such incentive benefits could include monies, co-op payments, advertising support monies, allocation of vehicles, or other preferential treatment from FCA.  FCA made some benefits normally associated with making bona fide sales available to dealers who reported False Sales.

In addition, the FCA employees urged these dealers to report false sales of cars that were scarce and in demand by consumers, such as the Jeep four-door Wrangler or the Jeep Grand Cherokee. The FCA employees indicated that reporting such vehicles as sold, even though they would ultimately be unwound, would entitle the dealer to receive allocations of such "hot" vehicles, which the dealers could easily sell and thereby earn additional allocations of such cars in succeeding months.

There may be additional methods not known by Plaintiffs at this stage of discovery by which certain competing dealers received benefits not functionally available to Plaintiffs.

Plaintiffs were further harmed by FCA's arbitrary and discriminatory application of its Volume Growth Program (VGP) and Minimum Sales Requirement (MSR) program as described in paragraphs 56-74 and 78-91 of the Complaint (Doc. 21).

FCA's conduct enabled certain dealers that competed with Plaintiffs to effectively receive their vehicles from FCA at lower wholesale prices than were available to Plaintiffs, and to receive other favorable treatment such as additional allocations of scarce, in-demand vehicles. By rewarding dealers who reported False Sales, FCA enabled those dealers to divert sales away from Plaintiffs by, among other things, offering lower prices and better selection of vehicles.

Based on discovery to date, Plaintiffs expect that their damage model will create a "but for" world to determine the sales and profits that Plaintiffs would have earned but for the conduct of FCA and the dealers that participated in the foregoing conduct. In creating such a "but for" world, Plaintiffs' may conduct profit contribution analysis, expense analysis, gross profit comparisons between Plaintiffs and competing dealers, and comparisons of volume-based objective achievement by Plaintiffs and competing dealers. Plaintiffs may undertake these analyses using various well-accepted econometric tools including regression analysis, comparison to averages, difference-in-differences analysis, before-and-after analysis, and time series analysis.

The particular econometric tools to be used as part of the but for damage model are not known with certainty at this time and will follow from the nature and types of data produced by FCA and third-parties as well as discovery not yet available.

As part of its "but for" damage model, Plaintiffs may conduct analyses of sales and market opportunities in order to compare the actual performance to the "but for" performance. The sales and market opportunity analyses may include dealer area definitions, market segmentation, registration effectiveness, sales effectiveness, gravity models, and calculations of "expected

registrations" which may scale overall market opportunity for specific brands based upon the types of vehicles purchased. Other analyses may include evaluation of dealer sales at various distances, cross-sell analyses by dealerships within a market, containment analyses of dealers' sales within certain geographic areas, and other similar analyses.

As part of its determination of the "but for" world, Plaintiffs may analyze various measures of product supply, including analysis of sales mix, analysis of days' supply, changes in sales mix, changes in days' supply, and days' supply modified at target sales levels.

Comparison of the "but for" world against the actual results is likely to result in calculation of Plaintiffs' lost sales and lost profits. Plaintiffs may analyze how the new vehicle sales by a dealership translates into the ability to generate trade-in sales and future parts and service sales. Such analysis may include reasonable estimations of trade-in rates, ancillary service business, after-market sales and profits, and future parts sales.

Finally a calculation of economic damages will likely involve profit-contribution analysis, opportunity-cost factors, and money-cost factors such as weighted average cost of capital, CAPM, statutory interest, or inflation rates.

To support Plaintiffs' damages theories, Plaintiffs' expert must examine the following data and information:

DOCUMENTS NEEDED FROM FCA:

1. Dealer financial statements in the form submitted to FCA, in Microsoft Excel or other computer-readable form, for Competing Dealers, by month from 2011-present.

2. Allocation summaries in computer-readable form showing FCA's derivation of the formulaic allocation offered to Plaintiffs and Competing Dealers, the amount of discretionary allocation (Business Center Reserve) with dates and volumes by model, and reason codes for discretionary allocation, by model by month from 2011-present.

3. VGP data – for Plaintiffs and Competing Dealers from 2011-present;
    a. Monthly VGP objective levels (core);

      b.  Monthly VGP objective levels (final);
      c.  Monthly adjustments between VGP core and final objectives;
      d.  Monthly VGP objective payments (final) in aggregate and by program;
      e.  Monthly VGP program descriptions.

4. MSR data – from 2011-present;
   a. Annual MSR reports for Plaintiffs and Competing Dealers;
   b. Fair-share assignments for each sales locality containing a Plaintiff or Competing Dealer.

5. Structure lists showing Trade Zone and Sales Locality descriptions for each Sales Locality including and/or adjacent to a Plaintiff's dealership from 2011-present.

6. Dealer history file showing open dates, close dates, addresses, line makes carried, and relocation dates sufficient to cover Sales Localities including or adjacent to a Plaintiff's dealership from 2011-present.

7. Any internal worksheets, training, or presentation materials showing FCA's estimates or guidelines of the ancillary profit (trade-in, parts, service, F&I) associated with new vehicle sales and or purported lost profit opportunity associated with deficits of dealer sales to 100% MSR volumes.

