IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NAPLETON'S ARLINGTON HEIGHTS MOTORS, INC. f/k/a NAPLETON'S PALATINE MOTORS, INC. d/b/a NAPLETON'S ARLINGTON HEIGHTS CHRYSLER DODGE JEEP RAM, an Illinois corporation; NAPLETON'S RIVER OAKS MOTORS, INC. d/b/a NAPLETON'S RIVER OAKS CHRYSLER DODGE JEEP RAM, an Illinois corporation; CLERMONT MOTORS, LLC d/b/a NAPLETON'S CLERMONT CHRYSLER DODGE JEEP RAM, an Illinois limited liability company; NAPLETON'S NORTH PALM AUTO PARK, INC. d/b/a NAPLETON'S NORTHLAKE CHRYSLER DODGE JEEP RAM, an Illinois corporation; NAPLETON ENTERPRISES, LLC d/b/a NAPLETON'S SOUTH ORLANDO CHRYSLER DODGE JEEP RAM, an Illinois limited liability company; NAPLETON'S MID RIVERS MOTORS, INC. d/b/a NAPLETON'S MID RIVERS CHRYSLER DODGE JEEP RAM, an Illinois corporation; NAPLETON'S ELLWOOD MOTORS, INC. d/b/a NAPLETON'S ELLWOOD CHRYSLER DODGE JEEP RAM, an Illinois corporation, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CASE NO. 1:16-cv-0403 |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| FCA US, LLC, a Delaware corporation, and FCA REALTY, LLC, a Delaware limited liability corporation f/k/a CHRYSLER GROUP REALTY COMPANY, LLC, | ) ) ) ) ) ) | |
| Defendants. | ) | |

**SECOND AMENDED COMPLAINT**

Plaintiffs, Napleton's Arlington Heights Motors, Inc. f/k/a Napleton's Palatine Motors, Inc. d/b/a Napleton's Arlington Heights Chrysler Dodge Jeep Ram ("Napleton's Arlington Heights"); Napleton's River Oaks Motors, Inc. d/b/a Napleton's River Oaks Chrysler Dodge Jeep Ram ("Napleton's River Oaks"); Clermont Motors, LLC d/b/a Napleton's Clermont Chrysler Dodge Jeep Ram ("Napleton's Clermont"); Napleton's North Palm Auto Park, Inc. d/b/a Napleton's Northlake Chrysler Dodge Jeep Ram ("Napleton's Northlake"); Napleton Enterprises, LLC d/b/a Napleton's South Orlando Chrysler Dodge Jeep Ram ("Napleton's South Orlando"); Napleton's Mid Rivers Motors, Inc. d/b/a/ Napleton's Mid Rivers Chrysler Dodge Jeep Ram ("Napleton's Mid Rivers"); and Napleton's Ellwood Motors, Inc. d/b/a Napleton's Ellwood Chrysler Dodge Jeep Ram ("Napleton's Ellwood City") bring this action against the Defendant, FCA US, LLC ("FCA" and/or "Defendant"). Napleton's Arlington Heights also brings this action against the Defendant, FCA Realty, LLC f/k/a Chrysler Group Realty Company, LLC ("FCAR").[1] In this Second Amended Complaint, Plaintiffs allege as follows:

## I.     NATURE OF THE CASE

1.     As the seventh-largest automobile manufacturer in the world, Defendant FCA enjoys substantial economic power and leverage over its franchisee-dealers, including Plaintiffs, dealers variously located in Florida, Illinois, Missouri, and Pennsylvania. Dealers must invest substantial capital to start, operate, and maintain dealerships geared toward marketing and selling vehicles that FCA, and only FCA, produces. But this investment depends on the good faith and fair dealing of FCA, which maintains plenary control over the lifeblood of Plaintiffs' business: cars people want at a price they are willing to pay.

---

[1] As noted below, Plaintiffs are re-pleading their claims against FCAR solely for the purpose of protecting against any assertion of waiver at the time of any subsequent appeal.

2.      FCA places particular focus on the appearance of sales volume growth — in other words, the semblance of ever-increasing retail sales by dealers.  This figure provides the investing public, creditors, and partners in potential acquisitions with an important indicator of the underlying health of FCA's business.  In a February, 2016 press release, FCA prominently touted a 70-month record of year-on-year sales growth across all its brands (Chrysler, Dodge, Jeep and Ram Truck), and the most units sold in January by the company in the last nine years. Sales-volume growth is of paramount concern to FCA, and pervades its dealer relationships.

3.      To achieve the sales-growth figures management desires, FCA employs a carrot-and-stick approach.  One carrot is an incentive program known as the "Volume Growth Program."  The Volume Growth Program provides monies and other benefits to dealers who achieve sales targets that FCA in its sole discretion arbitrarily sets, and that it sets differently among competing FCA dealers.  Dealers who receive such monies have broad discretion to use those monies as they see fit, including as a subsidy to reduce the price of a given make and model below the competition's price.

4.      Another carrot is FCA's turn and earn policy of allocating vehicles, in which dealers who sell greater numbers of high-demand models are granted priority for those same models over other competitors.

5.      The two policies serve both as a reward to FCA dealers who sell greater numbers of specific vehicles, and also as an equally powerful punishment to dealers who do not achieve the sales targets set by FCA.

6.      FCA also has a "stick" at its disposal:  the Minimum Sales Responsibility metric, or MSR, which FCA uses as an indicator of sales effectiveness of its dealers.  FCA imposes non-negotiable, one-sided, and draconian terms on its dealers in its franchise agreements, which

even purport to permit FCA to terminate Plaintiffs' franchises in the event Plaintiffs do not achieve Minimum Sales Responsibility targets set by FCA in its sole discretion.  The methodology to determine the Minimum Sales Responsibility metric is not defined by contract; rather, FCA retains the discretion to calculate Plaintiffs' Minimum Sales Responsibility using whatever methodology and market it chooses.

7.      In practice, FCA has applied its "carrot-and-stick" approach arbitrarily, capriciously, and in bad faith so as to restrict the lifeblood of Plaintiffs' business — by discriminating on price, discriminating on vehicle allocation, and setting Minimum Sales Responsibility targets using unreasonable methods that do not fairly measure Plaintiffs' performance in the relevant market.  FCA's policies have, in effect, created a two-tier system where preferred dealers get access to better prices and cars, thereby creating an underclass of dealers who have no functional access to these benefits and are set up to fail until terminated in favor of a preferred dealer.

8.      FCA has flexed its economic muscle by placing Plaintiffs in this underclass, endangering the very existence of their businesses.  Notwithstanding having induced investments of tens of millions of dollars in new dealerships and repairs of existing dealerships and FCA brand image upgrades, FCA has engaged in a course of conduct to regularly threaten Plaintiffs' franchises, including through several pretextual default letters.

9.      In furtherance of keeping Plaintiffs in FCA's underclass, FCA has further stacked the deck against Plaintiffs by soliciting fraudulent sales reports from certain dealers, and by using the numbers generated from these false sales to further subsidize Plaintiffs' competing dealers and to allocate hotter-selling vehicles to them.  FCA's false sales reporting is another "carrot" that it provides to what it euphemistically terms "trusted" dealers.  As described in internal documents

- 4 -

produced by FCA, the "trusted" dealers who conspire with FCA to falsely report sales ("Conspiring Dealers") do so understanding that participating in FCA's scheme will net them more sales diverted from dealers, like Plaintiffs, who refrain from that practice ("Non-Conspiring Dealers") and who have refused and continue to refuse to participate in the fraudulent scheme. In short, FCA bribed its own dealers at the expense of Plaintiffs. While the amount of these bribes varied, in some instances they reached $3,300 per car. FCA_NAPLETON_00037508. Conspiring dealers were then instructed to unwind the false sales in the next month so that the false report would not impact warranties or Sirius XM contracts bundled with the sales of the cars. These internal documents further describe that FCA knew that this scheme gave conspiring dealers an "unfair competitive edge" against dealers who were not "trusted" to participate in the false sales reporting scheme. FCA_NAPLETON_00037506.

10.     Plaintiffs have, to no avail, repeatedly demanded that FCA's fraudulent practices come to an end. FCA's practice of soliciting false reports, however, continued unabated. Troublingly, based on FCA internal documents and other sources that include FCA's co-conspirators and former managers and employees, FCA's misconduct has not been confined to the geographic areas where Plaintiffs' customers are located. Rather, FCA engaged in such illegal practices on a nationwide scale, using mail and wire means of interstate communications to execute their fraudulent schemes.

11.     FCA actively concealed this scheme and related misconduct, and denied its existence during this litigation, until December 18, 2017, which was the deadline for producing documents in this matter. FCA's reticence to finally admit the truth was inexcusable, as it withheld these documents despite an order issued nearly *10 months* prior on February 23, 2017 to search "the entirety of documents collected pursuant to any internal investigation(s)" for

documents relevant to false sales reporting. It was only on this late date in December that FCA produced hundreds of pages of internal investigation files confirming FCA's unlawful false sales reporting scheme, which FCA executed with full knowledge that its misconduct directly harmed dealers who did not participate. FCA_NAPLETON_00037499-617; 00037483-98. While FCA began its internal investigation in early 2015, disclosure of relevant documents to Plaintiffs and the Court came nearly three full years later. Yet, FCA's disclosure still appears to be incomplete, as it made another production in late January (well after the production deadline) of "excerpted" text messages between an FCA employee and various FCA dealers containing the bombshell admissions that FCA was paying direct competitors of Plaintiff Napleton Arlington Heights in exchange for "fake sales."

12.     The testimony of just one of the many FCA whistleblowers whose knowledge was first disclosed in these documents aptly describes how the false sales reporting scheme worked: the employee explained that she was "directed to offer cash, [Dodge] Hellcats and [Jeep] Wranglers to various dealers in exchange for falsely reporting vehicles as sold." For instance, management instructed her to send an email with the title "Mktg funds" that brazenly offered $15,000 if the dealer "can punch nine [sales] tonight." The motivations for all participants are laid bare in her admissions that (1) "[d]ealers are directed to report all Wranglers as sold, then unwind the following day in order to increase allocation;" (2) FCA business center employees "are constantly told, 'We don't care what it takes, just get cars reported as sold'"; and (3) as a result, the business centers and "the dealers' VGP programs are compromised because of the false sales reporting."

13.     The example above is no isolated incident — text messages from Ralph Jones, an Area Sales Manager in the Midwest Business Center (where three Plaintiffs compete), states that

"[FCA] blew the budget paying guys for fake sales" and admits that FCA was engaged in false sales reporting "[a]ll over the country." FCA_NAPLETON_00089267-68. After Plaintiffs' complaint was filed, Mr. Jones expressed to another dealer that FCA's "entire management team is and should be nervous" because of concerns about a "potential federal investigation" that would reveal these facts. In response, the dealer asked Mr. Jones "if there could be a penalty for me taking the dough." *Id.* Additional documents show that Southeast Business Center (where three Plaintiffs compete) employees referred to the practice as "bribery" and "manufactured business," regularly instructing FCA subordinates to offer $5,000 to dealers as a quid pro quo for their agreement to falsely report ten to fifteen cars as sold. FCA_NAPLETON_00037549. FCA's own investigative files also show emails memorializing an agreement between the FCA Southwest Business Center and a dealer there for the dealer to receive cash and allocations: the dealer had agreed to "punch 35 deals to show 200 in the morning" and in exchange FCA agreed to provide $20,000 in co-op funds, "38 jeeps from earlier list of 75 we promised him" and "15 additional Wranglers." FCA_NAPLETON_00037588.

14. In one review performed by FCA, the investigator found "suspicious activity" in 46 of 49 of the dealers sampled — or a whopping *93%*. FCA_NAPLETON_00037504. FCA's investigators homed in on one type of sale most frequently used for false reports — alarmingly, the investigation found that what FCA denoted as "B" sales purportedly made by the dealership to itself increased "*five-fold*" from July 1, 2014 to November 2, 2015 (after a similarly disquieting 82% increase between 2013 and 2014). FCA_NAPLETON_00037508; FCA_NAPLETON_00037483-498. The false sales reporting scheme was so prevalent that numerous FCA managers simply could not stomach the "unethical" business practices any longer, and resigned from their lucrative positions at FCA. *See, e.g.*, FCA_NAPLETON_00037507.

15.      FCA managers relied on a pattern of egregious, intentional, and fraudulent activity to conduct and conceal their scheme and fatten their wallets.  The instances of mail fraud and wire fraud are numerous — after all, FCA solicited, and in some cases itself transmitted, thousands of New Vehicle Delivery Reports that were communicated via the Internet between FCA and its dealers, and which falsely represented that (1) new vehicles had been sold to *bona fide* customers and were not "available" for purposes of allocating cars, when in fact, (2) these vehicles had not been sold and were available.  FCA's documents confirm the dates, method, and recipients of the transactions, examples of which are detailed in this complaint.  FCA also sent numerous emails to dealers and other FCA employees to further the false sales reporting scheme.

16.      Documents recently (and belatedly) produced by FCA also prove that it relied on other unlawful methods to effectuate the false sales reporting scheme.  Examples include schemes to (1) fraudulently show aged vehicles as sold, FCA_NAPLETON_00037499; (2) fictitious sales to names obtained through targeted marketing data, FCA_NAPLETON_00037504; (3) using FCA "T" login codes to post fictitious sales on a dealer's DealerConnect Internet site without the dealer's knowledge, in some cases using the credentials of retired employees to avoid detection, FCA_NAPLETON_00037506; and (4) offering cash and allocations to certain "trusted" dealers to report cars as "sold" that were in fact part of the service loaner program. FCA_NAPLETON_00037506.

17.      FCA regularly offered commercial bribes, in the form of cash payments to fiduciaries (including general managers and sales managers) of the dealerships from which it sought false sales, without the knowledge or consent of these dealers' principals.  Commercial extortion was also a critical part of FCA's scheme.  FCA managers pressured lower level employees into participating in the wrongful scheme by informing them that their communications

- 8 -

were being monitored, instructing them to delete emails and put nothing in writing, and generally employing what one FCA employee called "fear, intimidation, and threats of dismissal." FCA_NAPLETON_00037518. Many employees spoke of their fear of retaliation, including one former employee who still feared retaliation even though she had already left FCA. *Id.* For dealers who were not "trusted" by FCA, including Napleton, the manufacturer leaned on the many "sticks" at its disposal. Dealers reported to investigators that they were "very concerned about retaliation" if FCA were to find out which dealers refused to participate with the scheme and instead elected to blow the whistle on FCA. FCA_NAPLETON_00037516.

18.　　FCA's pattern of racketeering has directly and proximately injured Plaintiffs' business and property. The acts of entering false sales reports directly deprived Plaintiffs of the opportunity to purchase popular vehicles, for which FCA has limited supply. FCA's system allocates high-demand, limited-supply vehicles based on a recent historical record of the sales reported by the dealer and the available vehicles that are reported to be remaining in the dealer's inventory, using the same data used to effectuate the false sales reporting scheme. Reported sales and reported availability determine what FCA terms the "days' supply" remaining for each popular model at a dealership — the lower a dealer's days' supply for a popular vehicle, the more of these popular vehicles FCA will allocate to the dealer. Thus, the effect of a false sale is mechanical, as Plaintiffs now know through discovery — each and every false sales report of a popular vehicle automatically reported to FCA's allocation system that the vehicle was actually sold and unavailable, even though in reality there was no contract to sell the vehicle and the vehicle remained in the Conspiring Dealer's inventory. The false sales reports automatically reduced the Conspiring Dealers' days' supply for popular vehicles, and thus improved the Conspiring Dealer's place in line to receive allocation for FCA's most popular vehicles. FCA's system further rewards

cheating because dealers who report vehicles as sold and unavailable (even though they were not contracted for sale and instead still remain in inventory) can receive multiple popular vehicles before any other dealers are even considered for those models. Grossly exaggerated sales reporting thus grossly disadvantaged Plaintiffs.

19. The benefit to the Conspiring Dealers and harm to Plaintiffs was by intentional *design*, as FCA's documents now confirm: FCA managers who concocted the false sales reporting scheme "specifically encouraged [subordinates] to recommend Wranglers as it would do [two] things. 1. [L]ower the dealers [*sic*] wrangler [*sic*] availability therefore increasing their earned allocation 2. Wranglers do not receive incentives therefore dealers were not at risk of being charged back any incentive money." FCA_Napleton_00037544. As characterized by FCA itself, the artificially "increased sales figures [for Conspiring Dealers] result in increased inventory allotments of hot-selling vehicles such as Wranglers and Grand Cherokees." FCA_NAPLETON_00037550. Because FCA knowingly and intentionally rigged the allocation system for the benefit of Conspiring Dealers, Plaintiffs suffered repeated denials of wholesale orders, each of which represented thousands of dollars in margin at retail and thousands more in ancillary profit over time. And because popular vehicles were often allocated on a nationwide and/or Business Center-wide basis, false sales reported by dealers far away from Plaintiffs (such as in the Southwest Business Center) impaired and continue to impair Plaintiffs' bottom line.

20. FCA compounded this injury by subsidizing Plaintiffs' competitors and rigging the incentive programs that were held out as neutral and unbiased. Lacking their fair share of popular vehicles, Plaintiffs' participation in incentive programs that rewarded volume was limited to less popular cars with slimmer margins. Unbeknownst to Plaintiffs, those incentive programs were inherently arbitrary, unreasonable, capricious, and unfair because the subsidies provided to

Conspiring Dealers enabled them to take losses and meet volume objectives that were set too high for Non-Conspiring Dealers such as Plaintiffs to achieve. Numerous potential customers did not complete transactions at Plaintiffs' dealerships, but were instead diverted to Conspiring Dealers who could offer better inventory and lower prices as a result of accepting FCA's bribes.

21.     FCA's commitment to concealing this scheme cannot be overstated. Even though FCA anticipated litigation at least as early as August 2015 when Plaintiffs blew the whistle with a draft complaint to FCA, (FCA_NAPLETON_00037429-460), FCA's documents show that, well after this threat of litigation, FCA managers instructed employees to "delete all the emails" referring to false sales reporting deals that FCA solicited and completed. FCA_NAPLETON_00037580.

22.     FCA had access to internal investigation files detailing the false reporting scheme at least from January 2015 through January 2016.[2] Yet, on January 14, 2016, FCA issued a press release stating that FCA had "carried out an investigation of the facts" that had found that Plaintiffs' "allegations of false sales reporting by FCA US" were "baseless." The same press release lashed out at Plaintiffs' business reputation and made thinly veiled threats to the press, calling Plaintiffs "two disgruntled dealers" who allegedly "failed to perform" their dealer agreements. In fact, FCA's internal investigation of the facts *confirmed* the truth of Plaintiffs' allegations. The reason for FCA's deception is apparent; as acknowledged in FCA's own files, "if these wholesale tactics became public, it could be very harmful to our reputation." FCA_NAPLETON_00037513. This concern may have animated FCA's July 2016 press release also, which falsely disavowed knowledge of any "obvious economic incentive for a dealer" to

_____

[2] According to document FCA_NAPLETON_00037505, FCA's Office of General Counsel put the internal investigation into FCA's false sales reporting on hold on January 22, 2016.

falsely report and then unwind a sale, even though FCA *itself* provided economic incentives to the dealers, instructed the dealers on how to avoid getting caught, and knew that such benefits would give dealers an "unfair competitive edge."

