## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

NAPLETON'S ARLINGTON HEIGHTS
MOTORS, INC. f/k/a NAPLETON'S
PALATINE MOTORS, INC.  d/b/a
NAPLETON'S ARLINGTON HEIGHTS
CHRYSLER DODGE JEEP RAM, an
Illinois corporation; NAPLETON'S RIVER
OAKS MOTORS, INC. d/b/a NAPLETON'S
RIVER OAKS CHRYSLER DODGE JEEP
RAM, an Illinois corporation; CLERMONT
MOTORS, LLC d/b/a NAPLETON'S
CLERMONT CHRYSLER DODGE JEEP
RAM, an Illinois limited liability company;
NAPLETON'S NORTH PALM AUTO
PARK, INC. d/b/a NAPLETON'S
NORTHLAKE CHRYSLER DODGE JEEP
RAM, an Illinois corporation; NAPLETON
ENTERPRISES, LLC d/b/a NAPLETON'S
SOUTH ORLANDO CHRYSLER DODGE
JEEP RAM, an Illinois limited liability
company; NAPLETON'S MID RIVERS
MOTORS, INC. d/b/a NAPLETON'S MID
RIVERS CHRYSLER DODGE JEEP RAM,
an Illinois corporation; NAPLETON'S
ELLWOOD MOTORS, INC. d/b/a
NAPLETON'S ELLWOOD CHRYSLER
DODGE JEEP RAM, an Illinois corporation,

      Plaintiffs,

  v.

FCA US LLC, a Delaware corporation,

      Defendant.

Case No. 1:16-cv-00403-VMK-SMF

Hon. Virginia M. Kendall
Hon. Sheila M. Finnegan

## PLAINTIFFS' MEMORANDUM OF LAW
## IN OPPOSITION TO FCA US LLC'S MOTION TO DISMISS
## COUNTS IV AND V OF PLAINTIFFS' SECOND AMENDED COMPLAINT

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

ARGUMENT ........................................................................................................ 2

I.   Plaintiffs Have RICO Standing........................................................................ 2

     A.   The Second Amended Complaint Adequately Alleges RICO Standing................ 2

     B.   The RICO Counts Adequately Allege Proximate Cause as to Each Plaintiff......... 7

II.  Plaintiffs Adequately Allege An Association-In-Fact Enterprise.................................... 10

     A.   FCA Is Sufficiently Distinct From the Enterprise. ............................................... 10

     B.   The Enterprise Has a Common Purpose. ........................................... 12

     C.   The Enterprise Is Sufficiently Distinct From the Alleged Racketeering
          Activity. ...................................................................................... 14

III. Plaintiffs Adequately Allege That FCA Participated In The Conduct Of The
     Enterprise's Affairs.......................................................................... 15

IV.  Plaintiffs Adequately Allege A Pattern Of Racketeering Activity. ................................. 18

     A.   Plaintiffs Adequately Allege That the Predicate Acts Constituted a Pattern........ 18

     B.   Plaintiffs Adequately Allege Racketeering Activity........................................... 20

CONCLUSION.................................................................................................... 25

## TABLE OF AUTHORITIES

CASES                                                                     PAGE(S)

*AARP v. Am. Fam. Prepaid Leg. Corp., Inc.*,
   604 F. Supp. 2d 785 (M.D.N.C. 2009) ................................................................14

*Abraham v. Singh*,
   480 F.3d 351 (5th Cir. 2007) ...........................................................................18

*Ackerman v. N.W. Mut. Life Ins. Co.*,
   172 F.3d 467 (7th Cir. 1999) .............................................................................9

*Allstate Ins. Co. v. Etienne*,
   No. 09-CV-3582, 2010 WL 4338333 (E.D.N.Y. Oct. 26, 2010)...........................................15

*Anza v. Ideal Steel Supply Corp.*,
   547 U.S. 451 (2006)....................................................................................5

*Bastian v. Petren Res. Corp.*,
   892 F.2d 680 (7th Cir. 1990) ............................................................................25

*BCS Servs., Inc.* v. *BG Invs., Inc.*,
   728 F.3d 633 (7th Cir. 2013) ...........................................................................21

*BCS Servs., Inc. v. Heartwood 88, LLC*,
   637 F.3d 750 (7th Cir. 2011) ......................................................................6, 8, 9

*Bible v. United Student Aid Funds, Inc.*,
   799 F.3d 633 (7th Cir. 2015) ..............................................................10, 13, 17, 21

*Boyle v. United States*,
   556 U.S. 938 (2009).............................................................................1, 10, 15

*Bridge v. Phoenix Bond & Indem. Co.*,
   553 U.S. 639 (2008)...............................................................................5, 6, 21

*Buchman v. Bear Stearns & Co.*,
   178 F.3d 930 (7th Cir. 1999) ............................................................................13

*Chambers v. King Buick GM, LLC*,
   43 F. Supp. 3d 575 (D. Md. 2014)....................................................................12, 14

*Chen v. Mayflower Transit, Inc.*,
   315 F. Supp. 2d 886 (N.D. Ill. 2004) .................................................................11, 12

*DeGuelle v. Camilli*,
   664 F.3d 192 (7th Cir. 2011) ........................................................................18, 19

*Ellis v. State*,
    794 S.E.2d 601 (Ga. 2016) ...................................................................................................24

*Fiorillo v. Winiker*,
    85 F. Supp. 3d 565 (D. Mass. 2015) ...................................................................................24

*Fitzgerald v. Chrysler Corp.*,
    116 F.3d 225 (7th Cir. 1997) ..............................................................................................11

*George v. Urban Settlement Servs.*,
    833 F.3d 1242 (10th Cir. 2016) ..........................................................................................16

*Goren v. New Vision Intern, Inc.*,
    156 F.3d 721 (7th Cir. 1998) ................................................................................................9

*Guaranteed Rate, Inc. v. Barr*,
    912 F. Supp. 2d 671 (N.D. Ill. 2012) ...................................................................10, 13, 18

*H.J. Inc. v. Nw. Bell Tel. Co.*,
    492 U.S. 229 (1989) .......................................................................................................18, 19

*Handeen v. Lemaire*,
    112 F.3d 1339 (8th Cir. 1997) .............................................................................................13

*Holmes v. Secs. Investor Protection Corp.*,
    503 U.S. 258 (1992) ...............................................................................................................5

*In re American Honda Motor Co., Inc. Dealerships Relations Litig.*,
    941 F. Supp. 528 (D. Md. 1996) .......................................................................................5, 6

*Jennings v. Auto Meter Prods., Inc.*,
    495 F.3d 466 (7th Cir. 2007) ..........................................................................................19, 22

*Kostovetsky v. Ambit Energy Holdings, LLC*,
    No. 15 C 2553, 2016 WL 015980 (N.D. Ill. Jan. 8, 2016) ....................................................18

*Maersk, Inc. v. Neewra, Inc.*,
    554 F. Supp. 2d 424 (S.D.N.Y. 2008) ...................................................................................18

*McKee v. State*,
    715 So. 2d 1010 (Fla. 5th Dist. App. 1998) ..........................................................................24

*MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*,
    62 F.3d 967 (7th Cir. 1995) ..........................................................................................13, 15

*Morgan v. Bank of Waukegan*,
    804 F.2d 970 (7th Cir. 1986) ...............................................................................................21

*Oberoi v. Mehta*,
    No. 10 C 7275, 2011 WL 1337107 (N.D. Ill. Apr. 6, 2011) .................................................13

*Ouwinga v. Benistar 419 Plan Servs., Inc.*,
    694 F.3d 783 (6th Cir. 2012) ..................................................................................................16

*Pennsylvania Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n*,
    No. 09 C 5619, 2010 WL 1979569 (N.D. Ill. May 17, 2010) ...........................................9, 14

