IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Napleton's Arlington Heights Motors, Inc. et. al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 16 C 403 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| FCA US LLC, et. al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs, a group of seven automotive dealers under the common control of Edward F. Napleton ("Napleton"), sued Defendants Fiat Chrysler Automobiles US, LLC ("FCA") and FCA Realty, LLC f/k/a Chrysler Group Realty Company, LLC ("FCAR") (collectively, "Defendants") on federal and state grounds alleging that Defendants took a number of illegal actions to drive the Plaintiffs out of business. On October 4, 2016, the Court ruled on Defendants' Motion to Dismiss all claims in the First Amended Complaint and, among other rulings, dismissed Plaintiffs' claims for violation of and conspiracy to violate the Racketeer Influence and Corrupt Organization Act, 18 U.S.C. §§ 1961(c), 1961(d), 1964 (Counts IV and V), without prejudice for lack of standing. (Dkt. 62.) On March 21, 2018, following an additional eighteen months of discovery, Plaintiffs filed a Second Amended Complaint alleging new facts to support their RICO claims. (Dkt. 275.) Defendant FCA moved to dismiss the re-pleaded RICO counts arguing Plaintiffs failed to cure the deficiencies identified by the Court in its prior Order. (Dkt. 289.) FCA's Motion to Dismiss (Dkt. 289) is granted for the following reasons.

1

**BACKGROUND**

Although Plaintiffs added several new paragraphs in the Second Amended Complaint, the core allegations remain the same as those described in the Court's prior Order. (*See* Dkt. 62.) For purposes of deciding FCA's Motion to Dismiss, the Court focuses only on those allegations in the Second Amended Complaint that are relevant to Plaintiffs' amended RICO claims. This Court treats these allegations as true for the purposes of FCA's motion. *See Gillard v. Proven Methods Seminars, LLC*, 388 F. App'x 549, 550 (7th Cir. 2010).

Defendant FCA, commonly known as Chrysler, manufactures and distributes new and unused Chrysler, Dodge, Jeep and Ram brand vehicles and is the seventh largest automobile manufacturer in the world. (Dkt. 275 at ¶¶ 1-2.) Plaintiffs are franchisee-dealers of FCA located in Illinois, Florida, Missouri and Pennsylvania and market and sell vehicles that FCA (and only FCA) produces. (*Id.* at ¶ 1.) FCA focuses on maintaining an appearance of sales volume growth and created two incentive programs to achieve this goal: 1) the "Volume Growth Program" which provided monies and other benefits to dealers who achieve sales targets that are set by FCA in its sole discretion; and 2) the "turn and earn" policy through which dealers who sell greater numbers of high demand models are granted priority access to those same models over other competitors. (*Id.* at ¶¶ 2-4.)

The "turn and earn" allocation system uses an algorithm based on a dealer's "days' supply" of each FCA model—the lower a dealer's days' supply for a vehicle, the more of that vehicle FCA will allocate to the dealer. (*Id.* ¶¶ 18, 183.) "Days' supply" is based on the dealer's historical records of sales and the available vehicles reported as remaining in the dealer's inventory. (*Id.* ¶ 18.) FCA calculates the "day's supply" metric for each dealer by performing an "availability snapshot" in the early part of each month. (*Id.* ¶ 183). FCA

allocates the majority of its vehicles using the allocation algorithm but also sets aside a discretionary pool of vehicles that its Business Center employees can award to dealers.[1] (*Id.* at ¶¶ 182-83). The discretionary pool is fixed each month. (*Id.* at ¶ 182). Plaintiffs allege generally that FCA solicited fraudulent sales reports from certain dealers ("Conspiring Dealers"), who through posting inflated sales numbers were allocated more high-demand vehicles, allowing the Conspiring Dealers to net more sales and divert sales from dealers who refused to participate in the fraudulent practice, including Plaintiffs (collectively the "Non-Conspiring Dealers"). (*Id.* at ¶ 9.) Plaintiffs further allege that FCA perpetuated these practices nationwide and the cumulative effect of the conduct caused Plaintiffs millions of dollars in lost sales and business value. (*Id.* at ¶¶ 10, 23.)