<u>DOCUMENTS NEEDED FROM THIRD-PARTY COMPETING DEALERS</u>:[2]

1. Documents concerning False Sales Reports or any request, plan, or action to submit or Unwind False Sales Reports or to give or receive a reward or benefit in connection with actual or potential False Sales Reports.

2. Documents concerning payments, vehicle allocations, or other benefits actually made by FCA to compensate dealerships for submitting False Sales Reports.

**II.    Status of FCA's production of information related to VGP, MSR, vehicle allocations, and other data necessary for Plaintiffs' damages analysis**

      The Court further ordered the parties to meet and confer regarding what information FCA has already produced and what remains outstanding, and to provide a status update in this supplemental response. (Doc. 144 (1)(b) and (1)(c))

---

[2] If FCA does not produce the dealer financial statements listed in bullet point (3), Plaintiffs will need the following alternative source of information from the Competing Dealers:
    (a)  New vehicle sales by Vehicle Identification Number ("VIN")
    (b)  New vehicle gross profits by VIN.

In 7/17/2017 correspondence, Plaintiffs proposed phased and narrowed subpoenas to third-party dealers, on the condition that Plaintiffs can obtain the following information from FCA rather than the third-parties:

1. Monthly dealer financial statements, including data sufficient to identify gross profits by vehicle models by month for competing dealers;
2. Vehicle allocation data;
3. VGP data including dealers' VGP targets/objectives and dealers' sales against VGP targets; and
4. Incentive and other reward payments and benefits from FCA to the competing dealers, including VGP incentive payments and rewards.

Counsel for Plaintiffs and FCA held a meet-and-confer conference call on July 25, 2017 to discuss the above, as well as the status of FCA's production of data and information related to VGP, MSR, and vehicle allocations, pursuant to the Court's Order.

Regarding VGP, MSR, and allocation data (including points 2 and 3 above), FCA represents that it has already produced this data and that it will provide the Bates numbers for these document productions, so that Plaintiffs can determine whether FCA's production on these topics is adequate. FCA has not yet provided the Bates number ranges for these documents, and Plaintiffs have not yet been able to determine whether the production is adequate. Plaintiffs intend to follow up with FCA on obtaining the Bates number ranges and reviewing the relevant documents.

As to point number 1 above—the monthly dealer financial statements, including data sufficient to identify gross profit by vehicle modeled by month—Plaintiffs' counsel noted that this request was in lieu of asking each dealer by subpoena to produce information or data showing the prices paid by each dealer's customers for each vehicle sold by VIN number. Plaintiffs' counsel pointed out that this request should be less burdensome because FCA collected such monthly financial statements electronically from each dealer. In addition, Plaintiffs' counsel pointed out that obtaining gross profit information from FCA instead of specific price information would be

less intrusive in terms of confidential information, a concern raised by the Court during the July 11 status hearing.

Yet FCA objects to producing monthly dealer financial statements for the Competing Dealers. This is unfortunate because the price and profit information contained in them is critical to Plaintiffs' intended expert analysis. And based on Plaintiffs' understanding, FCA, and not the dealers, possess these financial statements in a computer-readable form.

As for point number 4, FCA has not agreed to produce the requested incentive and reward information.

Since the parties 7/25/2017 meet-and-confer conference, Plaintiffs have identified additional information needed by their expert to conduct their damages analysis. This information is set forth in Section I above as "Documents Needed from FCA." This data substantially overlaps with the data previously requested, but adds more specificity. The list also includes additional data points. Counsel for Plaintiffs intend to meet and confer with counsel for FCA regarding production of these documents.

Dated: July 31, 2017

Respectfully submitted,

The Napleton Plaintiffs

By: */s/ Jeannie Evans*

Jeannie Y. Evans
HAGENS BERMAN SOBOL SHAPIRO LLP
455 N. Cityfront Plaza Drive, Suite 2410
Chicago, Illinois 60611
Telephone: (708) 628-4949
Facsimile: (708) 628-4950
jeannie@hbsslaw.com

Steve W. Berman
Thomas E. Loeser
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 8th Avenue
Suite 3300
Seattle, WA 98101
(206) 623-7292
steve@hbsslaw.com
toml@hbsslaw.com


David C. Gustman
Jeffery M. Cross
Alexander Vesselinovitch
Dylan Smith
David J. Ogles
FREEBORN & PETERS LLP
311 S. Wacker Drive, Suite 3000
Chicago, IL 60606
(312) 360-6000
dgustman@freeborn.com
jcross@freeborn.com
avesselinovitch@freeborn.com
dsmith@freeborn.com
dogles@freeborn.com


**CERTIFICATE OF SERVICE**

The undersigned, an attorney, certifies that she caused the foregoing *Plaintiffs' Supplemental Response to FCA's Motion to Compel* to be served on counsel of record via electronic mail on July 31, 2017.

*/s/ Jeannie Evans*
Attorney for Plaintiffs