23.     The cumulative effect of FCA's misconduct has already caused Plaintiffs millions in lost sales and profits, and will lead to substantially more losses if FCA is permitted to terminate certain of Plaintiffs' franchises, as it has threatened to do.  Plaintiffs have filed this federal civil action, requesting relief from the Court under several federal and state statutory and common law causes of action, seeking treble damages, injunctive and declaratory relief, attorneys' fees, interest, and punitive damages to deter FCA from engaging in such egregious and unlawful conduct in the future.

24.     Specifically, Plaintiffs pursue treble damages, costs of suit including attorneys' fees, interest, and injunctive and declaratory relief against FCA based upon its violations of the Automobile Dealers Day in Court Act (15 U.S.C. § 1221 *et seq.*), Section 2 of the Clayton Act (also known as the Robinson-Patman Act) (15 U.S.C. § 13 *et seq.*), Section 4 of the Clayton Act (15 U.S.C. § 15), and the Civil RICO Act (18 U.S.C. § 1961 *et seq.*).  Plaintiffs also seek remedies under the state-law statutes enacted to protect automobile dealers in each Plaintiff's respective state, as follows:  treble damages, costs of suit including attorneys' fees, interest, and injunctive and declaratory relief pursuant to the Illinois Motor Vehicle Franchise Act (815 ILCS § 710 *et seq.*) and Florida's Motor Vehicle Franchise Act (Florida Statutes § 320.64 *et seq.*); damages, punitive damages, costs of suit including attorneys' fees, interest, and injunctive and declaratory relief pursuant to the Missouri Motor Vehicle Franchise Protection Act (MO. Rev. Stat. § 407.810 *et seq.*); and damages, costs of suit including attorneys' fees, interest, and injunctive and declaratory relief pursuant to the Pennsylvania Board of Vehicles Act (63 P.S. § 818.1 *et seq.*).

Plaintiffs also seek damages (including punitive damages where applicable) and other relief against FCA and FCAR under the common law doctrines of fraud, negligent misrepresentation, breach of contract, and under the equitable doctrine of quantum meruit.[3]

## II.     **PARTIES**

25.     Plaintiff, Napleton's Arlington Heights, is a corporation existing under the laws of the State of Illinois and is authorized to do business in the State of Illinois. Napleton's Arlington Heights is an automobile dealer and a "motor vehicle dealer" as defined in 815 ILCS § 710/4 *et seq*. Napleton's Arlington Heights' primary place of business is located at 1155 West Dundee Road, Arlington Heights, Illinois 60004 (Cook County).

26.     Plaintiff Napleton's River Oaks is a corporation existing under the laws of the State of Illinois and is authorized to do business in the State of Illinois. Napleton's River Oaks is an automobile dealer and a "motor vehicle dealer" as defined in 815 ILCS § 710/4 *et seq*. Napleton's River Oaks' primary place of business is located at 17225 Torrence Avenue, Lansing, Illinois 60438 (Cook County).

27.     Plaintiff Napleton's Clermont is a limited liability company existing under the laws of the State of Illinois and is authorized to do business in the State of Illinois and the State of Florida. Napleton's Clermont is an automobile dealer and a "motor vehicle dealer" as defined in Florida Statutes § 320.60(11)(a). Napleton's Clermont's primary place of business is located at 15859 State Road, Clermont, Florida 34711.

---

[3] Plaintiffs are re-pleading their Counts VI, VII, XIII and XIV solely for the purpose of protecting against any assertion of waiver at the time of any subsequent appeal.

28.     Plaintiff Napleton's Northlake is a corporation existing under the laws of the State of Illinois and is authorized to do business in the State of Illinois and the State of Florida. Napleton's Northlake is an automobile dealer and a "motor vehicle dealer" as defined in Florida Statutes § 320.60(11)(a).  Napleton's Northlake's primary place of business is located at 3703 Northlake Boulevard, Lake Park, Florida 33401.

29.     Plaintiff Napleton's South Orlando is a limited liability company existing under the laws of the State of Illinois and is authorized to do business in the State of Illinois and the State of Florida.  Napleton's South Orlando is an automobile dealer and a "motor vehicle dealer" as defined in Florida Statutes § 320.60(11)(a).  Napleton's South Orlando's primary place of business is located at 1460 East Osceola Parkway, Kissimmee, Florida 34744.

30.     Plaintiff Napleton's Mid Rivers is a corporation existing under the laws of the State of Illinois and is authorized to do business in the State of Illinois and the State of Missouri. Napleton's Mid Rivers is an automobile dealer and a "franchisee" of "motor vehicles" as those terms are defined under MO. Rev. Stat. § 407.815.  Napleton's Mid Rivers' primary place of business is located at 4951 Veterans Memorial Parkway, Saint Peters, Missouri 63376.

31.     Plaintiff Napleton's Ellwood City is a corporation existing under the laws of the State of Illinois and is authorized to do business in the State of Illinois and State of Pennsylvania. Napleton's Ellwood City is an automobile dealer and a "new vehicle dealer" as that term is defined under 63 P.S. § 8182.  Napleton's Ellwood City's primary place of business is located at 1000 Lawrence Avenue, Ellwood City, Pennsylvania 16117.

32.     Plaintiffs are each franchised Chrysler, Dodge, Jeep, and Ram Truck ("CDJR") dealers engaged in, among other things, the business of purchasing vehicles from Defendant FCA and reselling those vehicles primarily to retail purchasers located in various markets in Northern

Illinois (for Napleton's Arlington Heights and Napleton's River Oaks); Palm Beach County, Florida (for Napleton's Northlake); the greater Orlando, Florida area (for Napleton's Clermont and Napleton's South Orlando); the greater St. Louis, Missouri area (for Napleton's Mid Rivers); and the greater Pittsburgh, Pennsylvania area (for Napleton's Ellwood City). Plaintiffs also sell vehicles to residents of other states at retail. Plaintiffs operate their businesses under the terms of the written agreements with FCA referenced above, each known as Dealer Sales and Service Agreements ("Franchise Agreements"). Each of the Franchise Agreements is a "franchise" as that term is defined under 15 U.S.C. § 1221(b).

33.     Defendant FCA is a limited liability company organized and existing under the laws of the State of Delaware, and is wholly owned by holding company Fiat Chrysler Automobiles N.V., a Dutch corporation headquartered in London, United Kingdom. FCA is doing business in the Northern District of Illinois and elsewhere. FCA's principal place of business and headquarters is in Auburn Hills, Michigan.

34.     FCA (commonly referred to as Chrysler) is a motor vehicle "Manufacturer" and a licensed "Distributor" of new, previously untitled Chrysler, Dodge, Jeep, and Ram brand motor vehicles (hereinafter referred to as "vehicles") as defined in 815 ILCS § 710/2(k) and Florida Statutes § 320.60(8). FCA's Chrysler brand is one of the "Big Three" American automobile brands. FCA engages in commerce by distributing and selling new and unused passenger cars and motor vehicles under its Chrysler, Dodge, Jeep, and Ram brands. Other major divisions of FCA include Mopar, its automotive parts and accessories division, and SRT, its performance automobile division. As of 2015, FCA is the seventh largest automaker in the world by unit production.

35.     FCA's business operations in the United States include the manufacture, distribution, and sale of motor vehicles and parts through its network of independent, franchised motor vehicle dealers.  FCA is engaged in interstate commerce in that it sells vehicles through this network located in every state of the United States.

36.     Defendant FCA Realty, LLC (hereinafter "FCAR")—formerly known as Chrysler Group Realty Company LLC—is a limited liability company organized and existing under the laws of the State of Delaware which has at all material times conducted business in the Northern District of Illinois.  FCAR's principal place of business is in Auburn Hills, Michigan.

37.     FCAR's business operations in the United States include the purchase, sale, and leasing of real property.  FCAR is engaged in interstate commerce through its purchase, sale, and lease of real property throughout the United States.  FCAR also holds options for ownership and lease on the physical locations of its FCA's dealers throughout the United States.  These options for lease or purchase are triggered by events such a dealer's operation of non-FCA line-make facilities, and are employed as a mechanism to circumvent applicable Federal and State law which prohibit such restrictions on dealers.

### III.     JURISDICTION AND VENUE

38.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1332.  There is also complete diversity of citizenship in this case because each Defendant is a citizen of different states from those states of Plaintiffs, and the amount in controversy exceeds the sum of $75,000.  28 U.S.C. § 1332.  This Court also has supplemental jurisdiction over the state-law claims because those claims are integrally related to the federal claims and form part of the same case and controversy under 28 U.S.C. § 1367.

39.     This Court has personal jurisdiction over Defendants FCA and FCAR by virtue of their transacting and doing business in this district and because Defendants FCA and FCAR are

registered to do business in Illinois. FCA and FCAR have transacted and done business in the State of Illinois and in this district and have engaged in statutory violations and common law tortious conduct in Illinois and in this district.

40.     Venue is proper pursuant to 28 U.S.C. § 1391(a) and (b) because a substantial part of the events or omissions giving rise to the claims occurred in this district. Venue is proper pursuant to 18 U.S.C. § 1965(a) and (b) because Defendants transact affairs in this district, and the ends of justice require it. Venue is also proper in this district under 28 U.S.C. §1391(b)(1) because Defendants FCA and FCAR reside in this judicial district for venue purposes.

## IV.     FACTS RELATING TO INTERSTATE COMMERCE

41.     FCA manufactures the vehicles sold to Plaintiffs in various locations throughout the United States.

42.     Some or all of the vehicles that Plaintiffs purchased from FCA cross state lines between the time of their manufacture and their delivery to Plaintiffs in the markets in which Plaintiffs compete.

43.     FCA also sells vehicles to other Chrysler, Dodge, Jeep, Ram ("CDJR") dealers, including other CDJR dealers located in the markets in which Plaintiffs compete ("Competing Dealers").

44.     Some or all of the vehicles that FCA sells to Competing Dealers also cross state lines between the time of their manufacture and their delivery to Competing Dealers.

45.     FCA's principal source of revenue is derived from the sale of new motor vehicles in the United States that comes from its network of independent franchised dealers (including Plaintiffs), which purchase new motor vehicles from FCA and resell them to the public.

## V.  GENERAL ALLEGATIONS

### A.  Mail and Wire Fraud

#### 1.  Scheme One: FCA's Scheme to Defraud Dealers and the Public by Reporting Fictitious Motor Vehicle Sales.

46.     FCA has created zones, or territories, to deal directly with its dealers, and has established a network of business centers ("Business Centers") responsible for each dealer zone or territory. Each Business Center, headed by an individual commonly referred to as a Business Center Director, is, in turn, comprised of districts (known as "Sales Localities"), which are the responsibility of Area Sales Managers.

47.     Beginning no later than 2013, and continuing until at least the beginning of 2016 (and, as far as Plaintiffs know, the present), FCA and its agents have actively devised and executed a scheme to falsely inflate the reported retail sales of FCA vehicles. As part of this scheme, FCA has solicited and encouraged Conspiring Dealers to falsely report and to inflate motor vehicle sales. FCA, through its employees, executed this scheme by causing Conspiring Dealers to create false New Vehicle Delivery Reports ("NVDRs") and transmit such false NVDRs to FCA over an Internet system known as DealerConnect.

48.     To induce the Conspiring Dealers to participate in the scheme, FCA has provided, and as far as Plaintiffs know continues to provide, incentives and subsidies to which those Conspiring Dealers would not otherwise be entitled. Based upon FCA's own internal documents, these Conspiring Dealers are located nationwide, including but not limited to the Mid Atlantic, Midwest, Southeast, Southwest, and Denver business centers.

49.     As part of the scheme, FCA also rewards dealers for "turn-and-earn" through the allocation process. "Turn-and-earn" rewards dealers who have a low "days' supply" of popular vehicles, which is calculated by comparing the NVDRs submitted by a dealer for a particular

model to the number of vehicles of those models remaining in inventory. If a dealer reports an NVDR for a popular vehicle, it will tell FCA's allocation system that the vehicle was sold and is now unavailable, which lowers the dealer's "days' supply." In other words, FCA will reward a dealer who reports sales of a particular model vehicle with more of that same model. As a result, Conspiring Dealers understand that, in order to maximize their competitive edge, it behooves them to transmit false NVDRs for FCA's most desirable models. Such false reports, in turn, increase the allocation and inclusion of FCA's models in highest demand in the inventory of the Conspiring Dealers at the expense of Non-Conspiring Dealers.

50.     Because a false NVDR reports a vehicle as sold and unavailable when there is, in fact, no contract for sale and the vehicle *is* available, a Conspiring Dealer that submits a false NVDR is rewarded with an artificially low "days' supply." Under FCA's "turn-and-earn" policy, Conspiring Dealers were thus repeatedly granted higher priorities for hot-selling cars when FCA induced them to submit false NVDRs of popular vehicles. Indeed, FCA regularly instructed dealers to submit false NVDRs for popular vehicles (such as Jeep Wranglers) for the very reason that it would improve the Conspiring Dealers' allocations of those same popular vehicles. Importantly, false NVDRs in states where Plaintiffs do not compete would also directly impair allocations of vehicles to Plaintiffs. Conspiring Dealers in the Southwest Business Center, for example, were directly able to jump ahead of Plaintiffs (located in the Midwest, Mid-Atlantic, or Southeast Business Centers) in the queue for vehicles that were allocated on a national basis, due to their participation in the false NVDR scheme.

51.     FCA has exclusive access to facts that would demonstrate the full extent of its scheme to falsify NVDRs, and how many Conspiring Dealers participated in the false sales reporting scheme. FCA also is in the best position to identify all those Conspiring Dealers who

have reported such fictitious motor vehicle sales. Nonetheless, Plaintiffs have learned the following facts to date proving the existence of this scheme:

a.　　On June 1, 2015, an FCA employee and Area Sales Manager for portions of northern Illinois, made a request to a manager of Napleton's River Oaks to falsely report twenty-three (23) vehicles in return for the payment of $15,000 by FCA to Napleton's River Oaks;

b.　　An FCA employee and Area Sales Manager for portions of northern Illinois confirmed in a conversation with a manager of Napleton's River Oaks on June 1, 2015, that the FCA Business Center Director for the Midwest Region had asked his Area Sales Managers to request certain classes of dealers in their respective areas -- those in good standing with FCA and who exceeded their target sales numbers (established by FCA's Volume Growth Program) -- to submit false NVDRs in return for the payment of incentives by FCA to the dealers submitting such false NVDRs;

c.　　On June 30, 2015, the FCA Business Center Director for the Midwest Region and an FCA Area Sales Manager requested that the manager of Napleton's River Oaks submit forty (40) false NVDRs at Napleton's River Oaks in exchange for the payment of $20,000 in incentives by FCA to the dealer. The same Business Center Director thereafter repeated the same offer over the telephone to the Dealer-Principal of the Napleton Dealership Group (the "Napleton Dealer-Principal");

d.　　Plaintiffs have learned from an executive at Sherman Dodge, a CDJR dealer in suburban Chicago, that in June 2015, FCA requested Sherman Dodge to submit eighty-five (85) false NVDRs in exchange for the payment by FCA of substantial incentives, and that

Sherman Dodge did in fact report false NVDRs and received incentives from FCA in return;

e.      In June 2015, a source who is an executive of Northwestern Chrysler Jeep Dodge Ram ("Northwestern") -- another CDJR dealership in suburban Chicago unaffiliated with Plaintiffs -- similarly confirmed that FCA had requested Northwestern to submit false NVDRs in return for the payment of incentives by FCA to the dealer, and that Northwestern did in fact report false NVDRs pursuant to an agreement that FCA would provide those incentives to Northwestern;

f.      In July 2015, a source who is a former manager at FCA confirmed with his contacts within FCA that Business Center Directors and other FCA employees in several regions were heavily engaged in the tactic of requesting dealers to submit false NVDRs in return for the payment of incentives by FCA to the dealers;

g.      On or about November 30, 2015, an FCA sales manager for the Orlando, Florida area placed a telephone call to a manager of various CDJR dealerships affiliated with Plaintiffs located in Florida, Georgia, and Pennsylvania, and, during the call, the FCA manager asked the CDJR manager to submit false NVDRs in exchange for co-op money or an allocation of vehicles high in demand by consumers; and

h.      On or about November 30, 2015, an FCA sales representative from the Mid Atlantic Business Center placed a telephone call to the general manager of Napleton's Ellwood City.  On the call, the FCA representative stated FCA was short on sales of units that month, that a directive from FCA had been handed down that "everyone needed to do their part," and that the representative wanted to do his part.  The FCA representative then requested that Napleton's Ellwood City report three (3) or four (4) new vehicles as sold,

and then back these sales out a day or two later, offering to help Ellwood City with the backing-out process. The Napleton's Ellwood City general manager, however, refused to report vehicles as sold that were not actually sold, and refused again when the FCA representative called a second time that night to repeat the request.

i.      FCA employees asked Mancari's CDJR to post false sales on at least two occasions, June 1, 2015 and June 30, 2015, and Mancari's CDJR complied with those requests.

j.      South Oak Dodge, Inc. was asked by FCA employees to post false NVDRs on July 1, 2013; July 31, 2013; September 30, 2013; October 31, 2013; April 30, 2015; June 1, 2015; and June 30, 2015. In response to a subpoena requesting all evidence of payments received in exchange for submitting false sales, South Oak Dodge produced invoices that were transmitted by FCA dated May 21, 2015 ($15,000), June 24, 2015 ($11,000), July 3, 2015 ($16,000), and July 29, 2015 ($18,000) — payments totaling $60,000 in a roughly two month span. Each of these payments were made under account #0774, the account FCA internal investigators and employees identified as the artifice through which FCA paid cash incentives to Conspiring Dealers. FCA_NAPLETON_00037504; FCA_NAPLETON_00037519.

k.      Liberty CDJR was asked by FCA employees to post false NVDRs on July 31, 2013 and June 30, 2015, and Liberty did so.

l.      DuPage Dodge Chrysler Jeep, Inc. was asked by FCA employees to post false NVDRs on April 30, 2013; July 1, 2013; September 30, 2013; October 31, 2013; January 2, 2014; July 31, 2014, and October 2014, and DuPage did so.

- 22 -

m.      In March 2015, the Myrtle Beach FCA dealership falsely reported 10-12 Wranglers as sold and then unwound them shortly thereafter.  FCA_NAPLETON_37506-07.

n.      An FCA whistleblower stated that FCA provided cash payments to dealers for reporting cars as "sold", after which FCA would submit invoices to the Southwest Business Center for "marketing" events that never occurred.  The whistleblower identified Clearlake Dodge, Mac Haik, and Northwest Dodge as co-conspirators of FCA in these schemes.

o.      According to FCA internal documents, Robert Weaver of the Southeast Business Center instructed subordinates to approach dealers and "offer them [$5,000] to falsely report 10-15 Wranglers as sold," and that some of the subordinates did so.  FCA managers Weaver and Sean Mirabel referred to this practice as "bribery" and "manufactured business" during phone conferences attended by Business Center Director Carlos Jimenez and approximately 25 sales managers.  The FCA internal documents state that this activity typically occurred on phone conferences.  FCA_NAPLETON_00037549.

p.      According to FCA internal documents, in January 2016, FCA's Southwest Business Center paid each of the following dealers monetary incentives ranging from $1,500 to $10,000 each, which FCA described as "funds [paid] to mark vehicles a 'B' sale": Bergeron CDJ, Blackburn Motor Co., Brown DCJ, Byford CDJR, Ed Payne Motors, North Star DCJ, Mac Haik DCJ, Ray Brandt DCJR, Red River DCJ, Steve Landers CDJR, Sunset CDJ, Texan DCDJR.  (FCA_NAPLETON_00037598, 00037600.)