*People v. Perry*,
    864 N.E.2d 196 (Ill. 2007) ......................................................................................................24

*Phoenix Bond & Indemnity Co. v. Bridge*,
    477 F.3d 928 (7th Cir. 2007) ..................................................................................................21

*Republic of Columbia v. Diageo North America Inc.*,
    531 F. Supp. 2d 365 (E.D.N.Y 2007) .....................................................................................14

*Reves v. Ernst & Young*,
    507 U.S. 170 (1993) ................................................................................................................15

*Rowe v. Bankers Life and Cas. Co.*,
    No. 09-CV-00491, 2010 WL 3699928 ......................................................................................9

*Safe Streets Alliance v. Hickenlooper*,
    859 F.3d 865 (10th Cir. 2017) ................................................................................................15

*Scott v. Chuhak & Tecson, P.C.*,
    725 F.3d 772 (7th Cir. 2013) ..................................................................................................25

*Stachon v. United Consumers Club Inc.*,
    229 F.3d 673 (7th Cir. 2000) ..................................................................................................13

*United Foods Commercial Workers Union v. Walgreen Co.*,
    719 F.3d 849 (7th Cir. 2013) ...............................................................................13, 15, 16, 17

*United States Textiles, Inc. v. Anheuser-Busch Cos., Inc.*,
    911 F.2d 1261 (7th Cir. 1990) ................................................................................................21

*United States v. Gotti*,
    459 F.3d 296 (2d Cir. 2006) ...................................................................................................23

*United States v. Ivezaj*,
    568 F.3d 88 (2d Cir. 2009) .....................................................................................................23

*United States v. Karigiannis*,
    430 F.2d 148 (7th Cir. 1970) ..................................................................................................23

*United States v. Russo*,
No. 87 CR 501, 1988 WL 17623 (N.D. Ill. Feb. 24, 1988) ....................................................23

**STATUTES**

720 ILCS 5/15-1 ...................................................................................................................24

720 ILCS 5/8-4 .....................................................................................................................24

18 U.S.C. § 1341...............................................................................................................22, 23

18 U.S.C. § 1952(b) ...............................................................................................................23

18 U.S.C. § 1961(1) ...............................................................................................................24

18 U.S.C. § 1962(c) ................................................................................................................15

Fl .Stat. Ann. § 836.05 ...........................................................................................................24

Tex. Pen. Code § 31.01(5) .....................................................................................................24

**OTHER AUTHORITIES**

31A Am. Jur. 2d § 33 (Feb. 2018 update) .............................................................................24

**INTRODUCTION**

Reading FCA's arguments for dismissal of Plaintiffs' RICO claims, one could wonder whether its motion targets some pleading other than the Second Amended Complaint.

Any fair reading of the RICO counts must acknowledge that they plead no "garden-variety business dispute." Rather, they allege with particularity that FCA directed a multi-year, nationwide scheme to falsely inflate reported sales figures—a scheme coordinated from the highest levels within FCA. FCA conducted that scheme, through an association-in-fact enterprise, in anything but the "ordinary way" of doing business with the Conspiring Dealers that were part of the enterprise. The well-pleaded allegations establish that FCA and the Conspiring Dealers perverted their normal course of dealing to serve the unlawful ends of the scheme. Moreover, as acknowledged in documents produced by FCA and cited throughout the Second Amended Complaint, the scheme, by design, proximately caused injury to Plaintiffs and other non-Conspiring Dealers. At bottom, FCA's arguments for dismissal depend on a willful refusal to reckon with the RICO counts as they are actually pleaded.

Only through that willful refusal can FCA argue that the cases it relies on support its position. To be sure, RICO does not cover routine frauds lacking in continuity or threat of repetition. But neither is it applicable only to paradigmatic organized crime. Indeed, the Supreme Court has "repeatedly refused to adopt narrowing constructions of RICO in order to make it conform to a preconceived notion of what Congress intended to proscribe." *Boyle v. United States*, 556 U.S. 938, 950 (2009) (citing cases) (internal quotations and citation omitted). Though the prerequisites to a RICO cause of action are meaningful, and in some respects rigorous, they are not as arcane or insurmountable as FCA suggests. Whatever the outer limits of a RICO claim, the Second Amended Complaint falls well within those boundaries. Accordingly, FCA's request to dismiss the RICO counts should be denied.

**ARGUMENT**

As demonstrated below, in the same order as in FCA's brief, FCA's arguments for dismissal of the RICO counts all lack merit. Given the Court's familiarity with the Second Amended Complaint's allegations, they are discussed below as relevant to the issues presented.

**I.      Plaintiffs Have RICO Standing.**

In seeking dismissal, FCA presents the same standing argument it made in opposition to Plaintiffs' motion for leave to amend. Because the Second Amended Complaint adequately alleges that FCA's racketeering activity directly harmed Plaintiffs, that argument is no more persuasive now than it was then. Nor is the argument enhanced by FCA's reliance on inapposite cases involving "group pleading" with regard to multiple defendants.

**A.      The Second Amended Complaint Adequately Alleges RICO Standing.**

As it did in opposition to Plaintiffs' motion for leave to amend, FCA once again argues that the Second Amended Complaint "fails to even address, let alone cure, the deficiencies that supported this Court's previous dismissal." (Doc. 290 ("FCA Br.") at 4.) To the contrary, the Second Amended Complaint responds directly to the Court's concerns about RICO standing, and does so with well-pleaded allegations of direct injury. Under governing case law, moreover, those allegations are more than sufficient to establish RICO standing.

In dismissing the original RICO counts without prejudice, the Court held that the Amended Complaint did not adequately allege proximate causation. The Court determined that the Amended Complaint "failed to allege sufficient facts to show that [Plaintiffs'] alleged harm was in fact caused by the FCA's alleged racketeering activity," as opposed to other possible causes. (Doc. 62 at 16-17.) Specifically, with regard to vehicle allocation, the Court concluded that the original allegations left open the possibility "that Plaintiffs were not allocated popular vehicles because they did not actually need those vehicles." (*Id.* at 17.) Further, "even if it were

- 2 -

the case that Plaintiffs did indeed receive fewer popular vehicles to sell due to the scheme," the Court reasoned, Plaintiffs failed to "plead with any factual enhancement that they were experiencing a shortage of popular vehicles and thus were losing out on sales due to the scheme." (*Id.* at 18.)

The Second Amended Complaint squarely addresses these points with non-conclusory allegations. *First*, it pleads that the false sales reporting scheme directly reduced Plaintiffs' inventory of hot-selling vehicles. Plaintiffs allege that FCA allocates the majority of its vehicles in mechanistic fashion, according to an algorithm that turns on a dealership's "days' supply" of vehicles. (*See* Doc. 222-1 ("SAC") ¶¶ 18, 183.) Based on discovery recently produced by FCA, the Second Amended Complaint alleges that, by counting fictitious sales as real sales for purposes of computing days' supply, FCA's scheme caused Conspiring Dealers to jump ahead of Plaintiffs in the line for hot-selling cars. (*Id.* ¶¶ 18, 49, 50, 60, 175, 184, 188.) Indeed, the Second Amended Complaint alleges that this skewing of the vehicle allocation system was a deliberate aspect of the scheme to falsely report sales. (*Id.* ¶¶ 19, 50.) FCA expressly held out the prospect of preferential hot-vehicle allocation as an incentive for Conspiring Dealers to falsely report sales of hot vehicles. (*Id.*) Both FCA and the Conspiring Dealers understood that the hot-car allocation incentive would give the Conspiring Dealers an advantage over those not participating. (SAC ¶ 175 (quoting FCA_Napleton_00037507); *id.* ¶¶ 178, 188.)