With regard to the RICO claims, Plaintiffs allege that FCA engaged in a pattern of racketeering—including mail fraud, wire fraud, bribery, extortion and violations of the Travel Act—over a period of time covering at least 2013 through the beginning of 2016 whereby FCA Business Center employees artificially increased sales figures reported to the public and to their superiors to meet objectives set by FCA. (*Id.* at ¶¶ 144-45.) FCA allegedly used two general methods for reporting false sales. (*Id.* at ¶ 144.) First, FCA employees entered into agreements with Conspiring Dealers in which the Conspiring Dealers submitted false New Vehicle Delivery Reports ("NVDRs") at the end of the month, reporting sales of vehicles that had not actually been sold in exchange for monies and extra vehicles from FCA. (*Id.*) Second, Conspiring Dealers permitted FCA to enter false NVDRs on the dealers' behalf at the end of the month in exchange for cash payments and favorable treatment in the FCA vehicle allocation system. (*Id.*) In both cases, FCA permitted the Conspiring Dealers to subsequently "back out" or "unwind" the

---

[1] FCA established a network of business centers ("Business Centers") that was each responsible for various districts that FCA created throughout the country. Each Business Center was headed by a Business Center Director. (*Id.* at ¶ 46.)

3

falsely reported sales even though they had already been reported and recorded by FCA as sales. (*Id.* at ¶¶ 58, 60.)

FCA allegedly encouraged the false reporting of sales by rewarding the District Managers and Business Center Directors with monetary and quarterly bonuses tied directly to the number of reported vehicle sales. (*Id.* at ¶ 52.) FCA Managers and Directors then threatened FCA employees with termination of their jobs and/or bonuses if the employees refused to go along with the false sales reporting scheme. (*Id.* at ¶ 159.) Plaintiffs allege that FCA benefitted directly from the scheme as the artificial inflation of the monthly sales created the appearance that FCA was performing at a higher level than it was in reality. (*Id.* at ¶ 54.) FCA allegedly solicited Conspiring Dealers to report false NVDRs at month's end for two reasons: 1) it permitted Business Center Directors to calculate the gap between their bonus target sales and the legitimate sales reported for the month, and then fill the gap through soliciting the required number of fraudulent sales; and 2) the Conspiring Dealers could back out of the sale on the first of the following month, before the factory warranty of the vehicles could be processed and start to run. (*Id.* at ¶¶ 59-60.) Additionally, by submitting the false sales reports at the end of the month, Conspiring Dealers were able to unwind the false sales in the early part of the following month after FCA performed its availability snapshot and, therefore, report an artificially low days' supply and achieve higher priority in the allocation system. (*Id.* at ¶ 60.)

Plaintiffs discovered FCA's scheme to falsely report sales when an FCA Business Center Director called a Napleton Dealer-Principal offering him $20,000 and extra allocations of high demand vehicles if Napleton's River Oaks falsely reported forty new vehicle sales. (*Id.* at ¶ 55.) The Business Director allegedly stated that the monies would be transferred under the guise of co-op payments or advertising support monies, that the scheme was "no harm, no foul," and that

4

Napleton's River Oaks would only receive the extra vehicles and monies if it falsified its reports. (*Id.*) The Napleton Dealer-Principal rejected the offer, and despite his subsequent statements to FCA that its actions were improper, FCA continued to solicit the Plaintiffs. (*Id.* at ¶¶ 56-57.)

Plaintiffs allege that the false sales reporting scheme, bribery and extortion "directly and proximately" harmed their business. (*Id.* at ¶¶ 18, 174.) According to Plaintiffs, each false sales report directly injures Non-Conspiring Dealers regardless of physical location because all dealers nationwide compete with each other for the same vehicles and the best-selling models are in limited supply. (*Id.* at ¶ 181). When a Conspiring Dealer submits a false sales report, the effect on the allocation system is automatic: the fraudulent report artificially reduces the Conspiring Dealer's days' supply for a popular vehicle and allows the Conspiring Dealer to "jump ahead" of Non-Conspiring Dealers in the queue for the same vehicle. (*Id.* at ¶¶ 18, 50, 184.) Plaintiffs allege that the false report, therefore, directly deprives Non-Conspiring Dealers of the opportunity to purchase that popular, limited-supply vehicle. (*Id.* at ¶ 18.) Plaintiffs allege they "suffered repeated denials of wholesale orders" as a result of this rigged allocation system. (*Id.* at ¶ 19.) Plaintiffs also allege they were directly injured by the scheme because FCA rewarded Conspiring Dealers by awarding them high-demand vehicles from the discretionary pool that, if the playing field were level, Plaintiff would have obtained. (*Id.* at ¶ 182.) Finally, Plaintiffs allege that the cash payments and incentives Conspiring Dealers received in exchange for reporting false sales subsidized Conspiring Dealers' operations and allowed them to charge lower prices than Plaintiffs. (*Id.* at ¶ 186.)