52.      As part of the scheme, FCA also knowingly endorses and encourages the false reporting of motor vehicle sales by directly rewarding its Area Sales Managers and Business Center Directors with monetary and quarterly bonuses which are directly related to reported

vehicle sales numbers. Upon information and belief, these bonuses resulting from this fraudulently pumped-up vehicle volume are to some lesser extent shared by the entire Business Center, ensuring everyone's cooperation in FCA's enterprise. Indeed, an FCA employee told FCA's internal investigators that "those area managers who are willing to participate in reporting false sales enjoy an unfair advantage over those managers who decline to participate in terms of obtaining better performance reviews, higher sales numbers and higher variable comp payoffs." FCA_NAPLETON_00037520.

53.     Based upon internal investigation documents and other reliable sources of information, FCA's deceptive practices and misconduct have been facilitated and occurred with the full consensus and cooperation of FCA's Vice President of U.S. Sales Operations as well as by certain Business Center Directors, including but not limited to the Directors for FCA's Midwest, Southeast, Mid-Atlantic, Denver, and Southwest Business Centers.

54.     FCA directly benefits from this scheme, as it results in the inflation of the number of monthly sales which, in turn, create the appearance that FCA's performance is better than, in reality, it actually is. These false and misleading results are reported on a monthly basis to the public at large and to the investment community. FCA has every reason to continue to conceal this practice as it would not be helpful for the truth to come to light at the same time as FCA may be pursuing mergers and other business opportunities.

55.     FCA's scheme to falsely report sales was discovered by the Napleton Dealer-Principal only when an FCA Business Center Director placed a telephone call to him to directly offer him $20,000.00 and extra allocations of high-demand vehicles in exchange for falsely reporting forty (40) new vehicle sales at Napleton's River Oaks. The FCA Business Center Director indicated that these monies would reach the accounts of Napleton's River Oaks as a credit

under the guise of being co-op payments or advertising support monies. FCA's Business Center Director told the Napleton Dealer-Principal that there would be "no harm, no foul" with regard to this scheme because FCA would later back the sales out before they triggered the warranties on these vehicles. FCA's Business Center Director confirmed that FCA would not provide these monies or extra vehicles to Napleton's River Oaks unless Napleton's River Oaks falsely reported the sales.

56.     The Napleton Dealer-Principal immediately rejected this improper offer, telling FCA's Business Center Director that his businesses would not get involved in falsely reporting sales. The Napleton Dealer-Principal subsequently notified FCA in August 2015 that (i) it was his opinion that FCA's actions appeared improper if not outright illegal; and (ii) Plaintiffs and their affiliates were not willing to participate in FCA's scheme. He further warned, requested, and admonished FCA to refrain from this practice in the future.

57.     Despite these admonitions in August 2015, FCA continued to solicit Plaintiffs, as well as affiliated dealers, to continue to report false NVDRs. The Napleton Dealer-Principal made FCA aware of these instances in August 2015, but the practice continued.

58.     Based upon FCA internal investigation documents and other reliable sources of information, including the FCA Business Center Director's illegal offer to the Napleton Dealer-Principal via telephone, it was part of FCA's scheme for FCA to allow its dealers to disavow these false sales (by "backing-out" the NVDRs) after the fact even though they had already been reported and recorded by FCA as sales.

59.     FCA furthered its scheme to falsely report and inflate sales by soliciting and causing Conspiring Dealers to report false NVDRs at month's end, a contrivance reflecting FCA's intent to conceal the scheme. By waiting until month's end to solicit falsified sales, Business

Center Directors could calculate the gap between their bonus target sales and the legitimate sales reported for the month, and then fill the gap by causing Conspiring Dealers to falsify that precise number of sales. This timing of the false reports thereby facilitated the payment of bonuses to the Business Center Directors.

60.     The end-of-month timing also facilitated execution of the scheme, as any given falsely reported sale for a particular month could then be backed out or unwound on the first of the following month — purportedly before the factory warranty on the vehicles could be processed and start to run. Conspiring Dealers also were able to unwind false sales reports after the date FCA executed its availability snapshots, which enabled the Conspiring Dealers to report an artificially low days' supply and achieve high priority in FCA's allocation system, ahead of Plaintiffs. In this manner, FCA engineered a plan to both reward and avoid adversely affecting the Conspiring Dealers, who, under normal circumstances, would be unable to sell these vehicles to an actual retail customer without a full factory warranty in place. By permitting the Conspiring Dealers to unwind the false NVDR sales, FCA enabled Conspiring Dealers to count those vehicles as "unavailable" for purposes of improving their chances of obtaining a limited supply vehicle, while in fact those vehicles remained in the inventory of the Conspiring Dealer to be later sold to a retail customer with the period of the full warranty remaining completely intact.

61.     It was further part of the scheme that, by making payments in the form of co-op advertising or advertising support, FCA assisted the Conspiring Dealers in evading audits that could expose the scheme. In some instances, FCA instructed dealers to generate false explanations for the payments to evade detection. FCA_NAPLETON_00037507. In other instances, FCA made payments through an account normally used for credits for parts purchases (#0774) to avoid detection. FCA_NAPLETON_00037519.

62.     FCA and the Conspiring Dealers intended and knew that Non-Conspiring Dealers would be harmed and directly injured by the scheme, resulting in the creation of a *de facto* multiple-tiered pricing system, in which Non-Conspiring Dealers pay significantly more for the motor vehicles that FCA supplies to them than do the Conspiring Dealers. Indeed, FCA's own employees stated to internal investigators that Conspiring Dealers hold an "unfair competitive edge" over those dealers that did not participate. FCA_NAPLETON_00037507.

63.     As a result of the cost discrepancy among FCA's dealers, FCA and the Conspiring Dealers directly injured and continued to directly injure Plaintiffs, which are Non-Conspiring Dealers and are unable to receive the same financial benefits as the Conspiring Dealers. The conspiracy diverted sales from Plaintiffs to the Conspiring Dealers, resulting in lower sales than Plaintiffs would have been able to obtain but for FCA's conduct.

64.     In furtherance of its scheme to defraud, FCA's practices in this regard are carefully designed to encourage and to coerce dealers to report false sales through the NVDR system in order to stay competitive and to have an "unfair competitive edge" over Non-Conspiring Dealers.

65.     For the purpose of executing the scheme to defraud, FCA's Business Center Directors have conspired to facilitate the false reporting of new motor vehicle sales through the submission of fraudulent NVDRs.

66.     At all relevant times, FCA was aware of the false NVDR scheme and has routinely attempted to avoid its detection by disguising the increased incentive payments to the Conspiring Dealers as items such as co-op, advertising support monies, or payments under parts account #0774, among other accounts that Plaintiffs may learn about through discovery.

### 2. Scheme Two: Separate Scheme to Defraud Plaintiffs by Impairing Their Businesses and Depriving Them of Monies.

67. Beginning no later than 2013, and continuing into the present, FCA and its agents have devised and executed a scheme to induce Plaintiffs to invest substantially in their dealership facilities and property, to conceal and affirmatively misrepresent the profitability of dealerships acquired after 2013, and to set Plaintiffs' Minimum Sales Responsibility baseline at unrealistic and unachievable levels based upon FCA's deceit and fraudulent manipulation of market sales data. FCA and its agents perpetrated the scheme by deceiving Plaintiffs about the existence of its false sales reporting scheme and threatening to terminate Plaintiffs' dealership agreements based upon skewed data and inaccurate assessments of Plaintiffs' performance against the Minimum Sales Responsibility baselines set by FCA.

68. Apart and aside from the conduct described in Scheme One, FCA's pattern of misconduct towards Plaintiffs has been one of deceit and threats of termination having nothing to do with the actual performance of Plaintiffs.

69. All dealers are required to enter into a Franchise Agreement with FCA to become one of its franchised dealerships. The Franchise Agreements contain standardized terms which are non-negotiable. Among the responsibilities undertaken by Plaintiffs is to use their best efforts to promote and retail FCA vehicle lines. FCA purports to monitor its dealers' sales performance by using a proprietary metric which it refers to as Minimum Sales Responsibility, or MSR, which, generally, is the minimum number of sales FCA asserts its dealerships should have achieved. FCA calculates Minimum Sales Responsibility by determining the number of new vehicle registrations for FCA's vehicle lines in the geographical market area established by FCA (referred to under the Franchise Agreements as "CC Sales Zones"), and then computing the number of retail sales FCA deems necessary for those vehicle lines to purportedly achieve statewide market share.

70.     Just as is the case generally with the Franchise Agreements, the boundaries of the CC Sales Zone are established by FCA in its sole discretion. The promises and commitments by FCA to consider input into the configuration of the CC Sales Zone as to Plaintiffs in particular, were, and have otherwise proven to be, completely illusory, as it has not allowed or permitted Plaintiffs to provide input into the determination of their CC Sales Zones.

71.     In one particular example, beginning in or about 2013, Plaintiff Napleton's Arlington Heights invested approximately $18,000,000.00 in the land and the new dealership facility currently being operated by its dealership in Arlington Heights, Illinois based, in large part, upon FCA's material representations that Plaintiff would have meaningful input with regard to FCA's definition of its applicable market and the establishment of a reasonable Minimum Sales Responsibility baseline for the dealership.

72.     Moreover, in or around 2013, the Napleton Dealer-Principal and FCA's Market Representative Manager conducted an in-person meeting in Illinois regarding Plaintiff's investment. At that meeting, FCA falsely represented that Napleton's Arlington Heights would have direct and meaningful input into the determination of the size and configuration of its CC Sales Zone, which would in turn significantly impact Napleton's Arlington Heights' Minimum Sales Responsibility. In particular, FCA's Market Representative Manager represented that FCA would share certain demographic data and analysis, such as "market bursts," with the Napleton Dealer-Principal and Napleton's Arlington Heights, which information would supposedly play a prominent role in determining Napleton's Arlington Heights' market. At all relevant times, FCA's Market Representative Manager knew that his material representations to the Napleton Dealer-Principal were false and inaccurate.

73.     Contrary to FCA's material representations and promises, FCA never provided any such data or analysis to Napleton's Arlington Heights, and never allowed Napleton's Arlington Heights to participate in or comment on FCA's determination of its CC Sales Zone.

74.     FCA's concealment and deceit in the determination of Napleton's Arlington Heights' CC Sales Zone resulted in the creation and designation of an illogical, arbitrary, and unfair market area, which has existed and been perpetuated ever since.

75.     The loss in revenue and profits to Napleton's Arlington Heights, caused by FCA's arbitrary and misleading determination of its market area, was exacerbated when FCA permitted a competing dealer, Fields Chrysler Jeep Dodge Ram, to relocate into what logically should have been Plaintiff's market area (hereinafter referred to as the "Fields Relocation").

76.     The Fields Relocation occurred after Napleton's Arlington Heights had constructed its new facility in Arlington Heights, Illinois. FCA represented to Plaintiffs that Napleton's Arlington Heights would have direct and meaningful input into the determination of the size and configuration of its "CC Sales Zone" in light of the Fields Relocation, but FCA also knew those statements were false at the time they were made.

77.     Beginning no later than 2013, and likely earlier, FCA has also deceptively and misleadingly assessed Plaintiffs' sales performance, *i.e.*, the percentage of the Minimum Sales Responsibility set by FCA that Plaintiffs achieved at a given time. As part of this scheme to defraud, FCA has used its deceptive methodology to set unrealistic and unachievable Minimum Sales Responsibility baselines for Plaintiffs in order to directly control and intimidate Plaintiffs to bow to FCA's will under the constant threat of the termination of their dealerships, based upon false and misleading allegations that Plaintiffs are not abiding by their Franchise Agreements.

78.     FCA has exclusive knowledge of the full extent of their deceptive practices with respect to determining Plaintiffs' Minimum Sales Responsibility baselines.     Plaintiffs have independently learned, however, that as part of this scheme, FCA compared Plaintiffs' sales of FCA's non-luxury sport utility vehicle models against not only other manufacturers' non-luxury models but also against premium brand "SUVs" or sport utility vehicles.  In doing so, FCA included luxury brands such as Lexus, Land Rover, BMW, and Mercedes Benz ("Luxury Brands") in its analysis in order to artificially inflate the size of the market, thereby driving down its dealers' market shares, and elevating the difficulty in achieving the Minimum Sales Responsibility set by FCA for each Plaintiff.

79.     FCA's arbitrary and deceptive conduct described above was intended to, and did in fact, further taint and inflate Plaintiffs' Minimum Sales Responsibility baselines, as each of the Plaintiffs operates in a market with a large Luxury Brand presence.

80.     As part of this scheme, FCA used third-party information vendors, such as J.D. Power and an entity commonly known as Urban Science, to provide market data under the pretense that FCA allows third parties to provide FCA with the statistical sales data, while FCA and its agents knew full well that these third parties routinely manipulate and skew that data. Notwithstanding their allied interests, the situation was so egregious that even Urban Science felt compelled to notify FCA that the inclusion of the Luxury Brands in FCA's Minimum Sales Responsibility analysis was skewing their metrics in a manner so as to put FCA's own dealers at an apparent disadvantage.  FCA intentionally ignored this notification from Urban Science, and continued to use this faulty data to impose pressure on Plaintiffs.

81.     By way of example, the Jeep Grand Cherokee SUV is sold in high volume by FCA dealers, typically generating the largest volume of sales for a typical Chrysler Dodge Jeep Ram

dealer. FCA is well aware that any data analysis that negatively affects Plaintiffs' apparent respective market shares in the Jeep Grand Cherokee market segment will have a significant effect on Plaintiffs' apparent performance against the Minimum Sales Responsibility targets set by FCA.

82.     Moreover, the negative impact of FCA's conduct is particularly acute in the large metropolitan areas — such as Chicago, St. Louis, Pittsburgh, Orlando, and Palm Beach, where Plaintiffs' dealerships operate — where there is a larger presence of Luxury Brand SUVs. Consequently, the market share for FCA's Jeep Grand Cherokee SUV is higher for almost every dealer outside of large metropolitan areas because the luxury segment is not as large and influential in such non-metropolitan markets. FCA knew and intended that its manipulation would result in a Minimum Sales Responsibility baseline for Jeep Grand Cherokee sales that would be virtually unattainable for large metropolitan dealers, like Plaintiffs. FCA is well aware that its Minimum Sales Responsibility methodology is flawed and misleading, and thus that the Minimum Sales Responsibility baseline it asserts each Plaintiff must meet is flawed and misleading, and further that this works to the competitive disadvantage of a large number of FCA's large metropolitan dealers, including Plaintiffs.

83.     Based upon a source of information, Urban Science notified FCA of the foregoing flaws in FCA's Minimum Sales Responsibility methodology. Although it would have been quite easy for FCA to correct this statistical flaw by simply eliminating the Luxury Brand vehicles from their determination of Minimum Sales Responsibility, FCA continued to calculate Plaintiffs' Minimum Sales Responsibility in the same irrational, misleading, and deceptive manner, thereby enabling FCA to engage in this intimidating and coercive conduct by continually threatening Plaintiffs with termination.

84.     As a direct result of FCA's willful and intentional scheme to defraud Plaintiffs by imposing unattainable Minimum Sales Responsibility baselines upon them, Plaintiffs lost substantial amounts of sales revenue and profits, among other injuries including but not limited to lost goodwill and business value.

85.     In furtherance of this scheme to defraud Plaintiffs, FCA sent communications by mail and wire transmissions on numerous occasions as early as 2013 and continuing to at least the beginning of 2016, including notice of default letters sent to Plaintiffs from time to time throughout these years, and communications setting forth Plaintiffs' Minimum Sales Responsibility baselines.

86.     All of the facts supporting the exact dates and times of the wire, mail, and electronic communications are not accessible to Plaintiffs, but they are accessible to FCA.

**B.      Defendants Engaged in Price Discrimination.**

**1.      Facts Relating to Price Differences Caused by False NVDRs.**

87.     When Plaintiffs purchase a vehicle from FCA, they pay FCA an invoice price for the vehicle that is the same as the invoice price that FCA charges to every other CDJR dealer for a vehicle of like grade and quality.

88.     The incentives and subsidies paid each month to Conspiring Dealers in the markets in which Plaintiffs compete created a price difference per vehicle sold each month to the Conspiring Dealers as compared to the prices of vehicles contemporaneously sold to Plaintiffs of like grade and quality.  Such price reduction was not functionally available to Plaintiffs because Plaintiffs are not involved in the fraudulent and illegal scheme for the ever higher and escalating levels of false NVDRs being offered by FCA through its Business Center Directors to Conspiring Dealers.

89.     The incentives and subsidies paid to Conspiring Dealers in the markets in which Plaintiffs compete who submit false NVDRs amount to more than $800 in incentives and subsidies for each vehicle sold each month, and reached upwards of $3,300 per vehicle.

**2.      Facts Relating to Price Differences Created by Volume Growth Program.**

90.     FCA has and continues to engage in a practice wherein it provides incentives to its dealers.  One of these programs is commonly referred to as the Volume Growth Program or "VGP."  Dealers can receive the benefits of the Volume Growth Program by achieving a target arbitrarily established by FCA for a specific number of sales.  The Volume Growth Program targets vary from dealership to dealership.

91.     Upon meeting the requirements of the Volume Growth Program, the dealership is provided subsidies on new motor vehicle sales that a dealer who does not meet Volume Growth Program requirements does not enjoy.

92.     The Volume Growth Program, as implemented by FCA, also provides dealers who meet Volume Growth Program requirements with a competitive advantage in pricing its vehicles to the public as compared to dealers that do not meet Volume Growth Program requirements. Such price reduction was not functionally available to Plaintiffs because of FCA's arbitrary and discriminatory application of the Volume Growth Program.

93.     FCA also created an arbitrary and discriminatory program whereby it penalized any dealer who did not, for whatever reason (including, but not limited to, FCA's drawing of flawed CC Sales Zones and inclusion of sales for market segments in which its dealers did not compete), meet Volume Growth Program requirements for a particular month, by increasing the Volume Growth Program target for following months by anywhere from 10% to 20% for those dealers who

did not reach their Volume Growth Program targets (the amount added being referred to herein as the "Clawback Penalty").

94.     The addition of the arbitrary and discriminatory Clawback Penalty, which was used to increase future Volume Growth Program targets, made it virtually impossible for a dealer who had at any time failed to meet Volume Growth Program requirements to do so in the future.

95.     This arbitrary and discriminatory Clawback Penalty, and its consequent effect on the Volume Growth Program targets for dealers who had not met Volume Growth Program requirements, was created to establish a permanent class of dealer who would not likely ever receive Volume Growth Program incentives and subsidies.

96.     The effect of the incentives and subsidies awarded to dealers who had met Volume Growth Program requirements created a net price difference in the prices paid by such dealers as compared to those dealers who were penalized with the Clawback Penalty and were therefore not likely to ever meet Volume Growth Program requirements and receive the incentives and subsidies.