Given the mechanistic nature of the vehicle allocation system, and the automatic impact of false sales reporting on that system, the allegations in the Second Amended Complaint rule out the possibility that the alleged diversion of popular vehicles from Plaintiffs to Conspiring Dealers resulted from causes other than FCA's racketeering activity. In other words, the Second

- 3 -

Amended Complaint adequately alleges that "Plaintiffs did indeed receive fewer popular vehicles to sell due to the scheme." (Doc. 62 at 18.)

*Second*, the amended RICO counts answer the Court's call for allegations that Plaintiffs "were experiencing a shortage of popular vehicles and thus were losing out on sales due to the scheme." (*Id.*) Plaintiffs allege that dealers compete with each other to obtain a limited supply of popular vehicles, and that FCA cannot fill every order. (SAC ¶ 181.) They also allege specifically that Plaintiffs' orders for popular cars were rejected, and allocations to Plaintiffs were withheld, in favor of Conspiring Dealers, and that these denials represented thousands of dollars in margin lost at retail, not to mention ancillary profits over time. (*Id.* ¶¶ 18-19, 49-50, 60, 188.) As FCA acknowledges, the Second Amended Complaint alleges, based on a comparison of Plaintiffs' records to FCA's NVDR database for competing dealers, "that numerous customers who visited their stores ultimately purchased vehicles from Conspiring Dealers due to availability (*because the Conspiring Dealer[s] had in their possession vehicles that Plaintiffs would have had but for an allocation method rigged to award Conspiring Dealers with popular vehicles*)." (SAC ¶ 186 (emphasis added); *id.* ¶ 188 (alleging that "customers who physically visited [Plaintiffs'] stores and expressed interest in particular vehicles ultimately purchased those vehicles from Conspiring Dealers because the competitors were able to undercut Plaintiffs on price . . . *and availability of popular models* (because FCA had rigged allocation in favor of Conspiring Dealers)" (emphasis added); *id.* ¶ 175 (quoting FCA_Napleton_00037507).)

Further, Plaintiffs allege that, in addition to the algorithmic method used to allocate the majority of vehicles, FCA maintained a discretionary vehicle pool that it used to reward Conspiring Dealers for their participation in the scheme. (SAC ¶ 182; *see also* ¶¶ 51(g), 55.) The Second Amended Complaint elaborates on this aspect of the scheme, and alleges that FCA itself

recognized that these preferential allocations would result in Plaintiffs' losing out on allocations of desirable vehicles—vehicles that Plaintiffs would have sold had they not been allocated exclusively to Conspiring Dealers who accepted FCA's bribes. (*Id.* ¶¶ 55, 175-79, 182, 186-88.) *Cf. In re American Honda Motor Co., Inc. Dealerships Relations Litig.*, 941 F. Supp. 528, 543-45 (D. Md. 1996) (holding that plaintiff Honda dealers adequately alleged proximate causation necessary for RICO standing under *Holmes v. Secs. Investor Protection Corp.*, 503 U.S. 258 (1992), where they claimed that the scheme [in which other dealers bribed Honda employees for favorable vehicle allocations] caused the misallocation of cars and that these diversions amounted to the direct denial of profits to plaintiff dealers").

In other words, based solely on the well-pleaded facts concerning vehicle allocation, the Second Amended Complaint adequately alleges what the Court's Order found wanting in the Amended Complaint—that Plaintiffs "were losing out on sales due to the scheme." (Doc. 62 at 18.) Moreover, unlike in *Anza*, there are no more "immediate victims" of FCA's scheme that "can be expected to vindicate the laws by pursuing their own claims." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 460 (2006). Faced with these well-pleaded allegations, FCA relies on selective citation to the Second Amended Complaint and the claim that amended allegations of direct injury are "conclusory." (FCA Br. at 7.) But FCA's rote incantation of that label does not do justice to the degree of sourcing and specificity in the amended allegations relevant to RICO standing.

FCA's position is also contrary to Supreme Court and Seventh Circuit teaching about what is necessary to plead direct injury. In this regard, not only the Supreme Court's ruling in *Bridge*, but also the Seventh Circuit's subsequent ruling in that same case, is instructive. In *Bridge*, the Supreme Court held that the plaintiffs (regular bidders at Cook County's real estate

tax lien auctions) adequately alleged RICO standing even though they themselves did not rely on the alleged fraudulent misrepresentations (*i.e.*, the defendants' false attestations of compliance with the County's "Single, Simultaneous Bidder Rule"). The plaintiffs had standing, the Supreme Court held, because "[i]t was a foreseeable and natural consequence of [the defendants'] scheme to obtain more liens for themselves that other bidders would obtain fewer liens." *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 658 (2008).

Nevertheless, on remand in *Bridge*, the district court granted summary judgment for the defendants on the ground that the plaintiffs could not prove that the fraud proximately caused their losses, which, in the district court's view, could have resulted from "'any number of reasons unrelated to Defendants' alleged violations of the SSBR.'" *BCS Servs., Inc. v. Heartwood 88, LLC*, 637 F.3d 750, 752 (7th Cir. 2011). Reversing, the Seventh Circuit rejected this logic. "Once a plaintiff presents evidence that he suffered the sort of injury that would be the expected consequence of the defendant's wrongful conduct," the appeals court instructed, "he has done enough to withstand *summary judgment* on the ground of absence of causation." *Id.* at 758 (emphasis added). "The causal relation between a defendant's act and a plaintiff's injury, like that required to establish standing under Article III of the Constitution, need only be probable." *Id.*

Here, of course, the case is at the pleading stage rather than the summary judgment stage. Moreover, for the reasons outlined above, the "causal relation" between the false sales reporting scheme and Plaintiffs' injury is more than "probable." On the well-pleaded facts, the scheme caused Plaintiffs to receive fewer hot-selling cars and thus to lose out on sales that they otherwise would have made. That is more than sufficient to establish RICO standing. *See In re Honda*, 941 F. Supp. at 545 ("That plaintiff [non-bribe-paying] dealers would be deprived of

- 6 -

profits is the direct and foreseeable result of the alleged scheme to give and receive bribes in exchange for higher allocations of cars.").

At bottom, FCA asks the Court to make inferences that are impermissible on a motion to dismiss. For example, FCA argues that "the automated allocation system Plaintiffs describe ensures that Plaintiffs would <u>not</u> have had a vehicle shortage at any time," because if Plaintiffs "were truly ever 'out of stock' of the most popular vehicles the automated system would have moved them to the front of the line for allocation." (FCA Br. at 6-7 n.5 (emphasis in original).) But that argument assumes, contrary to the well-pleaded allegations, and to the requirement that the complaint be read in the light most favorable to Plaintiffs, that (a) popular vehicle supply was unlimited, and (b) FCA had the ability to replenish dealerships' inventory on a near-instantaneous basis once popular vehicles were "out of stock." According to the Second Amended Complaint, a Conspiring Dealer would jump ahead of Plaintiffs in the line for hot-selling vehicles, even if that dealer actually had *more* of those vehicles than did Plaintiffs. (SAC ¶¶ 49-50, 175-79, 181-85.) Since dealers' demand for those vehicles exceeded FCA's supply, it follows that Plaintiffs' inventory of those vehicles would be exhausted before the Conspiring Dealers'. FCA's attempt to argue a competing (and implausible) inference is inappropriate at the pleading stage.

In short, the Second Amended Complaint plausibly alleges that Plaintiffs suffered direct injury, and thus have RICO standing.

**B.** **The RICO Counts Adequately Allege Proximate Cause as to Each Plaintiff.**

FCA also argues that the complaint lacks "individualized claims" of proximate causation as to each plaintiff. (FCA Br. at 8.) That claim likewise ignores well-pleaded allegations and misapprehends the law.