Plaintiffs allege that they "lost discrete sales opportunities" as a result of the scheme. (*Id.*) Specifically, Plaintiffs claim that according to their own analysis, which included comparing their records against the NVDR database, "numerous customers" who visited

Plaintiffs' stores and expressed interest in particular vehicles ultimately purchased those vehicles from Conspiring Dealers because the competing Conspiring Dealers were able to undercut Plaintiffs on price due to subsidies from FCA as a reward for participation and on availability of popular models because FCA had rigged allocation in favor of Conspiring Dealers. (*Id.* at ¶ 188.) Plaintiffs allege also that because FCA's conduct saddled them with poor inventory, they were unable to meet the Volume Growth Program targets and receive incentives. (*Id.* at ¶ 186.)

Plaintiffs allege that in 2015 and 2016, at least 5,608 sales were diverted to Plaintiffs' competition because of the scheme. (*Id.* at ¶ 186.) However, Plaintiffs also allege that "[p]reliminary estimates based upon market conditions" show they would have sold at least 4,100 more vehicles between 2013 and early 2016 but for FCA's scheme. (*Id.* at ¶ 187.)

## LEGAL STANDARD

A complaint must contain sufficient factual matter to state a claim to relief that is plausible on its face to survive a 12(b)(6) challenge. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible on its face when the complaint contains factual content that supports a reasonable inference that the defendant is liable for the harm. *Id.* The complaint should be dismissed only if the plaintiffs would not be entitled to relief under any set of facts that could be proved consistent with the allegations. *See Visiting Nurses Ass'n of Southwestern Indiana, Inc. v. Shalala*, 213 F.3d 352, 354 (7th Cir. 2000). In making the plausibility determination, the Court relies on its "judicial experience and common sense." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (quoting *Iqbal*, 129 S.Ct. at 1950). The Court accepts all well-pleaded allegations in the complaint as true and draws all reasonable inferences in the non-movant's favor. *See Yeftich v. Navistar, Inc.*, 722 F.3d 911, 915 (7th Cir. 2013).

**DISCUSSION**

FCA moves to dismiss Plaintiffs' RICO claims on two grounds. First, FCA argues Plaintiffs failed to cure their lack standing to bring the RICO claims. Second, FCA argues Plaintiffs failed to sufficiently plead the elements of a RICO claim. FCA also argues that Plaintiffs improperly re-pleaded claims previously dismissed with prejudice by the Court.

**I.      RICO Claims**

Plaintiffs allege a substantive RICO claim under § 1962(c) and a RICO conspiracy claim based on the same conduct in violation of §§ 1962(d) and 1964. Under § 1962(c) of the RICO statute, it is unlawful for any "person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C § 1962(c). To establish a violation of § 1962(c), Plaintiffs must allege: "(1) conduct; (2) of an enterprise; (3) through a pattern; (4) of racketeering activity." *Jennings v. Auto Meter Prod., Inc.*, 495 F.3d 466, 472 (7th Cir. 2007) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)). Section 1962(d) prohibits any person from conspiring to violation § 1962(c). Therefore, to plead a claim under § 1962(d), Plaintiff must allege FCA "intend[ed] to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense." *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 822 (7th Cir. 2016) (quoting *Salinas v. United States*, 522 U.S .52, 65 (1997)).

"[A] RICO plaintiff 'only has standing if, and can only recover to the extent that, he has been injured in his business or property by [reason of] the conduct constituting the violation.'" *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 279 (1992) (quoting *Sedima*, 473 U.S. at 496). In

meeting that requirement, a plaintiff must show that the defendant's violation was both a proximate and but for cause of her injury. *See Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457 (2006). "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." *Id.* The direct-relation requirement avoids the difficulties associated with attempting "to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors"; prevents courts from having '"to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries"; and recognizes the fact that "directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely." *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 654–55 (2008) (quoting *Holmes*, 502 U.S. at 269-70). A plaintiff fails to satisfy this requirement where, based on the facts alleged, the alleged harm could have resulted from factors other than the alleged acts of fraud. *See, e.g., Anza*, 547 U.S. at 458-59 (dismissing RICO claim where plaintiff failed to show defendant's acts proximately caused plaintiff's lost sales because defendant "could have lowered its prices for *any number of reasons unconnected to the asserted pattern of fraud*") (emphasis added); *James Cape & Sons Co. v. PCC Const. Co.*, 453 F.3d 396, 403 (7th Cir. 2006) ("A court could never be certain whether Cape would have won any of the contracts that were the subject of the conspiracy 'for any number of reasons unconnected to the asserted pattern of fraud.'") (quoting *Anza*, 547 U.S. at 458-59).