97.     For instance, FCA initially established a Volume Growth Program target for the Napleton's Arlington Heights dealership of eighty (80) units per month.  This was consistent with the projections of Napleton's Arlington Heights' management that, once the facility established itself as a mature facility in the area, it would sell one-hundred (100) vehicles per month.  FCA then arbitrarily increased the Volume Growth Program target for Napleton's Arlington Heights to one-hundred forty (140) vehicles per month.

98.     When Plaintiff Napleton's Arlington Heights was unable to meet this new arbitrarily imposed Volume Growth Program target, FCA arbitrarily and discriminatorily imposed a monthly Clawback Penalty on the subsequent Volume Growth Program targets for Napleton's

Arlington Heights. This Clawback Penalty made it virtually impossible for Napleton's Arlington Heights to ever meet the requirements of the Volume Growth Program.

99.     Napleton's Ellwood City, Napleton's South Orlando, Napleton's Mid Rivers, and Napleton's Northlake were each unable to meet Volume Growth Program requirements at various times in 2015 because of FCA's arbitrary and discriminatory conduct.

100.     FCA's arbitrary and discriminatory imposition of its monthly Clawback Penalty has made it virtually impossible for these dealerships to meet Volume Growth Program requirements.

101.     In furtherance of the establishment of a price differential between dealers who had met Volume Growth Program requirements and those who did not, FCA purposely structured its formula for Volume Growth Program targets so that falsely reported NVDRs would not operate to increase the Volume Growth Program targets for dealers who submitted false NVDRs. In that manner, the Conspiring Dealers were able to continue meeting Volume Growth Program requirements, but they would not be penalized by an ever-increasing Volume Growth Program target that would be based upon their false reporting of NVDRs.

102.     Because of FCA's arbitrary and discriminatory application of the Clawback Penalties, the Volume Growth Program targets for Napleton's Arlington Heights, Napleton's Ellwood City, Napleton's South Orlando, Napleton's Mid Rivers, and Napleton's Northlake increased over time.

103.     The effect of the foregoing price difference between dealers who met Volume Growth Program requirements and Plaintiffs is that the net wholesale prices paid by Competing Dealers who received incentives and subsidies were significantly lower by at least $800 per new vehicle, or more, than the prices paid by Plaintiffs.

### 3. Facts Relating to Injury to Competition Because of Price Discrimination.

104.     Plaintiffs and Competing Dealers in each relevant market sell the vehicles they purchase from FCA in the same form as the vehicles are received from FCA.

105.     In each relevant market, there is considerable resale price competition in the retail sale of vehicles to the public between Plaintiffs and Competing Dealers who receive the incentives and subsidies noted above from FCA not functionally available to Plaintiffs.

106.     In each relevant market, the retail prices at which Plaintiffs and the Competing Dealers sell vehicles are a substantial factor in most retail purchasers' decisions regarding from which dealer they will purchase a vehicle.

107.     In each relevant market, the gross margin of profits obtained by Plaintiffs and Competing Dealers in the resale of vehicles is relatively small.  Gross profits generally average less than 3% of the retail price of the vehicle.  Accordingly, the net wholesale price paid to FCA for each vehicle is an important factor in the competition in the retail sale of vehicles for Plaintiffs and Competing Dealers.

108.     By operation of FCA's conduct, the net wholesale price paid by Plaintiffs to FCA was significantly higher than the net wholesale price paid by the Competing Dealers in each relevant market who received incentives and subsidies from FCA that were and are not functionally available to Plaintiffs.  The result is that Plaintiffs cannot lower their retail prices to offer retail pricing which is competitive with such Competing Dealers without reducing (and perhaps eliminating) Plaintiffs' profits.

109.     These price differences were substantial and occurred over a significant period of time and, therefore, create a presumption of injury to competition.

110.    As a direct result of these price differences, vehicle sales have been siphoned from and diverted away from Plaintiffs and to Competing Dealers who received additional incentives and subsidies from FCA that were and are not functionally available to Plaintiffs.

111.    Such diversion has occurred because Competing Dealers receiving such additional incentives and subsidies were and are able to use the price advantage to lower their prices to levels with which Plaintiffs could not and cannot compete without reducing or even eliminating their profits.

112.    The additional incentives and subsidies paid to Competing Dealers through such co-op advertising and/or advertising support payments are promotions and allowances that were not available to Plaintiffs on proportionally equal terms.

### 4.    Facts Relating to Plaintiffs' Lost Sales and Lost Profits Caused by Price Differences.

113.    Since at least January 2015, Plaintiffs unit sales of vehicles have been substantially reduced compared to what they could have achieved if they had received the same incentives and subsidies as Competing Dealers, while the unit sales of vehicles made by those Competing Dealers who submitted false NVDRs and/or those who received Volume Growth Program incentives and subsidies, have substantially increased over what they would have achieved without such incentives and subsidies.

114.    Since January 2015, Plaintiffs unit sales of vehicles have been diverted to Competing Dealers who received incentives and subsidies not functionally available to Plaintiffs. This diversion has occurred as a direct result of the wholesale price differences between Plaintiffs and such Competing Dealers, and the resulting price advantage over Plaintiffs enjoyed by Competing Dealers who submitted false NVDRs and/or who subsequently obtained Volume Growth Program incentives and subsidies not functionally available to Plaintiffs.

- 38 -

## COUNT I

### (Violation of the Automobile Dealers Day in Court Act – 15 U.S.C. § 1221)

### Brought by All Plaintiffs against FCA

115.     Plaintiffs re-affirm, re-allege, and incorporate each allegation and averment in the preceding and succeeding paragraphs as though fully set forth herein.

116.     Each of the Plaintiffs is an automobile dealer protected under the Automobile Dealer's Day in Court Act ("ADDCA"), 15 U.S.C. § 1221, *et seq.*

117.     Defendant FCA is an "automobile manufacturer" engaged in interstate commerce, as that term is defined under the ADDCA.

118.     A manufacturer-dealer relationship is embodied in each of the separate Franchise Agreements that FCA entered into with each of the Plaintiffs.

119.     The Federal Automobile Dealer's Day in Court Act, 15 U.S.C. § 1221 *et seq.*, provides a cause of action for automobile dealers against automobile manufacturers that fail "to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer." 15 U.S.C. § 1222.

120.     Pursuant to 15 U.S.C. § 1221(e), the term "good faith" is defined as "the duty of each party to any franchise, and all officers, employees, or agents thereof to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party: *Provided*, That recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith."

121.     FCA failed to act in good faith in performing the terms of its Franchise Agreements with Plaintiffs.  As noted above, FCA uses its substantial economic leverage to impose terms upon

Plaintiffs in their respective Franchise Agreements. Nonetheless, a critical protection in these Franchise Agreements is the freedom from termination on the basis of sales performance unless FCA can prove that a given dealership fell short of its Minimum Sales Responsibility after providing the dealership an opportunity to cure a purported default. FCA has eviscerated and actively circumvented this protection, rendering it meaningless through actions that fall far short of acting fairly and equitably toward Plaintiffs, and guaranteeing them freedom from coercion, intimidation, or threats of coercion or intimidation from FCA.

122.     Rather, FCA has (i) arbitrarily applied the Volume Growth Program to create incentives and subsidies available to certain dealers but not to Plaintiffs; (ii) arbitrarily and deceptively calculated the components of its Minimum Sales Responsibility metric to raise baseline sales performance for Plaintiffs to unachievable levels; (iii) conspired with other dealers to engage in a sustained pattern of falsely reporting sales; (iv) discriminated in price in favor of Conspiring Dealers; and (v) actually deprived Plaintiffs of cost subsidies and vehicle allocations afforded to the Conspiring Dealers. Combined with its practice of repeatedly harassing Plaintiffs with threats of termination, FCA's conduct is all designed to intimidate Plaintiffs, threaten Plaintiffs' franchises, and drive them out of business.

123.     Indeed, FCA has regularly threatened Plaintiffs' businesses on the pretext of letters of default alleging that Plaintiffs have fallen short of their Minimum Sales Responsibility baselines. Despite Plaintiffs' lawsuit again alerting FCA to its unfair, discriminatory, and arbitrary practices that have prevented Plaintiffs from fairly competing within their respective markets, FCA again sent a notice of default to Plaintiffs in a letter from FCA dated January 30, 2016. In the letter, FCA notes it is "imperative" that Plaintiffs address what it calls "performance deficiencies." Perhaps recognizing the questionable timing of the letter in light of Plaintiffs' pending lawsuit,

FCA concluded its letter by stating "any claim by you that this follow-up letter somehow amounts to 'retaliation' for your lawsuit would not be credible."

124.     FCA's letters of default expose the coercive, intimidating, and inequitable nature of its business dealings with Plaintiffs. FCA regularly sent and continues to send Plaintiffs default letters threatening termination on the basis of sales volume, emphasizing that it can exercise termination at any time, and purporting to grant Plaintiffs short extensions during which FCA will closely "monitor" Plaintiffs' performance to align with FCA's objectives. FCA's recent correspondence purports to group the performance of several dealerships affiliated with Plaintiffs together, a tactic that has had the effect of intimidating and threatening all of Plaintiffs' dealerships at once. Meanwhile, FCA adopted underhanded, arbitrary, and fraudulent practices against each of the Plaintiffs — in many cases in favor of their direct competition — that together virtually ensure Plaintiffs will remain in a perpetual state of purported default, threatening the very existence of Plaintiffs' businesses.

125.     Defendant FCA's actions violate the express prohibitions set forth in 15 U.S.C. § 1221, *et seq.*

126.     As a direct result of FCA's bad faith and improper conduct, Plaintiffs have suffered substantial monetary and other damages including, but not limited to, lost retail sales of vehicles and related finance and insurance products, lost profits from vehicle sales, lost profits from the resale of used vehicles which would have been taken in trade on the lost vehicle sales, lost customer goodwill, lost market value as going concerns, lost marketing monies, lost potential future sales of vehicles to repeat customers, and lost profits from warranty and non-warranty sales of service and parts for vehicle owners who tend to have their vehicles serviced at the same

dealership where they were purchased. In addition, Plaintiffs have incurred substantial investigative fees, legal fees, and litigation expenses in an amount to be determined.

WHEREFORE, Plaintiffs demand entry of a judgment against FCA for treble damages, injunctive relief, costs of suit including reasonable attorneys' fees, and such other relief as this Court deems just and equitable.

## COUNT II

### (Violation of Section 2(a) of the Robinson-Patman Act – 15 U.S.C. § 13(a))

### Brought by All Plaintiffs against FCA

127.    Plaintiffs re-affirm, re-allege, and incorporate each allegation and averment in the preceding and succeeding paragraphs as though fully set forth herein.

128.    At all relevant times to this action, Plaintiffs and FCA were, and are, persons engaged in interstate commerce within the meaning of 15 U.S.C. § 13 of the Robinson-Patman Act in that the vehicles sold to Plaintiffs and to the Competing Dealers in the relevant markets crossed state lines.

129.    The vehicles sold to Plaintiffs and the Competing Dealers in each relevant market were of like grade and quality.

130.    FCA discriminated in price between Plaintiffs and Competing Dealers in each relevant market who received incentives and subsidies not functionally available to Plaintiffs. Such discrimination in price was for products of like grade and quality.

131.    The effect of the foregoing price discrimination was to injure, destroy, and prevent competition to the advantage of the Competing Dealers in each relevant market who received incentives and subsidies not functionally available to Plaintiffs.

132.     The incentives and subsidies paid to certain Competing Dealers were not functionally available to Plaintiffs.

133.     The foregoing price discrimination violates 15 U.S.C. § 13(a) of the Robinson-Patman Act.

134.     As a direct result of FCA's violation of 15 U.S.C. § 13(a), Plaintiffs have sustained injury to their businesses and property in the form of, among other things, lost retail sales of vehicles and related finance and insurance products, lost profits from vehicle sales, lost profits from the resale of used vehicles which would have been taken in trade on the lost vehicle sales, lost customer goodwill, lost market value as going concerns, lost marketing monies, lost potential future sales of vehicles to repeat customers, and lost profits from warranty and non-warranty sales of service and parts for vehicle owners who tend to have their vehicles serviced at the same dealership where they were purchased.   In addition, Plaintiffs have incurred substantial investigative fees, legal fees, and litigation expenses in an amount to be determined.

WHEREFORE, Plaintiffs respectfully request that judgment be entered against Defendant FCA, granting Plaintiffs the following relief:

(a)     This Court adjudge and decree that Defendant FCA has unlawfully breached Section 2(a) of the Robinson-Patman Act, 15 U.S.C. § 13(a);

(b)     Pursuant to 15 U.S.C. § 15(a), treble the damages that are shown to have been sustained by Plaintiffs by reason of Defendant FCA's above-alleged violations, plus interest, costs, and reasonable attorneys' fees; and

(c)     This Court grant Plaintiffs such other further and different relief as the nature of the case may require or as the Court may deem just and proper.

## COUNT III

### (Violation of Section 2(d) of the Robinson-Patman Act – 15 U.S.C. § 13(d))

### Brought by All Plaintiffs against FCA

135.     Plaintiffs re-affirm, re-allege, and incorporate each allegation and averment in the preceding and succeeding paragraphs as though fully set forth herein.

136.     At all relevant times to this action, Plaintiffs and FCA were, and are, persons engaged in interstate commerce within the meaning of 15 U.S.C. § 13 of the Robinson-Patman Act in that the vehicles sold to Plaintiffs and to the Competing Dealers in the relevant markets crossed state lines.

137.     To the extent that FCA was making payments of incentives and subsidies in the form of co-op advertising monies to dealers competing in the relevant markets who submitted false NVDRs, FCA was making payments to competitors of Plaintiffs not on proportionally equal terms in that Plaintiffs refused to engage in the false and illegal scheme to submit false NVDRs.

138.     The payment of the foregoing incentives and subsidies in the form of co-op advertising monies, which payments were not available to Plaintiffs on proportionally equal terms, allowed Competing Dealers in the relevant markets who received such payments to more effectively compete for the retail sales of vehicles than could Plaintiffs in competition with such dealers.

139.     The effect of the foregoing payment of monies not available on proportionally equal terms to Plaintiffs was to injure, destroy, and prevent competition to the advantage of the Competing Dealers in each relevant market.

140.     The foregoing payment of incentives and subsidies, which payments were not available to Plaintiffs on proportionally equal terms, constituted a violation of 15 U.S.C. § 13(d) of the Robinson-Patman Act.

141.     As a direct result of FCA's violation of 15 U.S.C. § 13(d), Plaintiffs have sustained injury to their businesses and property in the form of, among other things, lost retail sales of vehicles and related finance and insurance products, lost profits from vehicle sales, lost profits from the resale of used vehicles which would have been taken in trade on the lost vehicle sales, lost customer goodwill, lost market value as going concerns, lost marketing monies, lost potential future sales of vehicles to repeat customers, and lost profits from warranty and non-warranty sales of service and parts for vehicle owners who tend to have their vehicles serviced at the same dealership where they were purchased.     In addition, Plaintiffs have incurred substantial investigative fees, legal fees, and litigation expenses in an amount to be determined.

WHEREFORE, Plaintiffs respectfully request that judgment be entered against Defendant FCA, granting Plaintiffs the following relief:

(a)     This Court adjudge and decree that Defendant FCA has unlawfully breached Section 2(d) of the Robinson-Patman Act, 15 U.S.C. § 13(d);

(b)     Pursuant to 15 U.S.C. § 15(a), treble the damages that are shown to have been sustained by Plaintiffs by reason of Defendant FCA's above-alleged violations, plus interest, costs, and reasonable attorneys' fees; and

(c)     This Court grant Plaintiffs such other further and different relief as the nature of the case may require or as the Court may deem just and proper.

## COUNT IV

### (Substantive Civil RICO Violation – 18 U.S.C. § 1962)

**Brought by All Plaintiffs against FCA**

A.    **Introduction to Schemes**

142.        Plaintiffs re-affirm, re-allege, and incorporate each allegation and averment in the preceding and succeeding paragraphs as though fully set forth herein.

143.        This is an action for damages based upon FCA's violation of 18 U.S.C. § 1962.

144.        FCA engaged in a pattern of racketeering activity over the course of at least the period 2013 through the beginning of 2016 that, generally, can be summarized as follows: FCA business center employees artificially increased the monthly sales figures reported to the public and to their superiors to meet objectives set by FCA. They did so using two general methods: (1) entering into agreements with certain "trusted" FCA dealers, the Conspiring Dealers, in which the dealers would enter and transmit false NVDRs for which there was no bona fide customer, in exchange for which FCA would provide monies and extra vehicles; and (2) acting in concert with Conspiring Dealers to permit FCA to enter false NVDRs on the dealers' behalf, in exchange for cash payments and favorable treatment in the FCA vehicle allocation system. At all times, the participants in this scheme knew that, in fact, no vehicle sale had occurred. FCA used wires and mail to accomplish this fraudulent scheme, including the transmittal of NVDRs through the Internet, emails and text messages for negotiating and executing fraudulent agreements to enter false NVDRs, and various letters with co-conspirators and whistleblowers (such as Plaintiffs) sent for the purpose of concealing the reason, source, and nature of the payments.

145.        FCA engaged in a pattern of racketeering activity that comprised numerous predicate offenses under 18 U.S.C. § 1961(1). In addition to mail and wire fraud, FCA also engaged in commercial bribery to ensure that false reports would be submitted without interference from honest dealer-principals, used extortion to silence potential whistleblowers, and violated the Travel Act.

### B.    Mail and Wire

146.    At all relevant times, 18 U.S.C. §§ 1341 and 1343 prohibited mail and wire fraud, respectively.  In pertinent part, those statutes provide:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises … for the purpose of executing such scheme or artifice or attempting to do so, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon … any such matter or thing, shall be … [punished according to law].

*        *        *

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be [punished according to law].