- 7 -

Rather than accept Plaintiffs' well-pleaded allegations as true, FCA baldly asserts that the scheme set out in the Second Amended Complaint has "different effects on different Plaintiffs who operate in different geographic areas and with different competitors." (*Id.* at 9.) But that improperly contradicts paragraphs 181 through 185, which allege that false sales reports directly injure the Plaintiffs "regardless of the physical location of the Conspiring Dealer" because of the way that FCA's allocation systems work. Moreover, paragraph 48 alleges that the scheme was active in each of Plaintiffs' Business Centers, and paragraphs 175 through 188 allege that Plaintiffs lost sales as a direct result.

By themselves, those allegations—which tie the scheme to each Business Center and allege that it caused direct injury to Plaintiffs who compete in those Business Centers—are more than sufficient. But the Second Amended Complaint goes further: statements from FCA whistleblowers, auditors and investigators, and details on the "who, what, when" of offers and corrupt deals FCA struck with Conspiring Dealers located where Plaintiffs compete. (*See* SAC ¶ 13 (allegations regarding Southeast and Midwest Business Centers as well as nationwide conduct); ¶ 14 (findings regarding widespread nature of scheme); ¶ 50 (alleging harm to Plaintiffs through allocation system); ¶¶ 51(g), (m), (o) (Southeast); ¶¶ 51(a)-(e), (i)-(l) (Midwest); ¶ 51(h) (Mid-Atlantic).)

Moreover, rather than read these well-pleaded allegations in the light most favorable to Plaintiffs, FCA asks the Court to ignore them in favor of its own speculation that "different" markets and competitors would somehow break the chain of causation expressly pleaded in the complaint. FCA ignores that it (not Plaintiffs) has the burden to show that intervening causes may have broken the chain of causation. *BCS Servs.*, 637 F.3d at 757. Any such attempted proof

of intervening causes is an issue for trial, not for a motion to dismiss. *See id.* (reversing *summary judgment* in favor of defendants).

FCA's argument also finds no purchase in the cases it cites. (FCA Br. at 8-9.) None addresses cases with multiple plaintiffs alleging common injury from a common scheme, supported by facts showing that the scheme operated in relevant geographic areas. Rather, the common thread in each of these cases is a failure to plead particular facts regarding the nature of the fraudulent conduct attributable to specific defendants. *See Rowe v. Bankers Life and Cas. Co.*, No. 09-CV-00491, 2010 WL 3699928, at *6 (N.D. Ill. Sep. 13, 2010) (plaintiffs failed to plead any details of fraudulent documents that were in their possession); *Ackerman v. N.W. Mut. Life Ins. Co.*, 172 F.3d 467, 470 (7th Cir. 1999) (no allegations of who, what, or where of a single one of hundreds of discrete misrepresentations made individually to hundreds of plaintiffs); *Goren v. New Vision Intern, Inc.*, 156 F.3d 721, 730 (7th Cir. 1998) (single named plaintiff that failed to allege "the time, place and content of any of the misrepresentations attributed to [multiple] defendants," and failed to specify how each *defendant* was involved); *Pennsylvania Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n*, No. 09 C 5619, 2010 WL 1979569, at *10-11 (N.D. Ill. May 17, 2010) (fraudulent acts were demands for re-payment made to each plaintiff).

In this regard, FCA's heavy reliance on *Pennsylvania Chiropractic Association* is also misplaced. There, the plaintiffs "lump[ed] together all *defendants* in a single [RICO] claim," even though many of the defendants were regional entities that had no involvement with the plaintiffs. 2010 WL 1979569, at *11 (emphasis added). Rather than plead facts showing that specific entities caused them injury, they instead argued that all of the defendants were jointly liable because their actions were "intertwined." *Id.* Though that did not pass muster, there is no

such issue here: FCA is the only defendant, and Plaintiffs have pleaded specific facts showing that FCA participated in and conducted racketeering activity through each of the Business Centers (run by FCA) where Plaintiffs operate. (*E.g.*, SAC ¶¶ 13, 48, 51, 52.)

Finally, FCA's allusion to the *in pari delicto* doctrine is a red herring. (FCA Br. at 10-11.). As Plaintiffs showed when FCA raised the doctrine in opposing leave to amend, the doctrine would not apply even if the Court accepted FCA's invitation to look beyond the complaint's well-pleaded allegations. (Doc. 252 at 7-9 (citing, inter alia, *Circle Group Holdings, Inc. v. Akhamzadeh*, No. 5 C 3921, 2006 WL 2548164, at *8 (N.D. Ill. Sept. 1, 2006) (Kendall, J.)). The doctrine has no bearing on the sufficiency of the RICO counts, and the Court should reject FCA's attempt to inject it at the pleading stage.

## II.     Plaintiffs Adequately Allege An Association-In-Fact Enterprise.

As this Court has recognized, the Supreme Court has defined a RICO enterprise broadly since its 2009 decision in *Boyle*. *See Guaranteed Rate, Inc. v. Barr*, 912 F. Supp. 2d 671-89 (N.D. Ill. 2012) (citing *Boyle*, 556 U.S. at 948). An association-in-fact enterprise "does not require any structural features beyond 'a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purposes.'" *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 655 (7th Cir. 2015) (quoting *Boyle*, 556 U.S. at 946). Those requirements are readily satisfied here. Nevertheless, FCA argues that Plaintiffs' enterprise allegations are deficient in three respects. FCA is wrong as to each purported defect.

### A.     FCA Is Sufficiently Distinct From the Enterprise.

FCA first argues that Plaintiffs fail to plead an enterprise distinct from FCA itself. (FCA Br. at 12-15.) Essentially, FCA argues that a distinct RICO enterprise cannot be made up of FCA and the Conspiring Dealers. (*See* SAC ¶¶ 190-97 (alleging that enterprise consisted of FCA,

Conspiring Dealers, Business Center Directors, and third-party vendors).) Even assuming—contrary to the well-pleaded allegations (*see* ¶¶ 79-80, 190(c)—that the enterprise is limited to FCA and Conspiring Dealers, FCA is incorrect.

FCA relies primarily on *Fitzgerald* for its blanket assertion that an association-in-fact enterprise cannot consist of FCA and the Conspiring Dealers. (FCA Br.at 13-14 (citing *Fitzgerald v. Chrysler Corp.*, 116 F.3d 225 (7th Cir. 1997).) But *Fitzgerald* assumed that the dealers there were FCA's agents[1], and involved allegations that FCA "deal[t] with its dealers and other agents in the ordinary way, so that their role in the manufacturer's illegal acts is entirely incidental . . . ." 116 F.3d at 228; *see Chen v. Mayflower Transit, Inc.*, 315 F. Supp. 2d 886, 904 (N.D. Ill. 2004) (distinguishing *Fitzgerald* where there was evidence that defendant did "not deal with its affiliates in merely the 'ordinary way'"). Indeed, *Fitzgerald* expressly left open the possibility that "a manufacturer could use its dealers or other agents or affiliates in such a way as to bring about the sort of abuse at which RICO is aimed, in which event it might be possible to characterize the assemblage as a RICO enterprise." 116 F.3d at 228; *see also Chen*, 315 F. Supp. 2d at 902 (describing *Fitzgerald* as recognizing "that when an enterprise is used to engage in some criminal activity but, for the most part, conducts normal and lawful business, it is only one step removed from the prototypical case," and thus presumably satisfies distinctiveness requirement)[2].

---

[1] While consideration of the point is not necessary to reject FCA's motion, FCA's reliance on *Fitzgerald* is particularly dubious given FCA's contractual disclaimer of any agency relationship with its franchised dealers. (*See* Chrysler Group LLC Sales and Service Agreement Additional Terms and Provisions, Doc. 41-3, at 15 ¶ 36, submitted as an exhibit to FCA's original motion to dismiss.)