The Court previously dismissed Plaintiffs' RICO claims for lack of standing because Plaintiff failed to allege sufficient facts to show that FCA's alleged acts are what proximately

8

caused their harm as opposed to other possible causes. (Dkt. 62 at 17.) Specifically, the Court held that based on the facts alleged, it remained entirely possible that Plaintiffs would have lost sales or not received allocations for any number of reasons including their own underperformance. (*Id.* at 17-18.) The Court identified specific deficiencies fatal to Plaintiffs' claims, including that Plaintiffs failed to allege facts to show their sales numbers were meeting expectations before the scheme and then dropped after it began. (*Id.*) The Court found that Plaintiffs also failed to show they received fewer popular vehicles because of the scheme (and not because of any other of a multitude of independent factors) and, even if they had, "failed to plead with any factual enhancement that they were experiencing a shortage of popular vehicles and thus were losing out on sales due to the scheme"—in other words, that they actually needed those vehicles. (*Id.*)

Plaintiffs have not cured these deficiencies in the Second Amended Complaint. First, Plaintiffs added no allegations whatsoever as what their sales were prior to the scheme or whether Plaintiffs were meeting the Volume Growth Program targets before refusing to participate in the scheme. Therefore, it still remains possible that Plaintiffs "did not receive various incentives simply because they were not meeting their sales benchmarks." (*Id.* at 17.)

Second, Plaintiffs' new allegations also still fail to show that the scheme caused them to receive less vehicles—*i.e.*, that Conspiring Dealers actually jumped them in the allocation queue. Plaintiffs' Second Amended Complaint undoubtedly provides greater detail as to how the allocation system works and how by design, each false sales report automatically creates a *potential* for injury to Non-Conspiring Dealers nationwide. But based on the facts alleged, it is entirely possible that Plaintiffs were consistently positioned at the end of the queue even before the alleged scheme began and would not have been better-positioned than the Conspiring Dealers

9

regardless of whether those dealers submitted false sales reports. Additionally, Plaintiffs' bare allegations that they "suffered repeated denials of wholesale orders" due to the rigged system far from saves this claim. Plaintiffs plead no facts whatsoever about these denied orders, much less any fact connecting any denied order to any Plaintiff being surpassed in line for allocation of the vehicles in that order.

Plaintiffs again rely on *Bridge*, to support their argument that the design of the allocation system itself is sufficient to establish that they loss vehicles and sales because of the scheme. In *Bridge*, the Supreme Court held that the plaintiff had standing to bring a civil RICO claim because the alleged harm was "a foreseeable and natural consequence of [the defendants'] scheme." 533 U.S. at 658. As this Court explained it its prior Order, "*Bridge* is entirely distinguishable from *Holmes, Anza* and this case because in *Bridge* 'there [were] no independent factors that account[ed] for respondents' injury." (Dkt. 62 at 18 (quoting *Bridge*, 533 U.S. at 658).) Plaintiffs have not overcome this distinction. Instead, they rely now on a subsequent opinion issued on remand in *Bridge* in which the Seventh Circuit held that a plaintiff can withstand summary judgment on the issue of causation by "present[ing] evidence that he suffered the sort of injury that would be the expected consequence of defendant's wrongful conduct" because "[t]he causal relation between a defendant's act and a plaintiff's injury, like that required to establish standing under Article III of the constitution, need only be probable." *BCS Servs., Inc. v. Heartwood 88, LLC*, 637 F.3d 750, 758 (7th Cir. 2011). Plaintiffs' case is still distinguishable, not only because it is at the pleading and not summary judgment stage, but also because Plaintiffs have not alleged facts showing they suffered the sort of injury that would be expected from the FCA scheme—namely, fewer vehicles or lower sales relative to their pre-scheme inventory and sales numbers.