147.    In furtherance of the scheme to defraud, FCA and others under its direction or employment used or caused to be used, on numerous occasions, the wires (telephone, fax, email, the FCA DealerConnect system, text messages, and the Internet) in interstate or foreign commerce, in violation of 18 U.S.C. § 1343.  These uses of the wires were continuous over a period of several years and were related to one another and thus constitute a pattern of racketeering.  These uses of the wires in furtherance of the scheme to defraud included numerous wire communications that transmitted fraudulent NVDR reports to FCA beginning no later than in 2013 until at least the beginning of 2016.  In addition to the communications described in paragraph 51 above, at least the following wire communications were made in furtherance of the schemes to defraud:

| Recipient | Sender | Wire | Date |
|---|---|---|---|
| **Alan Siegel (dealer)** | **Ralph Jones (FCA)** | **Telephone** | **Various Dates in 2013-2015** |
| **David Dickens (dealer)** | **David Zachary (FCA)** | **Telephone** | **Various Dates in 2013-2015** |
| **FCA Personnel** | **Steven Gurnsey** | **Email (FCA_NAPLETON_ 00037501)** | **January 2, 2015** |
| **FCA Business Center Directors** | **Jeff Kommor (FCA)** | **Telephone conference (FCA_NAPLETON_ 00037499)** | **January 2, 2015** |
| **Confidential informant (FCA)** | **Scott Hayes (FCA), Joey Johnson (FCA)** | **Telephone conference (FCA_NAPLETON_ 00037499, 00037539)** | **January 2, 2015** |
| **FCA** | **Heritage CDJ, Altman Motor Co., Gildner DCJ** | **Internet (NVDRs) (FCA_NAPLETON_ 000375322)** | **January 2, 2015** |
| **Bergeron CDJ, Blackburn Motor Co., Brown DCJ, Byford CDJR, Ed Payne Motors, North Star DCJ, Mac Haik DCJ, Ray Brandt DCJR, Red River DCJ, Steve Landers CDJR, Sunset CDJ, Texan DCDJR (dealers)** | **FCA** | **Internet (credit Statements ranging from $1,500 to $10,000, which FCA described as "funds [paid] to mark vehicles a 'B' sale") (FCA_NAPLETON_ 00037598, 00037600)** | **January 2, 2015** |
| **FCA** | **Allen Samuels DCJ** | **Internet (NVDRs) (FCA_NAPLETON_ 00037539)** | **January 28, 2015** |
| **FCA Southeast Business Center Director and approximately 25** | **Robert Weaver (FCA), Sean Mirabel (FCA)** | **Telephone conferences (FCA_NAPLETON_ 00037549)** | **March, April, May, and June 2015** |

**FCA sales managers**

| | | | |
|---|---|---|---|
| Scott Hayes, Mike Dragojevic (FCA) | Terry Williams (FCA) | Email (FCA_NAPLETON_ 00037588) | November 2, 2015 |
| Scott Hayes, Joey Johnson (FCA) | Chris Boyer (FCA) | Email (FCA_NAPLETON_ 00037587) | November 2, 2015 |
| FCA | Gulfgate (dealer) | Internet (NVDRs) (FCA_NAPLETON_ 00037585) | On or about November 3, 2015 |
| Blake Helfman (dealer) | Confidential informant (FCA) | Email (FCA_NAPLETON_ 00037562) | November 2, 2015 |
| Scott Hayes and others at FCA, Mack Haik | Confidential informant (FCA) | Email, Internet (FCA_NAPLETON_ 00037560, 37561) | November 2, 2015 |
| FCA | Nancy Lambert (dealer) | Internet (NVDRs) (FCA_NAPLETON_ 00037518) | November 2, 2015 |
| Keating, Killibrew (dealers) | Confidential informant (per direction of Scott Hayes (FCA)) | Emails (FCA_NAPLETON_ 00037520) | November 12, 2015 |

148.     In addition, various FCA employees from at least early 2015 would use the Internet to enter false sales on a dealer's DealerConnect portal, using "T" login codes without making the dealer aware of these transactions. FCA employees in at least one instance pressured an FCA employee with access to these login codes to retire, and then to avoid detection used his login codes to enter false sale NVDRs. FCA_NAPLETON_00037507.

149.     In furtherance of the scheme to defraud, FCA and others under its direction or employment used and caused to be used the U.S. Postal Service and private or commercial carriers in interstate commerce, in violation of 18 U.S.C. §1341, including but not limited to the following:

(a)     On or about August 27, 2015, FCA caused its Office of General Counsel to send a letter to Edward F. Napleton in response to Mr. Napleton's letter of August 14, 2015;

(b)     On or about December 15, 2015, FCA caused one of its lawyers to send a letter to Edward F. Napleton in response to Mr. Napleton's letter of December 4, 2015.

(NAP_0065470)

150.    The FCA Office of General Counsel knew that the statements made in the foregoing letters were false at the time they were made.

151.    All of the facts supporting the exact dates and times of other wire, mail, and electronic communications are not accessible to Plaintiffs, but are accessible to FCA.

**C.     Bribery.**

152.    On July 21, 2015, FCA confirmed that its sales operations managers and other sales directors paid dealers (by cash incentives and popular vehicle allocations) to falsely report vehicle sales. Furthermore, in the course of telephone conferences, those FCA operations managers and directors often referred to their conduct as "bribery." FCA_NAPLETON_00037549.

153.    During the course of FCA's false sales reporting scheme, FCA managers and directors, and others under their direction or employment, offered or gave cash payments and popular vehicle allocations and other benefits to dealerships, managers, or employees in order to influence the dealership's conduct, to wit, to report false sales of vehicles. FCA_NAPLETON_00037549-50.

154.    In May or June 2015, in at least one case, a dealer's sales manager was approached by FCA's area manager who offered $3,000 in cash for the dealer to falsely report vehicles as sold. FCA_NAPLETON_00037516.

155.    During the course of FCA's false sales reporting schemes, FCA managers and directors, and others under their direction or employment, offered or gave such benefits like cash

incentives or popular vehicle allocations, to dealership managers or employees who had fiduciary duties and fiduciary relationships to the dealership and its owners. FCA_NAPLETON_00037555, 00037597-98.

156.    During the course of FCA's false sales reporting scheme, FCA's managers and directors, and others under their direction or employment, offered or gave those cash and other benefits to dealership employees without the consent of those dealership's principal in order to influence that employee's conduct in relation to his employer's or principal's affairs.

157.    The foregoing misconduct by FCA constituted acts of bribery under various and applicable state laws, including but not limited to Illinois, Ill. Rev. Stat. ch. 38, § 29A-1; Texas, Penal Code § 32.43; Pennsylvania, 18 Pa. Stat. and Cons. Stat. § 4108; Missouri, Mo. Ann. Stat. § 570.150.

**D.      Extortion.**

158.    During the course of FCA's false sales reporting scheme, FCA managers and directors, and others under their direction or employment, maliciously threatened dealerships with an intent to extort money or other pecuniary advantage from them, or maliciously and intentionally threatened the dealerships to take actions against the will of said dealerships.

159.    During the course of FCA's false sales reporting scheme, FCA managers and directors maliciously and unlawfully threatened FCA employees with termination of their jobs and bonuses if those employees refused to go along with FCA's false sales reporting scheme and bribery. Indeed, one of the business center directors told his area sales managers in a meeting that if anyone complained to the CEO of FCA, the business center would find out. FCA_NAPLETON_00037508. Several FCA employees chose to resign from FCA because of their serious concerns about FCA's unethical practices in perpetrating the false sales reporting scheme and in the bribes to dealerships. FCA_NAPLETON_00037515.

160.     During the course of FCA's false sales reporting scheme and bribery, FCA managers and directors unlawfully and maliciously threatened not to allocate popular vehicles, like Jeeps, to dealerships that refused to participate in the false sales reporting scheme. In that manner, FCA unlawfully appropriated property, to wit, popular vehicles, from dealerships. including Plaintiffs, which refused to go along with FCA's scheme. The effect of this misconduct was to harm the business repute and credit of Plaintiffs.

161.     No later than January 2015, FCA confirmed that some of its employees were not comfortable calling dealerships and asking them to falsify the sale of a vehicle. A number of FCA managers were in fear of losing their jobs so they went ahead in contacting dealerships and requesting that vehicles be marked falsely as sold. FCA_NAPLETON_00037500, 37504.

162.     The foregoing misconduct by FCA, including some of its managers and directors, constituted violations of the extortion statutes under applicable state laws, including but not limited to, Illinois, 720 ILCS 5/16-1; Texas, Tex. Penal. Code 31.02-31-03; Georgia, Ga. Code Ann. § 16-8-16.

### E.     Travel Act.

163.     At all relevant times, 18 U.S.C. § 1952 ("Travel Act") prohibited "travel[] in interstate or foreign commerce" or "use of mail or any facility in interstate or foreign commerce with intent to (1) distribute the proceeds of any unlawful activity; or … (3) otherwise promote, manage, establish, carry on or facilitate the promotion, management, establishment or carrying on of any unlawful activity." The Travel Act defines "unlawful activity" to include "extortion, [or] bribery … in violation of the laws of the state in which committed or of the United States." 18 U.S.C. § 1952(b)(2).

164.     At all relevant times, FCA committed acts of bribery and extortion as described above (including but not limited to paragraphs 152 through 157), in violation of the laws of the state in which the acts were committed.

165.     At all relevant times during the course of the false sales reporting scheme, FCA used the mails or other facilities in interstate commerce with the intent to promote, manage, and carry on unlawful activity. The unlawful activity involved repeated acts of bribery and extortion as described above, and in violation of 18 U.S.C. § 1952. Such uses of the mail and facilities in interstate commerce included, but were not limited to, the mailings, wire transfers, emails, and telephone calls identified above (including but not limited to in paragraphs 51 and 147). These uses of the mail and facilities in interstate commerce were continuous over a period of at least three years and were related to one another and thus constitute a pattern of racketeering.

**F.     Defendants' Efforts to Conceal and Perpetuate Their Scheme and Misconduct.**

166.     At all relevant times, FCA and others under FCA's direction or employment took affirmative steps to conceal their schemes to defraud, as well as their acts of bribery and extortion. FCA managers were specifically told not to put anything in writing to dealers relating to the false sales reporting activities. For the paper trail that did exist, FCA managers instructed area managers to delete deal-confirmation emails containing false sales details that they had sent. The destruction of emails occurred after Plaintiffs threatened litigation regarding FCA's false sales scheme. FCA_NAPLETON_00037580.

167.     Other instances of efforts by FCA to cover up this scheme are documented in FCA's internal investigation notes and interviews. For example, after an FCA employee was pressured to retire in the spring of 2015, his "T" code login ID was used to process false sales on unsuspecting dealer accounts on the Internet shortly after he retired because he would no longer be

available should questions arise. FCA_NAPLETON_00037507. In addition, for dealerships that closed early, FCA employees would logon to the dealer's "sales ticker," make false sales entries just before midnight, and then back them out after midnight, all so that the principal of the targeted dealer would never know. *Id.* A recently resigned FCA area manager told investigators that after working with a dealer to transmit false sales reports in exchange for payments using the #0774 parts fund described above as a conduit, the FCA manager would advise FCA management by email that the transaction had occurred using vague language that the Area Sales Manager had been directed to use by FCA management whenever referencing unethical activity. FCA_NAPLETON_00037519. Furthermore, the funds used to pay dealers for the false sales were from a fund that is supposed to be used for legitimate sales challenges or for funding special sales events. FCA_NAPLETON_00037551. FCA instructed dealers to falsify documentation for marketing events that never occurred to support the use of these funds and avoid suspicion from auditors. In other situations, FCA employees themselves would mark vehicles as so-called "B" sales. When one dealer called to complain, the dealer was told that they were marked sold in error, though FCA knew that the sales were entered knowingly and intentionally to effectuate the false sales reporting scheme. FCA_NAPLETON_00037512.

168.     Though FCA generated numerous false documents that it transmitted via the wires and mails, the perpetrators of the false sales reporting scheme took active measures to limit and cover up the paper trail. To further the scheme, FCA told at least two area managers to delete any emails in their "sent" folders that confirmed the deals they made about the false sales reporting and the bribes. FCA_NAPLETON_00037580. FCA's area managers were also told by their superiors to "hand write" what was owed to the participating dealers and to "delete all the emails" evidencing the false sales reporting scheme. FCA_NAPLETON_00037543;

FCA_NAPLETON_00037580. FCA's operations managers instructed area managers that "under no circumstances should any sensitive information be put in writing or in an email" relating to the false sales, bribes, and other misconduct. FCA_NAPLETON_00037521. At one point in January 2015, an FCA operations manager asked another FCA manager to call "trusted" dealers in order to offer them cash in return for false reports of sales, but was explicitly instructed not to put these offers "in writing." FCA_NAPLETON_00037536, 00037543.

169.    In order to conceal the scheme to defraud, bribery, and extortion, FCA and others under its direction or employment concealed unlawful cash payments to participating dealerships through the guise of "marketing support funds", credits for marketing events, or payments under parts account #0774. FCA_NAPLETON_00037507, 37512, 37518. Dealers were instructed to make up documentation for phony marketing events so that the incentives would appear to be for legitimate marketing events. FCA_NAPLETON_00037507.

170.    By no later than March 2015, FCA's executive management and Office of General Counsel were fully aware of the false sales reporting scheme, the bribery, and the extortion. On March 27, 2015, a senior investigative professional made clear to FCA that he saw three problems with the situation: a) FCA's use of marketing funds to pay dealers to report false sales; b) the impact of this activity on variable compensation of employees; and c) selectively offering inappropriate incentives such as Jeeps to some dealerships and not to others. According to that professional, "This leaves the Company [FCA] with possible liability concerns (with the slighted dealerships such as Auto Nation) along with possible regulatory violations." FCA_NAPLETON_00037594-595.

171.    Despite FCA's knowledge of the false sales reporting scheme and related misconduct by March 2015, FCA directed its outside counsel to continue to cover up the schemes

and misconduct in letters to Plaintiffs' principal Edward F. Napleton. On December 15, 2015, FCA's outside counsel was directed to falsely state to Mr. Napleton: "Your December 4, 2015 letter repeats allegations of the false reporting of sales that FCA US has previously investigated and found to be baseless." (NAP_0065470.) To the contrary, FCA was well aware at that time that its internal investigation had confirmed that the false sales reporting scheme had been in full swing for several years and had been continuing to occur. FCA_NAPLETON_00037499-617.

172.    As described above, FCA also took steps to cover up this scheme from the public, including by publishing deceptive and misleading press releases that (1) in January 2016, falsely claimed FCA's "investigation of the facts" showed that allegations of false sales reporting were "baseless", when in fact this investigation corroborated and proved the allegations; and (2) in July 2016, falsely claimed there was no "obvious economic incentive" for dealers to falsely report sales and then unwind the sales after the end of the month, when FCA in fact knew that FCA had bribed dealers to falsely report sales with cash payments, monetary incentives, and favorable allocations of popular vehicles.

173.    In sum, FCA took active measures to cover up the schemes, the bribery, and related misconduct through the above-described actions because it was aware of their illegal nature and FCA's liability.

**G.    The Pattern of Racketeering Activity Directly and Proximately Injured Plaintiffs' Businesses and Property.**

174.    At all relevant times, FCA recognized that its misconduct, which included the false sales reporting scheme, the bribery, and the extortion, did directly and proximately harm Plaintiffs, who refused to participate in FCA's false sales reporting scheme or to accept FCA's bribes.

175.    In the course of its internal investigation, FCA determined that about 5 or 6 of its 20 area managers in one region alone were participating in the scheme. FCA concluded in early 2016:

"This practice not only results in false sales reports and inappropriately awarded bonuses, but provides an unfair competitive edge to participating dealerships because increased sales figures result in increased allotments of hot-selling vehicles such as [Jeep] Wranglers and [Jeep] Grand Cherokees." FCA_NAPLETON_00037507. In other words, FCA was well aware that its false sales reporting scheme and related misconduct directly imposed a competitive disadvantage to non-participating dealers like Plaintiffs.

176.     As described above, a senior investigative professional informed FCA in March 2015 that FCA's selective offering of incentives, like hot-selling Jeeps, and FCA cash payments to participating dealers for their reporting of false sales, raised serious liability concerns and regulatory violations.

177.     In May 2015, FCA's internal investigation confirmed that the false sales reporting scheme raised several serious issues, including that sales figures were inaccurate and that inventory allocation of popular vehicles was "unfairly distributed." In short, FCA knew that non-participating dealers, like Plaintiffs, were proximately harmed by the pattern of illegal activity because they did not receive a fair distribution of hot-selling vehicles, like Jeeps.

178.     In July 2015, FCA's internal investigation confirmed through a former employee that dealers lost the opportunity to gain additional inventory of popular vehicles unless these dealerships chose to participate in the scheme. That employee resigned from FCA because of her discomfort working in an environment where such illegal behavior was encouraged. FCA_NAPLETON_00037551.

179.     Another FCA employee in November, 2015 told FCA internal investigators that the allocation of popular cars to dealers posting false sales was "unethical, because we [FCA] don't

offer the deal to every dealer, being very selective who we make the offer to."
FCA_NAPLETON_00037543.

180.     On several occasions, FCA's employees approached Plaintiffs' executives,
including Edward Napleton, and asked them "to punch" false sales reports in return for cash
incentives and allocations of hot-selling cars.  Plaintiffs' executives refused to go along with the
scheme.  When they asked FCA employees if they could receive the incentives and allocations
anyway, FCA's employees refused.

181.     Each and every false sales report made by a Conspiring Dealer, regardless of the
physical location of the Conspiring Dealer, directly injures the business and property of the
Plaintiffs.  Every dealer in FCA's United States network competes with each other to obtain new
factory vehicles from FCA.  The best-selling models are generally in limited supply, and FCA is
unable to fulfill every dealer's order.

182.     To solve the problem of orders from FCA dealers that exceed the supply of vehicles
to fulfill the orders, FCA uses two methods of allocation.  First, it sets aside a discretionary pool of
vehicles that Business Center employees can award to dealers.  The discretionary pool is fixed
each month, and vehicles that are awarded to FCA dealers other than the Plaintiffs cannot be
awarded to Plaintiffs and will not end up in Plaintiffs' inventories.  FCA used the discretionary
pool to reward Conspiring Dealers for their participation in the false sales reporting scheme, thus
denying Plaintiffs the ability to compete for and obtain vehicles that, if the playing field were level
and based on actual performance and need, Plaintiffs would have obtained.

183.     Second, FCA uses an algorithm to allocate the majority of the vehicles FCA
delivers to dealers in the United States.  The allocation algorithm is based on its dealers' "days'
supply" of each FCA model.  FCA calculates the days' supply metric for each dealer and for each

model vehicle by performing an "availability snapshot" in the early part of each month. The availability snapshot uses NVDR data submitted by dealers to determine the number of vehicles sold for a given model over a set period of time (sales) and the number of vehicles of a given model remaining on the lot at the instant FCA takes the snapshot (availability). Dealers with lower days' supply of a given model are granted priority in the allocation algorithm. Importantly, dealers with sufficiently low days' supply can even be awarded multiple vehicles before other dealers are able to obtain even a single vehicle, due to the iterative way in which the algorithm operates.

184.    As alleged above, because false NVDR data reports a vehicle as sold when it is in fact available, a Conspiring Dealer that submits a false NVDR is rewarded with an artificially low "days' supply." Thus, Conspiring Dealers were repeatedly granted higher priorities for hot-selling cars that FCA induced the dealers to falsely report were sold.

185.    Because high-demand vehicles can be sold more quickly and at higher profit margins, FCA's scheme directly impaired Plaintiffs' profitability during the entire conspiracy period, and increased the profitability of the Conspiring Dealers. Moreover, because the "turn-and-earn" program (which sets allocations based on past performance, *e.g.*, the more a dealer sells and less it has available, the more popular vehicles the dealer receives) rewarded past artificially inflated sales, the past injustices continue to haunt Plaintiffs' businesses through reduced allocations of vehicles and thus lower sales and profitability.

186.    Plaintiffs have lost discrete sales opportunities as a result of the NVDR scheme. For instance, Plaintiffs examined their records and compared those records against FCA's NVDR database for the dealers competing with Plaintiffs. This analysis confirmed that numerous customers who visited their stores ultimately purchased vehicles from Conspiring Dealers due to availability (because the Conspiring Dealer had in their possession vehicles that Plaintiffs would

have had but for an allocation method rigged to award Conspiring Dealers with popular vehicles). Numerous other potential customers visited Plaintiffs' stores and purchased from Conspiring Dealers because of lower price (because the Conspiring Dealers were subsidized by FCA's unlawful bribes and/or other monetary incentives ). Because FCA's conduct saddled Plaintiffs with poor inventory and impaired their ability to meet Volume Growth Program targets set by FCA, the false sales reporting scheme also provided an "unfair competitive edge" to Competing Dealers. In 2015 and 2016, respectively, at least 5,608 sales were diverted to Plaintiffs' competition.