[2] *Fitzgerald* was a consumer warranty-fraud class action alleging that the entire "Chrysler family," including dealers *collectively*, were the RICO enterprise. 116 F.3d at 226. Here, Plaintiffs are themselves dealers—precisely because a subset of other dealers (the Conspiring Dealers) departed from ordinary business practices to join the RICO enterprise.

This is such a case. The Conspiring Dealers who submitted and then unwound false sales reports were not merely "incidental" to FCA's scheme, nor were they dealing with FCA in any "ordinary way." Instead, they were integral to the false sales reporting scheme. In fact, as in *Chen*, "the success of the enterprise may *depend* on the distinctness between [FCA] and the enterprise." 315 F. Supp. 2d at 904 (emphasis in original). By its very nature, the scheme alleged here depended on the separateness of the Conspiring Dealers, without which there would have been no false sales *reporting*. Put another way, had FCA been a fully integrated manufacturing and distribution entity, it could not have carried out the same scheme in the same way. Moreover, FCA and the Conspiring Dealers clearly played "distinct role[s]" within the false sales reporting scheme. *Chen*, 315 F. Supp. 2d at 903; *see also Chambers v. King Buick GM, LLC*, 43 F. Supp. 3d 575, 590 (D. Md. 2014) (holding that plaintiff used car buyers satisfied distinctiveness requirement where complaint "delineates, to some extent, the roles played by different dealership Defendants").

In sum, FCA and the RICO enterprise are sufficiently distinct.

**B.      The Enterprise Has a Common Purpose.**

FCA also contends that, as pleaded, the association-in-fact enterprise lacks a "common purpose." That argument once again looks past the well-pleaded allegations in the Second Amended Complaint, and misapprehends the law regarding common purpose.

Unlike situations alleging a "run-of-the-mill" commercial relationship where each entity acts in its individual capacity to pursue its individual self-interest, the Second Amended Complaint alleges a truly joint enterprise, where each participant acts in concert with others, including FCA, to pursue a common purpose. (*See, e.g.*, SAC ¶¶ 9, 12-13, 15, 19, 47-50, 58-62, 144, 152, 190, 193, 196, 201.) That purpose was to falsely report vehicle sales in order to falsely inflate FCA's sales figures in any given month, while also benefiting Conspiring Dealers. (*Id.*)

*Cf. Bible*, 799 F.2d at 656 (distinguishing *United Foods Commercial Workers Union v. Walgreen Co.*, 719 F.3d 849 (7th Cir. 2013), *Stachon v. United Consumers Club Inc.*, 229 F.3d 673 (7th Cir. 2000), and *Buchman v. Bear Stearns & Co.*, 178 F.3d 930 (7th Cir. 1999)).

This purpose could not have been attained without the concerted activity of the enterprise. Unlike in *Guaranteed Rate* and the other cases on which FCA relies, FCA and the Conspiring Dealers shared in the scheme's financial benefits. Falsely reported sales not only resulted in inflated sales figures for FCA, but also generated cash bribes concealed as legitimate payments as well as favorable allocations for Conspiring Dealers, in contravention of FCA's obligation to allocate vehicles reasonably. As discussed above, moreover, that incentive system was baked into the scheme and the workings of the enterprise. Put another way, this is not a case in which FCA and the Conspiring Dealers "merely [took] their own respective profits from their respective actions related to the scheme." *Oberoi v. Mehta*, No. 10 C 7275, 2011 WL 1337107 (N.D. Ill. Apr. 6, 2011) (Kendall, J.). (FCA Br. at 17 n.8 (citing same and similar cases).)

FCA appears to assume that a common purpose cannot exist where members of a RICO enterprise also have distinct motivations or benefit in different ways from racketeering activities. Unsurprisingly, however, that is not the law, as participants in any common endeavor almost always have individual motivations and incentives as well. *See MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*, 62 F.3d 967, 979 (7th Cir. 1995) (enterprise can be comprised of and conducted by even "reluctant participants" who knowingly implement directions "enabling the enterprise to achieve its goals"); *Handeen v. Lemaire*, 112 F.3d 1339, 1352 (8th Cir. 1997) ("Our cases have established that the enterprise *itself*, broadly speaking, must be marked by a common purpose, but it is not necessary that every single person who associates with the entity gain some discrete advantage as a result of that particular motivation. . . . [I]t is sufficient if a RICO

- 13 -

defendant shared in the *general* purpose and to some extent facilitated its commission.") (emphasis in original).[3] Accordingly, the fact that Conspiring Dealers may have facilitated the false sales reporting scheme out of self-interest, or benefited from the scheme in ways distinct from FCA, does not mean that the enterprise itself lacked a common purpose.

### C. The Enterprise Is Sufficiently Distinct From the Alleged Racketeering Activity.

FCA also contends that the enterprise is not sufficiently distinct from the racketeering activity. (FCA Br. at 17-19.) FCA's argument boils down to the remarkable claim that an enterprise consisting chiefly of FCA and Conspiring Dealers who distribute FCA-manufactured vehicles (SAC ¶¶ 193, 195) has "no common identity beyond their participation in the alleged predicate acts." (FCA Br. at 18.) That argument is contrary to the well-pleaded allegations, case law, and common sense. In *Chambers*, the court rejected essentially the same argument. There, as here, that argument was "belied by plaintiff's assertion that the enterprise also engages in legitimate vehicle sales transactions." 43 F. Supp. 3d at 592; *see also Republic of Columbia v. Diageo North America Inc.*, 531 F. Supp. 2d 365, 426 (E.D.N.Y 2007) (enterprise sufficiently distinct from racketeering activity where "many—if not all—of the members of the alleged enterprise formed a liquor-distribution chain," and thus even if defendants did not engage in

---

[3] *See also Pennsylvania Chiropractic Ass'n*, 2010 WL 1979569, at *8 (enterprise where activities were "coordinated at the national level, operated and managed at the regional level . . . and designed to engage in large-scale fraud," rejecting argument that enterprise is defeated when entities "acted in their own interests"); *AARP v. Am. Fam. Prepaid Leg. Corp., Inc.*, 604 F. Supp. 2d 785, 792 (M.D.N.C. 2009) (observing that "[t]he members of an enterprise do not have to share all objectives as long as they have one in common," holding it was sufficient to plead members "shared an illegal purpose to defraud" even though members did not profit in the same way and "may not have shared in all the goals of the enterprise").

predicate acts, "they would still distribute their liquor through the distribution chain entities that comprise the alleged enterprise"). The same conclusion must be reached here.[4]

### III. Plaintiffs Adequately Allege That FCA Participated In The Conduct Of The Enterprise's Affairs.

Section 1962(c) makes it unlawful for anyone "associated with any enterprise" in interstate commerce "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." 18 U.S.C. § 1962(c). Putting its thumb on the scale by reformulating the statutory language, FCA argues that Plaintiffs fail "to show that FCA engaged in the conduct of the enterprise." (FCA Br. at 19.) This strained argument leans heavily on *Walgreen*, but FCA places more weight on that case than it can bear. (*Id.* at 20-21 (citing *Walgreen*).)