10

Finally, even if Plaintiffs had sufficiently shown they received fewer vehicles because of the scheme, they fail yet again to show they suffered any harm as a result. In an attempt to cure this deficiency, Plaintiffs provided statistics from two analyses they conducted, one comparing their records to FCA's NVDR database and other based on market conditions. Plaintiffs allege that in 2015 and 2016, more than 5,000 sales were diverted from Plaintiffs to Conspiring Dealers because of the scheme and that from 2013 to early 2016, Plaintiffs would have sold 4,100 more vehicles than they did but for the scheme. As an initial matter, the difference between these figures suggest that Plaintiffs would not have necessarily captured each sale that was diverted to a Conspiring Dealer. Regardless, these broad-stroke allegations are insufficient under the same reasoning already applied: Plaintiffs plead zero factual enhancements linking these figures directly to the scheme. First, these statistics say nothing about any Plaintiff's sales relative to its competitors *before* the scheme, leaving open the possibility once again that Plaintiffs' own underperformance is to blame. Second, these figures are overbroad. Even if Plaintiffs had shown their prices were higher and inventory of best-selling models lower than competitors because of the scheme, the figures they allege purport to include *any* sale in which a customer purchased a vehicle from a competitor instead of from one of the Plaintiffs. Customers base purchase decision on a multitude of factors. While some customers undoubtedly based their purchase decision on lower prices or availability, Plaintiffs offer nothing to show that *all* of these more than 5,000 (or 4,000, depending on which of Plaintiffs' two estimates is considered) did so. Therefore, any attempt to calculate the portion of lost sales attributable to the alleged pattern of racketeering would be speculative in nature and the type of "intricate, uncertain inquir[y]" the direct causation requirement is intended to prevent. *Anza*, 547 U.S. at 460.

The Court agrees with Defendants that the deficiencies identified in its prior Order should have been relatively straightforward to cure. As the Court previously noted, "such information—shortages, inability to receive a specific model type, etc.—would be in the Plaintiff's possession." (Dkt. 62 at 18-19 n. 15.) It is telling that, despite having the Court's explicit guidance and more than one year to conduct any necessary investigation, Plaintiffs still have not pleaded the facts necessary to show proximate causation.

In fact, the bulk of the new allegations in Plaintiffs' Second Amended Complaint are based on FCA internal documents produced during discovery that show FCA and its employees knew or at least suspected that the false sales reporting scheme gave Conspiring Dealers an "unfair competitive edge" over Plaintiffs. These allegations focus only on FCA's conduct and bolster the argument already made—that the scheme as designed had the *potential* to provide Conspiring Dealers an unfair advantage over any Non-Conspiring Dealer. They do nothing to show that any Conspiring Dealers in fact had an unfair advantage over any Plaintiff or that any Plaintiff was directly injured by such unfair advantage.

Because Plaintiffs failed to cure their lack of standing, their substantive civil RICO claim (Count IV) is dismissed with prejudice. Plaintiffs' RICO conspiracy claim (Count V) based on the same alleged pattern of racketeering activity fails for the same reasons and is also dismissed with prejudice.

## II. Re-Pleaded Claims

The Court previously dismissed with prejudice Counts VI, VII, XIII and XIV of Plaintiffs' First Amended Complaint. (Dkt. 62.) In the Second Amended Complaint, Plaintiffs re-pleaded these claims "solely for the purpose of protecting against any assertion of waiver at the time of any subsequent appeal." (Dkt. 275 at 2 n.1, 13 n.3.) FCA argues this was improper

and requests that the Court reaffirm dismissal of these Counts with prejudice. (Dkt. 275 at 24.) Plaintiffs need not re-plead dismissed claims in order to preserve them for appeal. *See Scott v. Chuhak & Tecson, P.C.*, 725 F.3d 772, 782 (7th Cir. 2013) (failure to re-plead in an amended pleading claims the court has already rejected does not mean the claims are abandoned or waived); *Bastian v. Petren Res. Corp.*, 892 F.2d 680, 683 (7th Cir. 1990) ("It is not waiver—it is prudence and economy—for parties not to reassert a position that the trial judge has rejected. Had the plaintiffs repleaded their Rule 10b–5 charge without alleging loss causation, the judge would have dismissed the charge, not only with prejudice but with annoyance."). The Court reaffirms that Counts VI, VII, XIII and XIV in the Second Amended Complaint are dismissed with prejudice.

## CONCLUSION

For the reasons set forth above, FCA's Motion to Dismiss (Dkt. 289) is granted. Plaintiffs' RICO claims in Counts IV and V are dismissed with prejudice. The Court also reaffirms that Counts VI, VII, XIII and XIV in the Second Amended Complaint are dismissed with prejudice.

_____
Hon. Virginia M. Kendall
United States District Judge

Date: July 10, 2018

13