187.     As a direct and proximate result of FCA's pattern of racketeering activity, Plaintiffs could not compete fairly and lost substantial sales and profits during the period that FCA's activity occurred, which was at least from 2013 through the beginning of 2016. Preliminary estimates based upon market conditions show that Plaintiffs would have sold at least 4,100 more vehicles but for FCA's scheme and its bribery of dealers to report false sales.

188.     Plaintiffs sustained a direct injury to business and property set forth herein. As FCA's own documents admit, every false report entered by a Conspiring Dealer — regardless where located — increases a Conspiring Dealer's rank in FCA's allocation system and correspondingly decreases Plaintiffs' rank *vis-à-vis* the Conspiring Dealer. As a result, Plaintiffs' orders for popular vehicles were rejected in favor of orders placed by Conspiring Dealers and vehicles granted to Conspiring Dealers as bribes. Moreover, Conspiring Dealers who participated were also offered subsidies in the form of monies disguised as advertising support and co-op payments. FCA admits that dealers who did not participate "lost the opportunity to gain additional inventory of popular vehicles, which would likely have resulted in increased sales." FCA_NAPLETON_00037662-663. Plaintiffs have uncovered evidence that customers who

physically visited their stores and expressed interest in particular vehicles ultimately purchased those vehicles from Conspiring Dealers because competitors were able to undercut Plaintiffs on price (due to subsidies from FCA as a reward for participation ) and availability of popular models (because FCA had rigged allocation in favor of Conspiring Dealers). FCA's schemes also caused Plaintiffs to pay more to acquire assets and make improvements to dealerships than they would have been willing to do had Plaintiffs known about the scheme.

189.     FCA has knowingly conducted and participated, directly or indirectly, in the conduct of the affairs of the Enterprise (defined below) through a "pattern of racketeering activity" as defined by 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c). Such racketeering activity consists of repeated violations of the Federal Mail Fraud Statute, 18 U.S.C. § 1341, and of the Federal Wire Fraud Statute, 18 U.S.C. § 1343, based upon at least two separate schemes to defraud Plaintiffs of millions of dollars and other property through the solicitation, preparation, and submission of false New Vehicle Delivery Reports, through the manipulation and misuse of market and sales data, and through intentional misrepresentations and omissions of material fact made to Plaintiffs; the Travel Act, 18 U.S.C. § 1952; bribery under applicable state laws; and extortion under applicable state laws. 18 U.S.C. § 1961(1). These predicate offenses have the same or similar purposes, results, participants, victims, and methods of commission and otherwise are interrelated by distinguishing characteristics and are not isolated events. Further, FCA's pattern of racketeering has persisted over several years as a continuing criminal activity from no later than 2013 (and likely earlier) until at least early 2016, and, as far as Plaintiffs know, the present.

### H.     The RICO Enterprise.

190.     Defendant FCA, the Conspiring Dealers, Business Center Directors, and third-party vendors are an association-in-fact "enterprise" (the "Enterprise"), as that term is

defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which, affect interstate commerce. These members of the Enterprise are and have been associated through time, joined in purpose and organized in a manner amenable to hierarchal and consensual decision-making, with each member fulfilling a specific and necessary role to carry out and facilitate its purpose. Specifically, the Enterprise had an identifiable structure with each member and entity fulfilling a specific role to carry out and facilitate its purpose as follows:

     a.      FCA induced and cajoled certain of its dealers, with which it had contractual relationships, to submit false NVDRs in return for unearned and illegitimate incentives and payments;

     b.      The Conspiring Dealers, which had contractual relationships with FCA, agreed to and did submit false NVDRs in order to gain a competitive advantage over dealers with the Conspiring Dealers and to profit from unearned and illegitimate payments;

     c.      Third-party vendors were retained by FCA to submit marketing and sales data that was then manipulated and abused by FCA in order to conceal its schemes, its misconduct, and its price discrimination that favored Conspiring Dealers; and

     d.      Certain Business Center Directors, and Area Sales Managers conspiring with those Business Center Directors, actively solicited, coerced, and induced the Conspiring Dealers to participate in FCA's schemes and in the price discrimination that injured and harmed Plaintiffs.

191.      The Enterprise had an ongoing organization over a period of years, beginning no later than 2013 (and likely earlier) and continuing until the present.

192.      The Enterprise, including Defendant FCA, functioned as a continuing unit over a period of years, beginning no later than 2013 (and likely earlier) and continuing until the present.

193.     On an ongoing basis, the Enterprise oversaw and coordinated the commission of the schemes to defraud and to harm Plaintiffs, the legitimate and illegitimate activities of its individual members, and the business conduct and financial affairs of its members. The legitimate activities of the Enterprise were to manufacture and to sell automobile vehicles of FCA, to provide legitimate incentives to its network of automobile dealers to make actual and proper sales of automobile vehicles, and to gather market data for support of the metrics needed to give such incentives to its dealer network.

194.     The Enterprise engaged in, and its activities affected, interstate and foreign commerce. The activities of the Enterprise directly affected interstate and foreign commerce in the states of Florida, Illinois, Missouri, Pennsylvania, and elsewhere.

195.     The Enterprise is distinct from and has an existence beyond the pattern of racketeering activity described above, in that it employs and contracts with third-party vendors, dealerships, suppliers, advertising firms, and other entities who conduct valid sales, manufacture actual automobile vehicles, and conduct legitimate marketing and research.

196.     The conduct of the Enterprise was not merely the conduct of FCA's business because FCA only invited select "trusted dealers" to participate in the scheme, not all of the CDJR dealers in a market. FCA_NAPLETON_00037508 (participants contacted only dealers "trusted" by Area Sales Managers); FCA_NAPLETON_00037543 (FCA was "selective" and did not offer deals to every dealer); FCA_NAPLETON_00037551 (Area Sales Manager who did not participate stated "her dealers lost the opportunity to gain additional inventory of popular vehicles").

197.     Defendant FCA has been employed by or is associated with the Enterprise.

198.     Plaintiffs are direct victims of Defendant FCA's pattern of racketeering, which consisted of the perpetration of two or more predicate acts including mail fraud, wire fraud,

bribery, extortion, and violations of the Travel Act. These predicate acts occurred over a duration of several years and continue to occur. Defendant FCA effectuated the pattern of racketeering through at least two schemes to defraud, bribery, extortion, and violations of the Travel Act as described above.

199.    Plaintiffs have been directly injured in their business and property by reason of Defendant's intentional, wanton, and malicious conduct in that Plaintiffs have been deprived of lost revenues, lost profits, and other consequential damages. Plaintiffs have incurred substantial legal fees and litigation expenses in an amount to be determined.

200.    Based upon Defendant FCA's misrepresentations of material fact and affirmative acts to conceal the schemes to defraud, which are described above, Plaintiffs did not discover and should not have reasonably discovered that their damages were attributable to fraud until sometime in 2015.

201.    FCA's actions providing Conspiring Dealers with price subsidies, payoffs, and preferred allocations were artifices and/or acts of deceit that were intended to deprive Plaintiffs of monies in favor of the Conspiring Dealers who were willing to falsely report sales.

202.    FCA fraudulently propped up the value of its stock by utilizing false year-over-year results based on false vehicle-sales reporting, thereby purposefully creating the illusion of financial strength in order to fraudulently induce its dealers, such as Plaintiffs, to invest in dealership improvements and otherwise to contribute ever-increasing capital to their business operations.

203.    FCA representatives on multiple occasions made representations to its dealers, including Plaintiffs, that FCA would treat all of its dealers alike on a level playing field and use their best efforts to make each and every one of its dealers, including Plaintiffs, profitable. As a

result, for instance, Plaintiff Napleton's Arlington Heights invested heavily in moving its CDJR dealership from its facility in Des Plaines, Illinois, and to a brand-new facility that it constructed in Arlington Heights, Illinois; and Plaintiff Napleton's Northlake agreed to renovate its dealership facility. FCA, in fact, had no intention of honoring this pledge of equal treatment among its dealers. Instead, FCA intended to and did take actions including, but not limited to, (i) giving preferential subsidies and allocations of vehicles to Conspiring Dealers at the cost of Non-Conspiring Dealers, such as Plaintiffs; and (ii) knowingly and intentionally manipulating Plaintiffs' Minimum Sales Responsibility performance baselines as a means to threaten and coerce dealers in large metropolitan areas, such as Plaintiffs.

204.     FCA knew that its representations of material facts as set forth herein were false and intentionally misrepresented the same.

205.     FCA's actions detailed herein violate 18 U.S.C. §§ 1341, 1343 and 1952 in that they used the United States mail, interstate telephone calls and/or electronic correspondence in furtherance of these schemes and of acts constituting bribery and extortion.

206.     As a result of FCA's actions in violation of 18 U.S.C. § 1962(c), Plaintiffs have suffered damages including, but not limited to, the loss of value of the franchise business as a going concern.

207.     Plaintiffs are direct victims of Defendant FCA's and the Conspiring Dealers' pattern of racketeering, which consisted of the perpetration of numerous predicate acts including mail fraud and wire fraud. These predicate acts occurred for a duration of several years, and they continue to occur. Defendant FCA and the Conspiring Dealers effectuated their pattern of racketeering through several schemes to defraud that are described above.

208.     Plaintiffs have been directly and permanently injured in their business and property by reason of Defendant FCA's and the Conspiring Dealers' pattern of racketeering in that Plaintiffs have lost retail sales of vehicles and related finance and insurance products, lost profits from vehicle sales, lost profits from the resale of used vehicles which would have been taken in trade on the lost vehicle sales, lost market value as going concerns, lost marketing monies, lost potential future sales of vehicles to repeat customers, and lost profits from warranty and non-warranty sales of service and parts for vehicle owners who tend to have their vehicles serviced at the same dealership where they were purchased. In addition, Plaintiffs have incurred substantial investigative fees, legal fees, and litigation expenses in an amount to be determined.

WHEREFORE, pursuant to section 18 U.S.C. §§ 1962(c) and 1964(c), Plaintiffs demand entry of a judgment against FCA for treble damages, costs of suit including reasonable attorneys' fees, and such other relief as this Court deems just and equitable.

## COUNT V

### (Racketeering Conspiracy – 18 U.S.C. §§ 1962(d) and 1964)

### Brought by All Plaintiffs against FCA

209.     Plaintiffs re-affirm, re-allege, and incorporate each allegation and averment in the preceding and succeeding paragraphs as though fully set forth herein.

210.     Since no later than 2013 (and likely earlier), Defendant FCA has willfully combined, conspired, and agreed with Conspiring Dealers and others to violate Title 18, United States Code, Section 1962(c), that is, to conduct and/or participate, directly or indirectly, in the conduct of the affairs of the Enterprise, the activities of which were conducted through a pattern of racketeering activities which are described above, and they agreed with one another that someone

would commit at least two predicate acts to accomplish the goals of the conspiracy, all in violation of Title 18, United States Code, Section 1962(d).

211.     The object of this conspiracy was to violate the RICO statute, as described in Count IV above, by participating in a pattern of racketeering activity to perpetrate two schemes to defraud Plaintiffs of money, profits, and revenues by means of mail and wire fraud, bribery, extortion, and violations of the Travel Act..

212.     As a direct and proximate result of Defendant's and the Conspiring Dealers' conduct and racketeering conspiracy, Plaintiffs were injured in that they have lost retail sales of vehicles and related finance and insurance products, lost profits from vehicle sales, lost profits from the resale of used vehicles which would have been taken in trade on the lost vehicle sales, lost market value as going concerns, lost marketing monies, lost potential future sales of vehicles to repeat customers, and lost profits from warranty and non-warranty sales of service and parts for vehicle owners who tend to have their vehicles serviced at the same dealership where they were purchased.  In addition, Plaintiffs have incurred substantial investigative fees, legal fees, and litigation expenses in an amount to be determined.

213.     By reason of this direct injury, Plaintiffs are entitled to receive treble damages, punitive damages, and reasonable attorneys' fees under Title 18, United States Code, Section 1964(c).

WHEREFORE, Plaintiffs demand entry of a judgment against FCA for treble damages, costs of suit including reasonable attorneys' fees, and such other relief as this Court deems just and equitable.

## COUNT VI

### (Common Law Fraud)

### Brought by All Plaintiffs against FCA

### [REPLED SOLELY TO PROTECT AGAINST ASSERTIONS OF WAIVER ON ANY SUBSEQUENT APPEAL]

214.     Plaintiffs re-affirm, re-allege, and incorporate each allegation and averment in the preceding and succeeding paragraphs as though fully set forth herein.

215.     At all relevant times, FCA has advised its dealers, including Plaintiffs, that its metrics to determine performance and allocation, as well as incentives and subsidies, are applied uniformly, fairly, without bias, and in good faith.  FCA well knew that those misrepresentations were material and false.

216.     In or around 2013, FCA's Market Representative Manager told the Napleton Dealer-Principal that Napleton's Arlington Heights would have direct and meaningful input into the size and configuration of the market area to be used to determine Napleton Arlington Heights' Minimum Sales Responsibility baseline.  FCA well knew that those misrepresentations were material and false.

217.     In addition, each of the Plaintiffs continued to invest substantial capital and monies into the operation of their dealerships, promotion, and sales of FCA's vehicle lines, in addition to other investments that, in part, inured to the benefit of FCA, at all relevant times.

218.     At all times before the Napleton Dealer-Principal first learned of FCA's schemes, FCA willfully omitted to disclose to Plaintiffs FCA's scheme by which Conspiring Dealers submitted false NVDRs at FCA's behest in order to gain monies and subsidies to which those Conspiring Dealers were not otherwise entitled, and would not be functionally available to

- 68 -

Plaintiffs unless Plaintiffs participated in these schemes. Those omissions were of material facts and were willfully concealed by FCA.

219.     At all times before the Napleton Dealer-Principal first learned of FCA's schemes, FCA failed to disclose and actively concealed its practice to offer Conspiring Dealers a subsidized lower actual price than the actual price offered and charged to Plaintiffs for the same model vehicle that was similarly equipped. Those omissions by FCA were of material facts and were willfully concealed by FCA.

220.     At all relevant times, FCA willfully failed to disclose and actively concealed the market and sales data and information provided to FCA by third-party vendors including Urban Science, which advised that FCA's inclusion of luxury brands was skewering FCA's market metrics. Those omissions by FCA were of material facts and were willfully concealed by FCA.

221.     At all relevant times, FCA willfully failed to disclose that it was falsely increasing its monthly sales throughout the country to give the appearance of financial strength to its dealers and inducing Plaintiffs to make substantial investments including with respect to their facilities and promotions.

222.     At all relevant times, FCA willfully failed to disclose and actively concealed that it was arbitrarily and discriminatorily applying its Volume Growth Program so as to provide incentives and subsidies to Competing Dealers and would not make such incentives and subsidies functionally available to others, including Plaintiffs. These omissions by FCA were of material facts and were willfully concealed by FCA.

223.     The misrepresentations and omissions of material fact described above were false, misleading, and made by FCA with knowledge of their falsity and with the intent that Plaintiffs

would believe, rely, and act upon them, thereby causing Plaintiffs to lose sales revenues and profits.

224.     Plaintiffs did, in fact, believe and rely upon the misrepresentations and omissions described above, and, in doing so, were induced to invest millions of dollars in a state-of-the-art facility in Arlington Heights, Illinois, and to continue to lose revenue and profit on automobile sales at the expense of Conspiring Dealers and Competing Dealers for whom Volume Growth Program subsidies were functionally available.

225.     By reason of the fraudulent misrepresentations and omissions described above, Plaintiffs have been directly damaged, and will continue to be damaged, from lost retail sales of vehicles and related finance and insurance products, lost profits from vehicle sales, lost profits from the resale of used vehicles which would have been taken in trade on the lost vehicle sales, lost customer goodwill, lost market value as going concerns, lost marketing monies, lost potential future sales of vehicles to repeat customers, and lost profits from warranty and non-warranty sales of service and parts for vehicle owners who tend to have their vehicles serviced at the same dealership where they were purchased.   In addition, Plaintiffs have incurred substantial investigative fees, legal fees, and litigation expenses in an amount to be determined.

WHEREFORE, Plaintiffs demand entry of a judgment against FCA for damages, including punitive damages, costs of suit including reasonable attorneys' fees, and such other relief as this Court deems just and equitable.

## COUNT VII

### (Negligent Misrepresentation)

### Brought by All Plaintiffs against FCA

**[REPLED SOLELY TO PROTECT AGAINST ASSERTIONS OF WAIVER ON ANY SUBSEQUENT APPEAL]**

226.     Plaintiffs re-affirm, re-allege, and incorporate each allegation and averment in the preceding and succeeding paragraphs as though fully set forth herein.

227.     FCA made representations that (i) were representations of material fact, (ii) were made with negligence in ascertaining the truth of the statements by FCA, (iii) did, in fact, induce Plaintiffs to act in reliance on the trust of the statements by FCA, and (iv) caused Plaintiffs damages including, but not limited to, lost retail sales of vehicles and related finance and insurance products, lost profits from vehicle sales, lost profits from the resale of used vehicles which would have been taken in trade on the lost vehicle sales, lost customer goodwill, lost market value as going concerns, lost marketing monies, lost potential future sales of vehicles to repeat customers, and lost profits from warranty and non-warranty sales of service and parts for vehicle owners who tend to have their vehicles serviced at the same dealership where they were purchased.  In addition, Plaintiffs have incurred substantial investigative fees, legal fees, and litigation expenses in an amount to be determined.

WHEREFORE, Plaintiffs demand entry of a judgment against FCA for damages, costs of suit including reasonable attorneys' fees, and such other relief as this Court deems just and equitable.

**COUNT VIII**

**(Breach of Franchise Agreements)**

**Brought by All Plaintiffs against FCA**

228.     Plaintiffs re-affirm, re-allege, and incorporate each allegation and averment in the preceding and succeeding paragraphs as though fully set forth herein.

229.     FCA executed Franchise Agreements with each of the Plaintiffs in exchange for valuable consideration.

230.     Plaintiffs have performed all material obligations under their respective Franchise Agreements at all relevant times.

231.     Pursuant to section 14 of the Franchise Agreements, "[FCA] shall use its best efforts to fill accepted orders for specified [FCA] vehicles, parts and accessories."  In the event demand exceeds supply of specified FCA vehicles, "[FCA] has the right to allocate such supply in any reasonable manner [FCA] deems fit in any geographical market."

232.     FCA repeatedly breached section 14 of each of the Franchise Agreements when it failed to use best efforts to allocate vehicles to Plaintiffs, and failed to do so in a reasonable manner.  Instead, FCA allocated vehicles to dealers who were provided price subsidies not functionally available to Plaintiffs, and allocated other vehicles as kickbacks to Conspiring Dealers who were willing to engage in FCA's scheme to falsely report vehicle sales.  This wrongful conduct diverted sales from Plaintiffs and eroded the value of Plaintiffs' businesses.

233.     FCA also failed to exercise its discretion under the Franchise Agreements honestly or in good faith, and has actively circumvented the rights these agreements granted to Plaintiffs and the parties' reasonable expectations thereto.