The law governing the "conduct or participate" element is set forth in *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993). All that is required is a well-pleaded allegation that the defendant "participate[d] in the operation or management of the enterprise itself." A RICO plaintiff "can easily satisfy *Reves*' operation and management test by showing that an enterprise member played some part—even a bit part—in conducting the enterprise's affairs." *Safe Streets Alliance v. Hickenlooper*, 859 F.3d 865, 844 (10th Cir. 2017). The requirement is merely that the defendant played some knowing role (even a small role) in the enterprise's scheme. *MCM Partners*, 62 F.3d at 979 (reversing dismissal where lower-rung participants in association-in-fact enterprise "knowingly implemented management's decisions, thereby enabling the

---

[4]Remarkably, FCA does not mention *Boyle*, even though that seminal case puts the distinctiveness requirement in critical perspective. As *Boyle* instructs, although "the existence of an enterprise is an element distinct from the pattern of racketeering activity and proof of one does not necessarily establish the other," nevertheless, "the evidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise may in particular cases coalesce." 556 U.S. at 947 (citations and internal quotations omitted); *see also Allstate Ins. Co. v. Etienne*, No. 09-CV-3582, 2010 WL 4338333, at *7-*8 (E.D.N.Y. Oct. 26, 2010) (discussing same).

- 15 -

enterprise to achieve its goals"); *Ouwinga v. Benistar 419 Plan Servs., Inc.*, 694 F.3d 783, 792-93 (6th Cir. 2012) (participation through ordinary commercial conduct armed with knowledge it would effectuate fraud); *George v. Urban Settlement Servs.*, 833 F.3d 1242, 1253 (10th Cir. 2016) (participation by unilaterally implementing system to help another conceal fraud).

Against this backdrop, *Walgreen* is not "closely similar" to this case at all. (FCA Br. at 20.) The alleged enterprise in *Walgreen* was between (1) a pharmaceutical manufacturer (Par), which had exclusive marketing rights to certain expensive forms of generic drugs, and (2) pharmacies (Walgreens). *Id.* at 850. Par, in a marketing pitch to Walgreens and other pharmacies, suggested that if the pharmacies switched prescriptions for cheap drugs to Par's more expensive drugs, both companies would profit. *Id.* at 852. Walgreens, without the assistance of Par, then implemented a system to automatically switch the cheap drugs for the expensive drugs on dosage forms, without consent from the doctor, and made false representations regarding these drugs to facilitate sales. *Id.* As a result, Walgreens sold more of the expensive drug, and Par was able to sell more of this expensive drug due to the increased demand from Walgreens. *Id.* at 854. There was no allegation, however, that the two companies coordinated in the scheme aside from Par initially communicating the idea to Walgreens. The only "cooperation" alleged was structural: Walgreens could not sell the drugs without Par first manufacturing them, and vice versa. *Id.* at 855-56. The Seventh Circuit was unimpressed with this allegation, because it described "virtually every prescription pharmaceutical distribution chain." *Id.* at 856. The illegal activities were parallel and uncoordinated, and thus not conducted for the enterprise. *Id.*

The facts in *Walgreen* could not be more different from the facts alleged in the Second Amended Complaint. Here, the coordination between FCA and the Conspiring Dealers was

- 16 -

repeated and continuous, and FCA not only participated in but also directed and managed the scheme. Plaintiffs allege that FCA employees (1) communicated with Conspiring Dealers to encourage and facilitate the false sales reports (SAC ¶¶ 12-13, 47, 51), (2) reached quid pro quo agreements with Conspiring Dealers for them to report false sales in exchange for money and extra vehicles from FCA (SAC ¶¶ 51, 144), (3) specifically instructed Conspiring Dealers how and when to report and unwind false sales in order to mutually benefit all members of the enterprise (SAC ¶¶ 19, 58-60), (4) coordinated with dealers to help them conceal the fruits of the fraud (SAC ¶ 61), (5) issued instructions to help dealers evade or avoid chargebacks on subsequent audits (SAC ¶ 19), (6) paid dealers monies and allocated them extra vehicles as a reward for participation and to induce future corrupt acts (SAC ¶¶ 12-13, 16, 51), and (7) intimidated and threatened potential whistleblowers in an effort to conceal and perpetuate the scheme. (SAC ¶ 17, 122-24, 158-61). These actions go far beyond the abstract allegations in *Walgreen*, where the lone coordination alleged was that one entity merely pitched an idea and then passively reaped profit when the other entity unilaterally implemented it.

By contrast, this fact pattern is more similar to the coordination the Seventh Circuit found sufficient to reverse dismissal of a RICO claim in *Bible*. 799 F.3d at 657. There, the appeals court held that a student loan lender, debt collector, and parent company of the debt collector constituted a RICO enterprise. *Id.* Notably, *Bible* distinguished *Walgreen* on the ground that there was no involvement by the officials of Par or Walgreens in the affairs of the other. *Bible*, 799 F.3d at 656-57. Unlike in *Walgreen*, the defendant lender "participated" in Bible because it allegedly directed the unlawful collection activity and was involved in the affairs of the debt collector more generally. *Id.* at 657. As discussed above, the complaint similarly alleges that

- 17 -

FCA was the ring-leader directing the activities of the Conspiring Dealers. Accordingly, the participation element is readily satisfied here.

**IV.    Plaintiffs Adequately Allege A Pattern Of Racketeering Activity.**

FCA also claims that the RICO counts fail to allege either a pattern of related conduct or sufficient racketeering activity. FCA is wrong on both counts.

**A.    Plaintiffs Adequately Allege That the Predicate Acts Constituted a Pattern.**

FCA contends that Plaintiffs fail to allege a "pattern of racketeering activity" because they "fail to sufficiently allege that the predicate acts are related." (FCA Br. at 22.) Notably, FCA does not even attempt to argue that the Second Amended Complaint fails to satisfy the continuity prong of the "continuity plus relationship" test for a pattern under RICO.[5] *See DeGuelle v. Camilli*, 664 F.3d 192, 199 (7th Cir. 2011) (describing "continuity plus relationship" test of *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989)). In any event, FCA's claim that the predicate acts are insufficiently related to constitute a pattern is untenable both as a matter of precedent and in light of the well-pleaded facts.

---

[5]Any such argument would be meritless, as the false sales reporting scheme alone meets the standard for both close-ended and open-ended continuity. That scheme began no later than 2013 (SAC ¶ 47, 144, 147), was coordinated and carried out on a nationwide basis (*id.* ¶¶ 10, 13-14, 48, 51, 53), and continued through the commencement of this suit in early 2016 (*id.* ¶¶ 21-22, 47, ¶ 51, 144, 147-50, 166-73). Particularly in light of the breadth of the scheme and the other allegations summarized above, the scheme's three-year duration is sufficient to establish close-ended continuity. *See generally Guaranteed Rate*, 912 F. Supp. 2d at 690 (collecting cases); *Maersk, Inc. v. Neewra, Inc.*, 554 F. Supp. 2d 424, 464 (S.D.N.Y. 2008) (wire and mail fraud spanning two-plus years sufficient). The Second Amended Complaint also alleges that the scheme was a regular way of conducting business and threatened to continue indefinitely into the future, without a natural end. *See H.J. Inc.*, 492 U.S. at 242-43 (instructing that, when action is brought before continuity can be established through duration, "liability depends on whether *threat* of continuity is demonstrated," and that continuity requirement is satisfied "where it is shown that the predicates are a regular way of conducting defendant's ongoing legitimate business") (emphasis in original); *Kostovetsky v. Ambit Energy Holdings, LLC*, No. 15 C 2553, 2016 WL 015980, *6 (N.D. Ill. Jan. 8, 2016) (open-ended continuity present when, among other scenarios, "a specific threat of repetition exists"); *Abraham v. Singh*, 480 F.3d 351, 356 (5th Cir. 2007) (victimization would have continued absent lawsuit); *cf. Guaranteed Rate*, 912 F. Supp. 2d at 693 (no open-ended continuity where there was no threat of repetition "because the alleged scheme had come to its natural end").