234.     As above, the Franchise Agreements expressly require FCA to use "best efforts" to sell CDJR vehicles to Plaintiffs, and, when demand exceeds supply, to allocate such vehicles to Plaintiffs in a "reasonable" manner.  The Franchise Agreements also protect Plaintiffs' investments in their dealerships by prohibiting termination by FCA unless specific criteria are met. Plaintiffs are free from termination on the basis of sales volume so long as they meet a certain Minimum Sales Responsibility, or MSR, and are given the opportunity to cure any deficiencies.

235.     Section 11 of the Franchise Agreement sets forth the formula for Plaintiffs' Minimum Sales Responsibility:

> [T]he ratio of the number of new [FCA] passenger cars and/or trucks registered in the most recent whole or partial calendar year-to-date period for which registration figures are available in the [FCA] Sales Zone in which DEALER is located to the total number of new passenger cars or, if [FCA] deems it appropriate, the total number of those new passenger cars or trucks which [FCA], in its sole discretion, determines to be competitive with any or all of its passenger cars or trucks so registered in that Zone during the same period. The ratio thus obtained will be applied to the comparable category of the total number of new passenger cars or competitive passenger cars and/or trucks, as appropriate, registered during the same period in Dealer's Sales Locality. . . . If DEALER's Sales Locality is shared by one or more other [FCA] dealer(s) of the same line, DEALER's Minimum Sales Responsibility for such line will be the number of new vehicles DEALER must sell in order to achieve DEALER's fair share of the Minimum Sales Responsibility for all such [FCA] dealers in the Sales Locality. . . . [FCA] will determine DEALER's fair share by assessing the relative importance of DEALER's immediate area of influence as compared with the Sales Locality as a whole.

236.     According to FCA, the Minimum Sales Responsibility metric is purportedly designed to compute the number of new vehicle retail sales necessary for each vehicle line to achieve statewide market share in a given sales zone. This metric, however, is far from a strictly objective mathematical formula.     Rather, it is comprised of several critical subjective determinations, each of which FCA controls in its sole discretion.

237.     For example, FCA, and only FCA, may (i) designate the sales zone for each of the Plaintiffs (which could expand the area for which Plaintiffs are responsible); (ii) deem which vehicles are "competitive" with the FCA-brand vehicles sold by Plaintiffs (which could increase the number of vehicles Plaintiffs must sell to meet their Minimum Sales Responsibility baselines); and (iii) apportion Plaintiffs' "fair share" of responsibility among Competing Dealers in the same sales zone (which could heighten Plaintiffs' burdens to achieve FCA's desired sales volume within a zone comprised of multiple FCA dealers).

238. FCA has repeatedly abused its discretion dishonestly, unfairly, and in bad faith to inflate each of the Plaintiffs' Minimum Sales Responsibility baselines to arbitrarily high levels, thus frustrating Plaintiffs' bargained-for rights under the Franchise Agreement. As detailed above, FCA established sales zones far beyond the reasonable reach of Plaintiffs' business. FCA, acting against the independent advice of JD Power and Urban Science, has deemed Luxury Brands to be "competitive" with the vehicles that Plaintiffs sell, further inflating the Minimum Sales Responsibility that FCA asserts Plaintiffs must achieve. And FCA has assigned Plaintiffs a "fair share" among competing CDJR dealers that fails to take into account the wrongful subsidies, allocations, and kickbacks FCA knowingly provides to dealers in direct competition with Plaintiffs. FCA's other underhanded and coercive conduct, detailed above and below, further evinces its bad faith and dishonesty in frustrating Plaintiffs' performance.

239. Plaintiffs reasonably expected that the Franchise Agreements would permit them to fairly compete against other CDJR dealers. Instead, FCA breached (and continues to breach) the Franchise Agreements when it actively, underhandedly, and dishonestly stacked the deck against Plaintiffs, diverting sales and vehicle allocations that Plaintiffs otherwise would have earned. FCA's conduct has rendered meaningless Plaintiffs' protections from termination under the Franchise Agreement, eroding the value and threatening the existence of Plaintiffs' businesses, among other injuries including lost retail sales of vehicles and related finance and insurance products, lost profits from vehicle sales, lost profits from the resale of used vehicles which would have been taken in trade on the lost vehicle sales, lost customer goodwill, lost market value as going concerns, lost marketing monies, lost potential future sales of vehicles to repeat customers, and lost profits from warranty and non-warranty sales of service and parts for vehicle owners who tend to have their vehicles serviced at the same dealership where they were purchased. In addition,

Plaintiffs have incurred substantial investigative fees, legal fees, and litigation expenses in an amount to be determined.

240. In addition to injuries Plaintiffs have already sustained, there currently exists a dispute among the parties regarding FCA's Minimum Sales Responsibility methodology, and whether FCA may terminate the Franchise Agreements notwithstanding its conduct frustrating Plaintiffs' performance. The uncertainty regarding this dispute continues to injure Plaintiffs by eroding the value of their businesses and providing FCA means to coerce and cajole Plaintiffs.

241. Plaintiffs would be irreparably harmed if FCA were allowed to terminate the Franchise Agreements, as this action would destroy Plaintiffs' businesses. Termination of the Franchise Agreements would implicate Plaintiffs' interests in real property—namely, the dealership locations themselves.

WHEREFORE, Plaintiffs demand entry of a judgment against FCA for

(a) Damages resulting from FCA's breaches, in an amount to be determined at trial;

(b) A declaration that Plaintiffs are not in default of the Franchise Agreements and that FCA has no basis to terminate such Franchise Agreements;

(c) An injunction barring FCA from terminating the Franchise Agreements;

(d) An injunction barring FCA from allocating vehicles in any unreasonable manner;

(e) An injunction barring FCA from determining or setting any component of Minimum Sales Responsibility arbitrarily, discriminatorily, or in bad faith;

(f) Costs of suit including reasonable attorneys' fees; and

(g) Such other relief as this Court deems just and equitable.

## COUNT IX

**(Violation of Illinois Motor Vehicle Franchise Act – 815 ILCS 710 *et seq.*)**

**Brought by Napleton's Arlington Heights and Napleton's River Oaks against FCA**

242.     Plaintiffs re-affirm, re-allege, and incorporate each allegation and averment in the preceding and succeeding paragraphs as though fully set forth herein.

243.     Napleton's Arlington Heights and Napleton's River Oaks (collectively, the "Illinois Plaintiffs") are each "motor vehicle dealers" as that term is defined under the Illinois Motor Vehicle Franchise Act.

244.     FCA is a "franchiser" as that term is defined under the Illinois Motor Vehicle Franchise Act.

245.     Each of the Franchise Agreements entered into by and between FCA and the respective Illinois Plaintiffs is a "franchise" as that term is defined under the Illinois Motor Vehicle Franchise Act.

246.     Section 710/4(b) of the Illinois Motor Vehicle Franchise Act provides that it is unlawful for a manufacturer and/or distributor, such as FCA, "to engage in any action with respect to a franchise which is arbitrary, in bad faith or unconscionable and which causes damage to any of the parties or to the public."

247.     As set forth in more detail above and below, FCA's conduct with respect to the Illinois Plaintiffs' franchises was arbitrary, in bad faith, and/or unconscionable and caused damage to the Illinois Plaintiffs or to the public.

248.     Section 710/4 further provides, in pertinent part, that it is unlawful for FCA:

> (d)(1)  to adopt, change, establish or implement a plan or system for the allocation and distribution of new motor vehicles to motor vehicle dealers which is arbitrary or capricious or to modify an existing plan so as to cause the same to be arbitrary or capricious;

> ***

> (d)(4)  to coerce, or attempt to coerce, any motor vehicle dealer to enter into any agreement with such manufacturer, distributor, wholesaler, distributor

branch or division, factory branch or division, or wholesale branch or division, or officer, agent or other representative thereof, or to do any other act prejudicial to the dealer by threatening to reduce his allocation of motor vehicles or cancel any franchise or any selling agreement existing between such manufacturer, distributor, wholesaler, distributor branch or division, or factory branch or division, or wholesale branch or division, and the dealer. . . .

***

(e)(2)   to offer to sell or lease, or to sell or lease, any new motor vehicle to any motor vehicle dealer at a lower actual price therefor than the actual price offered to any other motor vehicle dealer for the same model vehicle similarly equipped or to utilize any device including, but not limited to, sales promotion plans or programs which result in such lesser actual price or fail to make available to any motor vehicle dealer any preferential pricing, incentive, rebate, finance rate, or low interest loan program offered to competing motor vehicle dealers in other contiguous states;

***

(e)(3)   to offer to sell or lease, or to sell or lease, any new motor vehicle to any person, except a wholesaler, distributor or manufacturer's employees at a lower actual price therefor than the actual price offered and charged to a motor vehicle dealer for the same model vehicle similarly equipped or to utilize any device which results in such lesser actual price . . .

249.     FCA's actions amount to a wrongful preferential pricing scheme prohibited under 815 ILCS 710/4(e)(2)-(3).  Specifically, the Volume Growth Program and the wrongful scheme to falsify NVDRs of Competing Dealers were each devices, subsidies, and/or sales promotion plans that resulted in FCA selling and/or leasing new vehicles of the same model to other dealers and persons for a lesser (or subsidized) actual price than FCA sold or leased such vehicles to the Illinois Plaintiffs.

250.     Also as a result of these schemes, FCA unlawfully adopted, implemented, or modified a plan or system for the allocation and distribution of new motor vehicles to the Illinois Plaintiffs which is or has become arbitrary and capricious.  FCA allocated vehicles to dealers who were provided price subsidies not functionally available to Illinois Plaintiffs, and allocated other vehicles as kickbacks to Conspiring Dealers who were willing to engage in FCA's scheme to

falsely report vehicle sales. This wrongful conduct diverted sales from Illinois Plaintiffs and eroded the value of the Illinois Plaintiffs' businesses. In furtherance of FCA's schemes, FCA also coerced or attempted to coerce the Illinois Plaintiffs into entering into an agreement to falsify NVDRs and subsequently back out those reports in exchange for advertising and/or co-op monies and favorable allocations, acts that were or would have been prejudicial to the Illinois Plaintiffs, by threatening to reduce the Illinois Plaintiffs' allocation of motor vehicles via its withholding of favorable vehicle allocations from Illinois Plaintiffs if they did not acquiesce to FCA's coercive demands.

251. In addition, FCA has unlawfully imposed unreasonable restrictions on the Illinois Plaintiffs' assertion of legal or equitable rights, thereby violating 815 ILCS 710/7.

252. FCA conducts an incentive program called the Customer First Award for Excellence (the "Customer First Program"). Generally, dealers are eligible when they meet objective and subjective criteria based on customer satisfaction, facility evaluations, and completed sales training.

253. The Customer First Program provides important marketing benefits for dealers, including recognition on FCA websites, designation on "Find a Dealer" pages, press release material, and the dealer's ability to use the Customer First Program logo in its marketing.

254. In 2016, FCA wrongfully promulgated rules that disqualify any participant from the Customer First Program who "engages in litigation with FCA US during the certification period," and further provides that any dealer engaging in litigation "will have its certification withdrawn and will be disqualified from receiving all further recognition and events relating to the certification."

255.     This unreasonable restriction on the Illinois Plaintiffs' rights to assert their legal and equitable rights has no rational connection to the sales, facility, and training goals the program is designed to incentivize.

256.     Each of FCA's wrongful actions resulted in damage to Illinois Plaintiffs, including but not limited to lost retail sales of vehicles and related finance and insurance products, lost profits from vehicle sales, lost profits from the resale of used vehicles which would have been taken in trade on the lost vehicle sales, lost customer goodwill, lost market value as going concerns, lost marketing monies, lost potential future sales of vehicles to repeat customers, and lost profits from warranty and non-warranty sales of service and parts for vehicle owners who tend to have their vehicles serviced at the same dealership where they were purchased.  In addition, Illinois Plaintiffs have incurred substantial investigative fees, legal fees, and litigation expenses in an amount to be determined.  If allowed to continue, FCA's actions will result in further loss of the Illinois Plaintiffs' money or property.

257.     Each of FCA's wrongful actions were and are willful and wanton.

WHEREFORE, pursuant to 815 ILCS 710/4, 815 ILCS 710/7, and 815 ILCS 710/13, the Illinois Plaintiffs demand entry of a judgment against FCA for

(a)     Treble damages in an amount to be determined at trial;

(b)     An injunction restraining FCA from engaging or continuing to engage in the unfair methods of competition or deceptive acts or practices declared unlawful under 815 ILCS 710/4 or 815 ILCS 710/7;

(c)     A declaration that the incentive plan provision conditioning eligibility on whether a dealer is in active litigation is unlawful, null, void, and of no legal effect;

(d)     An injunction barring FCA from implementing or enforcing any provision purporting to restrict the Illinois Plaintiffs' right to bring a lawsuit against FCA;

(e)     An injunction barring FCA from implementing the Volume Growth Program or any similar program;

(f)     An injunction barring FCA from falsifying sales reports or taking any steps in furtherance of any such scheme;

(g)     Costs of suit including reasonable attorneys' fees; and

(h)     Such other relief as this Court deems just and equitable.

## COUNT X

### (Violations of Florida Automobile Dealers Act – Section 320.64, Florida Statutes)

### Brought by Napleton's Clermont, Napleton's Northlake, and Napleton's South Orlando

### against FCA

258.     Plaintiffs re-affirm, re-allege, and incorporate each allegation and averment in the preceding and succeeding paragraphs as though fully set forth herein.

259.     FCA is a "licensee" as that term is defined under Sections 320.60-320.70, Florida Statutes (the "Florida Automobile Dealers Act").

260.     Each of Plaintiffs Napleton's Clermont, Napleton's Northlake, and Napleton's South Orlando (collectively, the "Florida Plaintiffs") are "licensed motor vehicle dealers" as that term is defined under the Florida Automobile Dealers Act.

261.     The Franchise Agreements entered into by and between FCA and each of the Florida Plaintiffs are each "franchise agreements" of licensed motor vehicle dealers under the Florida Automobile Dealers Act.

262.     Section 320.64 of the Florida Automobile Dealers Act, in pertinent part, provides a

licensee is prohibited from committing the following acts, among others:

> (4)     The applicant or licensee has indulged in any illegal act relating to
> his or her business.
>
> ***
>
> (6)     The applicant or licensee has coerced or attempted to coerce any
> motor vehicle dealer to enter into any agreement with the licensee.
>
> ***
>
> (18)     The applicant or licensee has established a system of motor vehicle
> allocation or distribution or has implemented a system of allocation or distribution
> of motor vehicles to one or more of its franchised motor vehicle dealers which
> reduces or alters allocations or supplies of new motor vehicles to the dealer to
> achieve, directly or indirectly, a purpose that is prohibited by ss. 320.60-320.70, or
> which otherwise is unfair, inequitable, unreasonably discriminatory, or not
> supportable by reason and good cause after considering the equities of the affected
> motor vehicles dealer or dealers.

263.     FCA has violated each of these express statutory demands, and, in each case,

FCA's acts will, can, or have adversely and pecuniarily affected each of the Florida Plaintiffs.

264.     As set forth in detail above, FCA has committed wire and mail fraud, in addition to

other illegal activities, by engaging in a scheme to falsify and inflate the reports of new vehicle

sales in Florida and elsewhere.

265.     Furthermore, as set forth in detail above, in furtherance of its scheme to falsify sales

reports, FCA attempted to coerce the Florida Plaintiffs into entering into an agreement to falsify

NVDRs and subsequently back out such NVDRs in exchange for advertising and/or co-op monies

and favorable allocations.

266.     FCA has also unlawfully established a system for the allocation and distribution of

motor vehicles to the Florida Plaintiffs which is unfair, inequitable, unreasonably discriminatory,

or not supportable by reason and good cause after considering the equities of the Florida Plaintiffs.

FCA allocated vehicles to dealers who were provided price subsidies not functionally available to Florida Plaintiffs, and allocated other vehicles as kickbacks to Conspiring Dealers who were willing to engage in FCA's scheme to falsely report vehicle sales. This wrongful conduct diverted sales from Florida Plaintiffs and eroded the value of Florida Plaintiffs' businesses.

267.     Each of FCA's wrongful actions resulted in damage to the Florida Plaintiffs, including but not limited to lost retail sales of vehicles and related finance and insurance products, lost profits from vehicle sales, lost profits from the resale of used vehicles which would have been taken in trade on the lost vehicle sales, lost customer goodwill, lost market value as going concerns, lost marketing monies, lost potential future sales of vehicles to repeat customers, and lost profits from warranty and non-warranty sales of service and parts for vehicle owners who tend to have their vehicles serviced at the same dealership where they were purchased. In addition, the Florida Plaintiffs have incurred substantial investigative fees, legal fees, and litigation expenses in an amount to be determined. If allowed to continue, FCA's actions will result in further loss of the Florida Plaintiffs' money or property.

268.     FCA has also violated Section 320.64(7) of the Florida Automobile Dealers Act with respect to Napleton's Northlake and Napleton's South Orlando, and its conduct will or can adversely and pecuniarily affect these dealerships. Section 320.64(7) provides that FCA shall not "threaten[] to discontinue, cancel, or not to renew a franchise agreement of a licensed motor vehicle dealer, where the threatened discontinuation, cancellation, or nonrenewal, if implemented, would be in violation of the provisions of s. 320.641." Section 320.641(3) of the Act, in turn, bars licensees from initiating any "unfair" termination, cancellation, or nonrenewal, defining "unfair" to mean:

if it is not clearly permitted by the franchise agreement; is not undertaken in good faith; is not undertaken for good cause; or is based on an alleged breach of the franchise agreement which is not in fact a material and substantial breach; or, if the grounds relied upon for termination, cancellation, or nonrenewal have not been applied in a uniform and consistent manner by the licensee.

269.     FCA engaged in bad faith conduct with respect to Napleton's Northlake and Napleton's South Orlando, routinely threatening to terminate the Franchise Agreements for these dealerships.  FCA has repeatedly made these threats and has done so in writing no fewer than four (4) times against Napleton's Northlake (on January 3, 2014; December 29, 2014; July 24, 2015; and November 4, 2015) and at least twice against Napleton's South Orlando (June 17, 2015 and November 4, 2015).  These threats are based on FCA's allegations that Napleton's Northlake and Napleton's South Orlando have failed to meet one-hundred percent (100%) of the Minimum Sales Responsibility metric set by FCA, and that Napleton's Northlake's dealership facilities are purportedly in need of "urgent" repair.

270.     The Franchise Agreements, however, do not specify a particular Minimum Sales Responsibility baseline for Napleton's Northlake or Napleton's South Orlando to achieve.  FCA has vested itself with discretion to set the significant components of Minimum Sales Responsibility, including these dealerships' respective sales zones, competitive markets, and "fair shares" of sales responsibility among other dealers in their respective sales zones.

271.     As detailed above, FCA has repeatedly abused its discretion dishonestly, unfairly, and in bad faith to inflate the Minimum Sales Responsibility for Napleton's Northlake and Napleton's South Orlando to unachievable levels, thus frustrating these dealerships' bargained-for rights under the Franchise Agreement, and manufacturing a basis to threaten them with

termination. As detailed above, FCA established sales zones far beyond the reasonable reach of these dealerships' businesses. FCA, acting against the advice of Urban Science, has deemed Luxury Brands to be "competitive" with the vehicles that these dealerships sell, further inflating their Minimum Sales Responsibility baselines. And FCA has assigned these dealerships a "fair share" among competing CDJR dealers that fails to take into account the wrongful subsidies, allocations, and kickbacks FCA knowingly provides to dealers in direct competition with Napleton's Northlake and Napleton's South Orlando. FCA's other underhanded and coercive conduct, detailed above and below, further evinces its bad faith and dishonesty in frustrating these dealerships' performance, and thereafter wrongfully threatening termination.