As a matter of precedent, the cases FCA cites in support of its relatedness argument either undermine that argument or are wholly inapposite. (*See* FCA Br. at 22 (citing *H.J. Inc.*, 492 U.S. at 239-42; *Jennings v. Auto Meter Prods., Inc.*, 495 F.3d 466 (7th Cir. 2007); and *DeGuelle*, 664 F.3d at 199). In *H.J. Inc.*, the Supreme Court held that a plaintiff need not allege multiple schemes to plead a pattern, and instead adopted "a more natural and commonsense approach to RICO's pattern element." 492 U.S. at 235-37 (reversing the Rule 12(b)(6) dismissal). Moreover, contrary to the tenor of FCA's brief, the Supreme Court expressly rejected the notion "that a defendant's racketeering activities form a pattern only if they are characteristic either of organized crime in the traditional sense, or of an organized-crime-type perpetrator . . . ." *Id.* at 244. In *DeGuelle*, the Seventh Circuit likewise reversed a Rule 12(b)(6) dismissal predicated on the plaintiff's purported failure to allege a pattern. Concluding that the district court applied an unduly narrow concept of relatedness, the Seventh Circuit reiterated that the relationship standard under RICO is "'relatively broad.'" *DeGuelle*, 664 F.3d at 203 (quoting *United States v. Maloney*, 71 F.3d 645, 661 (7th Cir. 1995)). Finally, *Jennings*—"at root . . . a dispute over who invented an aftermarket dashboard bezel"—bears no resemblance to this action. 495 F.3d at 473.

As a factual matter, the Second Amended Complaint amply satisfies the "relatively broad" relationship standard. Predicate acts are sufficiently related if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J. Inc.*, 492 U.S. at 240 (internal quotations and citation omitted). The predicate acts here were committed in furtherance of the scheme to falsely inflate FCA's sales. (SAC ¶¶ 47, 144.) Far from being "isolated events," those acts were the product of coordination at the highest levels within FCA. (SAC ¶¶ 13, 53.) That is why essentially the same fraudulent conduct repeated itself across

- 19 -

different regions at the hands of multiple Business Centers Directors and Area Sales Managers. (*See, e.g.*, SAC ¶ 51(f), (g), (h), (n), (p).) Across those different regions, there were similar methods of commission—the submission and unwinding of false sales reports. (SAC ¶¶47-52, 58-60, 144.) Moreover, this fraudulent conduct not only shared similar goals and methods but also relied on identical means that FCA established in furtherance of the scheme. For example, the Second Amended Complaint details the means by which FCA surreptitiously funneled bribes to Conspiring Dealers. (SAC ¶¶ 51(j), 61, 66, 167.) The scheme also impacted multiple, similar victims (Plaintiffs and other non-Conspiring Dealers) similarly. In short, the well-pleaded allegations in the Second Amended Complaint belie FCA's attempt to characterize the RICO predicates as "a mixture of isolated events involving different actors with independent motives and varying results." (FCA Br. at 22.) Under any pleading standard, those allegations more than satisfy the relatedness requirement.

### B.     Plaintiffs Adequately Allege Racketeering Activity.

FCA also argues that the Second Amended Complaint does not adequately allege "racketeering activity"—either because the alleged predicate acts "distill down to the same few isolated acts of alleged mail and wire fraud" (FCA Br. at 22), or because "the underlying predicate acts have not been adequately pleaded" (*id.* at 23). This argument proceeds from a faulty premise. Contrary to FCA's assumption, a pattern of racketeering activity may be predicated exclusively on mail and wire fraud. As just described, the acts of wire and mail fraud alleged in the Second Amended Complaint are not "few" or "isolated," and are sufficient, in their own right, to make out a pattern of racketeering activity. (*See supra* at 18-20 & n.4.) And, in any case, the Second Amended Complaint adequately pleads distinct predicate acts in addition to those (already sufficient) predicate acts of mail and wire fraud.

FCA implies that a pattern of racketeering activity cannot consist of a multi-year, nationwide fraud scheme executed (like the scheme alleged here) through repeated use of the mails and wires. That suggestion is simply wrong. For example, *Bridge*—which ultimately proceeded to trial and a plaintiff's verdict after the Supreme Court upheld the Seventh Circuit's holding that the plaintiffs adequately alleged standing—was predicated on mail fraud. *See Phoenix Bond & Indemnity Co. v. Bridge*, 477 F.3d 928, 930 (7th Cir. 2007) ("Because the tax-sale process employs the mail—perhaps to send affidavits, and certainly to send notices to owners that the liens have been sold and the taxes must be paid or the property forfeited—any fraud that affects which bidders obtain how many liens is 'mail fraud.'") (summarizing plaintiff's allegations), *aff'd*, 553 U.S. 639; *BCS Servs., Inc.* v. *BG Invs., Inc.*, 728 F.3d 633, 638 (7th Cir. 2013) (noting that RICO claim was based on mail fraud). The Seventh Circuit has held in other cases that a complaint satisfied the pattern element based solely on allegations of mail and wire fraud. *See Bible*, 799 F.3d at 657-60 (holding that plaintiff adequately alleged pattern of racketeering activity based on mail and wire fraud) (reversing dismissal of complaint); *Morgan v. Bank of Waukegan*, 804 F.2d 970, 976 (7th Cir. 1986) (reversing dismissal of complaint where "plaintiffs have alleged that defendants committed several acts of mail fraud over a period of several years").

To the extent courts in this Circuit have expressed concern about mail and wire frauds as predicate acts, that concern arises from the truism that even a "garden-variety" scheme to defraud may be executed multiple times, through multiple mailings or wirings. *See United States Textiles, Inc. v. Anheuser-Busch Cos., Inc.*, 911 F.2d 1261, 1268 (7th Cir. 1990) (quoting *Marshall-Silver Constr. Co., Inc. v. Mendel*, 894 F.2d 593, 597 (3d Cir. 1990)). For that reason, a plaintiff cannot satisfy the pattern element merely by pointing to the number of mailings or

wirings alleged. *Jennings*, 495 F.3d at 475 (explaining that multiplicity of acts of wire and mail fraud "'may be no indication of the requisite continuity of the underlying fraudulent activity'") (quoting *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1024-25 (7th Cir. 1992)). But here, as described above, the Second Amended Complaint adequately alleges a massive, multi-year, nationwide fraud scheme that threatened to continue.[6] Those features of the false sales reporting scheme—not the mere number of mailings and wirings in execution of the scheme—establish the requisite continuity in this case. Accordingly, the Second Amended Complaint adequately alleges a pattern of racketeering activity even without regard to alleged predicate acts other than mail and wire fraud.

That said, the Second Amended Complaint adequately alleges other predicate acts, distinct from wire and mail fraud, forming part of FCA's pattern of racketeering activity. FCA claims that the "bribery, extortion, and Travel Act violations [are] merely relabeled versions of the same alleged mail and wire fraud." (FCA Br. at 22-23.) But that claim is nonsensical. Although the predicate acts in the Second Amended Complaint all furthered the false sales reporting scheme, FCA's acts of bribery and extortion, and its violations of the Travel Act, involved conduct distinct from its violations of the mail and wire fraud statute. Submitting a false sales report over the mails or wires may violate 18 U.S.C. § 1341 or 1343; it does not constitute bribery or extortion. Those latter offenses involve additional conduct implicating different elements. The fact that FCA at times used bribes or extortion to induce participation in the fraud scheme does not render those offenses interchangeable.

Also unavailing is FCA's claim that the Second Amended Complaint fails to adequately allege predicate acts other than mail and wire fraud. FCA's only challenge to the alleged Travel

---

[6]It does so, moreover, with a level of particularity beyond anything Rule 9(b) requires. (*See, e.g.*, SAC¶¶ 51, 147.) Notably, FCA does not contend otherwise.