272. Moreover, Napleton's Northlake undertook to renovate its dealership facility, having no obligation to do so as a direct result of the bad faith coercive conduct of FCA. Notwithstanding that FCA has acknowledged the fact that it has undertaken improvements to its facility, it has done nothing to account for these facts in setting Minimum Sales Responsibility, and its threats of termination continue unabated.

273. FCA's threats of termination are not in good faith or for good cause and have not been applied in a uniform and consistent manner by FCA.

274. Because the termination threatened by FCA violates section 320.641, Florida Statutes, FCA's threat constitutes a violation of section 320.64(7) of the Florida Automobile Dealers Act.

275. As a result of FCA's illegal conduct, Napleton's Northlake and Napleton's South Orlando have already suffered damages including, but not limited to, lost market value as going concerns. In addition, Florida Plaintiffs have incurred substantial investigative fees, legal fees,

and litigation expenses in an amount to be determined. These dealerships will each suffer further irreparable harm if FCA is permitted to terminate their Franchise Agreements.

WHEREFORE, pursuant to sections 320.695 and 320.697 of the Florida Automobile Dealers Act, the Florida Plaintiffs demand entry of a judgment against FCA for:

(a)     Treble damages in an amount to be determined at trial;

(b)     A declaration that the Florida Plaintiffs are not in default of their Franchise Agreements and that FCA has no basis to terminate their Franchise Agreements;

(c)     An injunction barring FCA from terminating or threatening termination of the Franchise Agreements for the Florida Plaintiffs;

(d)     An injunction barring FCA from determining or setting any component of Minimum Sales Responsibility arbitrarily, discriminatorily, or otherwise in bad faith;

(e)     Costs of suit including reasonable attorneys' fees; and

(f)     Such other relief as this Court deems just and equitable.

## COUNT XI

### (Violations of the Missouri Motor Vehicle Franchise

### Practice Act – MO. Rev. Stat. § 407.825)

### Brought by Napleton's Mid Rivers against FCA

276.     Plaintiffs re-affirm, re-allege, and incorporate each allegation and averment in the preceding and succeeding paragraphs as though fully set forth herein.

277.     FCA and Napleton's Mid Rivers, a dealership located in Missouri, are parties to a Franchise Agreement, which is a "franchise" or "franchise agreement" as defined under the Missouri Motor Vehicle Franchise Practice Act or "MVFPA" (MO. Rev. Stat. § 407.810, *et seq.*).

FCA is a franchisor that, on information and belief, obtained or renewed its license after August 28, 2010. Napleton's Mid Rivers is a franchisee under the MVFPA.

278.     Section 407.825(1) of the MVFPA provides that it is unlawful for a franchisor such as FCA "[t]o engage in any conduct which is capricious or not in good faith or unconscionable and which causes damage to a motor vehicle franchisee or to the public . . . " As set forth in more detail above and below, FCA unlawfully engaged in conduct that was capricious or in bad faith or unconscionable, and this conduct caused damage to Napleton's Mid Rivers or to the public.

279.     Section 407.825 further provides that it is unlawful for FCA to commit the following acts:

>      (9)     To impose unreasonable standards of performance upon a motor vehicle franchisee or to require, attempt to require, coerce or attempt to coerce a franchisee to adhere to performance standards that are not applied uniformly to other similarly situated franchisees.

>                                      ***

>      (18)     To fail or refuse to offer to sell to all franchisees for a line-make reasonable quantities of every motor vehicle sold or offered for sale to any franchisee of that line-make.

>                                      ***

>      (28)     To fail to make practically available any incentive, rebate, bonus, or other similar benefit to a franchisee that is offered to another franchisee of the same line-make within this state.

>                                      ***

>      (32)     Offering rebates, cash incentives, or other promotional items for the sale of a vehicle by its franchisees unless: the same rebate, cash incentive, or promotion is offered to all of its franchisees of the same line-make; and any rebate, cash incentive, or promotion that is based on the sale of an individual vehicle is not increased for meeting a performance standard.

>                                      ***

>      (33)     Unreasonably discriminating among its franchisees in any program that provides assistance to its franchisees, including internet listings, sales leads,

warranty policy adjustments, marketing programs, and dealer recognition programs.

\*\*\*

(40) Establishing any performance standard or program for measuring franchisee performance that may have a material impact on a franchisee that is not fair, reasonable, and equitable, or applying any such standard or program to a franchisee in a manner that is not fair, reasonable, and equitable.

\*\*\*

(41) Establishing or implementing a plan or system for the allocation, scheduling, or delivery of new motor vehicles, parts, or accessories to its franchisees that is not fair, reasonable, and equitable or modifying an existing plan or system so as to cause the plan or system to be unreasonable, unfair, or inequitable.

280.    FCA has violated each of these express statutory demands.

281.    The Volume Growth Program, as designed and as applied, imposes unreasonable standards of performance on Napleton's Mid Rivers. The Volume Growth Program has a material impact on Napleton's Mid Rivers and is a performance standard or program for measuring franchisee performance that is not fair, reasonable, and equitable.

282.    The Volume Growth Program unlawfully offers incentives and promotional benefits to franchisees by increasing the incentives and benefits that franchisees can receive based on meeting a performance standard set by FCA. Moreover, due to the arbitrary nature of the Volume Growth Program targets and discriminatory and punitive nature of the Clawback Penalty, FCA has required and continues to require Napleton's Mid Rivers to adhere to performance standards in the Volume Growth Program that FCA does not set uniformly among similarly situated dealers.

283.    FCA's wrongful and fraudulent scheme to solicit and cause Conspiring Dealers to falsify NVDRs in exchange for providing Conspiring Dealers monies and allocations of high-demand vehicles also violates the MVFPA. As a result of FCA's unlawful Volume Growth

Program and false sales reporting schemes, FCA has failed to make practically available incentives, rebates, bonuses, or other similar benefits to Napleton's Mid Rivers that it has made to other franchisees of the same line-make within Missouri. Also as a result of these schemes, FCA (i) failed or refused to offer to sell to Napleton's Mid Rivers reasonable quantities of every motor vehicle it sold or offered for sale to any franchisee of FCA; (ii) unreasonably discriminated among its franchisees in programs providing assistance to franchisees (including advertising and co-op support programs); and (iii) established or implemented a plan or system for the allocation of new motor vehicles that is not fair, reasonable, and equitable.

284.    Moreover, the Minimum Sales Responsibility metric is a performance standard that if not met may have a material impact on Napleton's Mid Rivers, and violates several prohibitions in the MVFPA. FCA has repeatedly abused its discretion dishonestly, unfairly, and in bad faith to inflate Napleton's Mid Rivers' Minimum Sales Responsibility baseline to arbitrarily high levels. As detailed above, FCA established unreasonable sales zones; has deemed Luxury Brands to be "competitive" with the vehicles that Napleton's Mid Rivers sells; and assigned Napleton's Mid Rivers a "fair share" among competing CDJR dealers that fails to take into account the wrongful subsidies, allocations, and kickbacks FCA knowingly provides to its Competing Dealers. FCA's other underhanded and coercive conduct, detailed above and below, further evinces its bad faith and dishonesty in imposing an unreasonable performance standard or program for measuring Napleton's Mid Rivers' performance that it also fails to apply uniformly to all similarly situated franchisees.

285.    In addition, FCA has imposed unreasonable restrictions on Napleton's Mid Rivers' ability to assert legal or equitable rights.

286.     FCA conducts an incentive program called the Customer First Award for Excellence (the "Customer First Program"). Generally, dealers are eligible when they meet objective and subjective criteria based on customer satisfaction, facility evaluations, and completed sales training.

287.     The Customer First Program provides important marketing benefits for dealers, including recognition on FCA US brand websites, designation on "Find a Dealer" pages, press release material, and the dealer's ability to use the Customer First Program logo in its marketing.

288.     In 2016, FCA wrongfully promulgated rules that disqualify any participant from the Customer First Program who "engages in litigation with FCA US during the certification period," and further provides that any dealer engaging in litigation "will have its certification withdrawn and will be disqualified from receiving all further recognition and events relating to the certification."

289.     This unreasonable restriction on Napleton's Mid Rivers' rights to assert its legal and equitable rights has no rational connection to the sales, facility, and training goals the program is designed to incentivize.

290.     Each of FCA's wrongful actions resulted in damage to Napleton's Mid Rivers, including but not limited to lost retail sales of vehicles and related finance and insurance products, lost profits from vehicle sales, lost profits from the resale of used vehicles which would have been taken in trade on the lost vehicle sales, lost customer goodwill, lost market value as going concerns, lost marketing monies, lost potential future sales of vehicles to repeat customers, and lost profits from warranty and non-warranty sales of service and parts for vehicle owners who tend to have their vehicles serviced at the same dealership where they were purchased. In addition, Plaintiff has incurred substantial investigative fees, legal fees, and litigation expenses in an amount

to be determined.  If allowed to continue, FCA's actions will result in further loss of Plaintiff's money or property.

291.	Each of FCA's wrongful actions were and are willful.

292.	In addition, FCA willfully violated a "franchise" as that term is defined under the MVFPA when it breached its Franchise Agreement with Napleton's Mid Rivers through its actions and omissions, as detailed above.  Pursuant to section 407.835 of the MVPFA, Napleton's Mid Rivers is entitled to actual damages, injunctive relief, and expenses of litigation (including attorneys' fees) where FCA is liable for damages resulting from a violation of a franchise, and may be awarded punitive damages for any willful violation.

WHEREFORE, pursuant to section 407.835 of the MVFPA, Plaintiff Napleton's Mid Rivers demands entry of a judgment against FCA for:

(a)	Damages in an amount to be determined at trial;

(b)	Punitive damages in an amount to be determined at trial;

(c)	An injunction restraining FCA from engaging or continuing to engage in the unfair methods of competition or deceptive acts or practices declared unlawful under the MVFPA;

(d)	A declaration that the incentive plan provision conditioning eligibility on whether a dealer is in active litigation is unlawful, null, void, and of no legal effect;

(e)	An injunction barring FCA from implementing or enforcing any provision purporting to restrict Plaintiff's right to bring a lawsuit against FCA;

(f)	An injunction barring FCA from implementing the Volume Growth Program or any similar program;

(g)     An injunction barring FCA from falsifying sales reports or taking any steps in furtherance of any such scheme;

(h)     An injunction barring FCA from setting any component of Minimum Sales Responsibility in any unreasonable manner;

(i)     Costs of suit including reasonable attorneys' fees; and

(j)     Such other relief as this Court deems just and equitable.

## COUNT XII

### (Violations of the Pennsylvania Board of Vehicles Act – 63 P.S. § 818.12)

### Brought by Napleton's Ellwood City against FCA

293.     Plaintiffs re-affirm, re-allege, and incorporate each allegation and averment in the preceding and succeeding paragraphs as though fully set forth herein.

294.     Plaintiff Napleton's Ellwood City is a new vehicle dealer under the Pennsylvania Board of Vehicles Act ("Board of Vehicles Act," 63 P.S. § 818.1 *et seq.*).

295.     FCA is a manufacturer and/or distributor as those terms are defined under the Board of Vehicles Act.

296.     FCA and Napleton's Ellwood City, a dealership located in Pennsylvania, are parties to a Franchise Agreement, which is a "franchise" as that term is defined under the Board of Vehicles Act.

297.     Section 818.12(b) of the Board of Vehicles Act provides that it shall be a violation for any manufacturer, distributor, field representative, officer, agent, or any representative whatsoever to:

(12)     Operate a system for the allocation of new vehicles which is not reasonable or fair to a new vehicle dealer; [or]

\*\*\*

- 91 -

(18)     Vary the price charged to any of its new vehicle dealers, which has the effect of causing a difference in the price of any similarly equipped new vehicle to its new vehicle dealers or to the ultimate purchaser. This paragraph shall not be construed to prevent the offering of incentive programs or other discounts if the incentive or discounts are available to all competing new vehicle dealers of the same line-make in this Commonwealth on a proportionately equal basis.

298.     FCA has violated both of these express statutory commands.  As detailed above, the Volume Growth Program has the effect of causing a difference in the price of any similarly equipped new vehicle to new vehicle dealers or to the ultimate purchaser, to the detriment of Napleton's Ellwood City.  The Volume Growth Program is not functionally or actually available to all competing new dealers on a proportionately equal basis.

299.     Moreover, FCA has unlawfully operated a system for the allocation of new vehicles which is not reasonable or fair to Napleton's Ellwood City.  FCA allocated vehicles to dealers who were provided price subsidies not functionally available to Napleton's Ellwood City, and allocated other vehicles as kickbacks to Conspiring Dealers who were willing to engage in FCA's scheme to falsely report vehicle sales.  This wrongful conduct diverted sales from Plaintiff and eroded the value of Plaintiff's business.

300.     Each of FCA's wrongful actions resulted in damage to Napleton's Ellwood City, including but not limited to lost retail sales of vehicles and related finance and insurance products, lost profits from vehicle sales, lost profits from the resale of used vehicles which would have been taken in trade on the lost vehicle sales, lost customer goodwill, lost market value as going concerns, lost marketing monies, lost potential future sales of vehicles to repeat customers, and lost profits from warranty and non-warranty sales of service and parts for vehicle owners who tend to have their vehicles serviced at the same dealership where they were purchased.  In addition, Plaintiff has incurred substantial investigative fees, legal fees, and litigation expenses in an amount

to be determined. If allowed to continue, FCA's actions will result in further loss of Plaintiff's money or property.

WHEREFORE, pursuant to sections 818.12 and 818.29 of the Pennsylvania Board of Vehicles Act, Plaintiff Napleton's Ellwood City demands entry of a judgment against FCA for:

(a)    Damages in an amount to be determined at trial;

(b)    An injunction restraining FCA from engaging or continuing to engage in the unfair methods of competition or deceptive acts or practices declared unlawful under 63 P.S. § 812.12;

(c)    An injunction barring FCA from implementing the Volume Growth Program or any similar program;

(d)    An injunction barring FCA from falsifying sales reports or taking any steps in furtherance of any such scheme;

(e)    Costs of suit including reasonable attorneys' fees; and

(f)    Such other relief as this Court deems just and equitable.

## COUNT XIII

### (Fraud in the Inducement)

**Brought by Napleton's Arlington Heights against FCAR**

**[REPLED SOLELY TO PROTECT AGAINST ASSERTIONS OF WAIVER ON ANY SUBSEQUENT APPEAL]**

301.    Plaintiffs re-affirm, re-allege, and incorporate each allegation and averment in the preceding and succeeding paragraphs as though fully set forth herein.

302.    Plaintiff Napleton's Arlington Heights acquired substantially all of the assets of that CDJR new and used motor vehicle sales and service facility commonly referred to as

Advantage Chrysler Jeep Dodge, located at 77 Rand Road, Des Plaines, Illinois 60005 (the "Dealership Location"). Napleton's Arlington Heights subleased the Dealership Location from FCAR and occupied the Dealership Location in connection with its business operations as the successor franchisee.

303.     In connection with its occupancy of the Dealership Location, Napleton's Arlington Heights made certain repairs to the Dealership Property including, but not limited to, replacing cracked tile, broken glass, and approximately seventy-eight (78) lighting fixtures in the parking lot of the Dealership Location (hereinafter collectively referred to as "Dealership Repairs").

304.     At no time was Napleton's Arlington Heights legally obligated to make such repairs. Rather, FCAR fraudulently induced Napleton's Arlington Heights to make the subject repairs based upon FCAR's representations, upon which Napleton's Arlington Heights relied, that it would be fully reimbursed for all of its out-of-pocket expenses in connection with the Dealership Repairs including, but not limited to, the replacement of the approximately seventy-eight (78) lighting fixtures.

305.     Napleton's Arlington Heights had no legal obligation to make any of the Dealership Repairs.

306.     The foregoing representations made by FCAR that Napleton's Arlington Heights would be reimbursed for its out-of-pocket expenses for the Dealership Repairs (i) were representations of fact, (ii) were false and material, (iii) were made with FCAR's knowledge of its falsity or with reckless disregard of whether same was true or false, (iii) were made by FCAR with the intent that it should be acted upon by Napleton's Arlington Heights; and (iv) upon which Napleton's Arlington Heights justifiably relied thereupon.

307.     FCAR engaged in a scheme to defraud and, in furtherance thereof, made misrepresentations with the intent to induce Napleton's Arlington Heights to rely upon those misrepresentations. FCAR's misrepresentations deceived Napleton's Arlington Heights, which relied upon FCAR's foregoing statements of fact to its detriment.

WHEREFORE, Plaintiff Napleton's Arlington Heights demands entry of a judgment against FCAR for damages, costs of suit including reasonable attorneys' fees, punitive damages, and such other relief as this Court deems just and equitable.

## COUNT XIV

### (Quantum Meruit)

### Brought by Napleton's Arlington Heights against FCAR

### [REPLED SOLELY TO PROTECT AGAINST ASSERTIONS OF WAIVER ON ANY SUBSEQUENT APPEAL]

308.     Plaintiffs re-affirm, re-allege, and incorporate each allegation and averment in the preceding and succeeding paragraphs as though fully set forth herein.

309.     Plaintiff Napleton's Arlington Heights performed the Dealership Repairs for the benefit of FCAR. The Dealership Repairs were not gratuitous, and FCAR accepted the Dealership Repairs. No contract existed between Plaintiff, Napleton's Arlington Heights, and FCAR for the payment of the Dealership Repairs.

310.     It would be unjust to permit FCAR to retain the benefits of the Dealership Repairs, and Plaintiff Napleton's Arlington Heights is entitled to the reasonable value of the work performed.

311.     WHEREFORE, Plaintiff Napleton's Arlington Heights demands entry of a judgment against FCAR for damages, costs of suit including reasonable attorneys' fees, and such other relief as this Court deems just and equitable.

### Jury Trial Demand

Plaintiff hereby demands trial by jury of all matters so triable.

Dated: February 7, 2018                    Respectfully submitted,


Napleton's Arlington Heights Motors, Inc.
Napleton's River Oaks Motors, Inc.
Clermont Motors, LLC
Napleton's North Palm Auto Park, Inc.
Napleton Enterprises, LLC
Napleton's Mid Rivers Motors, Inc.
Napleton's Ellwood Motors, Inc.


By: /s/ Steve W. Berman_____


Steve W. Berman
Thomas E. Loeser
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 8th Avenue
Suite 3300
Seattle, WA 98101
(206) 623-7292


Jeannie Y. Evans
HAGENS BERMAN SOBOL SHAPIRO LLP
455 N. Cityfront Plaza Drive, Suite 2410
Chicago, Illinois 60611
Telephone: (708) 628-4949
Facsimile: (708) 628-4950
jeannie@hbsslaw.com

David C. Gustman
Jeffery M. Cross
Alexander Vesselinovitch
Dylan Smith
David J. Ogles
Freeborn & Peters LLP
311 S. Wacker Drive, Suite 3000
Chicago, IL  60606
(312) 360-6000
dgustman@freeborn.com
jcross@freeborn.com
avesselinovitch@freeborn.com
dsmith@freeborn.com
dogles@freeborn.com