Act violations is that they are "dependent upon Plaintiffs' claims of bribery and extortion," which FCA claims are deficient. (*Id.*) But FCA's lone critique of the bribery predicates—that three of the four bribery statutes cited in the Second Amended Complaint are misdemeanors (*id.*)—has no bearing on the viability of the Travel Act violations. Putting aside FCA's implicit concession that at least one of the alleged bribery offenses is a felony, the law is clear that a state misdemeanor charge may serve as a predicate for a Travel Act violation. *See* 18 U.S.C. § 1952(b) (defining "unlawful activity" to include extortion or bribery "in violation of the laws of the State in which they are committed" but not requiring felony violation); *United States v. Karigiannis*, 430 F.2d 148, 150 (7th Cir. 1970) (rejecting argument that "indictment [charging Travel Act violation] is insufficient because it failed to distinguish the unlawful extortion as being either a felony or a misdemeanor"); *United States v. Russo*, No. 87 CR 501, 1988 WL 17623, at *1 (N.D. Ill. Feb. 24, 1988) (Williams, J.) (rejecting argument "that prostitution, a misdemeanor under Illinois law, is an improper predicate act under § 1952"). So, even assuming for argument's sake that all of the alleged predicate state-law violations are misdemeanors, the Second Amended Complaint adequately alleges Travel Act violations.

Finally, FCA's challenge to the extortion predicates—that they do not allege a deprivation of tangible "property"—also misses the mark. Contrary to FCA's assumption, criminal extortion may target intangible property rights as well as tangible property. *See United States v. Ivezaj*, 568 F.3d 88, 92-93 (2d Cir. 2009) (holding that even illegal intangibles qualify as "property" under New York extortion law serving as RICO predicate, and citing "New York courts' recognition that intangible property as well as illegal tangible property are covered by the statute); *United States v. Gotti*, 459 F.3d 296, 323-27 (2d Cir. 2006) (reaffirming that "intangible property rights can qualify as extortable property under the Hobbs Act," including: "union

members' [Labor–Management Reporting Disclosure Act] rights . . . to loyal representation by their officers, agents, and other representatives"; health plan beneficiaries' right "to have [the plan's] trustees and fiduciaries discharge their duties in [the plan's] best interest"; and "intangible right to decide with whom to work"); *Fiorillo v. Winiker*, 85 F. Supp. 3d 565, 573 (D. Mass. 2015) (holding that that union members' LMRDA rights were extortable property); 31A Am. Jur. 2d § 33 (Feb. 2018 update) (noting that the following, among other things, have "been held to constitute property obtained in violation of extortion statutes": a debt, a business relation or customer, employment and labor and the right to labor; and an agreement not to compete in a competitive and lucrative market).[7]

Moreover, because attempted extortion meets the definition of racketeering activity, the extortionate conduct need not have been successful to serve as a RICO predicate. *See* 18 U.S.C. § 1961(1) ("racketeering activity" includes "any act or *threat* involving . . . bribery, [or] extortion") (emphasis added); 720 ILCS 5/8-4 (Illinois general attempt provision).

Here, the well-pleaded facts establish that, through extortionate threats to harm the business of Plaintiffs and other dealers, FCA obtained, and sought to obtain, valuable benefits from Plaintiffs and other dealers, including the participation of the dealers and their employees in the false sales reporting scheme, and the ability to allocate vehicles to reward Conspiring Dealers

---

[7]*See also Ellis v. State*, 794 S.E.2d 601, 604 (Ga. 2016) (threat to cancel contract if victim would not contribute campaign funds was sufficient to convict of theft by extortion, but reversing on evidentiary grounds), *reconsideration denied* (Dec. 8, 2016), *reinstatement granted sub nom. Matter of Ellis*, 794 S.E.2d 653 (Ga. 2016); Tex. Pen. Code § 31.01(5) (defining property to include "tangible or intangible personal property" or "a document, including money, that represents of embodies anything of value"); *People v. Perry*, 864 N.E.2d 196, 207 (Ill. 2007) (holding that "in enacting section 15–1 [the theft statute] the legislature intended the definition of property to include not only items of tangible personal property, but also other things of value"); 720 ILCS 5/15-1 (providing non-exhaustive list of "property" under Illinois law that encompasses intangible rights); Fl .Stat. Ann. § 836.05 (threat "with intent to extort . . . any pecuniary advantage whatsoever, or with intent to compel the person so threatened, or any other person, to do any act or refrain from doing any act against his or her will"); *McKee v. State*, 715 So. 2d 1010, 1011 (Fla. 5th Dist. App. 1998) (threat to destroy business or disrupt contracts was extortion).

at the expense of Plaintiffs and other non-Conspiring Dealers, who had contractual rights to reasonable vehicle allocations. (SAC ¶¶ 8, 17-20, 55-57, 62-64, 158-62, 231.) Accordingly, the Second Amended Complaint adequately alleges predicate acts of extortion.

In short, although Plaintiffs adequately allege that FCA engaged in a pattern of racketeering activity by violating the mail and wire fraud statutes, the Second Amended Complaint goes beyond those already-sufficient allegations by also setting forth plausible allegations of bribery, extortion, and Travel Act violations.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny FCA's motion to dismiss Counts IV and V of the Second Amended Complaint.[8]

Dated:  April 20, 2018

Respectfully submitted,

The Napleton Plaintiffs

By: /s/ Dylan Smith

Jeannie Y. Evans
HAGENS BERMAN SOBOL SHAPIRO LLP
455 N. Cityfront Plaza Drive, Suite 2410
Chicago, IL  60611
Telephone: (708) 628-4949
Facsimile: (708) 628-4950
jeannie@hbsslaw.com

---

[8]FCA makes no independent argument for dismissal of the RICO conspiracy count (Count V), but argues that it should fall with the substantive RICO count (Count IV). (FCA Br. at 23.) Accordingly, because the substantive RICO claim is well-pleaded, the conspiracy claim should survive as well. In the alternative, because FCA has produced yet more damning information subsequent to the drafting of the Second Amended Complaint, even if the Court were to dismiss the RICO counts, that dismissal should be without prejudice. With regard to Counts VI, VII, XIII, and XIV, FCA acknowledges Plaintiffs' right to appeal from the dismissal of any count in the Court's October 4, 2016 Order (Doc. 62), whether or not the counts are re-pleaded, and argues that the Court should dismiss anew those counts. (*Id.* at 24.) Plaintiffs cite Seventh Circuit cases rejecting defense arguments that a failure to re-plead dismissed counts waives the right to appeal. *Scott v. Chuhak & Tecson, P.C.*, 725 F.3d 772, 782 (7th Cir. 2013); *Bastian v. Petren Res. Corp.*, 892 F.2d 680, 683 (7th Cir. 1990). In any case, the Second Amended Complaint makes clear that those counts are re-pleaded only to the extent necessary to preserve appellate rights.

Steve W. Berman
Thomas E. Loeser
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 8th Avenue, Suite 3300
Seattle, WA 98101
(206) 623-7292
steve@hbsslaw.com
toml@hbsslaw.com

David C. Gustman
Jeffery M. Cross
Alexander Vesselinovitch
Dylan Smith
David J. Ogles
FREEBORN & PETERS LLP
311 S. Wacker Drive, Suite 3000
Chicago, IL 60606
(312) 360-6000
dgustman@freeborn.com
jcross@freeborn.com
avesselinovitch@freeborn.com
dsmith@freeborn.com
dogles@freeborn.com

## <u>CERTIFICATE OF SERVICE</u>

 The undersigned, an attorney, certifies that on April 20, 2018, he caused the foregoing **Plaintiffs' Memorandum of Law in Opposition to FCA US LLC's Motion to Dismiss Counts IV and IV of Plaintiffs' Second Amended Complaint** to be filed via the Court's CM/ECF system, which will send notice to all counsel of record.

        */s/* Dylan Smith _____
        Attorney for Plaintiffs